**SMILEY WANG-EKVALL, LLP**
Lei Lei Wang Ekvall, State Bar No. 163047
*lekvall@swelawfirm.com*
Philip E. Strok, State Bar No. 169296
*pstrok@swelawfirm.com*
Robert S. Marticello, State Bar No. 244256
*rmarticello@swelawfirm.com*
Michael L. Simon, State Bar No. 300822
*msimon@swelawfirm.com*
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:    714 445-1000
Facsimile:    714 445-1002

Proposed Attorneys for Debtor and
Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:17-bk-11996-SC |
| WJA ASSET MANAGEMENT, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | (Jointly Administered with Case Nos. 8:17-bk-11997-SC; 8:17-bk-11998-SC; 8:17-bk-11999-SC; 8:17-bk-12000-SC; 8:17-bk-12001-SC; 8:17-bk-12002-SC; 8:17-bk-12003-SC; 8:17-bk-12004-SC; 8:17-bk-12005-SC; 8:17-bk-12006-SC; 8:17-bk-12008-SC; 8:17-bk-12009-SC; 8:17-bk-12010-SC; 8:17-bk-12011-SC; 8:17-bk-12012-SC; 8:17-bk-12013-SC; 8:17-bk-12014-SC; 8:17-bk-12015-SC; 8:17-bk-12016-SC; 8:17-bk-12018-SC; and 8:17-bk-12019-SC) |
| ☐ Affects 5827 WINLAND HILLS DRIVE DEVELOPMENT FUND, LLC | |
| ☐ Affects ALABAMA HOUSING FUND, LLC | |
| ☐ Affects CA EXPRESS FUND, LLC | |
| ☐ Affects CA SEE JANE GO FUND, LLC | |
| ☐ Affects CA WHIRL FUND, LLC | **EMERGENCY MOTION FOR ORDER AUTHORIZING, FOR AN INTERIM PERIOD, THE FOLLOWING: (1) CONTINUED USE OF PRE-PETITION BANK ACCOUNTS; (2) CONTINUED USE OF CUSTODIANS; AND (3) CONTINUED FORECLOSURES UNDER DEEDS OF TRUST AND SALES OF REOS IN THE ORDINARY COURSE OF BUSINESS; MEMORANDUM OR POINTS AND AUTHORITIES; AND DECLARATIONS OF HOWARD B. GROBSTEIN AND WILLIAM JORDAN IN SUPPORT** |
| ☐ Affects CLAIRTON RESIDENTIAL RENEWAL, LLC | |
| ☐ Affects EQUITY INDEXED MANAGED FUND, LLC | |
| ☐ Affects LUXURY ASSET PURCHASING INTERNATIONAL, LLC | |
| ☐ Affects LVNV MULTI FAMILY LLC | |
| ☐ Affects PMB MANAGED FUND, LLC | |
| ☐ Affects PROSPER MANAGED FUND, LLC | |

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2706212.1

1

EMERGENCY MOTION

☐ Affects TD OPPORTUNITY FUND, LLC

☐ Affects TD REO FUND, LLC

☐ Affects URBAN PRODUCE FUND, LLC

☐ Affects WHIRL FUND, LLC

☐ Affects WJA EXPRESS FUND, LLC

☐ Affects WJA REAL ESTATE OPPORTUNITY FUND I, LLC

☐ Affects WJA REAL ESTATE OPPORTUNITY FUND II, LLC

☐ Affects WJA SECURE REAL ESTATE FUND, LLC

☐ Affects WJA SECURE INCOME FUND, LLC

☐ Affects WILLIAM JORDAN INVESTMENTS, INC.

☒ Affects All Debtors

**Hearing Information:**
**DATE:  To Be Set**
**TIME:   To Be Set**
**CTRM: To Be Set**

SMILEY WANG-EKVALL, LLP

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1

2

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

3    I.    INTRODUCTION ................................................................................... 1

4    II.   FACTUAL BACKGROUND .................................................................. 2

5          A.    The Commencement of the Cases................................................ 2

6          B.    Organization and Background of the Debtors ............................... 3

7          C.    Summary of the Assets of the Debtors......................................... 4

8          D.    TD Opportunity Fund and TD REO .............................................. 5

9    III.  EVENTS LEADING TO THESE CASES ............................................. 6

10   IV.   THE DEBTORS' CHAPTER 11 STRATEGY ...................................... 7

11   V.    DEBTORS' CASH MANAGEMENT AND USE OF THE CUSTODIANS ................ 8

12   VI.   LEGAL ARGUMENT .......................................................................... 11

13         A.    Cause Exists to Approve the Interim Use of the Debtor's Pre-Petition
                 Bank Accounts ........................................................................... 11

14

15         B.    The Debtors Use the Custodians, Foreclose Under Deeds of Trust,
                 and Sell REOs in the Ordinary Course of their Business ........................... 12

16         C.    Alternatively, the Debtors' Continued Use of the Custodians,
                 Foreclosures Under Their Deeds of Trust, and Sale of Their REOs
17               are Supported by a Sound Business Justification ...................................... 14

18         D.    Interim Relief is Necessary to Avoid Irreparable Harm............................... 15

19         E.    Proposed Notice and Service of the Motion for the Emergency
                 Hearing........................................................................................ 16

20

21   VII.  CONCLUSION ................................................................................... 17

22   DECLARATION OF HOWARD B. GROBSTEIN............................................. 19

23   DECLARATION OF WILLIAM JORDAN ....................................................... 23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY JUDGE:**

WJA Asset Management, LLC, et al., the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submits this *Emergency Motion for Order Authorizing, for an Interim Period, the Following: (1) Continued Use of Pre-Petition Bank Accounts; (2) Continued Use of Custodians; and (3) Continued Foreclosures Under Deeds of Trust and Sales of REOs in the Ordinary Course* (the "Motion").  In support of the Motion, the Debtors submit the following memorandum of points and authorities and the declarations of Howard B. Grobstein and William Jordan in support thereof.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    <u>INTRODUCTION</u>**

With a few exceptions, the Debtors consist of "Funds," *i.e.*, limited liability companies formed to provide investment opportunities to clients.  The Funds raised monies from investors through private placement memoranda and used the proceeds to acquire a variety of assets.  The Debtors collectively own real estate, deeds of trust, cash, and ownership interests in companies that operate a business or own real estate.

To manage their assets, the Debtors use the custodial services of three outside entities, BSI Financial Services, Inc. ("BSI"), Citivest, Inc. ("Citivest"), and The Kingdom Trust Company ("KTC" and collectively with BSI and Citivest, the "Custodians").  BSI services the Debtors' performing loans.  Citivest, as asset manager, oversees loan servicing and the process of foreclosing on deeds of trust securing delinquent loans and selling REOs.  KTC holds the assets of the Funds and any proceeds from those assets as custodian.  Each of these custodians maintains one or more bank accounts for the Debtors.

As part of their investment strategy, certain of the Debtors made private loans secured by first-position deeds of trust against real property throughout the United States.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

When borrowers default, the Debtors, through Citivest and BSI, take steps to mitigate any losses by foreclosing on the deeds of trust, acquiring the real estate collateral (if not sold to a third party at the foreclosure sale), and selling any resulting REOs.  As of the filing of the Petition Date, there are approximately 60 active foreclosures at various stages. Moreover, TD REO owns approximately 29 REOs and certain properties are under contract to be sold with closing dates as early as May 25, 2017.  The disruption or delay of the foreclosure and sale process could significantly impact the value available for creditors and investors.  As such, the Debtors seek authority to continue to foreclose on deeds of trust and to sell their real estate collateral or REOs in the ordinary course of their business.

Accordingly, by the Motion, the Debtors request an order for the following relief for an interim period of 120 days in order to prevent the disruption of their ordinary course operations to the detriment of investors and creditors:

1.    Authorizing the Debtors to keep open their pre-petition bank accounts, including bank accounts held by the Custodians;

2.    Authorizing the Debtors to continue to use the services of the Custodians; and

3.    Authorizing the Debtors to continue to foreclose under their deeds of trust and to sell their REOs and pay brokers' fees and other customary fees and costs related thereto.

## II.    FACTUAL BACKGROUND

### A.    The Commencement of the Cases

On May 18, 2017, the Debtors filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code.  The Debtors continue to operate their businesses and manage their affairs as debtors and debtors-in-possession.

The Debtors are part of a network of entities or "Funds" formed to offer a range of investment opportunities to individuals.  Many of the existing Funds are performing and

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   some Funds had substantial gains.  However, as discussed in further detail below,

2   certain Funds, *i.e.*, those invested in private trust deeds secured by real estate, suffered

3   losses.  These cases were commenced to liquidate the Debtors' holdings and close out

4   the Funds in an orderly fashion in order to maximize the return for creditors and investors

5   and to distribute the proceeds in a manner consistent with the Code's priority scheme.

6   **B.    Organization and Background of the Debtors**

7       William Jordan Investments, Inc. ("Advisor"), is a registered investment advisor.

8   WJA Asset Management, LLC ("Manager"), is the managing member of the Debtors, with

9   the exception of itself and Advisor.  William Jordan is the President and sole owner of

10  Advisor and is the sole member and manager of Manager.  (*See* Jordan Decl. ¶¶ 1 & 2.)

11      In 2010, Advisor began creating opportunities for its clients to invest in real estate

12  related assets and, in particular, private mortgages.  The creation of new real estate

13  investment funds, as opposed to investing in existing third party funds, had several

14  benefits for the investors.  First, it enabled the clients to invest in real estate without

15  having to personally purchase rental property or make a loan.  Second, Advisor found it

16  difficult to vet existing funds to ensure that their assets did not suffer from lingering issues

17  arising from the 2008 financial crisis.  Third, the creation of new funds could avoid the

18  hidden fees and costs included in other existing offerings and Manager could charge

19  lower fees.  (*See* Jordan Decl. ¶ 3.)

20      Advisors' clients pursued investment opportunities by acquiring membership units

21  in one or more of the Funds.[1]  Each Fund is a limited liability company formed to pursue

22  a particular type of investment.  The Funds typically raised investments by offering

23  membership units in the Funds through Private Placement Memoranda.  Investors who

24  acquired membership units are members of the corresponding Debtor or Fund.  Some

25  Funds invested in other Funds if, for example, the assets of such Funds were consistent

26

27      [1]    The term "Fund" refers to a Debtor other than Advisor, Manager, and TD REO, LLC.  Funds with
"California" in its name are for California qualified purchasers and the similarly named Fund with "WJA" in

28  its name is for SEC accredited investors.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 ● Fax 714 445-1002

1    with the business purpose of the investing Fund and the investment could help to

2    diversify and reduce the risk of the investors' overall portfolio.  Thus, there are Funds

3    owned by only individual investors and others in which the investors are individuals and

4    other Funds.  Some Funds and investors also participated in certain Funds by making

5    loans and receiving promissory notes in exchange.  (*See* Jordan Decl. ¶ 4.)

6        Organizational charts of the Debtors are collectively attached hereto as Exhibit "1."

7        **C.**    **Summary of the Assets of the Debtors**

8        Collectively, the Debtors hold the following types of assets:  (1) cash; (2) real

9    estate; (3) deeds of trust; (4) promissory notes; and (5) stock or membership units in third

10    party companies, which, in turn, either operate a business or own a real estate

11    development project.  (*See* Jordan Decl. at ¶ 5.)

12        The Funds hold a variety of diverse and performing assets.  For example, Urban

13    Produce Fund, LLC, holds stock in a third party entity called Urban Produce, Inc.  Urban

14    Produce, Inc., is a vertical farming company that sells leafy greens and wheat grass to

15    companies such as PepsiCo and Jamba Juice.  WJA Express Fund, LLC, also invested

16    in Urban Produce.  Another notable investment for certain Funds is See Jane Go.  See

17    Jane Go is a ride-hail service designed for women (*i.e.*, women driving women), which

18    was conceived by Mr. Jordan's daughter.  (*See* Jordan Decl. at ¶ 6; *see also* Ex. 1.)

19        Other Funds invested in commercial real estate development projects.  WJA Real

20    Estate Opportunity I, LLC, holds a 38% ownership in a special purpose entity named

21    Boulder At Nellis, LLC, which, in turn, owns a retail shopping center in Las Vegas.  WJA

22    Real Estate Opportunity II, LLC, purchased a vacant Ralphs in Long Beach, California,

23    invested $1.3 million in the project, re-developed the property and secured new retail

24    tenants, and then sold the property for a profit that was more than twice the amount

25    invested within 19 months.  WJA Real Estate Opportunity Fund II, LLC, also holds

26    ownership interests in companies that own real property located at 902 State Street,

27    Lemont, IL 60539, which is in the process of being refinanced, and 418 apartment units in

28    Las Vegas, Nevada, which was rehabilitated and is in the process of being sold.  WJA

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

Express Fund, LLC, and California Express Fund II, LLC, own 50% and 8%, respectively, in Gothard Partners, L.P., which owns a car wash and retail buildings in Huntington Beach, California.  These are only a few of the types of assets owned by some of the Funds.  (*See* Jordan Decl. at ¶ 7.)

### D.   TD Opportunity Fund and TD REO

The losses experienced by some Funds are traceable to certain trust deed investments.  These losses are largely concentrated in the assets held by TD Opportunity Fund, LLC ("TD Opportunity Fund"), and TD REO, LLC ("TD REO").  The first six Funds created were WJA Secure Real Estate Fund, WJA Secure Income Fund, California Indexed Growth Fund, Equity Indexed Managed Fund, PMB Managed Fund, and Secure California Income Fund (collectively, the "Original Six Funds").  The Original Six Funds each held a small pool of deeds of trust secured by real estate as well as other assets. (*See* Jordan Decl. at ¶ 8.)

In June 2013, TD Opportunity Fund was formed.  TD Opportunity Fund was created and raised funds in order to make new loans secured by first-position deeds of trust on real estate.  The Original Six Funds invested in TD Opportunity Fund, which both diversified and lessened the risk of the investors in the Original Six Funds by giving them an interest in a larger pool of trust deeds.  TD Opportunity Fund also issued promissory notes to individuals.  Initially, the loan opportunities were selected with the assistance of a third party, Purchase Money Bank ("PMB"), and almost all of the loans made by TD Opportunity Fund were accompanied by an appraisal from a licensed professional or by a broker price opinion indicating a loan-to-value ratio that was typically between 60% to 70%.  (*See* Jordan Decl. at ¶ 9.)

TD REO was created in August 2013.  TD REO was formed to manage the foreclosure process for loans in default.  As a borrower defaulted, the loan and deed of trust were assigned by the Fund that was the original lender, such as TD Opportunity, to TD REO pursuant to a foreclosure agreement and/or a buyout agreement.  TD REO would foreclose on the collateral and sell it, or would reach a more favorable

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  accommodation.  TD REO's obligations to repay the loans assigned to it are reflected as

2  loans to TD REO from the assigning Fund.  The formation of TD REO centralized the

3  process for handling defaulted loans for TD Opportunity Fund and the Original Six Funds.

4  (*See* Jordan Decl. at ¶ 10.)

5       TD REO also has individual noteholders.  Each individual noteholder of TD REO is

6  the product of a buyout agreement, which is essentially a form of guaranty.  Generally

7  speaking, under the buyout agreement, TD REO would acquire a defaulted loan from the

8  individual who made the loan.  TD REO would guaranty the payment of the principal of

9  the defaulted loan and would absorb any losses, and TD REO would be entitled to any

10  profits in excess of the principal amount.  (*See* Jordan Decl. at ¶ 11.)

11

12  **III.    <u>EVENTS LEADING TO THESE CASES</u>**

13       A series of events led to losses for the Funds that invested in trust deeds and,

14  ultimately, these bankruptcy cases.  First, the real property collateral securing the largest

15  single loan was condemned and the building was demolished.  TD Opportunity Fund was

16  owed roughly $6,000,000 with principal and interest secured by real property in the city of

17  Baytown, Texas.  The building on the property was a 100,000 square foot hospital that

18  was to be redeveloped into an assisted living facility.  The  valuations of the property

19  indicated a value between approximately $9,000,000 and $13,000,000.  (*See* Jordan

20  Decl. at ¶ 12.)

21       The borrower defaulted on the Baytown loan.  The borrower purportedly secured

22  take-out financing and Manager received repeated assurances from the new lender that it

23  would fund the take-out loan.  In the meantime, the city sued the borrower in order to

24  force repairs to the building or have it torn down.  Due to the borrower's default, TD REO

25  commenced foreclosure proceedings, however, by the time that TD REO foreclosed, the

26  city had already obtained a judgment against the borrower.  The city subsequently had

27  the building demolished.  TD REO is pursuing its options to recoup as much as possible

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  from this investment, but, at this time, the Baytown property has been marked down to

2  the value of the land.  (*See* Jordan Decl. at ¶ 13.)

3      Second, the loans secured with the help of PMB generally underperformed.  PMB

4  focused on smaller loans in less serviced areas of the country.  Over the years, Manager

5  has found that these smaller loans have a higher rate of default.  Moreover,

6  notwithstanding an otherwise meaningful equity cushion, the foreclosure costs, unpaid

7  taxes and, sometimes, damage to the property, create a potential for loss when these

8  smaller types of loans go into default.  (*See* Jordan Decl. at ¶ 14.)

9      Third, the Securities & Exchange Commission ("SEC") and the California

10  Department of Business Oversight ("CDOBO") began investigating Advisor and other

11  Debtors.  The SEC and CDOBO raised that annual audits were required by all of the

12  Funds.  As a result, Manager began working proactively to secure the appropriate

13  reviews and audits for the Funds involved.  SEC also raised concerns regarding

14  documented loans between certain Funds.  As of the filing of the bankruptcy petition, an

15  audit for TD REO is close to completion.  The Debtors will be seeking to employ audit

16  firms to continue the audit process for the Funds post-petition.  (*See* Grobstein Decl. at ¶

17  4.)

18

19  **IV.    THE DEBTORS' CHAPTER 11 STRATEGY**

20      The Debtors commenced this case to protect creditors and investors.  The Debtors

21  are in the process of liquidating their assets in an orderly fashion.  The Debtors have

22  discontinued creating additional funds, raising monies from investors, or making new

23  investments.  (*See* Grobstein Decl. at ¶ 1; *see also* Jordan Decl. at ¶ 16.)  A neutral party

24  and panel trustee, Howard Grobstein of Grobstein Teeple, LLP, has been retained as the

25  Chief Restructuring Officer for the Debtors and is now overseeing and directing the

26  Debtors' operations and guiding the Debtors in bankruptcy.  Mr. Grobstein's continued

27  retention as CRO following the Petition Date is subject to a separate motion.

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    The Debtors' strategy is simple. The Debtors intend to confirm a plan that permits

2  them to continue the process they commenced pre-petition, *i.e.*, the orderly liquidation of

3  their assets to maximize the return for investors and creditors, and to distribute the

4  proceeds in a manner consistent with the priority scheme in the Code. (*See* Grobstein

5  Decl. at ¶ 3.) The alternative, a "fire sale" of the Funds' assets through a receivership,

6  could severely impair the value available for investors and creditors.

7    A controlled liquidation of the Debtors' assets is important and could significantly

8  impact the return for investors and creditors. As discussed above, the assets of certain

9  Funds are performing and a forced sale could unnecessarily reduce the return for the

10  investors of those Funds. Also, the amount of losses in other Funds could be potentially

11  minimized by the additional time and value that an orderly process provides. For

12  example, TD REO holds an interest in a 10 acre piece of real property located at 5827

13  Winland Hills Dr., Rancho Santa Fe, California. Manager is working on entitlements to

14  enable the property to be developed as a senior care facility. The value of the Winland

15  Hills property is approximately $7.5 million, but if certain entitlements are obtained the

16  value has been estimated to be as high as $15.4 million by Colliers International, and the

17  entitlement process is ongoing. (*See* Jordan Decl. at ¶ 17.) Thus, investors and

18  creditors should benefit greatly from the protections bankruptcy provides.

19

20  **V.    DEBTORS' CASH MANAGEMENT AND USE OF THE CUSTODIANS**

21    Manager, Advisor, TD REO, California Express Fund II, LLC, and Alabama

22  Housing Fund, LLC, each have an account at California Bank & Trust. Advisor and

23  Clairton Residential Renewal, LLC, each have an account at Citizens Business Bank.

24  With these exceptions, all of the Debtors' cash is held in accounts with BSI, Citivest, and

25  KTC. The Debtors' accounts, including those held by the Custodians, are listed in the

26  spreadsheet attached hereto as Exhibit "2" with the last four digits of the account

27  numbers and balances for each bank account as of May 15, 2017.

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

The Debtors' performing loans secured by trust deeds are serviced using BSI pursuant to a service agreement between BSI and Manager.  A true and correct copy of BSI's service agreement is attached hereto as Exhibit "3."  BSI collects payments of principal and interest, as well as any taxes or other amounts that are to be impounded, from the borrowers as they become due.  (*See* Ex. 3 at § 2.3(a).)  Among other responsibilities of BSI, the amounts collected are held in one or more segregated custodial accounts in a financial institution insured by the FDIC.  (*See id.* at § 2.3(d) & (e).)  BSI is required to remit to Manger all principal and interest collected, less BSI's agreed upon fees.  (*See id.* at § 2.5(e).)  BSI currently holds one account for Manager at Texas Capital Bank, which account is in the name of BSI.  This account currently has a balance of approximately $10,023.92.  BSI distributes interest payments and any loan payoffs bi-weekly.  (*See* Grobstein Decl. at ¶ 6.)

As discussed above, TD REO was formed for the sole purpose of managing the foreclosure process for loans in default, which were assigned to it from the lending Funds, such as, TD Opportunity Fund and the Original Six Funds.  (*See* Jordan Decl. at ¶ 10.)  Foreclosures on the Debtors' defaulted loans are processed using Citivest.  Manager retained Citivest to serve as the asset manager in connection with the operation and disposition of the Debtors' deeds of trust.  A true and correct copy of the Asset Management Agreement between Citivest and Manager is attached hereto as Exhibit "4."  In particular, Citivest oversees BSI and is tasked with negotiating with borrowers to cure existing defaults and mitigate any future defaults and to oversee any required foreclosures.  (*See* Ex. 4 at Exhibit "A.")  In exchange for its services, Citivest is to receive the fees set forth in the Asset Management Agreement.  (*See* Ex. 4 at § 3.)  Citivest holds a reserve account in the name of Citivest at California Republic Bank, which currently has a balance of approximately $35,606.89.  (*See* Grobstein Decl. at ¶ 7.)  Amounts due to TD REO in connection with the sale of an REO it owns are wired to TD REO's bank account at California Bank & Trust, and any other amounts owed to TD REO are sent via check to its offices.  (*See id.*)

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    Based on information provided by BSI, it was servicing over 270 loans and there

2  are approximately 60 active foreclosures pending at various stages.  Moreover, TD REO

3  owns approximately 29 REOs and certain properties are under contract to be sold with

4  closing dates as early as May 25, 2017, and nine sale closings scheduled between May

5  25, 2017 and June 15, 2017.  Mr. Grobstein and his team are still in the process of

6  obtaining information from Citivest and BSI.  (*See* Grobstein Decl. at ¶ 8.)

7    Many of the Debtors retained KTC as a custodian to hold their assets.  A true and

8  correct copy of a Custodial Services Agreement with KTC is attached hereto as Exhibit

9  "5."  The cash of each Debtor that utilizes KTC's services is held in a segregated

10  account, subject to the direction of such Debtor.  (*See* Ex. 5 at §§ 1, 5, & 6; *see also* Ex.

11  2.)  The Debtors remain in full control and responsibility for the management, control, and

12  disposition of the custodial assets.  (*See id.* at §§ 5 & 6.c.)  KTC must provide the

13  Debtors with quarterly reports regarding the assets in custody.  (*See id.* at § 6.e.)  KTC

14  receives a one-time set-up fee and an annual maintenance fee.  (*See id.* at § 12.)  The

15  cash of the Debtors in KTC's custody is held at Branch Banking & Trust and Kingdom

16  has 22 deposit accounts for the Debtors with amounts ranging from $66.94 to

17  $810,035.15.  (*See*  Ex. 2.)  Proceeds from investments of the Debtors that use KTC are

18  received and held by KTC as custodian.  This includes payments from BSI to Funds who

19  are lenders of loans serviced by BSI.  (*See* Grobstein Decl. at ¶ 9.)

20    Upon the commencement of the Cases, the Debtors opened debtor-in-possession

21  accounts at East West Bank.  Mr. Grobstein is the only signatory on the debtor-in-

22  possession accounts.  Also, Citivest, BSI, and KTC have each been advised that all

23  check requests, contracts, and any other final transactions must be approved by Mr.

24  Grobstein.  (*See* Grobstein Decl. at ¶ 11.)  Mr. Grobstein and his team have transferred

25  the majority of the funds from the Debtors' pre-petition accounts at California Bank &

26  Trust to the Debtors' new DIP accounts, subject to reserving amounts for approved

27  outstanding checks, and they will be instructing BSI and Citivest that payments moving

28  forward should be made to the DIP accounts.  (*See id.* at ¶ 12.)

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 ● Fax 714 445-1002

VI.    **LEGAL ARGUMENT**

A.    **Cause Exists to Approve the Interim Use of the Debtor's Pre-Petition Bank Accounts**

The United States Trustee's guidelines provide that "[a]ll pre-petition bank accounts must be closed." *See* Guidelines and Requirements for Chapter 11 Debtors in Possession § III.D.2.(a) (October 2014).  Nevertheless, bankruptcy courts routinely permit the continued use of existing bank accounts where the benefits provided by the guidelines are outweighed by the disruption they cause.  In fact, requests to use pre-petition accounts are so uncontroversial that they are rarely contested and there is very little, if any, published case law on the subject.

References to court orders authorizing the continued use of pre-petition accounts are found in published decisions on other issues, as opposed to decisions analyzing and approving or denying the request.  *See, e.g.*, *In re American HomePatient, Inc.*, 301 B.R. 713, 715 (Bankr. M.D. Tenn. 2003) (referring to order authorizing the debtor's maintenance of existing bank accounts, cash management system, and business forms); *In re Enron Corp.*, 279 B.R. 671, 677-78 (Bankr. S.D.N.Y. 2002) (referring to "order granting the motion to authorize the continued use of existing bank accounts, cash management system, checks and business forms. . . ."); *In re Interco, Inc.*, 130 B.R. 301, 303 (Bankr. E.D. Mo. 1991) (declining to clarify order authorizing maintenance of existing cash management systems and continued use of certain existing bank accounts, investment and deposit guidelines and certain business forms).

Here, good cause exists to authorize the Debtors' continued use of its existing cash management system.  The immediate closing of the Debtors' network of 31 accounts could cause significant disruption to their operations to the detriment of the Debtors' creditors and investors.[2]  The Custodians receive the proceeds from the

---

[2]    The Debtors have five accounts at California Bank & Trust and two accounts at Citizens Business Bank.  KTC has 22 accounts for the benefit of various Debtors, and BSI and Citivest each have one account for Manager.

Debtors' secured loans, real estate and other investments from third parties and deposit such proceeds in the accounts in their possession.  The immediate closing of the Custodians' accounts could significantly delay, and potentially jeopardize, the Debtor's receipt of payment.  For example, the closing of the Custodians' accounts could cause payments from third parties to be returned.  Similarly, the closing of the Debtor-held accounts could delay receipts from the Custodians, such as, wires from Citivest upon the sale of REOs.  One of the goals of these cases is the orderly sale of the Debtors' assets and the closing of the Funds in order to maximize the return for creditors and investors. Ensuring that the Debtors capture all of the proceeds from their investments is important to that goal.  (*See* Grobstein Decl. at ¶ 13.)

Continued use of the Debtors' pre-petition accounts, at least, for an interim period of 120 days, will allow the Debtors to continue day-to-day operations in the most cost-effective manner and will prevent disruption of their operations.  Moreover, the bankruptcy estates are protected as Mr. Grobstein is the sole party with the authority to approve any transactions involving the Debtors' pre-petition accounts.  (*See* Grobstein Decl. at ¶ 11.)

**B.      The Debtors Use the Custodians, Foreclose Under Deeds of Trust, and Sell REOs in the Ordinary Course of their Business**

A debtor-in-possession may sell, lease, or use property of the estate "in the ordinary course of business" without notice or hearing.  *See* 11 U.S.C. § 363(c); *see also* 11 U.S.C. §§ 1107(a) & 1108.  "A determination of whether a transaction falls outside the ordinary course of business is a question of fact that depends on the nature of industry practice."  *See In re Straightline Investments, Inc.*, 525 F.3d 870, 879 (9th Cir. 2008) (internal quotation marks omitted).

There are two tests for determining whether a transaction is within the ordinary course of a debtor's business, the vertical test and the horizontal test.  *See In re Straightline Investments, Inc.*, 525 F.3d at 879.  The "vertical" test views the transaction in question "from the vantage point of a hypothetical creditor and inquires whether the

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    transaction subjects a creditor to economic risks of a nature different from those he

2    accepted when he decided to extend credit." *See id.* (internal quotation marks omitted).

3    In determining whether the vertical test is met, "courts often look to the debtor's pre-

4    petition business practices." *See id.*  The "horizontal" test, in contrast, analyzes whether

5    the subject transaction "is of a type that other similar business would engage in as

6    ordinary business." *See id.* at 880-81 (internal quotation marks omitted).  "If both tests

7    are satisfied, the court must conclude that the challenged transaction occurred in the

8    debtor's ordinary course of business." *Id.* at 879.  Thus, to be considered "ordinary

9    course," a transaction must be consistent with the debtor's pre-petition business activities

10   and the conduct of similar businesses.

11        The sale of real property can be an ordinary course transaction.  Section 363

12   specifically authorizes the use and sale of estate property in the ordinary course of

13   business.  *See* 11 U.S.C. § 363(c).  Where the very nature of a debtors' business is to

14   sell real estate, the sale of real estate is in the ordinary course of the debtor's business.

15   *See, e.g.*, *In re WRB W. Assocs. Joint Venture*, 106 B.R. 215, 218–19 (Bankr. D. Mont.

16   1989) ("The very nature of the Debtors' business is to sell the developed, but unimproved

17   lots, so that the ordinary course of Debtor's business is land sales."); *see also In re*

18   *Stroud Ford, Inc.*, 205 B.R. 722, 725 (Bankr. M.D. Pa. 1996) ("Not every sale of real

19   estate is necessarily out of the ordinary course of the debtor's business. The very

20   essence of a residential real estate development is to market real estate.").

21        Here, the very nature of the Debtors' business involves making loans secured by

22   real estate.  The Debtors that hold deeds of trust and/or real estate were formed for that

23   purpose.  (*See* Jordan Decl. at ¶ 21.)  For example, TD Opportunity was created to make

24   new loans secured by deeds of trust and TD REO was created to manage the loans of

25   other Funds in default.  (*See id.*)  When borrowers default, the Debtors must proceed with

26   foreclosures under their deeds of trust and sell the REOs in order to minimize their

27   losses.  The Debtors have used the Custodians to hold their investments and the

28   proceeds therefrom, to service performing loans, and to help manage the foreclosure

1  process for loans in default and the Debtors have done so since 2014. (*See* Exs. 3-5.)

2  Thus, the Debtors' use of the Custodians and their foreclosure on their deeds of trust and

3  sale of REOs are entirely consistent with the Debtors' pre-petition practice and the

4  expectations of creditors and investors. (*See* Jordan Decl. at ¶ 21.) Moreover, it is

5  axiomatic that a company that makes loans will, as part of its business, foreclose when

6  borrowers default and sell its collateral. Accordingly, the Debtors' use of the Custodians,

7  foreclosure on their deeds of trust, and sale of their REOs are ordinary course

8  transactions.

   **C.     Alternatively, the Debtors' Continued Use of the Custodians,**

9

10  **Foreclosures Under Their Deeds of Trust, and Sale of Their REOs are**

11  **Supported by a Sound Business Justification**

12      Section 363(b) of the Bankruptcy Code empowers a trustee to "use . . . other than

13  in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). In

14  deciding whether to approve the use of estate property by a debtor-in-possession, courts

15  typically consider whether the proposed use is based on a sound business justification.

16  *See, e.g., In re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1998); *In re Ernst Home Center,*

17  *Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997); (*In re Continental Air Lines, Inc.*, 78

18  F.2d 1223 (5th Cir. 1986); *In re Lionel Corporation,* 722 F.2d 1063, 1066 (2d Cir. 1983).

19  Courts also look at whether the transaction is in the best interests of the estate based on

20  the facts and history of the case. *In re America West Airlines*, 166 B.R. 908, 912 (Bankr.

21  D. Ariz. 1994), *citing*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

22      The Debtors' continued use of the Custodians is supported by a valid business

23  justification. As of the Petition Date, the Debtors' operations depend on the services of

24  the Custodians. BSI is servicing the Debtors' performing loans, Citivest is overseeing the

25  foreclosures on loans in default and the sale of REOs, and KTC is holding certain of the

26  Debtors' assets and is receiving the proceeds from those assets. The immediate

27  cessation of the Custodians' services could cause severe disruption of the Debtors'

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    ongoing efforts to maximize the returns for creditors and investors.  Therefore, the

2    continued use of the Custodians is supported by a valid business justification.[3]

3         The Debtors must continue the process of foreclosing on their deeds of trust and

4    selling REOs in order to mitigate any losses from their investments.  BSI was servicing

5    over 270 loans and there are approximately 60 active foreclosures pending at various

6    stages.  TD REO owns approximately 29 REOs and certain properties are under contract

7    to be sold with nine sale closings scheduled between May 25, 2017 and June 15, 2017.

8    (*See* Grobstein Decl. at ¶ 8.)  These matters are time sensitive and any disruption in the

9    foreclosure or sale process could negatively impact the Debtors' recoveries by delaying

10   or preventing the Debtors from recovering there collateral and the proceeds therefrom.

11   Moreover, any sales in the ordinary course will be subject to the business judgment and

12   approval of Mr. Grobstein as CRO.  Accordingly, authorizing the Debtors' to continue the

13   process of foreclosing on deeds of trust and selling REOs is supported by a sound

14   business justification and is in the best interests of the estates.  (*See id.* at ¶ 14.)

15        **D.    Interim Relief is Necessary to Avoid Irreparable Harm**

16        Federal Rule of Bankruptcy Procedure 6003 provides that the Court cannot, within

17   21 days of the Petition Date, enter an order granting a motion to use, sell or lease

18   property of the estate, except as necessary "to avoid immediate or irreparable harm[.]"

19   *See* Fed. R. Bankr. P. 6003(b).  Moreover, Rule 2002(a) requires at least 21 days' notice

20   of the proposed use, sale, or lease of estate property outside the ordinary course, unless

21   the court, for cause shown, shortens the notice required.  *See* Fed. R. Bankr. P.

22   2002(a)(2).

23        Here, interim relief is appropriate.  First, the use and sale of estate property

24   contemplated by the Motion is within the ordinary course of the Debtors' business, which,

25   according to § 363(c), does not require prior Court approval and, arguably, is not within

---

26

27        [3]    The Debtors are not seeking to assume any contracts with the Custodians at this time.  Rather, the
Debtors are seeking an order authorizing, but not requiring, the Debtors to use of the services of the
Custodians as they have done pre-petition in order to prevent the disruption of their ordinary course
28   operations.

1    the purview of Rule 6003.  Second, the requested relief is necessary to avoid immediate

2    and irreparable harm.  The Debtors are using the Custodians' services to collect the

3    proceeds from their investments and to mitigate any potential losses.  As of the Petition

4    Date, there are approximately 60 active foreclosures pending at various stages and

5    pending REO sales with closing dates as early as May 25, 2017.  (*See* Grobstein Decl. at

6    ¶ 8.)  As discussed above, any disruption of the pending foreclosure proceedings, REO

7    sales, or any of the other 200 active matters being managed by Citivest could cause a

8    loss of value to the detriment of creditors and investors.  According, the entry of an order

9    granting the Motion on an emergency basis is appropriate.

10           **E.       Proposed Notice and Service of the Motion for the Emergency Hearing**

11           Pursuant to the Federal Rules of Bankruptcy Procedure, a motion for the

12   "proposed use, sale, or lease of property of the estate other than in the ordinary course of

13   business" must be provided to all creditors "unless the court for cause shown shortens

14   the time or directs another method of giving notice."  *See* Fed. R. Bankr. P. 2002(a)(2);

15   *see also* Fed. R. Bankr. P. 6004(a).  Local Rule of Bankruptcy Procedure requires that,

16   with respect to emergency motions, "[u]nless otherwise ordered by the court," telephonic

17   notice of the hearing and the substance of the motion must be provided to "the parties to

18   whom notice of the motion is required to be given under the FRBP and these rules, the

19   United States trustee, and any other party that is likely to be adversely affected by the

20   granting of the motion."  In addition, these same parties must receive the motion by

21   email, fax or personal service unless otherwise ordered by the court.  *See* LBR 9075-

22   1(a)(5) & (6).  Thus, under the Local Bankruptcy Rules, the Court has the authority to

23   tailor the method and amount of notice to be provided and the parties to be noticed.

24           The Debtors propose that the Motion and the notice of the hearing on the Motion

25   (the "Notice") be served on following parties and/or their respective counsel by email:

26   (1) the United States Trustee; (2) the SEC; (3) the California Department of Business

27   Oversight; and (4) parties receiving Notice of Electronic Filings.  The Debtors propose

28   that, in addition, the Notice be served via overnight mail on the consolidated list attached

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000  •  Fax 714 445-1002

1   hereto as Exhibit "6" of the creditors holding the 30 largest unsecured claims against all

2   of the Debtors, which list does not include insiders or persons or entities who hold equity

3   security interests in any of the Debtors.  The Debtors propose that the Notice be served

4   on such creditors by overnight mail because the Debtors do not have email addresses,

5   telephone numbers, or facsimile numbers for all such creditors.  The Debtors believe that

6   the proposed service of the Motion and the notice of the emergency hearing on the

7   Motion are consistent with the Federal Rules of Bankruptcy Procedure and the Local

8   Bankruptcy Rules.

9

10  **VII.    <u>CONCLUSION</u>**

11          Based on the foregoing, the Debtors respectfully request that the Court enter an

12  order:

13          1.      Granting the Motion;

14          2.      Authorizing, but not requiring, for an interim period of 120 days from the

15  entry of the order granting the Motion:

16                  a.      The Debtors to keep open their pre-petition bank accounts, including

17                          bank accounts held by the Custodians;

18                  b.      The Debtors to continue to use the services of the Custodians; and

19                  c.      The Debtors to continue to foreclose under their deeds of trust and to

20                          sell their REOs and to pay brokers' fees and other customary fees

21                          and costs related thereto; and

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1       3.     Granting such other relief as the Court may deem just and appropriate.

2

3             Respectfully submitted,

4 DATED:  May 23, 2017       SMILEY WANG-EKVALL, LLP

5

6           By:     */s/ Robert S. Marticello*

7              ROBERT S. MARTICELLO
             Proposed Attorneys for Debtor and

8              Debtor-in-Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1

## **<u>DECLARATION OF HOWARD B. GROBSTEIN</u>**

2

3         I, Howard B. Grobstein, declare as follows:

4         1.        I am a founder and partner of Grobstein Teeple, LLP.  I know each of the

5    following facts to be true of my own personal knowledge, except as otherwise stated and,

6    if called as a witness, I could and would competently testify with respect thereto.  I make

7    this declaration in support of the Debtors' *Emergency Motion for Order Authorizing, for an*

8    *Interim Period, the Following: (1) Continued Use of Pre-Petition Bank Accounts; (2)*

9    *Continued Use of Custodians; and (3) Continued Foreclosures Under Deeds of Trust and*

10   *Sales of REOS in the Ordinary Course of Business.*  Unless otherwise defined in this

11   declaration, all terms defined in the Motion are incorporated herein by this reference.  I

12   was retained as the Chief Restructuring Officer of all of the Debtors prior to the Petition

13   Date.  Since early May, 2017, I and/or certain other members of Grobstein Teeple, LLP

14   ("Grobstein Teeple"), have been onsite at the Debtor's headquarters each business day

15   and have spent significant time getting up to speed on the Debtors' operations, assets,

16   and liabilities, and since my retention, I have begun the process of overseeing the

17   Debtor's operations.  The Debtors are not offering any new investment vehicles or

18   soliciting any new investments.

19        2.        Attached hereto as Exhibit "1" is a true and correct copy of organizational

20   charts prepared by Grobstein Teeple at my direction and under my supervision.

21        3.        Based on my involvement to date, I believe that the overall strategy for the

22   Debtors' cases is to confirm a plan that permits the Debtors to continue the process they

23   commenced pre-petition, *i.e.*, the orderly liquidation of their assets to maximize the return

24   for investors and creditors, and to distribute the proceeds in a manner consistent with the

25   priority scheme in the Code.

26        4.        As of the filing of the bankruptcy petition, I have been informed that an audit

27   for TD REO is close to completion.  The Debtors will be seeking to employ audit firms to

28   continue the audit process for the Funds post-petition.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

5.      Manager, Advisor, TD REO, California Express Fund II, LLC, and Alabama Housing Fund, LLC, each have an account at California Bank & Trust.  Advisor and Clairton Residential Renewal, LLC, each have an account at Citizens Business Bank. With these exceptions, pre-petition, all of the Debtors' cash was held in accounts with BSI, Citivest, and KTC.

6.      BSI currently holds one account for Manager at Texas Capital Bank, which account is in the name of BSI.  This account has a balance of approximately $10,023.92 as of May 15, 2017.  Based on my teams' conversations with BSI and the Debtors' employees to date, we understand that BSI distributes interest payments and any loan payoffs bi-weekly.

7.      Citivest holds a reserve account in the name of Citivest at California Republic Bank, which has a balance of approximately $35,606.89 as of May 15, 2017. Based on my teams' conversations with Citivest to date, we understand that amounts due to TD REO in connection with the sale of an REO it owns are wired to TD REO's bank account at California Bank & Trust, and any other amounts owed to TD REO are sent via check to its offices.

8.      Based on information provided by BSI to date, it is my understanding that BSI was servicing over 270 loans and there are approximately 60 active foreclosures pending at various stages.  Moreover, I understand that TD REO owns approximately 29 REOs and certain properties are under contract to be sold with closing dates as early as May 25, 2017, and nine sale closings scheduled between May 25, 2017 and June 15, 2017.  My team and I are still in the process of obtaining information from Citivest and BSI.

9.      The cash of the Debtors in KTC's custody is held at Branch Banking & Trust and KTC has 22 deposit accounts for the Debtors with amounts ranging from $66.94 to $810,035.15 as of May 15, 2017.  I understand that proceeds from investments of the Debtors that use KTC are received and held by KTC as custodian.  This includes payments from BSI to Funds who are lenders of loans serviced by BSI.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

10.     The Debtors' accounts, including those held by the Custodians, are listed in the spreadsheet attached hereto as Exhibit "2" with the last four digits of the account numbers and balances for each bank account. The spreadsheet attached hereto as Exhibit "2" was prepared by employees of Grobstein Teeple under my supervision and at my direction.

11.     Upon the commencement of the cases, I opened debtor-in-possession accounts at East West Bank on behalf of the Debtors. I am the only signatory on the debtor-in-possession accounts. Also, Citivest, BSI, and KTC have each been advised that all check requests, contracts, and any other final transactions must be approved by me.

12.     My team and I have transferred the majority of the funds from the Debtors' pre-petition accounts at California Bank & Trust to the Debtors' new DIP accounts, subject to reserving amounts for approved outstanding checks, and we will be instructing BSI and Citivest that payments moving forward should be made to the DIP accounts. The requested use of the Debtors' pre-petition bank accounts for an interim period will help to prevent any disruption during this transition.

13.     I believe that the relief requested in the Motion is in the best interests of the estates and is supported by a sound business justification. The continued use of the Debtors' pre-petition accounts for an interim period of 120 days will allow the Debtors to continue day-to-day operations in the most cost-effective manner and will help to prevent disruption to their operations. The continued use of the Debtors' pre-petition accounts will also help to ensure that the Debtors capture all of the proceeds from their investments, which is important to the Debtors' goals in these cases.

///

///

///

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

14.     At this stage, I believe that the Debtors' continued (a) use of the
Custodians, (b) foreclosure on deeds of trust, and (c) sale of REOs is in the best interests
of the estates as it will help to prevent any disruption to the Debtors' ordinary course
operations and their efforts to minimize any losses.  Any disruption or delay of the
pending foreclosure proceedings, REO sales, or of the other matters being managed by
Citivest could cause a loss of value to the detriment of creditors and investors.
Therefore, I believe that the relief requested in the Motion is supported by a valid
business justification.

I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

Executed on this 23rd day of May, 2017, at Laguna Hills, California.


HOWARD B. GROBSTEIN

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2706212.1

22

DECLARATION

1

## **DECLARATION OF WILLIAM JORDAN**

2

3        I, William Jordan, declare as follows:

4        1.       I am the sole owner of Advisor and the sole member and manager of WJA

5   Asset Management, LLC.  I know each of the following facts to be true of my own

6   personal knowledge, except as otherwise stated and, if called as a witness, I could and

7   would competently testify with respect thereto.  I make this declaration in support of the

8   Debtors' *Emergency Motion for Order Authorizing, for an Interim Period, the Following:*

9   *(1) Continued Use of Pre-Petition Bank Accounts; (2) Continued Use of Custodians; and*

10  *(3) Continued Foreclosures Under Deeds of Trust and Sales of REOS in the Ordinary*

11  *Course of Business.*  Unless otherwise defined in this declaration, all terms defined in the

12  Motion are incorporated herein by this reference.

13       2.       With a few exceptions, each Debtor is a limited liability company formed to

14  pursue a particular type of investment.  Manager is the managing member of all the

15  Debtors, with the exception of itself and Advisor.  Howard Grobstein is the Chief

16  Restructuring Officer for all of the Debtors, including Manager and Advisor.

17       3.       In 2010, Advisor began creating opportunities for its clients to invest in real

18  estate related assets and, in particular, private mortgages.  In my opinion, the creation of

19  new real estate investment funds, as opposed to investing in existing third party funds,

20  had several benefits for the investors.  First, it enabled the clients to invest in real estate

21  without having to personally purchase rental property or make a loan.  Second, Advisor

22  found it difficult to vet existing funds to ensure that their assets did not suffer from

23  lingering issues arising from the 2008 financial crisis.  Third, the creation of new funds

24  could avoid the hidden fees and costs included in other existing offerings and Manager

25  could charge lower fees.

26       4.       The Debtors typically raised investments by offering membership units

27  through Private Placement Memoranda.  Investors who acquired membership units are

28  members of the corresponding Debtor.  Certain investors are members of more than one

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   Debtor.  Also, some Debtors invested in other Debtors if doing so was consistent with the

2   business purpose of the investing Debtor and the investment could help to diversify and

3   reduce the risk of the investing Debtors' overall portfolio.  Thus, there are Debtors owned

4   by only individual investors and others in which the investors are individuals and other

5   Debtors.  Some Funds and investors also participated in certain Funds by making loans

6   and receiving promissory notes in exchange.

7        5.      Collectively, the Debtors hold the following types of assets:  (1) cash; (2)

8   real estate; (3) deeds of trust; (4) promissory notes; and (5) stock or membership units in

9   third party companies, which, in turn, either operate a business or own a real estate

10  development project.

11       6.      The Funds hold a variety of diverse and performing assets.  For example,

12  Urban Produce Fund, LLC, holds stock in a third party entity called Urban Produce, Inc.

13  Urban Produce, Inc., is a vertical farming company that sells leafy greens and wheat

14  grass to companies such as PepsiCo and Jamba Juice.  WJA Express Fund, LLC, also

15  invested in Urban Produce.  Another notable investment for certain Funds is See Jane

16  Go.  See Jane Go is a ride-hail service designed for women (*i.e.*, women driving women),

17  which was conceived by my daughter.

18       7.      Other Funds invested in commercial real estate development projects.

19  WJA Real Estate Opportunity I, LLC, holds a 38% ownership in a special purpose entity

20  named Boulder At Nellis, LLC, which, in turn, owns a retail shopping center in Las Vegas.

21  WJA Real Estate Opportunity II, LLC, purchased a vacant Ralphs in Long Beach,

22  California, invested $1.3 million in the project, re-developed the property and secured

23  new retail tenants, and then sold the property for a profit that was more than twice the

24  amount invested within 19 months.  WJA Real Estate Opportunity Fund II, LLC, also

25  holds ownership interests in companies that own real property located at 902 State

26  Street, Lemont, IL 60539, which is in the process of being refinanced, and 418 apartment

27  units in Las Vegas, Nevada, which was rehabilitated and is in the process of being sold.

28  WJA Express Fund, LLC, and California Express Fund II, LLC, own 50% and 8%,

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1 respectively, in Gothard Partners, L.P., which owns a car wash and retail buildings in

2 Huntington Beach, California.  These are only a few of the types of assets owned by

3 some of the Funds.

4      8.    The losses experienced by some Funds are traceable to certain trust deed

5 investments.  These losses are largely concentrated in the assets held by TD Opportunity

6 Fund, LLC ("TD Opportunity Fund"), and TD REO, LLC ("TD REO").  The first six Funds

7 created were WJA Secure Real Estate Fund, WJA Secure Income Fund, California

8 Indexed Growth Fund, Equity Indexed Managed Fund, PMB Managed Fund, and Secure

9 California Income Fund (collectively, the "Original Six Funds").  The Original Six Funds

10 each held a small pool of deeds of trust secured by real estate as well as other assets.

11      9.    In June 2013, TD Opportunity Fund was formed.  TD Opportunity Fund was

12 created and raised funds in order to make new loans secured by first-position deeds of

13 trust on real estate.  The Original Six Funds invested in TD Opportunity Fund, which both

14 diversified and lessened the risk of the investors in the Original Six Funds by giving them

15 an interest in a larger pool of trust deeds.  TD Opportunity Fund also issued promissory

16 notes to individuals.  Initially, the loan opportunities were selected with the assistance of

17 a third party, Purchase Money Bank ("PMB"), and almost all of the loans made by TD

18 Opportunity Fund were accompanied by an appraisal from a licensed professional or by a

19 broker price opinion indicating a loan-to-value ratio that was typically between 60% to

20 70%.

21      10.    TD REO was created in August 2013.  TD REO was formed to manage the

22 foreclosure process for loans in default.  As a borrower defaulted, the loan and deed of

23 trust were assigned by the Fund that was the original lender, such as TD Opportunity or

24 the Original Six Funds, to TD REO pursuant to a foreclosure agreement and/or a buyout

25 agreement.  TD REO would foreclose on the collateral and sell it, or would reach a more

26 favorable accommodation.  TD REO's obligations to repay the loans assigned to it are

27 reflected as loans to TD REO from the assigning Fund.  The formation of TD REO

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  centralized the process for handling defaulted loans for TD Opportunity Fund and the

2  Original Six Funds.

3      11.    TD REO also has individual noteholders.  Each individual noteholder of TD

4  REO is the product of a buyout agreement, which is essentially a form of guaranty.

5  Generally speaking, under the buyout agreement, TD REO would acquire a defaulted

6  loan from the individual who made the loan.  TD REO would guaranty the payment of the

7  principal of the defaulted loan and would absorb any losses, and TD REO would be

8  entitled to any profits in excess of the principal amount.

9      12.    A series of events led to losses for the Funds that invested in trust deeds

10  and, ultimately, these bankruptcy cases.  First, the real property collateral securing the

11  largest single loan was condemned and the building was demolished.  TD Opportunity

12  Fund was owed roughly $6,000,000 with principal and interest secured by real property in

13  the city of Baytown, Texas.  The building on the property was a 100,000 square foot

14  hospital that was to be redeveloped into an assisted living facility.  The valuations on the

15  property indicated a value between approximately $9,000,000 and $13,000,000.

16      13.    The borrower defaulted on the Baytown loan.  The borrower purportedly

17  secured take-out financing and Manager received repeated assurances from the new

18  lender that it would fund the take-out loan.  In the meantime, the city sued the borrower in

19  order to force repairs to the building or have it torn down.  Due to the borrower's default,

20  TD REO commenced foreclosure proceedings, however, by the time that TD REO

21  foreclosed, the city had already obtained a judgment against the borrower.  The city

22  subsequently had the building demolished.  TD REO is pursuing its options to recoup as

23  much as possible from this investment, but, at this time, the Baytown property has been

24  marked down to the value of the land.

25      14.    Second, the loans secured with the help of PMB generally underperformed.

26  PMB focused on smaller loans in less serviced areas of the country.  Over the years,

27  Manager has found that these smaller loans have a higher rate of default.  Moreover,

28  notwithstanding an otherwise meaningful equity cushion, the foreclosure costs, unpaid

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    taxes and, sometimes, damage to the property, create a potential for loss when these

2    smaller types of loans go into default.

3        15.    Third, the Securities & Exchange Commission ("SEC") and the California

4    Department of Business Oversight began investigating Advisor and other Debtors.

5        16.    The Debtors commenced this case to protect creditors and investors.  The

6    Debtors are in the process of liquidating their assets in an orderly fashion.  The Debtors

7    have discontinued creating additional funds, raising monies from investors, or making

8    new investments.

9        17.    A controlled liquidation of the Debtors' assets is important and could

10   significantly impact the return for investors and creditors.  As discussed above, the assets

11   of certain Funds are performing and a forced sale could unnecessarily reduce the return

12   for the investors of those Funds.  Also, the amount of losses in other Funds could be

13   potentially minimized by the additional time and value that an orderly process provides.

14   For example, TD REO holds an interest in a 10 acre piece of real property located at

15   5827 Winland Hills Dr., Rancho Santa Fe, California.  Manager is working on entitlements

16   to enable the property to be developed as a senior care facility.  The value of the Winland

17   Hills property is approximately $7.5 million, but if certain entitlements are obtained the

18   value has been estimated to be as high as $15.4 million by Colliers International, and the

19   entitlement process is ongoing.

20       18.    The Debtors' performing loans secured by trust deeds are serviced using

21   BSI pursuant to a service agreement between BSI and Manager.  A true and correct copy

22   of BSI's service agreement is attached hereto as Exhibit "3."

23       19.    Foreclosures on the Debtors' defaulted loans are processed using Citivest.

24   Manager retained Citivest to serve as the asset manager in connection with the operation

25   and disposition of the Debtors' deeds of trust.  A true and correct copy of the Asset

26   Management Agreement between Citivest and Manager is attached hereto as Exhibit "4."

27       20.    Many of the Debtors retained KTC as a custodian to hold their assets.  A

28   true and correct copy of a Custodial Services Agreement with KTC is attached hereto as

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   Exhibit "5."  Generally speaking, KTC holds the assets of the Funds and any proceeds
2   from those assets as custodian.

3       21.    The Debtors that hold deeds of trust and/or real estate were formed for that
4   purpose.  For example, TD Opportunity was created to make new loans secured by
5   deeds of trust and TD REO was created to manage the loans of other Funds in default.
6   The Debtors' continued use of the Custodians and foreclosure on their deeds of trust and
7   sale of REOs are entirely consistent with the Debtors' pre-petition practice.

8       22.    At this stage, I believe that the Debtors' continued (a) use of the
9   Custodians, (b) foreclosure on deeds of trust, and (c) sale of REOs is in the best interests
10  of the estates as it will help to prevent any disruption to the Debtors' ordinary course
11  operations and their efforts to minimize any losses.  Any disruption or delay of the
12  pending foreclosure proceedings, REO sales, or of the other matters being managed by
13  Citivest could cause a loss of value to the detriment of creditors and investors.
14  Therefore, I believe that the relief requested in the Motion is supported by a valid
15  business justification.

16      I declare under penalty of perjury under the laws of the United States of America
17  that the foregoing is true and correct.

18      Executed on this 23rd day of May, 2017, at Laguna Hills, California.

19

20  _____

21  WILLIAM JORDAN

22

23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

# EXHIBIT "1"

**WJA ASSET MANAGEMENT, LLC ET AL.**
**Master Organization Chart**



PRELIMINARY DRAFT
SUBJECT TO CHANGE

EXHIBIT 1, PAGE 29





PRELIMINARY DRAFT
SUBJECT TO CHANGE

**WJA ASSET MANAGEMENT, LLC ET AL.**
**Alabama Housing Fund, LLC Ownership Structure**



PRELIMINARY DRAFT
SUBJECT TO CHANGE

EXHIBIT 1, PAGE 32



**WJA ASSET MANAGEMENT, LLC ET AL.**
**CA Express Fund II, LLC Ownership Structure**



**WJA ASSET MANAGEMENT, LLC, ET AL.**
**CA Real Estate Opportunity Fund I, LLC Ownership Structure**



**WJA ASSET MANAGEMENT, LLC ET AL.**
**CA Real Estate Opportunity Fund II, LLC Ownership Structure**





**WJA ASSET MANAGEMENT, LLC ET AL.**
**CA See Jane Go Fund, LLC Ownership Structure**



**WJA ASSET MANAGEMENT, LLC ET AL.**
**CA Whirl Fund, LLC Ownership Structure**





**WJA ASSET MANAGEMENT, LLC ET AL.**
**California Indexed Growth Fund, LLC Ownership Structure**



PRELIMINARY DRAFT
SUBJECT TO CHANGE

**WJA ASSET MANAGEMENT, LLC ET AL.**
**Equity Indexed Managed Fund, LLC Ownership Structure**



PRELIMINARY DRAFT
SUBJECT TO CHANGE

EXHIBIT 1, PAGE 42

**WJA ASSET MANAGEMENT, LLC ET AL.**
**LVNV Multi Family LLC, Ownership Structure**





PRELIMINARY DRAFT
SUBJECT TO CHANGE





**WJA ASSET MANAGEMENT, LLC ET AL.**
**See Jane Go Fund I, LLC Ownership Structure**





PRELIMINARY DRAFT
SUBJECT TO CHANGE

**WJA ASSET MANAGEMENT, LLC ET AL.**
**TD REO Fund, LLC Ownership Structure**





PRELIMINARY DRAFT
SUBJECT TO CHANGE







PRELIMINARY DRAFT
SUBJECT TO CHANGE

**WJA ASSET MANAGEMENT, LLC ET AL.**
**WJA Real Estate Opportunity Fund I, LLC Ownership Structure**



PRELIMINARY DRAFT
SUBJECT TO CHANGE

EXHIBIT 1, PAGE 54

**WJA ASSET MANAGEMENT, LLC ET AL.**

**WJA Real Estate Opportunity Fund II, LLC Ownership Structure**

PRELIMINARY DRAFT
SUBJECT TO CHANGE



**WJA ASSET MANAGEMENT, LLC ET AL.**
**WJA Secure Income Fund, LLC Ownership Structure**



PRELIMINARY DRAFT
SUBJECT TO CHANGE

EXHIBIT 1, PAGE 56

**WJA ASSET MANAGEMENT, LLC ET AL.**
**WJA Secure Real Estate Fund, LLC Ownership Structure**



EXHIBIT "2"

| DEBTOR | ACCOUNT NO. | BALANCE (5/15/17) | BANK |
|---|---|---|---|
| 5827 Winland Hills Drive, LLC | 8902 | $ 311,382.22 | Kingdom Trust -- Branch Banking & Trust Company |
| Alabama Housing Fund, LLC | 8821 | $ 60,158.63 | California Bank & Trust |
| CA Express Fund, LLC | 4617 | $ 478.48 | Kingdom Trust -- Branch Banking & Trust Company |
| CA Express Fund II, LLC | 5248 | $ 35,090.22 | California Bank & Trust |
| CA Real Estate Opportunity Fund I, LLC | 4620 | $ 2,241.79 | Kingdom Trust -- Branch Banking & Trust Company |
| CA Real Estate Opportunity Fund II, LLC | 4787 | $ 330.90 | Kingdom Trust -- Branch Banking & Trust Company |
| CA Real Estate Opportunity Fund III, LLC | 4448 | $ 810,035.15 | Kingdom Trust -- Branch Banking & Trust Company |
| CA See Jane Go Fund, LLC | 7808 | $ 258.81 | Kingdom Trust -- Branch Banking & Trust Company |
| CA Whirl Fund, LLC | 7797 | $ 2,706.47 | Kingdom Trust -- Branch Banking & Trust Company |
| Clairton Residential Renewal, LLC | 8241 | $ 1,052.94 | Citizens Business Bank |
| California Indexed Growth Fund, LLC | 4615 | $ 3,751.60 | Kingdom Trust -- Branch Banking & Trust Company |
| Equity Indexed Managed Fund, LLC | 4621 | $ 383,147.84 | Kingdom Trust -- Branch Banking & Trust Company |
| LVNV Multi Family, LLC | 5438 | $ 596.93 | Kingdom Trust -- Branch Banking & Trust Company |
| PMB Managed Fund, LLC | 4616 | $ 66.94 | Kingdom Trust -- Branch Banking & Trust Company |
| Prosper Managed Fund, LLC | 4619 | $ 27,376.86 | Kingdom Trust -- Branch Banking & Trust Company |
| Secure California Income Fund, LLC | 4662 | $ 510.62 | Kingdom Trust -- Branch Banking & Trust Company |
| See Jane Go Fund I, LLC | 8503 | $ 853.82 | Kingdom Trust -- Branch Banking & Trust Company |
| TD Opportunity Fund, LLC | 4659 | $ 383,208.48 | Kingdom Trust -- Branch Banking & Trust Company |
| TD REO Fund, LLC | 2501 | $ 1,465,412.42 | California Bank & Trust |
| Urban Produce Fund, LLC | 6754 | $ 215.37 | Kingdom Trust -- Branch Banking & Trust Company |
| Whirl Fund, LLC | 7457 | $ 548.57 | Kingdom Trust -- Branch Banking & Trust Company |
| William Jordan Investments, Inc | 9111 | $ 50,511.51 | California Bank & Trust |
| William Jordan Investments, Inc | 8020 | $ 5,359.68 | Citizens Business Bank |
| WJA Asset Management LLC | 5321 | $ 15,998.18 | California Bank & Trust |
| WJA Asset Management LLC | 6081 | $ 35,606.89 | California Republic Bank - Reserve Account in name of Citivest |
| WJA Asset Management LLC | 8796 | $ 10,023.92 | Texas Capital Bank - Loan Servicing Account in name of BSI |
| WJA Express Fund I, LLC | 4607 | $ 14,154.75 | Kingdom Trust -- Branch Banking & Trust Company |
| WJA Real Estate Opportunity Fund I, LLC | 4605 | $ 44,282.41 | Kingdom Trust -- Branch Banking & Trust Company |
| WJA Real Estate Opportunity Fund II, LLC | 4447 | $ 314,429.01 | Kingdom Trust -- Branch Banking & Trust Company |
| WJA Secure Income Fund, LLC | 4606 | $ 53,929.27 | Kingdom Trust -- Branch Banking & Trust Company |
| WJA Secure Real Estate Fund, LLC | 4661 | $ 58,764.98 | Kingdom Trust -- Branch Banking & Trust Company |

EXHIBIT "3"

**BSI FINANCIAL SERVICES, INC.**
**SERVICING AGREEMENT**

THIS SERVICING AGREEMENT (this "**Agreement**") is made and entered into this _____, 2014, by and between WJ asset management CA, LLC _____ ("**Lender**"), whose principal place of business is located at _____, and **SERVIS ONE, INC. D/B/A BSI FINANCIAL SERVICES, INC.**, a Delaware corporation ("**Servicer**"), whose principal place of business is located at 1425 Greenway Drive, Suite 400, Irving, Texas 75038.

**RECITALS:**

**WHEREAS**, Servicer is engaged in the business of managing and servicing mortgage loans, including residential mortgage loans evidenced by notes and secured by deeds of trust, mortgages, trust deeds or like security instruments; and

**WHEREAS**, Lender desires that Servicer perform certain subservicing functions with respect to certain residential mortgage loans pursuant to this Agreement, and Servicer is willing to perform such functions on and subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Capitalized terms used but not otherwise defined in this Agreement have the following meanings, unless the context otherwise requires:

1.1     <u>Agreement</u>:  "**Agreement**" shall mean this subservicing agreement as the same may be from time to time amended or supplemented.

1.2     <u>Borrower</u>:  "**Borrower**" shall mean any maker, endorser, guarantor or other person or entity obligated for the payment of a Note in accordance with its terms.

1.3     <u>Delivery Date</u>:  "**Delivery Date**" means the date loans are received from Lender by Servicer.  All Loans to be serviced in a particular month must be received pursuant to Servicer requirements.

1.4     <u>Direct Cost</u>:  "**Direct Cost**" shall mean all costs incurred by Servicer in underwriting the Loans and accepting them for subservicing, including costs of travel, meals and lodging, costs of transferring data to Servicer from the current servicer, if applicable, and letters to Borrowers advising them of the change in servicing.

1.5     <u>Effective Date</u>:  "**Effective Date**" shall mean, with respect to each Loan, the date of transfer of servicing of such Loan to the Servicer under the terms of this Agreement.

1.6     <u>FDIC</u>:  "**FDIC**" shall mean the Federal Deposit Insurance Corporation and any successor thereto.

1.7     <u>FHA</u>:  "**FHA**" shall mean the Federal Housing Administration.

1.8    **FHLMC:** "FHLMC" shall mean the Federal Home Loan Mortgage Corporation and any successor thereto.

1.9    **FNMA:** "FNMA" shall mean the Federal National Mortgage Association and any successor thereto.

1.10    **HUD:** "HUD" shall mean the U.S. Department of Housing and Urban Development or any federal agency or official thereof which may from time to time succeed to the functions thereof.

1.11    **Lender:** "Lender" shall mean the owner and holder of a Note.

1.12    **Loan Documents:** "Loan Documents" shall mean any and all documents related to a Loan, including the Note, the Mortgage, and any other documents evidencing or securing the Loans or otherwise related to the Loans.

1.13    **Loans:** "Loans" shall mean any loans made subject to this Agreement on a periodic basis. Any one of the Loans shall be referred to herein as a "Loan".

1.14    **Mortgage:** "Mortgage" shall mean the original security deed, trust deed, deed of trust, security agreement, financing statement, guaranty, and other document securing a Loan, including any riders, addenda, assumption agreements, modifications, and amendments thereto.

1.15    **Mortgagor:** "Mortgagor" or "Mortgagors" shall mean the grantors or makers of any Mortgages, including mortgagors and trustors of trust deeds and deeds of trust.

1.16    **Note:** "Note" shall mean for each Loan, the original promissory note, bond or other evidence of indebtedness executed by a Borrower and evidencing the indebtedness of such Borrower under such Loan and any riders, addenda, modification or amendments thereto.

1.17    **Servicer:** "Servicer" shall mean Servis One, Inc. d/b/a BSI Financial Services, Inc., a Delaware corporation, and its successors and permitted assigns.

1.18    **Taxes:** "Taxes" shall mean all real estate taxes and other taxes assessed against property securing Loans, the nonpayment of which will result in a lien taking priority over the Mortgage (if applicable).

1.19    **Termination Fee:** "Termination Fee" means the fee described on Exhibit I to this Agreement that is payable to Servicer under Article IV and Article V hereof.

1.20    **VA:** "VA" shall mean the U.S. Department of Veterans Affairs.

<div align="center">

**ARTICLE II**
**AGREEMENTS OF SERVICER**

</div>

2.1    **General:**

Servicer hereby agrees to service each Loan pursuant and subject to the terms of this Agreement. Lender and Servicer agree that this Agreement shall be effective as of the Effective Date.

**Compliance:**

Servicer will comply with the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. 6801 *et seq.*) and the regulations promulgated with respect thereto (the "GLB Act") regarding privacy of nonpublic personal information. Servicer will comply with all state and federal laws and regulations relating

to its obligations under this Agreement. With respect to Loans insured by private mortgage insurance, Servicer shall comply with the requirements of private mortgage insurance companies, including those requiring the giving of notices.

**2.2    Confidentiality and Exchange of Proprietary Data**

**Privacy of Consumer Financial Information**

All capitalized terms used in this Section and not otherwise defined shall have the meanings set forth in the Federal "Privacy of Consumer Financial Information" Regulation (12 CFR Part 40), as amended from time to time (the **"Privacy Regulation"**), issued pursuant to Section 504 of the GLB Act. The parties acknowledge that the Privacy Regulation governs disclosures of nonpublic personal information about consumers (**"Nonpublic Personal Information"**).

(i)    Servicer hereby agrees that it shall:

    (A)    Comply with the terms and provisions of the Privacy Regulation, including, without limitation, the provisions regarding the sharing of Nonpublic Personal Information (as defined in the Privacy Regulation);

    (B)    Not disclose or use any Nonpublic Personal Information that it obtains from the Lender except to carry out the purposes for which the Lender provided such Nonpublic Personal Information, or as otherwise permitted by the Privacy Regulation and other applicable laws;

    (C)    Refrain from sharing and/or transmitting Nonpublic Personal Information by means of e-mail or other methods which transmit information in the public domain. In the event Servicer discovers that it has transmitted Nonpublic Personal Information in an unauthorized format or in a format contrary to the Privacy Regulation, Servicer shall immediately notify those individuals listed in Section 9.8 below via facsimile at the numbers provided; and

    (D)    Not disclose any Nonpublic Personal Information disclosed to Servicer by Lender or Borrower to any other entity, except as follows:

        (1)    to Lender affiliates, with the prior consent of Lender;

        (2)    to Servicer affiliates, provided, that its affiliates may, in turn, disclose and use the information only to the extent that Servicer may disclose and use the information;

        (3)    to an unaffiliated third party, in the ordinary course of business in order to carry out the activity for which the information was disclosed to Servicer, pursuant to one of the following exceptions to the Privacy Regulation:

            (a)    as necessary to effect, administer or enforce a transaction that a consumer requests or authorizes;

            (b)    in connection with servicing or processing a financial product or service that a consumer requests or authorizes, or maintaining or servicing the consumer's account with Lender;

(c)    with the consent or at the direction of the consumer; or

(d)    to protect the confidentiality or security of Lender's records pertaining to the consumer, service, product or transaction; to protect against or prevent actual or potential fraud, unauthorized transactions, claims or other liability; for required institutional risk control; for resolving consumer disputes or inquiries; to persons holding a legal or beneficial interest relating to the consumer, or acting in a fiduciary or representative capacity on behalf of the consumer; to provide information to insurance rate advisory organizations, guaranty funds or agencies, or Lender's attorneys, accountants and auditors; to the extent specifically permitted or required under other provisions of law, to law enforcement agencies, a state insurance authority, self-regulatory organizations or for an investigation on a matter related to public safety; to a consumer reporting agency in accordance with the Fair Credit Reporting Act; to comply with Federal, State or local laws, rules and other applicable legal requirements, or a properly authorized civil, criminal or regulatory investigation, or subpoena or summons; or to respond to judicial process or to government regulatory authorities having jurisdiction over Servicer for examination, compliance or other purposes as authorized by law.

(ii)    At any time, upon Lender's request, Servicer shall return to Lender or destroy all Nonpublic Personal Information in its possession. Servicer agrees that money damages would not be a sufficient remedy for any breach of this Section and that Lender shall be entitled to seek injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Section by Servicer. Such remedy shall not be the exclusive remedy for any breach of this Section by Servicer, but shall be in addition to all other rights and remedies available to Lender at law or in equity. Finally, Lender shall be under no obligation to take any action which, in Lender's reasonable judgment, would constitute a violation of the Privacy Regulation or its internal privacy policies.

(iii)    Notwithstanding any other term to the contrary contained herein, this Section regarding Privacy of Consumer Financial Information shall survive any termination, cancellation, expiration, and/or rescission of this Agreement.

**Confidentiality**

Both Servicer and Lender have made and, throughout the term of this Agreement, will continue to make available to the other party confidential and proprietary materials and information ("**Proprietary Information**"). Prospectively, each party shall advise the other of material and information that is confidential and/or proprietary. All material and information provided by either party to the other relating to the business, policies, procedures, customs, forms, customers and strategies of such party or any of its affiliates, including information previously or hereafter divulged or delivered to the other party by such party regarding the aforementioned subject matter is hereby designated as confidential and proprietary and shall be considered to be Proprietary Information. It is understood that the obligations set forth in this Section do not apply to materials or information that: (i) are already, or otherwise become, generally known by third parties as a result of no act or omission of the receiving party; (ii) subsequent to disclosure hereunder are lawfully received from a third party having the right to disseminate the information

without restriction on disclosure; (iii) are generally furnished to others by the disclosing party without restriction on disclosure; (iv) were already known by the receiving party prior to receiving them from the disclosing party and were not received from a third party in breach of that third party's obligations of confidentiality; or (v) are independently developed by the receiving party without the use of Proprietary Information of the disclosing party.

Each party shall maintain the confidentiality of the other party's Proprietary Information and will not use or disclose such Proprietary Information without the prior written consent of the other party. Notwithstanding the foregoing, each party may disclose the other party's Proprietary Information to its affiliates, agents, and other third parties on a need-to-know basis, provided that such third-parties are under a similar obligation to maintain the confidentiality of the Proprietary Information so disclosed.

Further, the parties may disclose the other's Proprietary Information in a judicial or quasi-judicial proceeding when required to do so by law when responding to a subpoena, deposition notice or similar judicial or governmental demand; in such situations, however, the party being requested to disclose the other's Proprietary Information shall provide notice to the other party whereby the other party may intervene in the proceeding, if it wishes, and endeavor to prevent such disclosure. Additionally, the parties may, upon inquiry and if required by governing law, disclose the other's Proprietary Information to their various governmental regulatory agencies.

Notwithstanding any contrary provision of this Agreement, as long as each party protects the Proprietary Information of the other, neither the exposure to the other party's Proprietary Information, nor its ownership of work products, shall prevent either party from using ideas, concepts, expressions, know-how, skills and experience possessed by either party prior to its association with the other party or developed by either party during its association with the other party, so long as the Proprietary Information of the other party is not used.

**2.3** **Procedure:**

Until the principal and interest of each Note and all obligations under each Note and Mortgage are paid in full, unless sooner terminated pursuant to the terms hereof, Servicer shall:

a)    Collect as they become due (i) payments of principal and interest, (ii) any sums to be held in escrow for the payment of taxes, assessments and other public charges that are generally impounded, hazard and/or flood insurance premiums, FHA insurance or private mortgage insurance premiums, condominium association dues and fees and other sums required to be collected and disbursed for Borrowers (collectively, "**Escrowed Sums**"), if applicable, and (iii) all other amounts due from Borrowers and/or Mortgagors;

b)    Accept payments of principal and interest and impound deposits (if applicable) only in accordance with the Loan Documents or information provided by Lender including information received from Lender's/Servicer's servicing system. Deficiencies or excess in payments or deposits shall be accepted and applied in accordance with the Loan Documents or, if not covered in such documents, in accordance with Lender's instructions;

c)    Apply all installments and impound deposits (if applicable) collected by it from the Borrower or Mortgagor, and maintain permanent mortgage account records capable of producing, at any time in chronological order: the date, amount, distribution, installment due date or other transactions affecting the amounts due from or to the Borrower and/or Mortgagor and indicating the latest outstanding balances of principal, impound deposits, advances, and unapplied payments;

Confidential & Proprietary

d) Pending disbursement, segregate and hold by it in a custodial account or accounts in a financial institution insured by the FDIC (each a "**Custodial Account**" and collectively, the "**Custodial Accounts**"), in such manner as to show the custodial nature thereof, and so that the Lender and each separate Borrower whose funds have been deposited in any such account will be individually protected under the rules of the FDIC. Servicer's records shall show the respective interest of the Lender and each Borrower in all Custodial Accounts. All funds collected for principal and interest shall be held by and carried in records of the Servicer as "trustee" for the Lender, and accounts shall be established in compliance with all applicable rules and regulations of any governmental agency insuring or guaranteeing each Loan;

e) Maintain deposits received for the payment of Escrowed Sums in a separate custodial account as specified in subparagraph (d) of this Section for each Borrower ("**Borrower Custodial Account**"). If any federal or applicable state statute or regulation requires the payment of interest on escrowed funds, Servicer will pay such interest on each affected Borrower Custodial Account, which it maintains or controls. Lender shall reimburse Servicer for such interest payments immediately upon billing. Servicer will determine the amount of deposits to be made by Borrowers and will furnish to each Borrower, at least once a year, an analysis of his/her Borrower Custodial Account (if applicable);

f) Maintain accurate records reflecting the status of taxes, ground rents and other recurring charges which may result in a lien against the secured property. For all Loans providing for the payment to and collection by Servicer of any Escrowed Sums, Servicer shall pay such charges before any penalty date. Servicer assumes responsibility for the timely payment of all Escrowed Sums and will hold harmless and indemnify Lender from all penalties, loss or damage resulting from Servicer's failure to discharge said responsibility (if applicable);

g) For all Loans having no provisions for the collection by Servicer of Escrowed Sums for Taxes, Servicer shall, upon notification by its tax service, promptly contact Lender regarding the delinquency of any such Taxes. Upon Lender's instruction and remittance, Servicer will pay any delinquent Taxes. Additionally, Servicer shall not be responsible for payment for ground rents or other charges for any Loan for which it is not obligated to collect Escrowed Sums and will pay such charges only upon Lender's instruction and remittance;

h) When Escrowed Sums held in a Borrower Custodial Account are insufficient to pay Taxes, assessments, mortgage insurance premiums, hazard or flood insurance premiums, or other items due therefrom, Lender shall reimburse Servicer monthly for all outstanding deficiencies, and any other advances made by Servicer to protect the security of Lender and Lender shall wire funds necessary to reimburse Servicer for any advances within five (5) days after receipt of an invoice therefor. Funds received after the fifth day will bear interest on the unpaid balance from the due date until the date paid to Servicer at a rate equal to the lesser of the maximum rate permitted by law or one and one-half percent (1.5%) above the prime rate of interest published in *The Wall Street Journal* or any successor publication on the due date of the payment obligation (the "**Default Rate**").

i) Maintain in full force and effect at all times FHA mortgage insurance, or private mortgage insurance, as applicable, in accordance with the type of Loan, and will assume responsibility for the payment of the premium thereon for each Loan to the extent funds are available from each Borrower Custodial Account; and

**EXHIBIT 3, PAGE 64**

*Servicing Agreement:*

j)    Assure that improvements on property securing each Mortgage are insured by hazard insurance issued by companies acceptable to Lender in an amount at least equal to the unpaid principal balance of the Loan or the full insurable value of the improvements, whichever is less, of a type at least as protective as fire and extended coverage, and containing a "standard" or "union" mortgage clause (without contribution) in the form customarily used in the area in which the property is located.  In all events, the provisions of the Loan Documents shall prevail.  The mortgagee clause will be reflected as running to the benefit of Lender, its successors and assigns.  During the course of subservicing, the mortgagee clause in the hazard insurance will read as follows:

WJ Asset Management

Its Successors and Assigns
c/o BSI Financial Services, Inc.
PO Box 702168
Dallas, Texas 75370

**2.4    Other:**

To further safeguard Lender's interest and rights in any real property, mobile home, or other property securing any Loan under any Mortgage, Servicer shall:

a)    Upon Lender's request, inspect such property when any Borrower becomes sixty (60) days or more delinquent in the payment of principal and interest or Escrowed Sums under the Note and perform such other inspections in accordance with accepted servicing practices or upon written request from Lender.  These will occur monthly while in foreclosure;

b)    Upon Lender's request, to the extent possible, secure any such property found to be vacant or abandoned, and advise Lender of the status thereof;

c)    Notify Lender whenever Servicer receives notice or otherwise becomes aware of any notice of liens, bankruptcy, condemnations, probate proceeding, tax sale, partition, local ordinance violation, condemnation, or proceeding in the nature of eminent domain or similar event that would, in Servicer's reasonable judgment, impair Lender's security; and Servicer shall assist Lender in undertaking appropriate action to preserve its security;

d)    Advise Lender with respect to requests for partial releases, easements, substitutions, division, subordination, alterations, or waivers of security instrument terms;

e)    Advise Lender of any change in ownership of secured property, and subject to governing laws and regulations, comply with all instructions from Lender with respect to the acceleration of the Note.

f)    Maintain in force at all times a policy of errors and omissions insurance coverage at Servicer's sole expense.  Among others purposes, one purpose of such coverage is to provide Lender protection in liquidating a Loan against net loss that can be attributed to damage to the property from a hazard or peril required to be insured by the Lender and that otherwise would be insured but for Servicer's negligence in allowing insurance coverage to lapse or failing to keep a sufficient amount of insurance in force; and

g)    Disburse insurance loss settlements according to Lender's guidelines.

**2.5    Lender Accounting:**

Servicer shall:

a)    Make interest rate adjustments in accordance with the terms of the Note and applicable laws. Servicer shall execute and deliver all appropriate notices required by applicable laws and the Note regarding such interest rate adjustments; including, but not limited to, timely notification to Borrower of: (i) applicable date of such interest rate adjustment, (ii) new rate of interest, and (iii) new payment amount;

b)    Perform such other reasonable duties, furnish such other reports and execute such other documents in connection with its duties hereunder as Lender may from time to time require consistent with accepted servicing practices. By way of example and not limitation, such reports may include categories including: Reporting cutoff date, Loan Number, Borrower Name, Beginning Principal Balance, Date Paid, P&I Payment Amount, Amount Paid, Interest Rate, Installment Due Date, Next Installment Due Date, Amount Applied to Principal, Amount Applied to Interest, Total Remittance, Ending Principal Balance;

(c)    Not accept any prepayment of any Loan except as specified by law or as permitted by law or by the terms of the Loan Documents, nor waive, modify, release or consent to postponement on the part of the Borrower or Mortgagor of any term or provision of the Loan Documents without the written consent of Lender; provided, however, that Servicer shall not be required to obtain written consent for the waiver of any late charge or the waiver, modification, release or consent to postponement of any term or provision which may be waived, modified, released or consented to without the consent of the Lender under the terms of its written instruction ("**Lender's Instructions**");

d)    Upon payment of a Loan in full, prepare or cause to be prepared and file any necessary release or satisfaction documents, and shall continue subservicing of the Loan pending final settlement, and refund any Escrowed Sums (if applicable);

e)    Remit to the Lender, on a/those date(s) and in a manner specified by Lender, all principal and interest collected from Borrowers or Mortgagors, subject to Servicer's right to retain as compensation the fees set forth in Exhibit I attached hereto; and

f)    In the event the Lender instructs Servicer to service release any Loan(s) and Lender delivers written notice thereof to Servicer, Servicer shall proceed in accordance with the Lender's instructions.

**2.6    Delinquency Control:**

Servicer shall:

a)    Be responsible for protecting Lender's investment in the Loans by maintaining the maximum possible number of Loans in a current status, dealing quickly and effectively with Borrowers who are delinquent or in default. Servicer's delinquent mortgage servicing program shall include an adequate accounting system which will immediately and positively indicate the existence of delinquent Loans, a procedure that provides for sending delinquent notices, assessing late charges, and returning inadequate payment, and a procedure for the individual analysis of distressed or chronically delinquent Loans;

b)    Maintain a collection department and on-line automated collection system. All delinquent Loans shall be serviced in accordance with Lender's Instructions or where none apply, then in accordance with accepted servicing practices;

*Servicing Agreement:*

c)     Provide Lender with a month-end collection and delinquency report. Servicer will from time to time as the need may arise, provide Lender with loan service reports relating to any items of information which Servicer is otherwise required to provide hereunder, or detailing any matters the Servicer reasonably believes should be brought to the special attention of Lender; and

d)     Upon the request and under the direction of Lender, assist in the foreclosure or other acquisition of the property securing the Loan pursuant to a Mortgage, the transfer of title to such property and the collection of any applicable mortgage insurance, and pending completion of these steps, protect such property from waste and vandalism. Servicer will cause title to such property to be conveyed to the entity designated by Lender. Lender agrees to immediately reimburse Servicer, for all of its actual expenses incurred under this paragraph, including court costs and attorneys' fees, net five (5) days after receipt of an invoice from Servicer for such expenses. In case of a voluntary deed in lieu of foreclosure, and purchase by Lender for its account, Servicer will protect the property while so owned. These operations shall be on terms and as determined and directed by Lender from time to time.

**2.7     Book and Records:**

Upon Lender's written request, Servicer shall give Lender or its authorized representative the opportunity at any time during Servicer's normal business hours to examine Servicer's books and records as they relate to the Loan portfolio serviced by the Servicer. Any additional requests for a Loan audit or confirmations to be performed by Servicer's audit firm on Loans shall be at Lender's sole expense. Servicer will keep records satisfactory to Lender pertaining to each Loan, which records shall be the property of Lender, and upon termination of this Agreement, such records shall be delivered to Lender at Lender's expense. Notwithstanding the foregoing, Servicer at its own expense may produce and retain a copy any such records before delivery to the Lender.

**2.8     Insurance:**

Servicer will maintain in effect at all times and at its cost, a blanket fidelity bond and an errors and omission policy. If so requested by Lender, Servicer shall cause certificates evidencing the existence of such coverage to be delivered to Lender.

<div align="center">

**ARTICLE III**
**AGREEMENTS OF LENDER**

</div>

**3.1     Documentation:**

Lender shall provide to Servicer at Lender's sole cost and expense:

a)     Any documents or records which are reasonably necessary or appropriate for Servicer to receive in order to service the Loans;

b)     Applicable documentation for each Loan submitted hereunder to enable Servicer to place and continue each Loan on its computer system. All such documentation must be received in a reasonable amount of time by Servicer, prior to any reporting due Lender;

c)     Its pro-rata portion of the fee required for any extraordinary audit expense levied by any state or other jurisdiction;

**EXHIBIT 3, PAGE 67**

d) If applicable and as soon as possible, a complete listing of any Loans where the mortgage payment is inclusive of a personal or group insurance premium. This list will include the name of the insurance company; type of premium coverage; premium amount; and the name and telephone number of the individual at Lender's firm or affiliate knowledgeable of such coverage. Should Lender misrepresent, misinform, provide inadequate information or provide no information to Servicer regarding the status of such personal or group insurance coverage (e.g., mortgage, life or disability insurance) which would cause Servicer to incur a loss or damage, Lender agrees to hold Servicer harmless from any and all claims, liabilities, damages, and loss, including reasonable attorney's fees, resulting therefrom, other than claims, liabilities, damages, or losses to the extent arising as a result of Servicer's gross negligence or willful misconduct;

e) Physical evidence that a hazard insurance policy is in force for each Mortgage delivered to Servicer for subservicing. Lender shall allow Servicer up to thirty (30) days to verify hazard insurance coverage and/or Lender required insurance coverage for any Loan transfer up to a maximum of fifty (50) Loans per week. Further, Lender agrees to hold Servicer harmless from any loss or damage caused by insufficient evidence of hazard insurance coverage delivered to Servicer or any loss or damage which occurred during a lapsed policy prior to delivery of servicing to Servicer; and

f) Remittance by check for any amount sufficient to pay for a real estate tax contract issued by Servicer's tax service. If a tax contract is in existence, pay any fees associated with a transfer to Servicer as described on <u>Exhibit I</u> and attachment (if applicable).

**3.2** <u>**Default:**</u>

In the event Lender shall fail to pay to Servicer any sums due and payable to Servicer under this Agreement when and as the same shall be due and payable, whether as compensation, reimbursement, or otherwise, Servicer shall be entitled to offset against Lender's remittance due hereunder the amount of any sum so owing and unpaid, together with any finance charges payable in accordance with <u>Section 9.12</u> below or as otherwise provided herein, after providing written notice of such offset to Lender prior to Servicer's exercise of such right of offset.

**ARTICLE IV**
**COMPENSATION**

**4.1** <u>**Compensation to Servicer:**</u>

For providing the services contained in this Agreement, the parties hereto agree that:

a) Servicer shall be paid in accordance with the fees established by the attached fee schedules, attached hereto as <u>Exhibit I</u>. Servicer may change any fees set forth herein at any time upon thirty (30) days prior written notice delivered to Lender;

b) Any miscellaneous costs incurred by Servicer from extraordinary requests, which costs Servicer will advise Lender of before incurring, shall be billed to Lender and promptly paid by Lender upon receipt of billing;

c) All monthly fees and charges (including guaranty fees on pools of mortgage-backed securities, net curtailment interest and unrecoverable scheduled interest and all Lender charges and/or interest related to negative balances, for example, interest charged by Servicer's depository bank for payments received but not collected from Borrower's depository bank and disbursed to the appropriate Custodial Accounts but not collected

as of the date of disbursement) shall be billed to the Lender and due within five (5) days of receipt of the invoice thereof. All invoices for special services will be due within five (5) days after receipt of the invoice therefor. Funds received after five (5) days will bear interest at the Default Rate from the due date until the date paid. Servicer reserves the right to deduct any unpaid fees and charges from Lender's gross servicing fee remittance.

**4.2** **Servicer's Termination Fee:**

If subservicing hereunder is terminated with respect to any or all of the Loans for any reason other than foreclosure or acquisition of the property securing the Loan in lieu of payment or payment in full, Lender shall pay to Servicer the Termination Fee described on Exhibit I in consideration of Servicer's work in assisting with the transfer of servicing for any such Loans. Servicer shall offset the Termination Fee against amounts next due to Lender hereunder. Any amount still due to Servicer after this offset is exhausted shall be paid by Lender within five (5) days after receipt of an invoice therefor. Funds received after five (5) days will be subject to interest at the Default Rate from the due date until the date paid.

<div align="center">

**ARTICLE V**
**TERM AND TERMINATION**

</div>

**5.1** **Term:**

The term of this Agreement shall be for three (3) year(s) commencing upon the Effective Date. Thereafter, the term of this Agreement will automatically renew for successive terms of one year each, provided that either party may terminate this Agreement at any time upon not less than 120 days prior written notice of termination to the other party.

**5.2** **Notice:**

a)   In the event Lender terminates this Agreement pursuant to Section 5.1 during the initial three (3) year term, Lender shall pay Servicer the Termination Fee described in Exhibit I. If any termination of subservicing for 75% or more of the Loans (except Interim Servicing) occurs at any time during the initial term of this Agreement, Lender shall pay Servicer the Termination Fee unless otherwise agreed to in writing.

b)   Subject to Section 5.2(d) below, this Agreement shall immediately terminate, at Lender's option, upon fifteen (15) days prior written notice after the occurrence of any event which constitutes a material breach on the part of the Servicer of its servicing obligations and covenants described in Articles II and VII and VIII.

c)   Subject to Section 5.2(d) below, this Agreement shall immediately terminate, at Servicer's option, upon fifteen (15) days prior written notice after the occurrence of any event which constitutes a breach on the part of the Lender of the obligations and covenants described in Articles III, VI and VIII. If terminated pursuant to this Section 5.2 (c), Servicer shall be entitled to receive a Termination Fee with respect to all Loans.

d)   Notwithstanding the provisions of Sections 5.2(b) and 5.2(c) above, any party receiving notice of termination under those paragraphs shall have thirty (30) days to cure any such breach of a covenant (other than a covenant to make payments hereunder which shall be made in strict accordance with the terms hereof), or to correct any untrue or inaccurate facts, unless curing any such failure requires acts to be done or conditions to be removed which cannot, by their nature, be performed, done or removed, as the case may be, within such thirty (30) day period, in which event, the curing party may avoid termination so long

as such curing party shall have commenced curing such failure within such thirty (30) day period and shall diligently prosecute the cure to completion, provided that the curing party shall in any event complete such cure within seventy-five(75) days after written notice of termination, and termination shall become effective upon such date if the cure has not been completed at the expiration of such seventy-five (75) day period.

**5.3    Servicer's Contingencies:**

Servicer's obligation and duties under this Agreement shall be contingent upon Lender providing the information and documents described in Section 3.1 (a) above.

**5.4    Reimbursement of Servicing Released Loans:**

Servicer's right to reimbursement for actual expenses, and reimbursement for any advances of principal and interest and escrow (if applicable) made on behalf of Lender in accordance with the terms of this Agreement, shall also apply to any Loans sold by Lender to a new investor on a "servicing released" basis.

**5.5    Accounting:**

Upon termination of this Agreement under this Article V, Servicer will: (i) account for and turn over to Lender, or Lender's designee, all funds collected under each Note and Mortgage, less the Servicer's compensation and any fees due Servicer in accordance with Exhibit I of the Agreement, (ii) deliver to Lender, or Lender's designee all records and documents relating to each Loan then subserviced at the expense of the Lender, and (iii) notify Borrowers in writing that their Loans will henceforth be serviced by Lender, or Lender's designee.

**ARTICLE VI**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER**

Lender warrants and represents to, and covenants and agrees with, Servicer as follows:

**6.1    Assistance:**

Lender warrants and represents to, and covenants and agrees with Servicer that, to the extent possible, Lender shall cooperate with and assist Servicer as requested by Servicer, in carrying out Servicer's covenants, agreements, duties and responsibilities under this Agreement, and in connection therewith, Lender shall execute and deliver all such papers, documents, quality control check sheets and instruments as may be reasonably necessary and appropriate in furtherance thereof.

**6.2    Notice of Breach:**

Lender shall immediately notify Servicer (i) of any failure or anticipated failure on Lender's part to observe and perform any covenant or agreement required to be observed and performed by it as a Lender, and (ii) if any representation or warranty of Lender made in connection with this Agreement is untrue or inaccurate in any material respect.

**6.3    Taxes:**

Lender will indemnify and hold Servicer harmless of and from any tax penalties and interest which arose or accrued prior to the Effective Date and for any other claims, demands, costs fee or expenses, including attorney's fees, resulting from any failure to pay such Taxes in a timely manner.

Confidential & Proprietary

**EXHIBIT 3, PAGE 70**

**6.4**   **Authority; Prior Servicing:**

Lender is duly organized, validly existing and in good standing under the laws of its state of formation and has all requisite power and authority to enter into this Agreement, and the persons executing this Agreement on behalf of Lender are duly authorized so to do.  Lender is the owner of all servicing rights for all Loans, represents, and warrants that all information contained in any database or document related to the Loans is true, accurate, and correct in all material respects.

<div align="center">

**ARTICLE VII**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER**

</div>

Servicer warrants and represents to, and covenants and agrees with, Lender as follows:

**7.1**   **Notice of Breach:**

Servicer shall immediately notify Lender (i) of any failure or anticipated failure on Servicer's part to observe and perform any covenant or agreement required to be observed and performed by it as Servicer, and (ii) if any representation or warranty of Servicer made in connection with this Agreement is untrue or inaccurate in any material respect.

**7.2**   **Agency Approvals:**

Servicer is an approved servicer for FHLMC, FNMA and well as VA and FHA.

**7.3**   **Authority:**

Servicer is a duly organized, validly existing and in good standing under the laws of its state of formation and has all requisite power and authority to enter into this Agreement, and the persons executing this Agreement on behalf of Servicer are duly authorized so to do.

Servicer has all requisite licenses, permits and approvals to perform its obligations hereunder in each jurisdiction in which any property securing a Mortgage is located, except where the failure to possess any such license, permit, or approval would not materially and adversely affect the enforceability of the related Note or Mortgage.

<div align="center">

**ARTICLE VIII**
**INDEPENDENCE OF PARTIES; INDEMNIFICATION SURVIVAL**

</div>

**8.1**   **Independence of Parties:**

The following terms shall govern the relationship between Lender and Servicer.

a)   Servicer shall have the status of and act as an independent contractor.  Nothing herein contained shall be construed to create a partnership or joint venture between Lender and Servicer.

b)   Servicer shall not be responsible for representations, warranties, or contractual obligations in connection with (i) any sale to an investor of any of the Loans, or (ii) the servicing of any such Loans prior to the assumption of subservicing of the Loans pursuant to this Agreement.

c)   Anything herein contained in this Article VIII or elsewhere in this Agreement to the contrary notwithstanding, the representations and warranties of Servicer contained in

EXHIBIT 3, PAGE 71

this Agreement shall not be construed as a warranty or guarantee by Servicer as to future payments by any Borrower or Mortgagor.

d)      Anything contained in this Article VIII or elsewhere in this Agreement to the contrary notwithstanding, Servicer shall not be responsible for performance or compliance under any loan repurchase agreements, representations or warranties of an origination nature, or those servicing representations and warranties directly or indirectly related to the origination process made between Lender and any investor, either prior or subsequent to this Agreement.

**8.2     Indemnification by Servicer:**

Except as otherwise stated herein, Servicer indemnifies and holds harmless Lender from any liabilities, claims, losses, damages, actions, fees, costs and expenses, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Servicer's failure to observe or perform any or all of Servicer's covenants, agreements, warranties or representations contained in this Agreement.

**8.3     Indemnification by Lender:**

Except as otherwise stated herein, Lender indemnifies and holds harmless the Servicer from any liabilities, claims, losses, damages, actions, fees, expenses and costs, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of (I) Lender's failure to observe or perform any or all of Lender's covenants, agreements, warranties or representations contained in this Agreement, (ii) the performance, negligence, actions or failure to act of any servicer of the Loans, other than Servicer, (iii) any inaccuracies in any information provided by Lender, and (iv) the untruth or inaccuracy of any of the representations and warranties contained in this Agreement, other than claims, losses or damages arising out of the gross negligence or willful misconduct of Servicer, including, but not limited to, Section 6.4 and the following additional representations and warranties.

a)      To the best of Lender's knowledge (excepted as stated in subsection (c) below), each Loan, the Note and Mortgage, any insurance policy, certificate of coverage, or other contract or agreement relating to each Loan: is in every respect genuine; is complete in all respects; is the legal, valid, binding and enforceable obligation of the Borrower thereunder in accordance with its terms and is free from all claims, defenses, rights of rescission, any discount, allowance, set-off, counterclaim, presently pending bankruptcy or other defenses or contingent liability by any Borrower which could adversely affect the value or collectability of any Loan; none of the Note or Mortgages nor anything contained in the Loan Documents is forged or has affixed thereto any unauthorized signature or has been entered into by any persons without the required legal capacity; and no foreclosure or any other legal action has been brought by any servicer in connection therewith.

b)      To the best of Lender's knowledge (excepted as stated in subsection (c) below), the applicable Loan Documents have been duly and properly executed by the Borrower, acknowledged, and recorded. To the best of Lender's knowledge, each Loan is valid and complies with all applicable lending laws and regulations, including the Truth-In-Lending Act, Real Estate Settlement and Procedures Act, Equal Credit Opportunity Act, Fair Housing and Disclosure Act and Regulation Z (collectively, the "**Acts**"). The Loan Documents have been duly executed on the dates indicated and in due and proper form.

c)      Except as otherwise stated herein, Lender and Servicer agree that Lender will from time to time acquire loans that maybe out of compliance. Lender indemnifies and holds

Confidential & Proprietary

EXHIBIT 3, PAGE 72

harmless the Servicer from any liabilities, claims, losses, damages, actions, fees, expenses, and costs, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Servicer's obligations under this Agreement. At Lender's request, Servicer will use commercially reasonable efforts to bring the Loan into compliance based on commercially reasonable methods and agreed to by both parties.

d)   To the best of Lender's knowledge, in connection with the creation, acquisitions, ownership, servicing, execution, and content of all Loans, all applicable federal and state laws, rules, and regulations have been, and are being, complied with by each servicer thereof. All information requested to be disclosed to the Borrower by the Acts has been properly and accurately disclosed to the Borrower by each Servicer thereof, in compliance and in accordance with the Acts. The Borrower has duly executed appropriate documents or evidence indicating that the Borrower has received the disclosure materials as required by applicable law and regulations, including the Acts, and such evidence is located among the Loan Documents.

e)   To the best of Lender's knowledge, the servicing and collection procedures used by each servicer (other than Servicer) with respect to each Loan have been in all material respects legal, proper, and prudent.

f)   To the best of Lender's knowledge, all of the terms, conditions and provisions of the interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance are enforceable, and all adjustments have been timely and properly made, including, but not limited to all required notices, and any adjustments so made will not affect the enforceability of each Note (if applicable).

g)   **Specific Limitation on Liability of the Servicer and Others – Direct Contact**

Lender agrees and understands that all communication with Borrowers is to be conducted by/through Servicer. Notwithstanding the foregoing, where the Lender, with or without the Servicer's approval, engages in direct communication with the Borrower for the purpose of collection, modification, information request, whether oral or in writing, Lender agrees to the following provision to this <u>Section 8.3</u>:

Lender has all requisite licenses, permits, qualifications and approvals to contact Borrowers in each jurisdiction in which any Mortgaged Property is located; and,

The Servicer and any director, officer, agent, or employee of the Servicer shall be indemnified and held harmless by Lender against any loss, liability, forfeiture or expense, including, without limitation, carrying costs, investigation costs, fines, penalties and attorneys' fees and expenses, including, without limitation, the costs and expense of curing any breaches of Lender's representations and warranties relating to the serviced assets (collectively, the **"Liabilities"**), suffered or incurred by Servicer arising out of, resulting from or relating to:

i.   Lender's willful misconduct, bad faith, fraud, gross negligence, or reckless disregard of its obligations hereunder, including, but not limited to, violation of: Equal Credit Opportunity Act ( ECOA) and Regulation D, Federal Truth in Lending Act (FTLA) and Regulation Z, Home Ownership and Equity Protection Act (HOEPA), Real Estate Settlement, Procedures Act (RESPA), Fair Credit Reporting Act (FCRA), Fair Debt Collection Practices Act (FDCPA), state debt collection statutes and regulations, Telephone Consumer Protection Act, GLB

Act, USA Patriot Act, Servicemembers' Civil Relief Act, Fair and Accurate Credit Transactions Act of 2003 (FACT);

ii.    any material breach by Lender of a representation, warranty or covenant contained in this Agreement, the Loan, the Note or the Mortgage;

iii.    errors and omissions in the processing, acquiring, origination or servicing of any Loan prior to the applicable Delivery Date;

iv.    compliance by the Servicer with instructions or requirements of Lender in connection with this Agreement and special instructions by Lender in connection with collection and loss mitigation request(s); and

v.    any claim, litigation or proceeding to which Servicer is made a party as a result of its acting as, or status as, Servicer of a serviced asset, other than any such claim, litigation or proceeding (i) which is based on a misrepresentation, breach or error or omission on the part of Servicer and under which Servicer is found liable for such action, and (ii) with respect to which Servicer must indemnify Lender pursuant to <u>Section 8.2</u>.

In no event shall Servicer be entitled to indemnification of any Liabilities pursuant to this <u>Section 8.3</u> that are otherwise compensable by Servicer pursuant to this Agreement.

**8.4    <u>Survival</u>:**

The terms and conditions of this Agreement regarding confidentiality, indemnification, payment, representations and warranties, and all others that by their sense and context are intended to survive the execution, delivery, performance, termination or expiration of this Agreement survive and continue in effect.

<div align="center">

**ARTICLE IX**
**MISCELLANEOUS**

</div>

**9.1    <u>Changes in Practices</u>:**

The parties hereto acknowledge that the standard practices and procedures of the mortgage servicing industry change or may change over a period of time. To accommodate these changes, Servicer may from time to time notify Lender of such changes in practices and procedures. Should any such proposed changes, made in good faith by Servicer, be unacceptable to Lender, then Servicer shall have no further obligation to continue to accept subservicing under the terms of this Agreement, and may terminate this Agreement in accordance with <u>Article V</u>.

**9.2    <u>Assignment</u>:**

Neither party may assign this Agreement, by operation of law or otherwise, or delegate its obligations hereunder without the prior written consent of the other party hereto, which consent will not be unreasonably withheld.

**9.3    <u>Force Majeure</u>:**

Neither party will be liable to the other party for any losses arising out of the delay or interruption of its performance of its obligations under this Agreement (other than its payment obligations) due to any natural disaster, act of governmental authority, act of public enemy, terrorism, war

Confidential & Proprietary

**EXHIBIT 3, PAGE 74**

(whether or not declared), riot, flood, civil commotion, insurrection, or any other material event beyond the reasonable control of the party delayed (each, **"Force Majeure Event"**). The party not claiming protection from a Force Majeure Event may terminate this Agreement, without penalty and at no additional cost, if a Force Majeure Event delays performance by more than fifteen (15) days.

**9.4     Entire Agreement:**

This Agreement, together with the referenced exhibits and attachments hereto, contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, proposals, discussions and communications, whether written or oral, in relation to this subject matter. This Agreement cannot be modified in any respect except by an instrument in writing signed by an officer or other authorized person of both parties.

**9.5     Severability:**

If any provision of this Agreement is found invalid, illegal, or unenforceable pursuant to judicial decree or decision of a court of competent jurisdiction or under applicable law, then (i) such invalidity, illegality, or unenforceability will not affect the remaining provisions of this Agreement; (ii) this Agreement will be construed as if such invalid, illegal, or unenforceable provision were excluded from this Agreement; and (iii) the court in its discretion may substitute for the excluded provision an enforceable provisions which in economic substance reasonably approximates the excluded provision.

**9.6     Effect:**

Unless otherwise terminated in accordance with the terms and conditions of this Agreement, this Agreement shall remain in effect until Lender's interest in all of the Loans, including the underlying security, are liquidated completely.

**9.7     Applicable Law:**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

**9.8     Notices:**

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given and received (i) upon delivery if personally delivered, (ii) on the next business day if sent for next day delivery by a nationally-recognized overnight courier service, or (iii) on the third business day after deposit in the U.S. Mail if sent by registered or certified mail, return receipt requested, addressed to the party to receive notice at the following addresses or at such other address as a party may hereafter designate in the manner provided herein:

**If to BSI Financial Services, Inc.:**
Gagan Sharma
President and CEO
1425 Greenway Drive, Suite 400
Irving, Texas 75038

**With a Copy to:**

Confidential & Proprietary

EXHIBIT 3, PAGE 75

*Servicing Agreement:*

BSI Financial Services, Inc
1425 Greenway Drive, Suite 400
Irving, Texas 75038
Fax: 972-518-1385
Attn: General Counsel

**If to Lender:**

_____

**9.9**    <u>Waiver:</u>

No waiver of any provision of this Agreement is effective unless in writing and signed by the party against whom such waiver is sought to be enforced. No failure or delay by either party in exercising any right, power, or remedy under this Agreement operates as a waiver of any such right, power, or remedy. The express waiver of any right or default hereunder is effective only in the instance given and does not operate as or imply a waiver of any similar or other right or default on any subsequent occasion.

**9.10**    <u>Binding Effect:</u>

This Agreement inures to the benefit of and is binding on the parties hereto and their respective successors and permitted assigns.

**9.11**    <u>Headings; Certain Terms:</u>

Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect. The term "include" or "including" shall mean without limitation by reason of enumeration. References herein to "paragraphs," "sections" and other subdivisions without a reference to document are to designated paragraphs, sections and other subdivisions of this Agreement. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders, the singular shall include the plural and vice versa.

**9.12**    <u>Due Date of Payments:</u>

Unless otherwise stated herein, all fees, payments, charges, expenses, advances and any other sums payable to Servicer by Lender hereunder are due and payable within five (5) business days from date of Servicer's invoice. Any sums not paid when due will bear interest at the Default Rate from the due date until the date received by Servicer..

**9.13**    <u>Multiple Counterparts:</u>

This Agreement may be executed in multiple counterparts, each of which is deemed an original, and all which when taken together constitute one and the same instrument.


**IN WITNESS WHEREOF**, each party has caused this Agreement to be signed in its corporate name on its behalf by its duly authorized representative to be effective as of the day, month, and year first above written.

Confidential & Proprietary

**EXHIBIT 3, PAGE 76**

*Servicing Agreement:*

**SERVICER:**

**SERVIS ONE, INC.**
**d/b/a BSI FINANCIAL SERVICES, INC.**

By: _____

Name: ___ Jordan D Dorchuck _____

Title: _ Executive Vice President _____

**LENDER:**

WJ Asset management

By: _____

Name: _ James Nichols _____

Title: _ President _____

Confidential & Proprietary

EXHIBIT 3, PAGE 77

*TSA Subordinate Servicer*
*Servicing Agreement:*

**EXHIBIT I Fee Schedule**

Confidential & Proprietary

EXHIBIT 3, PAGE 78



## Special Servicing LM

| As of: | 10/7/2014 | SPECIAL SERVICING PRICING |
|---|---|---|
| **A. One Time Program Set Up Fee** | | Note: This fee includes reasonable implementation cost, planning, development and project management.  Any additional services would require a mutually agreed to SOW. |
| Non-Private Label | $ 2,000.00 | |
| **B.  Loan Boarding Fee Per Loan** | | |
| | $ 50.00 | |
| **C.  Monthly Service Fee Per (per Loan)** | | Per loan/ $40 from loans tranferred from FCI until 12-31-14 |
| | $ 15.00 | Per loan |
| **D.  Default Servicing Fee (fee is in addition to mthly service fee)** | | |
| Collection/Loss Mitigation 30-59 days | $ 28.00 | Loss Mitigation Solicitation, Collections Calling, Past Due Letters. Includes determining optimal workout strategy and negotiation of workouts. Per Month In addition to base Subservicing Fee. Applies for every occurrence of delinquency |
| Collection/Loss Mitigation 60+ days | $ 38.00 | activity. Once loan is current or goes into foreclosure/ bankruptcy, this fee does not apply. |
| Special State Upcharge | $ 12.50 | Currently applicable only to California loans to comply with SB900 (includes sending out denial letters, acknowledgement letters, missing doc letters etc, monitoring of denial, appeal etc.). In addition to all other fees, applicable to 30+ delinquent loans. |
| Foreclosure Administration | $ 72.00 | Per Month In addition to base Subservicing Fee. |
| Bankruptcy  Administration | $ 72.00 | Per Month In addition to base Subservicing Fee. |
| Loss Mitigation Fulfillment : Repayment Plan/Forbearance | $ 220.00 | Includes generation of workout document and closing the loan. One time fee. Repayment plan/ Forbearance fee due after borrower makes 3 payments in 3 months. |
| Loss Mitigation Fulfillment : Modification | $ 550.00 | Includes generation of workout document and closing the loan. Payment due after borrower makes 3 payments in 3 months for trial or permanent mod.In case of HAMP, BSI to retain HAMP Servicer Incentives |
| Loss Mitigation Fulfillment : Deed-in-Lieu/ Cash For Keys | $ 825.00 | |
| Loss Mitigation Fulfillment : Short Sale / Short Payoff/ Full Payoff/Third Party Sale/ Loss Mit Refinance | 1.28% or $1,000 (whichever is greater) | Loan must be at least 90 days delinquent prior to full/ short payoff |
| Full Reinstatement Fee | 1% of UPB | Loan must be at least 60 days delinquent prior to reinstatement |
| Hardest Hit Funds/ MI Claims/ Hazard Claims | 10% | Percentage of gross recovery amount |
| **E.  Asset Liquidation and REO Marketing Fee** | | |
| Eviction Services | $ 250.00 | One time fee. *Waived if BSI manages REO sale process.* |
| BSI manages REO sale process | 1.25% or $1,250 (whichever is greater) | Per REO. BSI keeps REO open for inspections, manage evictions, insurance and accounting purposes. Calculated of the net funds received |
| Investor manages REO sale process | $45.00 | Monthly fee if loan kept open on system for inspections, paying force placed insurance, taxes  and accounting purposes. |
| **F. Ancillary Income** | | |
| Loan Prepayment Fees | 100% | Lender |
| Late Charges & Other Ancillary Income | 100% | BSI |
| **G.  Lien Releases, Assignments and Transfers** | | |
| Deboarding fee -- for Lien Releases (for Full Payoff), Assignments (for loan sales to third party), and Transfers (to another servicer) | $ 40.00 | per loan |
| Deconversion Fee (0 - 6 Mos) | $ 40.00 | WAIVED |
| **H.  Special Reporting/ Special Projects** | | |
| Special Reports & Projects, Technology | $ 125.00 | per hour. Any issues of clean up due the prior servicer, is billed as an hourly fee, based on scope and is on a case-by-case basis. |
| Tax & Insurance Track only | $ 2.00 | Per loan per month fee payable in case investor wants to track insurance, but not utilize BSI force placed insurance placement services |
| **I. Web - System Access** | | |
| Fiserv Web Access Set Up | $ 600.00 | One time fee to set up client on servicing system |
| Fiserv access Monthly Fee | $ 50.00 | Per named user per month, includes access to loan data and images |
| **J. Termination Fee due BSI** | | |
| | $ 150.00 | Per Loan. Payable in case Client terminates servicing agreement. |
| **K. CPI Adjustment** | | |
| Calendar CPI Adjustment | 4% or CPI (Whichever is greater) | Adjusted annually on Jan 1 following the signature of the agreement and annually thereafter (after minimum of 6 months of agreement). Applies to all BSI fees with exception of pass through fees |
| **L. Advances** | | |
| | | *Client to provide funding for all required servicing advances, i.e. principal, interest, taxes, insurance, foreclosure costs, etc. In case advances are not forwarded to BSI within required timeframe, Client is responsible for any fees and penalties assessed to the loan and/ or BSI* |

*Note: There may be additional pass through fees for additional items including legal costs of foreclosure, bankruptcy, force placed insurance, skip tracing, property preservation, taxes, county charges for recordings, filing claims with FHA/ VA, tax contracts etc. This is not an exhaustive list of possible pass through charges.*

*Hard Money SS Orange County*

# EXHIBIT "4"

## ASSET MANAGEMENT AGREEMENT

This Asset Management Agreement ("Agreement") is entered into effective as of September 17, 2014, (the "Effective Date") between WJA Asset Management, LLC, ("Owner"), and Citivest, Inc., a California Corporation ("Manager").

In consideration and mutual covenants expressed herein, and for other good and valuable consideration, the sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    MANAGER'S ENGAGEMENT AND SERVICES.

1.1    Services. Owner hereby retains Manager to provide, and Manager agrees to provide, the asset management services described herein and in the attached Exhibit A (the "Services") in connection with the operation and disposition of a portfolio (the "Portfolio") of performing, semi-performing and/or nonperforming notes ("Notes") secured by mortgages and deeds of trust encumbering single family residences and condominiums ("Properties") as more particularly described in Exhibit B which Portfolio may be amended by mutual written consent from time to time.

1.2    Term.  The term of Manager's engagement shall commence on the Effective Date and continue for a period until the earlier of one (1) year or sale of all of the Notes and REO's or rented homes to one or more third parties, unless sooner terminated or extended as provided herein. The Agreement shall automatically renew for another one (1) year period unless terminated in writing by the Owner. The Agreement can be terminated upon thirty (30) day written notice by the Owner to the Manager at any time.

2.    OWNER'S RESPONSIBILITIES AND APPROVALS.

2.1    Responsibilities.  Owner shall have the following responsibilities in connection with the services to be provided by Manager:

2.1.1    Owner shall pay all amounts due under this Agreement promptly, provided that all amounts are accompanied by detailed invoices and appropriate back-up approved by Owner.

2.1.2    Owner shall designate a representative fully acquainted with the Portfolio and with full mandate and authority to approve matters requiring Owner's approval and to render decisions promptly (the "Owner's Rep").

2.2    Pre-Authorized Actions.  Owner authorizes the Manager to take the following actions in the name of the Owner; provided, however, that all of the actions associated with loan modification terms, listings, leases, contracts and agreements, and dispositions of Notes and/or REO's are consistent with Owner's preapproved value/price guidelines and business methodology, and all contracts and agreements will be in Owner's name or freely assignable to Owner. All contracts and agreements shall include standard payment terms of net 30 days from receipt of invoices by Manager.

2.2.1    Enter into retainer, engagement, listing and/or representation agreements with attorneys, accountants, property managers, property security companies, real estate and mortgage brokers, and other similar professionals ("Professional Agreements") at fair market cost and without any mark up by/for the manager; provided, however, Manager may not enter into any such Professional Agreement in which the Fund's estimated payment liability would exceed $5,000 in any calendar year without the Owner's Rep's written approval; and

792213.06/SD
142681-00011

2.3     <u>Actions Requiring Further Approval</u>.  Manager is authorized to engage in the following activities subject to the prior written approval of the Owner's Rep:

2.3.1     Enter into loan modification agreements, forbearance agreements, deeds in lieu of foreclosure, short sale agreements, short pay agreements, and other similar loss mitigation or refinancing arrangements with the borrowers on the Notes.

2.3.2     Take all actions, incur all costs, and execute all documents reasonably necessary to sell any portion of the Portfolio or the Properties.

3.     <u>COSTS AND FEES</u>.

3.1     Owner shall pay Manager fees (the "<u>Fees</u>") in the amounts set forth below; provided that Manager may direct that certain of Manager's fees shall be directly payable to certain Affiliates of Manager although Manager shall remain directly responsible for the performance of all services by Manager's affiliates.

3.1.1     <u>Asset Management Fee</u>.  Owner shall pay Manager an Asset Management Fee of $40/loan per month.

3.1.2     <u>Disposition Fee</u>. 3% of the selling price, (3%) or a minimum of $750, payable to the Manager, for all Properties sold with or without the participation by an outside broker.

3.1.3     <u>Systems Fees</u>.  Owner shall pay subscriber fees associated with the use of GLASS, Res.net and any other asset management tools.  Currently Res.net charges a monthly maintenance fee of $500 for 1-125 files or $4 for each active file over 125 assets.  This fee is divided over all assets boarded.  Currently GLASS charges a monthly hosting fee of $500 which is divided over all assets boarded by the Manager.

3.1.4     <u>Property Management Fee</u>.  Upon acquisition of title to Properties following Manager's loss mitigation efforts, Manager shall assume asset management responsibility for such "REO" Properties. If the properties are leased the Manager may retain a local property management company to manage the property and will oversee such property management company for a fee of $40/property per month. If the Manager manages the property directly and collects the rent on behalf of the Owner directly, such management will be done pursuant to a separate Property Management Agreement between the Manager and the Owner.

3.2     <u>Payment of Costs</u>.  During the Term, Owner shall pay all of the Portfolio's direct third party costs approved by Owner (the "<u>Direct Costs</u>").  Owner shall pay such expenses directly to vendors or reimburse Manager for any out-of-pocket third party costs.

3.3     <u>Transfer Reimbursement</u>.  In the event the Owner shall sell, assign, or transfer all or a portion of the Portfolio to an Affiliate, Owner shall reimburse Manager for any third party, out-of-pocket costs incurred by Manager and approved by Owner as a result of such a transfer.

4.    INDEPENDENT CONTRACTOR.

4.1    Status.  Manager is an independent contractor of Owner and shall not perform any services under this Agreement as an employee of Owner.

4.2    No Exclusive Duty.  Except as otherwise provided in this Agreement and as may be reasonably necessary to provide the Services, (i) the Manager shall not be required to devote all or substantially all of its time or efforts to the management of the Owner, (ii) the Manager may have other business interests and may engage in other activities not related to the Owner, (iii) the Manager may also own and/or manage interests in numerous other real estate projects, pools of mortgages, and ventures, some of which might be considered competitive with the portfolio or the Owner, and (iv) neither the Owner nor the Manager shall have any right to share or participate in such other business interests or activities.

4.3    Licenses.  The Owner and Manager acknowledge that the loans will be serviced by a third party Servicer, who shall be responsible for procuring, obtaining, maintaining and complying with all licenses, permits, state banking requirements, or other governmental approvals, if any, which may be required under any applicable laws for the provision of the services to be rendered.

5.    INDEMNITY.

5.1    Indemnity by Owner.  Owner shall indemnify and hold the Manager and its agents and Affiliates harmless from and against all claims, losses, damages, liabilities and expenses, including without limitation reasonable attorney's fees ("Claims") arising in connection with the Portfolio and the Properties, to the fullest extent permitted by law, but only to the extent that such Claims are caused by the negligent or wrongful acts or omissions of Owner or its affiliates.

5.2    Indemnity by Manager.  Manager shall fully indemnify and hold Owner and its agents and Affiliates harmless from and against all claims, losses, damages, liabilities and expenses, including without limitation reasonable attorney's fees ("Claims") arising in connection with the Portfolio and the Properties, to the fullest extent permitted by law and caused by (a) the negligent or wrongful acts or omissions of the Manager or its agents, or (b) any acts of Manager or its agents outside the scope of its engagement or authority.

5.3    Survival.  The obligations set forth in this Section 5 shall survive any termination of Manager's engagement.

6.    TERMINATION AND SUSPENSION.

6.1    Manager's Breach.  If the Manager fails to perform any of the Manager's obligations under this Agreement, and such failure is not cured by the Manager to Owner's reasonable satisfaction within thirty (30) calendar days after the Manager receives written notice from Owner which must specify the breach, the Manager shall be in default under this Agreement.  Upon such default, Owner shall have, in addition to any and all rights and remedies available under applicable law or under the terms of this Agreement, the right to immediately terminate the Manager's engagement without the need for further notice, legal proceedings or court order, Manager shall have no further right to receive fees or reimbursements pursuant to this Agreement, and Manager shall assign all agreements, contracts and work product associated with the portfolio or the management thereof to Owner.

6.2    Owner's Breach.  If Owner fails to perform any of Owner's obligations under this Agreement and such failure is not cured by Owner to the Manager's reasonable satisfaction within thirty (30) calendar days after Owner receives written notice from the Manager specifying the breach, Owner shall be in default under this Agreement.  Upon such default, the Manager shall have the right to immediately terminate the Manager's engagement without the need for further notice, legal proceedings or court order.

6.3    Suspension.  The Manager shall not be obligated to continue to provide services under this Agreement so long as Owner has failed to pay a substantial amount as described in Section 3 of this Agreement. For the purpose of this agreement a substantial amount means any amount in excess of $5,000.

7.    GENERAL PROVISIONS.

7.1    Notices.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) on the date of delivery if personally delivered by overnight courier, telegram or facsimile, or (ii) three business days after mailing if mailed by first class mail to Owner and Manager at their addresses set forth below, or such other address designated from time to time in writing by Owner or Manager.

7.2    Confidentiality.  Except as permitted in Section 8.3 below, the Manager undertakes to keep strictly confidential all information, whether in written or in any other form, which has been provided by the Owner or exchanged under this Agreement. The Manager undertakes not to use any such information for any purpose other than the performance of the services hereunder and the Manager shall procure that its shareholders, officers, directors, employees and representatives keep secret and treat as confidential all such information. This confidentiality undertaking shall survive the expiry or earlier termination of this Agreement.

7.3    License to Use Proprietary Information.  Subject to applicable provisions of state and federal law, including without limitation, the Gramm-Leach-Bliley Act (*15 USC Sec. 6801-6809*), Owner hereby grants to the Manager a non-exclusive license to use, manipulate, and disclose proprietary and other information regarding the Portfolio which the Manager obtains by operation of this Agreement. The terms of this Section 8.4 shall govern any termination of the Manager's engagement.

7.4    Assignment.  The Manager may not assign or transfer its rights and/or obligations under this Agreement without the written consent of the Owner, which consent may be granted or withheld in Owner's sole and absolute discretion. The Owner may assign, transfer, dispose or otherwise deal with all or part of its rights and/or obligations under this Agreement to any third party.

7.5    Amendment and Waiver.  This Agreement may be amended only by a written Agreement signed by Owner and Manager.  Waiver of any provision of this Agreement shall not be deemed or constitute a waiver of any other provision, nor shall such waiver constitute a continuing waiver.

7.6    Counterparts.  This Agreement may be executed in any number of counterparts, all of which together shall constitute a binding Agreement.

7.7    Governing Law and Severability.  This Agreement shall be governed by and construed under the laws of the State of California, without regard to its conflicts of laws principles.  If any provision of this Agreement is invalid or unenforceable, such provision shall (i) be modified to the minimum extent necessary to render it valid and enforceable, or (ii) if it cannot be so modified, be deemed not to be a part of this Agreement

EXHIBIT 4, PAGE 83

and shall not affect the validity or enforceability of the remaining provisions.

7.8    _Approval._  Wherever in this Agreement the consent or approval of a party is required to be given, the same shall not be unreasonably withheld or delayed.

7.9    _Entire Agreement_.  This Agreement represents the entire Agreement between the parties with respect to the subject matter set forth above, and supersedes all previous oral and written agreements, communications, representations or commitments.

*OWNER:*

WJA Asset Management, LLC

By: _____
    James Nichols, President

*MANAGER:*

CITIVEST, INC.,
A California Corporation

By: _____
    Dana Haynes, President

EXHIBIT 4, PAGE 84

## EXHIBIT A

### Scope of Services

Manager will be providing the following services:

- Oversee the Servicer's Conduct, which will include all borrower contact on behalf of the Owner, including without limitation, the following, all of which shall conform to applicable law:

  - Contact borrowers to introduce the Owner as each borrower's lender.

  - Negotiate any advisable loan modifications with borrowers for the purpose curing current defaults and mitigating future defaults through principal reductions, rate adjustments, and forbearances.

  - Oversee any required foreclosures or negotiated deeds in lieu of foreclosure.

- Provide reports to Owner and access to all of Manager's information, computer programs, and online servicing websites regarding the operation of the Portfolio including stabilization estimates, borrower contact logs, loan modification and forbearance activity, collections, and any foreclosure or real estate ownership or rental activity.

- Provide representatives to meet with Owner and their associates to review and discuss the operation of the Portfolio.

- Immediately Notify Owner of anticipated material budget variances, and recommend revisions to the budget for approval by Owner.

- Engage and supervise third party service providers reasonably necessary for the performance of these Services.

- Oversee the tax and insurance management by the Servicer.

- Oversee the duties of third party property management companies who are retained to manage leased properties owned by the Owner.

# EXHIBIT "5"

*IC1500 9605*

## Custodial Services Agreement

This Custodial Services Agreement (collectively with any and all schedules and exhibits attached hereto, this "Agreement") is made this 30th day of December, 2014 by and between **WJA Real Estate Opportunity Fund I, LLC,** of **23046 Avenida De La Carlota, Suite 150, Laguna Hills, CA 92653** (hereinafter referred to as **WJA RE Opp**) and **The Kingdom Trust Company** of 1105 State Route 121 Bypass North, Suite B, Murray, Kentucky 42071 (hereinafter referred to as **Kingdom**).  **WJA RE Opp** and **Kingdom** do hereby agree as follows:

WHEREAS, WJA RE Opp is a **Limited Liability Company** formed to purchase real property either held directly by the fund or through joint ventures with other operators or notes and partnerships related to real estate; and

WHEREAS, WJA RE Opp seeks a qualified custodian to (i) maintain custody of the assets listed on Schedule 1 and owned by the **WJA RE Opp** in a separate account for **WJA RE Opp** under **WJA RE Opp**'s name and (ii) send quarterly account statements to **WJA RE Opp** and to those other individuals and entities listed on Schedule 2 showing (1) assets held in the account and (2) any activity in the account during that reporting period.  And

WHEREAS, Kingdom is in the business of providing such custodial services; and

WHEREAS, WJA RE Opp and Kingdom have discussed a relationship whereby Kingdom will hold the assets owned by WJA RE Opp; and

WHEREAS, WJA RE Opp and Kingdom desire to reduce their agreement to writing;

NOW THEREFORE, for and in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the terms and conditions of this Agreement, the parties agree as follows:

1. **Kingdom** shall establish a separate account for **WJA RE Opp** at Kingdom in the name of **WJA RE Opp** (the "**Custodial Account**") to hold all assets that **WJA RE Opp** delivers to Kingdom to hold in custody (collectively, the "Custodial Assets").  The Custodial Assets as of the date of this Agreement are identified on <u>Schedule 1</u> attached hereto.  Schedule 1 shall be updated from time to time to reflect the current Custodial Assets.

Page 1 of 10

2. **Kingdom** hereby represents that it is a "qualified custodian" within the meaning of Rule 206(4)-2 under the Investment Advisors Act of 1940.

3. **WJA RE Opp** shall deliver to **Kingdom** any documentation necessary to effectuate the transfer of the Custodial Assets to the Custodial Account.

4. **Kingdom** will provide key points of contact for **WJA RE Opp** or any other authorized individuals or entities designated by **WJA RE Opp**. The initial points of contact will include Matthew Morris and Lisa Tabers who will be the coordinators for all account set-up and transfer activity. Each can be reached through **Kingdom**'s toll-free number.

5. During the duration of this Agreement, **Kingdom** shall maintain all Custodial Assets in the Custodial Account, subject to the direction of **WJA RE Opp** or any other authorized individuals or entities designated by **WJA RE Opp**.

   While **Kingdom** shall maintain custody of all assets held in the Custodial Account, **WJA RE Opp** or other individuals or entities as may be designated by **WJA RE Opp** and identified in writing to **Kingdom**, shall retain full responsibility for the management, control, investment and disposition of all assets held in the Custodial Account. **WJA RE Opp** will provide **Kingdom** with any and all information concerning activity related to the assets held in the Custodial Account necessary for **Kingdom** to maintain a complete and accurate record of such assets. Such information will be provided in a timely manner so that **Kingdom** may meet its quarterly reporting obligations.

6. In furtherance of its responsibilities and subject to the limitations and qualifications otherwise set forth in this Agreement, **Kingdom** shall:

   a. safe keep the Custodial Assets and shall segregate all Custodial Assets from both (i) the proprietary property of **Kingdom** and (ii) the assets of any other customer;

   b. not lend, pledge, hypothecate or rehypothecate any Custodial Assets;

   c. monitor, maintain and/or dispose of Custodial Assets as specifically directed by **WJA RE Opp** or other such individual or entity authorized by **WJA RE Opp** to do so;

   d. keep timely and accurate records as to the deposit, disbursement, investment, reinvestment and/or other application of the Custodial Assets;

   e. no less frequently than quarterly, prepare, maintain and deliver a statement (the "Quarterly Statement") to **WJA RE Opp, and WJA RE Opp**'s Administrator, reflecting:

      i. the then current inventory of assets held in the Custodial Account as of the end of the previous quarter;

      ii. all transactions in the Custodial Account since the last Quarterly Statement.

EXHIBIT 5, PAGE 87

WJA RE Opp hereby directs Kingdom, and Kingdom hereby agrees, to deliver a copy of each Quarterly Statement to **WJA RE Opp** and **WJA RE Opp's** Administrator at the following addresses:

> **WJA Real Estate Opportunity Fund I, LLC**
> **c/o William Jordan or Mickey Payne**
> 23046 Avenida De La Carlota, Suite 150
> Laguna Hills, CA 92653
>
> And
>
> Opus Fund Services
> 1812 High Grove Lane, Suite 101
> Naperville, IL 60540
>
> And
>
> Name of other Funds, Entities or Investors listed on Schedule 2 attached hereto.

f.  **Kingdom** will provide to **WJA RE Opp** and **WJA RE Opp's** Administrator the capability to download transaction and account data daily or as necessary. Each party will provide the technical personnel and support to establish the necessary interface and keep it operational should such be necessary.

g.  **Kingdom** will, in preparing reports, statements and any other disclosures to be provided under the terms of this Agreement, cooperate with **WJA RE Opp** in satisfying any information and/or timing requirements that may be imposed upon **WJA RE Opp** or any of its advisors under the provisions of any applicable federal or state law.

    In valuing the assets of the Custodial Accounts for recordkeeping and reporting purposes, **Kingdom** understands that the assets may be illiquid or that their value may not be readily ascertainable on either an established exchange or generally recognized market. **WJA RE Opp** acknowledges that, under those circumstances, **Kingdom** will be dependent upon information supplied by **WJA RE Opp** or the investment's sponsor to value the assets in the account.

Except as otherwise set forth in this Agreement, **WJA RE Opp** will have 30 days after receipt of any document, statement or other information from **Kingdom** to notify **Kingdom** in writing of any errors or inaccuracies reflected in any particular document, statement or other information. If **WJA RE Opp** does not notify **Kingdom** within 30 days, the applicable document, statement or other information shall be deemed correct and accurate, and **Kingdom** shall have no further liability or obligation with respect to such document, statement, other information or any transactions described therein unless such liability or obligation results from **Kingdom's** negligence or willful misconduct.

7. **WJA RE Opp** represents that any asset which is to be acquired or otherwise dealt with pursuant to this Agreement is a permissible investment and/or transaction pursuant to applicable law. Further, **WJA RE Opp** represents that if any asset delivered under this Agreement is a security under applicable federal or state securities laws, such investment has been registered or is exempt from registration under federal and state securities laws.

All directives for withdrawal or transfer of all or a portion of Custodial Assets from the Custodial Account shall be in writing on a form provided by or reasonably acceptable to **Kingdom**. The method of distribution must be specified in writing. The tax identification number of the recipient must be provided to **Kingdom** before **Kingdom** is obligated to make a distribution. Withdrawals shall be subject to all applicable tax and other laws and regulations, including possible early withdrawal penalties or surrender charges and tax withholding requirements.

8. **Kingdom** shall act in the capacity of a passive, non-discretionary custodian and shall not be responsible or liable for any investment decisions or recommendations with respect to the utilization, investment, reinvestment, sale or disposition of Custodial Assets held in the Custodial Account. **Kingdom** shall not be responsible for reviewing any assets held in the Custodial Account and shall not be responsible for questioning, investigating, analyzing, monitoring, or otherwise evaluating any of the investment decisions of **WJA RE Opp** or such other investment direction that may be provided by any individual or entity with authority to direct the investment of the Custodial Assets. It is not the responsibility of **Kingdom** to review the prudence, merits, viability or suitability of any investment directed by **WJA RE Opp** or such other individual or entity with authority to direct the investment of Custodial Assets or to determine whether the investment is acceptable under applicable law. **Kingdom** does not and will not offer any investment advice, nor does **Kingdom** endorse any investment, investment product or investment strategy; and **Kingdom** does not and will not endorse any investment advisor,

Page 4 of 10

representative, broker, or other party selected by **WJA RE Opp** or such other individual or entity with authority to direct the investment of Custodial Assets. **Kingdom** shall not be responsible for any loss resulting from any failure to act because of the absence of directions from **WJA RE Opp** or such other individual or entity with authority to direct the investment of the Custodial Assets.

9. **Kingdom** is not responsible for inquiring into the nature, amount, timing or propriety either of any deposit into the Custodial Account made by **WJA RE Opp** or such other individual or entity with authority to make such deposits, or of any disbursement from the Custodial Account required or requested, including, without limitation, any required minimum distributions mandated under applicable law. Except as otherwise provided, **WJA RE Opp** shall have full responsibility for any tax or investment consequences with respect to any and all Custodial Assets deposited into, held by, and disbursed from the Custodial Account.

10. **Kingdom** shall not be liable for, and **WJA RE Opp** agrees to indemnify and hold harmless **Kingdom** from and against any loss, damage, reasonable cost or expense (including reasonable attorneys' fees and disbursements), liability or claim of any third party arising directly or indirectly (a) from any action or inaction by **Kingdom** at the request or direction of or in reliance on the advice of **WJA RE Opp** or such other individual or entity with authority from **WJA RE Opp** to give such direction and/or advice, or (b) generally, from the performance (or absence or lack thereof) of its obligations under this Agreement; provided, however, that **Kingdom** shall not be indemnified or held harmless under this Agreement against any such loss, damage, cost, expense, liability or claim arising from **Kingdom**'s negligence or willful misconduct. If **WJA RE Opp** requests **Kingdom** to take any action with respect to Custodial Assets or the Custodial Account that may, in the reasonable opinion of **Kingdom**, result in **Kingdom** becoming liable for the payment of money or incurring liability of some other form, **Kingdom** shall not be required to take such action until **WJA RE Opp** shall have provided indemnity therefore to **Kingdom** in an amount and form satisfactory to **Kingdom**.

Further, **Kingdom** shall not be liable for any loss arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control. Similarly, **Kingdom** shall not be liable for any delay in execution or failure to execute of any instruction received from **WJA RE Opp** arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control.

EXHIBIT 5, PAGE 90

11. **Kingdom** and **WJA RE Opp** shall treat all record of and information related to their business relationship under this Agreement as confidential and will not disclose such information without the prior written consent of the other, such permission not to be unreasonably withheld, unless required to do so by law, regulation, or an order issued by a regulatory body or court of law. **Kingdom** shall not use such information other than in connection with carrying out its duties hereunder. In the event that any record is requested by any means by a regulatory body or court of law, **Kingdom** and/or **WJA RE Opp** will provide the other with an opportunity to review such order to determine whether it wishes to contest the order. Should **Kingdom** or **WJA RE Opp** choose to contest such order, neither will release the information until the contest is resolved and the order affirmed.

12. In return for its custodial services, **Kingdom** shall receive a one-time Account Set-up Fee equal to $1,500.00. The Set-up Fee is due upon execution of this Custodial Services Agreement. In addition, there will be an annual maintenance fee that will be charged in accordance with the Pricing Proposal dated December 16th, 2014 and delivered to WJA Asset Management, LLC. Ancillary fees such as over-night fees or other miscellaneous fees will be invoiced by **Kingdom** to **WJA RE Opp** and shall accrue at such rates as are agreed between the parties from time to time.

13. **Kingdom** and **WJA RE Opp** agree that this Agreement may not be assigned without the written consent of the other.

14. This Agreement and any attachments hereto constitute the entire Agreement between **WJA RE Opp** and **Kingdom**. No amendment to this Agreement shall be valid unless made in writing and signed by both parties.

15. If any provision of this Agreement is deemed invalid or unenforceable, the remainder of this Agreement shall not be affected thereby.

16. This Agreement shall be governed by and construed according to the laws of the State of Kentucky. Any suit filed against Kingdom arising out of or in connection with this Agreement shall only be instituted in the county courts of Calloway County, Kentucky and **WJA RE Opp** agrees to submit to such jurisdiction both in connection with any suit which **WJA RE Opp** may file and in connection with any suit which Kingdom may file against **WJA RE Opp.**

17. Either party may terminate this Agreement upon sixty (60) days prior written notice to the other party by registered, certified or express mail. Such notice of termination shall be effective as of the date it is received. Each party agrees to cooperate fully with the other upon any such termination so that transition to a successor custodian is completed in an efficient and timely manner.

EXHIBIT 5, PAGE 91

Notices required by this Agreement shall be served upon the parties as follows:

If to **WJA RE Opp**:

      **WJA Real Estate Opportunity Fund I, LLC**
      c/o **William Jordan or Mickey Payne**
      23046 Avenida De La Carlota, Suite 150
      Laguna Hills, CA 92653

If to **Kingdom**:

      Charles "Bo" Ives, President
      The **Kingdom** Trust Company
      1105 State Route 121 Bypass North, Suite B
      Murray, Kentucky 42071

18. This Agreement may be executed in one or more counterparts, and on separate counterparts, each of which shall be deemed an original but all of which together shall constitute but on and the same instrument.

19. Each signatory hereto warrants and represents to the other that each has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any provision or constitute a default under any other agreement or contract, written or oral, to which he or she or the company which he or she represents is bound; and that this Agreement is valid and enforceable in accordance with its terms and conditions.

**THIS SPACE INTENTIONALLY LEFT BLANK**

20. By executing this Agreement, **WJA RE Opp** does hereby appoint **Kingdom** as custodian of the Custodial Assets described in this Agreement and **Kingdom** agrees to act in the capacity of custodian with respect to such assets during the term of this Agreement. **Kingdom** shall perform the services and maintain the Custodial Assets as set forth herein. **Kingdom** shall be held to the exercise of reasonable care in carrying out its obligations under this Agreement. Except as specifically set forth herein, **Kingdom** shall have no liability and assumes no responsibility for any non-compliance by **WJA RE Opp** of any laws, rules or regulations.


_____                    12/30/14
WJA Real Estate Opportunity Fund I, LLC             Date
By: _____
    [Individual Signer, Title of Signer]


_____                    12/30/14
The Kingdom Trust Company                           Date
By: Charles "Bo" Ives, President


Page 8 of 10

EXHIBIT 5, PAGE 93

**SCHEDULE 1**

**CUSTODIAL ASSETS**

**Page 9 of 10**

## SCHEDULE 2

### ENTITIES AND INDIVIDUALS RECEIVING STATEMENTS

**Name:**                                         **Address:**


See Excel File from Mickey Payne
12/19/2014

# EXHIBIT "6"

| Name | ClaimAmt | Address1 | City | State | Zip | Basis | Case | Debtor |
|------|----------|----------|------|-------|-----|-------|------|--------|
| John Sullivan IND | $ 2,251,188.12 | 10752 Walnut St #D | Los Alamitos | CA | 90220 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Steve William Ind | $ 1,430,000.00 | 430 Narcissus Ave | Corona Del Mar | CA | 92625 | Promissory Note | 8:17-bk-12009; 8:17-bk-12003 | TD Opportunity Fund; Equity Indexed Managed Fund |
| Toch Family Trust | $ 1,125,000.00 | 7 Cantar St | Rancho Mission Viejo | CA | 92694 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Cannon Gasket PSP | $ 1,011,899.33 | 7784 Edison Avenue | Fontana | CA | 92336 | Promissory Note | 8:17-bk-12016 8:17-bk-12009 | WJA Secure Real Estate Fund/TD Opportunity Fund |
| The Realty Associates Fund VIII, LP | $ 1,011,251.25 | 1301 Dove Street Suite 860 | Newport Beach | CA | 92660 | Lease of property at 23046 Avenida de la Carlota, Suite 150, Laguna Hills, CA 92653 (subject to reduction pursuant to 11 U.S.C. Section 502(b)(6)) | 8:17-bk-12019 | William Jordan Investments |
| Thomas B Lewis & Dori Lewis | $ 787,715.83 | 33681 Scotty Cove Drive | Dana Point | CA | 92629 | Buyout Obligation/Promissory Note | 8:17-bk-12010; 8:17-bk-12009; 8:17-bk-12016 | TD REO Fund/TD Opportunity Fund/WJA Secure Real Estate Fund |
| Daniel McNally/McNally-Krainz Family Trust | $ 646,338.74 | 1426 N. Harwood Street | Orange | CA | 92867 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Dean and Cindy James | $ 550,000.00 | 30722 Fairgreens West | Laguna Niguel | CA | 92677 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Caprow Family Trust | $ 540,553.97 | 962 Hihimanu Street | Kihei | HI | 96753 | Promissory Note | 8:17-bk-12009 8:17-BK-12010 | TD Opportunity Fund/TD REO |
| Nash Living Trust 12mo/Jay Nash | $ 534,780.00 | 26 Bodega Bay | Irvine | CA | 92602 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| RTH Investment | $ 512,500.01 | 1201 Emerald Bay | Laguna Beach | CA | 92651 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Alicia Wolff Living 24mo | $ 490,500.00 | PO Box 2690 | Valley Center | CA | 92082 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Marilou Heckman/Heckman Family Trust | $ 454,047.81 | 33555 Halyard Drive | Dana Point | CA | 92629 | Promissory Note | 8:17-bk-12009 8:17-BK-12010 8:17-bk-12018 | TD Opportunity Fund/WJA Secure Income Fund/TD REO |
| Paul Kirch IRA 12 mo | $ 422,813.32 | 35 Malibu | Laguna Niguel | CA | 92677 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Tom Lowis | $ 387,528.33 | 33681 Scotty Cove Drive | Dana Point | CA | 92629 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Kenneth McFall | $ 342,442.72 | 8487 E Frostwood ST | Anaheim | CA | 92808 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| David Hughes Jr. IRA | $ 332,000.00 | 6 Sendero | Rancho Santa Magarita | CA | 92688 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Jeffrey Kurszewski IRA | $ 331,000.00 | 82 Via Sonrisa | San Clemente | CA | 92673 | Promissory Note | 8:17-bk-12009 8:17-bk-12010 | TD Opportunity Fund/TD REO |
| Steve Williams Holding | $ 325,000.00 | 430 Narcissus Ave | Corona Del Mar | CA | 92625 | Promissory Note | 8:17-bk-12003 | Equity Indexed Managed Fund |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Philip and Dawn Danna/Danna Family Trust | $ | 312,552.49 | 24096 Ramada Ln. | Mission Viejo | CA | 92691 | Promissory Note | 8:17-bk-12009 8:17-bk-12010 | TD Opportunity Fund/TD REO |
| Tilley Family Trust 12 Mo | $ | 309,577.78 | 14 Poppy Hills Rd. | Laguna Niguel | CA | 92677 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Gloria Maxine Eggers/Paul Donnelly | $ | 306,038.89 | 28832 Drakes Bay | Laguna Niguel | CA | 92677 | Promissory Note | 8:17-bk-12009 8:17-bk-12016 | TD Opportunity Fund/WJA Secure Real Estate Fund |
| Elaine Garland | $ | 302,075.00 | 21852 Seacrest Ln. | Huntington Beach | CA | 92646 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Stan and Gail Savitski | $ | 299,757.93 | 1214 Via Visalia | San Clemente | CA | 92672 | Promissory Note | 8:17-bk-12009 8:17-bk-12018 | TD Opportunity Fund/WJA Secure Real Estate Fund |
| John Wilkins IRA | $ | 293,446.09 | 27256 Via Burgos | Mission Viejo | CA | 92691 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Ashley Captan | $ | 269,176.66 | 28 Foliate Way | Ladera Ranch | CA | 92694 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Angie Rust | $ | 267,000.00 | 493 South Grand St. | Orange | CA | 92866 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Rudy Torres Prendiz IRA | $ | 253,846.23 | 18 Salvatore | Ladera Ranch | CA | 92694 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| William Somerville IRA | $ | 252,963.00 | 28385 La Pradera | Laguna Niguel | CA | 92677 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |
| Roger Wong Mulley | $ | 251,500.00 | 6000 Tarin Rd | Wilmington | NC | 28409 | Promissory Note | 8:17-bk-12009 | TD Opportunity Fund |