1    **SMILEY WANG-EKVALL, LLP**
Lei Lei Wang Ekvall, State Bar No. 163047
2    *lekvall@swelawfirm.com*
Philip E. Strok, State Bar No. 169296
3    *pstrok@swelawfirm.com*
Robert S. Marticello, State Bar No. 244256
4    *rmarticello@swelawfirm.com*
Michael L. Simon, State Bar No. 300822
5    *msimon@swelawfirm.com*
3200 Park Center Drive, Suite 250
6    Costa Mesa, California 92626
Telephone:   714 445-1000
7    Facsimile:   714 445-1002

8    Attorneys for Debtor and
Debtor-in-Possession

9

10        **UNITED STATES BANKRUPTCY COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA**

12        **SANTA ANA DIVISION**

| | |
|---|---|
| In re | Case No. 8:17-bk-11996-SC |
| WJA ASSET MANAGEMENT, LLC, | Chapter 11 |
| Debtor and Debtor-in-Possession. | (Jointly Administered with Case Nos. 8:17-bk-11997-SC; 8:17-bk-11998-SC; 8:17-bk-11999-SC; 8:17-bk-12000-SC; 8:17-bk-12001-SC; 8:17-bk-12002-SC; 8:17-bk-12003-SC; 8:17-bk-12004-SC; 8:17-bk-12005-SC; 8:17-bk-12006-SC; 8:17-bk-12008-SC; 8:17-bk-12009-SC; 8:17-bk-12010-SC; 8:17-bk-12011-SC; 8:17-bk-12012-SC; 8:17-bk-12013-SC; 8:17-bk-12014-SC; 8:17-bk-12015-SC; 8:17-bk-12016-SC; 8:17-bk-12018-SC; 8:17-bk-12019-SC; 8:17-bk-12124-SC; 8:17-bk-12125-SC; 8:17-bk-12126-SC; 8:17-bk-12127-SC and 8:17-bk-12285-SC) |
| ☐ Affects 5827 WINLAND HILLS DRIVE DEVELOPMENT FUND, LLC | **MOTION FOR ORDER:** |
| ☐ Affects ALABAMA HOUSING FUND, LLC | **(1) APPROVING PROCEDURES FOR FORECLOSURE SALES, SHORT SALES, REO SALES, AND PAYOFF SETTLEMENTS; AND** |
| ☐ Affects CA EXPRESS FUND, LLC | |
| ☐ Affects CA SEE JANE GO FUND, LLC | **(2) AUTHORIZING PAYMENT OF FEES AND EXPENSES OF BSI FINANCIAL SERVICES, INC., AND CITIVEST INC., FOR ALL POST-PETITION SERVICES;** |
| ☐ Affects CA WHIRL FUND, LLC | |
| ☐ Affects CLAIRTON RESIDENTIAL RENEWAL, LLC | |
| ☒ Affects EQUITY INDEXED MANAGED FUND, LLC | |
| ☐ Affects LUXURY ASSET PURCHASING INTERNATIONAL, LLC | |
| ☐ Affects LVNV MULTI FAMILY LLC | |
| ☐ Affects PMB MANAGED FUND, LLC | |
| ☐ Affects PROSPER MANAGED FUND, LLC | |

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SMILEY WANG-EKVALL, LLP

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

☒ Affects TD OPPORTUNITY FUND, LLC

☒ Affects TD REO FUND, LLC

☐ Affects URBAN PRODUCE FUND, LLC

☐ Affects WHIRL FUND, LLC

☐ Affects WJA EXPRESS FUND, LLC

☐ Affects WJA REAL ESTATE OPPORTUNITY FUND I, LLC

☐ Affects WJA REAL ESTATE OPPORTUNITY FUND II, LLC

☒ Affects WJA SECURE REAL ESTATE FUND, LLC

☐ Affects WJA SECURE INCOME FUND, LLC

☐ Affects WILLIAM JORDAN INVESTMENTS, INC.

☐ Affects CA REAL ESTATE OPPORTUNITY FUND I, LLC

☐ Affects CA REAL ESTATE OPPORTUNITY FUND II, LLC

☐ Affects CALIFORNIA INDEXED GROWTH FUND, LLC

☒ Affects SECURE CALIFORNIA INCOME FUND, LLC

☐ Affects CA REAL ESTATE OPPORTUNITY FUND III, LLC

☐ Affects All Debtors

**MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**

**[No hearing required pursuant to Local Bankruptcy Rule 9013-1(o)]**

2709135.1

2

MOTION FOR ORDER APPROVING PROCEDURES

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  BACKGROUND FACTS................................................................................. 2

    A.   Factual Background ............................................................................. 2

    B.   The Debtors' Loans and REOs............................................................ 3

    C.   BSI and Citivest.................................................................................. 3

III. REQUESTED RELIEF .................................................................................. 4

    A.   Procedures for Real Property Transactions ....................................... 4

    B.   Payment of BSI's and Citivest's Fees............................................... 7

IV.  LEGAL ANALYSIS........................................................................................ 8

    A.   The Sale Procedures are Appropriate Under the Particular
         Circumstances of this Case................................................................. 8

    B.   Sales to Third Parties Should be Free and Clear of Liens........................ 11

    C.   Waiver of the 14-Day Stay Set Forth in Bankruptcy Rule 6004(h) Is
         Appropriate............................................................................................ 12

    D.   The Debtors' Continued Use of BSI and Citivest is Supported by a
         Valid Business Justification ................................................................. 12

V.   CONCLUSION ............................................................................................ 13

DECLARATION OF HOWARD GROBSTEIN ................................................. 15

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*,
    94 B.R. 343 (E.D. Pa. 1988) ..................................................................... 11

*FutureSource LLC v. Reuters Ltd.*,
    312 281, 285 (7th Cir. 2002) ..................................................................... 11

*GBL Holding Co., v. Blackburn/Travis/Cole, Ltd.*,
    331 B.R. 251 (N.D. Tex. 2005) ..................................................................... 9

*In re 240 North Brand Partners, Ltd.*,
    200 B.R. 653 (B.A.P. 9th Cir. 1996) ............................................................ 9

*In re America West Airlines*,
    166 B.R. 908 (Bankr. D. Ariz. 1994) ........................................................... 9

*In re Lahijani*,
    325 B.R. 282 (B.A.P. 9th Cir. 2005) ............................................................ 9

*In re Lionel Corp.*,
    722 F.2d 1062 (2d Cir. 1983) ..................................................................... 9

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ........................................................................ 9

*In re Montgomery Ward Holding Corp.*,
    242 B.R. 147 (D. Del. 1999) ....................................................................... 9

*In re Psychrometric Systems, Inc.*,
    367 B.R. 670 (Bankr. D. Colo. 2007) ........................................................ 9

*In re Stroud Ford, Inc.*,
    205 B.R. 722 (Bankr. M.D. Pa. 1996) ........................................................ 8

*In re WRB W. Assocs. Joint Venture*,
    106 B.R. 215 (Bankr. D. Mont. 1989) ......................................................... 8

*Matter of Tabone, Inc.*,
    175 B.R. 855 (Bankr. D.N.J. 1994) .......................................................... 11

## **STATUTES**

11 U.S.C. § 102 ..................................................................................... 9, 11

11 U.S.C. § 105(a) ..................................................................................... 10

11 U.S.C. § 105(d) ..................................................................................... 10

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

MOTION FOR ORDER
APPROVING PROCEDURES

11 U.S.C. § 1107(a) ................................................................................................................8

11 U.S.C. § 1108 ....................................................................................................................8

11 U.S.C. § 363(b) .............................................................................................................9, 11

11 U.S.C. § 363(b)(2) ...........................................................................................................12

11 U.S.C. § 363(c) ..................................................................................................................8

11 U.S.C. § 363(f)(2) .........................................................................................................2, 11

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY JUDGE:**

TD REO Fund, LLC, and the other above-affected debtors (collectively, the "Debtors"), hereby submit this Motion for Order: (1) Approving Procedures for Foreclosure Sales, Short Sales, REO Sales, and Payoff Settlements; and (2) Authorizing Payment of Fees and Expenses of BSI Financial Services, Inc., and Citivest Inc., for All Post-Petition Services (the "Motion").  In support of the Motion, the Debtors submit the following memorandum of points and authorities, and the declaration of Howard Grobstein.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

By this Motion, the Debtors seek the Court's approval of certain procedures (the "Sale Procedures") to consummate foreclosure sales, short sales, REO sales, short payoff settlements, and certain other transactions (collectively, the "Real Property Transactions").  As of the petition date, the Debtors collectively owned approximately 31 REOs and 81 loans secured by first-position mortgages, the majority of which are currently in default.  The Debtors must foreclose on their mortgages and sell the REOs in order to minimize losses.  Preparing a separate motion every time the Debtors wish to consummate one or more Real Property Transactions would be costly.  The Sale Procedures, in contrast, will reduce the administrative overhead associated with the Real Property Transactions while still providing parties with notice and an opportunity to be heard.  The Debtors have worked with the Official Committee of Unsecured Creditors (the "Committee") and the Office of the United States Trustee to design the Sales Procedures.

The Debtors request authority to pay BSI Financial Services, Inc. ("BSI"), and Citivest, Inc. ("Citivest"), their agreed upon fees for managing the Debtors' mortgages and REOs and any expenses they have advanced retroactive to the petition date.  BSI services the Debtors' loans and Citivest, as asset manager, oversees BSI and sells the

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   REOs.  The Debtors considered other options to BSI and Citivest in order to reduce

2   costs, but there are no feasible, less expensive options.  Nonetheless, the Debtors were

3   able to negotiate some meaningful reductions to Citivest's fees, which will provide

4   savings to the estates.  The Debtors believe that the continued use of BSI and Citivest is

5   supported by a valid business justification.

6        The Debtors also request that sales to third parties be free and clear of liens and

7   on an "as is, where is" basis.  Sales by the Debtors to third parties will be in connection

8   with or following foreclosure of the Debtors' first priority mortgages, which would eliminate

9   any junior encumbrances.  Thus, any real estate assets to be sold by the Debtors

10  pursuant to the Sale Procedures should be unencumbered.  However, as provided in the

11  Sale Procedures, any party with a security interest in a property subject to a Real

12  Property Transaction will receive notice and an opportunity to object.  Any such party's

13  failure to object constitutes consent to the sale of the subject property free and clear of

14  liens as provided in 11 U.S.C. § 363(f)(2).

15       Accordingly, the Debtors respectfully request that the Court grant this Motion and

16  approve the proposed procedures and other requested relief.

17

18  **II.**     **BACKGROUND FACTS**

19       **A.**     **Factual Background**

20       The above-captioned cases now involve twenty-seven debtors.  On May 18, 2017

21  (the "Petition Date"), twenty-two of the debtors filed voluntary Chapter 11 petitions.  On

22  May 25, 2017, four additional debtors filed voluntary petitions.  On June 6, 2017, one last

23  debtor filed a voluntary petition.  The Court has entered an order authorizing the joint

24  administration of the debtors' twenty-seven cases.  The Debtors continue to operate their

25  businesses and manage their affairs as debtors-in-possession.  Howard Grobstein is the

26  Chief Restructuring Officers for the debtors (the "CRO").

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

B.    **The Debtors' Loans and REOs**

The Debtors are part of a network of entities or "Funds" formed to offer a range of investment opportunities to individuals.  Certain of the debtors made private loans secured by first-position deeds of trust against real property throughout the United States.  TD REO Fund, LLC ("TD REO"), was formed in August 2013 to manage the foreclosure process for loans in default.  As a borrower defaulted, the loan and deed of trust were typically assigned by the lending debtor to TD REO.

As of the Petition Date, TD REO owned approximately 31 REOs.  The Debtors collectively held approximately 81 loans as follows:  (a) two loans are held by TD Opportunity Fund, LLC; (b) one loan each is held by Secure California Income Fund, LLC, WJA Secure Real Estate Fund, LLC, and Equity Indexed Managed Fund, LLC; and (c) 76 loans are held by TD REO.  (*See* Grobstein Decl. at ¶ 2.)

C.    **BSI and Citivest**

BSI services the Debtors' loans.  The pre-petition agreement between BSI and WJA Asset Management, LLC ("WJAAM"), is attached hereto as Exhibit "1" (the "BSI Agreement").  BSI is paid a monthly flat fee of $15.00 per loan, which increases once a loan goes into default.  For example, the monthly fee of $15.00 for a particular loan is increased by $72.00 if BSI must commence foreclosure proceedings.  (*See* Ex. 1 at Bates Stamp No. 39.)  BSI is also paid certain one-time fees for various transactions, such as a short sale or short payoff (*i.e.*, the greater of 1.28% or $1,000).  (*See id.*)  Taxes and insurance premiums associated with the real property collateral securing the loans are essentially passed through to the Debtors (to the extent that they are not paid from amounts impounded from the borrowers).  The CRO understands that it was the pre-petition practice for the Debtors or WJAAM to pay to BSI in advance amounts necessary to satisfy upcoming estimated taxes and insurance premiums.  Advanced funds were held in a reserve account in BSI's name pending payment.  (Grobstein Decl. at ¶ 4.)

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    The Debtors are responsible for paying the attorney's fees associated with

2  foreclosing on their mortgages.  The CRO understands that BSI retains the attorneys

3  directly.  Attorneys are permitted to charge fees in accordance with the schedule

4  established by FannieMae, a copy of which is attached hereto as Exhibit "2," subject to

5  certain increases based on the circumstances.  The Debtors understand that BSI pays

6  the attorney's fees as certain milestones are reached in the foreclosure process.

7  (Grobstein Decl. at ¶ 5.)

8    Citivest, as asset manager, oversees the loan servicing by BSI and handles the

9  process of selling REOs.  The pre-petition agreement between Citivest and WJAAM is

10  attached hereto as Exhibit "3" (the "Citivest Agreement").  Citivest receives a monthly

11  asset management fee of $40.00 per loan, which ceases for a particular loan upon

12  conversion into a REO.  (*See* Ex. 3 at Bates Stamp No. 43, § 3.1.1.)  Upon the sale of an

13  REO, Citivest is entitled to a fee of 3% of the sale price or $750.00 (whichever is greater).

14  This is in addition to the broker's commission.  The buyer's broker and the seller's broker

15  are collectively paid the greater of 5% of the sale price or $1,800.  Citivest receives a

16  referral fee from the seller's broker equal to the greater of $250.00 or 25% of the broker's

17  commission.  The referral fee is paid directly from the broker's commission and does not

18  reduce the proceeds to the Debtors.  Citivest is also paid certain "systems" fees for

19  software it uses to manage the Debtors' portfolio.  (*See* Ex. 3 at Bates Stamp No. 43,

20  § 3.1.3.)

21

22  **III.**    **REQUESTED RELIEF**

23    **A.**    **Procedures for Real Property Transactions**

24    The Sales Procedures are summarized as follows:

25    1.    The Debtors will file a notice of the proposed foreclosure sale, short sale,

26  REO sale, and payoff settlement (the "Sale Notice") with the Court and serve the Sale

27  Notice on the following parties: (a) the Office of the United States Trustee; (b) counsel for

28  the Committee; (c) parties receiving Notification of Electronic Filings; and (d) any party

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   holding a security interest in the real property to be sold (collectively, the "Sale Notice

2   Parties").  The Sale Notice shall also be posted on Grobstein Teeple's web portal, which

3   can be accessed here: https://grobstein.egnyte.com/fl/Xr4EPThbfC#folder-link/.  If the

4   REO to be sold or the deed of trust subject to the foreclosure sale, short sale, or payoff

5   settlement is held or owned by a Debtor in whose case the Committee is not appointed,

6   then the "Sale Notice Parties" as defined above will also include the creditors holding the

7   20 largest claims in such Debtor's case.

8        2.    A Sale Notice shall contain the following information:

9        (a)    For foreclosure sales, the Sale Notice shall contain the name of the

10  Debtor that is the lender and holds the deed of trust; the property address (street

11  address, city, state, zip); the unpaid balance of the note secured by the deed of trust; the

12  value according to any broker's price opinion obtained by the Debtors; the date of the

13  broker's price opinion; and the scheduled foreclosure sale date.

14       (b)    For short sales, the Sale Notice shall contain the name of the Debtor

15  that is the lender and holds the deed of trust; the property address (street address, city,

16  state, zip); the unpaid balance of the note secured by the deed of trust; the value

17  according to any broker's price opinion obtained by the Debtors; the date of the broker's

18  price opinion; the sale price; the estimated net sale proceeds after costs; and the

19  scheduled sale date.

20       (c)    For REO sales, the Sale Notice shall contain the name of the Debtor

21  that owns the REO; the property address (street address, city, state, zip); the unpaid

22  balance of the note secured by the deed of trust prior to or as of the acquisition of the

23  REO; the value according to any broker's price opinion obtained by the Debtors; the date

24  of the broker's price opinion; the sale price; the estimated net sale proceeds after costs;

25  and the scheduled close date.

26       (d)    For payoff settlements, the Sale Notice shall contain the name of the

27  Debtor that is the lender and holds the deed of trust; the property address (street

28  address, city, state, zip); the unpaid balance of the note secured by the deed of trust; the

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2709135.1

5

1   value according to any broker's price opinion obtained by the Debtors; the date of the

2   broker's price opinion; the payoff amount; and the scheduled closing or payment date.

3          (e)    For all other transactions that the Debtors seek approval of using the

4   Sale Procedures, the Sale Notice shall contain the name of the Debtor that is the owner

5   of the deed of trust or REO in question; the property address (street address, city, state,

6   zip); the unpaid balance of the note secured by the deed of trust; the value according to

7   any broker's price opinion obtained by the Debtors; the date of the broker's price opinion;

8   and any material terms of the particular transaction in question.

9          (f)    The deadline and manner to object to the Sale Notice as provided in

10  Paragraphs 3 and 4 below.

11         (g)    The contact information for the Debtors' counsel, from whom

12  interested parties may request more information regarding the transactions proposed in

13  the Sale Notice.

14         (h)    A declaration from the Chief Restructuring Officer that he has

15  reviewed the foreclosure sale, short sale, REO sale, payoff settlement and/or other

16  transaction included in the Sale Notice, and he agrees that, in his business judgment, it is

17  in the best interests of the affected Debtor's estate to proceed with such foreclosure sale,

18  short sale, REO sale, payoff settlement, and/or other transaction.

19         3.     Any objection to the Sale Notice must be in writing and must specifically

20  state which foreclosure sale, short sale, REO sale, payoff settlement or other transaction

21  it objects to and request a hearing.  If such a written objection is timely served so as to be

22  received by the Debtor's counsel as set forth in paragraph 4 below, then the Debtors

23  shall schedule a hearing on such objection at the earliest practicable opportunity on at

24  least 10 days' notice by filing with the Court and serving, via first class U.S. mail,

25  facsimile, email or overnight delivery, a written notice of the hearing on the Sale Notice

26  Parties.  In the event of a timely written objection, the subject foreclosure sale, short sale,

27  REO sale, payoff settlement and/or other transaction specifically identified in such

28  objection shall be consummated only upon further order of the Court.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

6

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

4.      If, within 10 days after service of the Sale Notice, no written objection is served on the Debtors' counsel and the Sale Notice Parties so as to be received by such parties prior to such 10-day deadline, then the Debtors will be authorized to immediately consummate the foreclosure sale, short sale, REO sale, payoff settlement and/or other transaction included in the Sale Notice without further notice or order of the Court.  The Debtors shall be authorized, but not required, to lodge an order authorizing and approving the foreclosure sale, short sale, REO sale, payoff settlement and/or other transaction included in the Sale Notice.

**B.      Payment of BSI's and Citivest's Fees**

The Debtors seek authority to pay BSI and Citivest their agreed upon fees and expenses retroactive to the Petition Date .[1]  BSI will be compensated in accordance with the BSI Agreement.  Citivest will be compensated in accordance with the Citivest Agreement, subject to the following modifications: (1) Citivest will not receive a monthly accounting fee of $1,500 per month; (2) Citivest's asset disposition fee shall be reduced to the greater of $750.00 or 2% of the sale price (down from 3%); and (3) the systems fee for "GLASS" will be reduced to $5.00 per unit from $12.50 per unit.[2]  (*See* Grobstein Decl. at ¶ 7.)

The CRO considered other options.  First, the CRO considered moving the entire loan and REO portfolio to an entirely new servicer, FCI Lender Services, Inc. ("FCI").  However, FCI was unwilling to service the Debtors' loans.  (*See* Grobstein Decl. at ¶ 8.)  Moreover, even if the Debtors could retain FCI, it is not clear that FCI is a better option.  Moving the loan portfolio to FCI would cause the estates to incur onboarding or setup fees per loan.  (*See* Ex. 4, FCI rate sheet.)  FCI's monthly loan fee for delinquent loans is higher than BSI's monthly fee.  (*See id.*)  Also, FCI would service the loans only and

---

[1]      The Debtors are not seeking to assume any contracts with BSI and Citivest at this time.  Rather, the Debtors are seeking an order authorizing, but not requiring, the Debtors to use BSI's and Citivest's services in order to maximize recovery for creditors and investors.

[2]      Based on Citivest's invoice for April 2017, the reduction in the GLASS fee, as provided herein, reduces the total GLASS fee for that particular month by about $1,000 ($12.50 * 134 units = $1,675 vs. $5.00 * 134 units = $670).

1    would not manage the disposition of the REOs, and, therefore, the Debtors would be

2    required to continue to use Citivest in conjunction with FCI.  (*See* Grobstein Decl. at ¶ 8.)

3        Second, the CRO considered moving the REOs to BSI such that BSI would both

4    service the loans and manage the REOs for reduced overall fees.  However, the terms

5    proposed by BSI to manage the REOs were not an improvement from the fees charged

6    by Citivest.  Rather, BSI would charge a $45.00 flat fee per month for managing the

7    REOs and charge a disposition fee in the amount of the greater of 1.25% of the sale price

8    and $1,500.  While BSI's maximum disposition fee is .75% less than the reduced fee to

9    be charged by Citivest, the minimum fee is greater and BSI would charge a monthly flat

10   fee on REOs, which the Debtors do not currently pay.  The CRO believes that continuing

11   to use BSI and Citivest pursuant to the reduced fee structure set forth above is the best,

12   and perhaps only, alternative.  (*See* Grobstein Decl. at ¶ 9.)

13

14   **IV.   LEGAL ANALYSIS**

15       **A.    The Sale Procedures are Appropriate Under the Particular**

16             **Circumstances of this Case**

17       The Real Property Transactions are ordinary course transactions that do not

18   require court approval.  A debtor-in-possession may sell, lease, or use property of the

19   estate "in the ordinary course of business" without notice or hearing.  *See* 11 U.S.C.

20   § 363(c); *see also* 11 U.S.C. §§ 1107(a) & 1108.  Where the very nature of a debtors'

21   business is to sell real estate, the sale of real estate is in the ordinary course of the

22   debtor's business.  *See, e.g.*, *In re WRB W. Assocs. Joint Venture*, 106 B.R. 215, 218–19

23   (Bankr. D. Mont. 1989) ("The very nature of the Debtors' business is to sell the

24   developed, but unimproved lots, so that the ordinary course of Debtor's business is land

25   sales."); *see also In re Stroud Ford, Inc.*, 205 B.R. 722, 725 (Bankr. M.D. Pa. 1996) ("Not

26   every sale of real estate is necessarily out of the ordinary course of the debtor's

27   business. The very essence of a residential real estate development is to market real

28   estate.").

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1      Assuming the Real Property Transactions are considered outside the ordinary

2  course of the Debtors' business, then they may be approved if they are supported by a

3  sound or valid business justification.  *See* 11 U.S.C. § 363(b); *see also, e.g., In re 240*

4  *North Brand Partners, Ltd.,* 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996); *In re Martin*, 91

5  F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153

6  (D. Del. 1999).  Courts also look at whether a transaction outside the ordinary course is in

7  the best interests of the estate based on the facts and history of the case.  *See In re*

8  *America West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994), *citing, In re Lionel*

9  *Corp.*, 722 F.2d 1062, 1071 (2d Cir. 1983).  A debtor-in-possession's application of its

10  business judgment is subject to great judicial deference.  *See In re Lahijani*, 325 B.R.

11  282, 289 (B.A.P. 9th Cir. 2005); *see also GBL Holding Co., v. Blackburn/Travis/Cole,*

12  *Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Psychrometric Systems, Inc.,* 367 B.R.

13  670, 674 (Bankr. D. Colo. 2007).

14      The Court has discretion to alter the notice and hearing required for the approval

15  of sales outside the ordinary course on a case-by-case basis.  *See* 11 U.S.C. § 102; *see*

16  *also* Fed. R. Bankr. P. 2002(a)(2).  As stated above, the sale of property outside the

17  ordinary course is appropriate "after notice and a hearing."  Pursuant to § 102, "after

18  notice and a hearing" means the following:

19      (A) means after such notice as is appropriate in the particular
circumstances, and such opportunity for a hearing as is
20      appropriate in the particular circumstances; but

21      (B) authorizes an act without an actual hearing if such notice is
given properly and if—
22

23      (i) such a hearing is not requested timely by a party in
interest; or

24      (ii) there is insufficient time for a hearing to be
commenced before such act must be done, and the court
25      authorizes such act.

26  11 U.S.C. § 102.  *See also* Fed. R. Bankr. P. 2002(a)(2) (providing that for a proposed

27  sale of property of the estate other than in the ordinary course of business, the court may,

28  for cause, shorten the 21-day notice period and direct another method of giving notice).

1   Further, § 105(a) provides that "[t]he court may issue any order, process, or judgment

2   that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.

3   § 105(a).  Under )§ 105(d), the Court may, "unless inconsistent with another provision of

4   this title or with the applicable [Bankruptcy Rules], issue an order . . . prescribing such

5   limitations and conditions as the court deems appropriate to ensure that the case is

6   handled expeditiously and economically."  11 U.S.C. § 105(d); *see also e.g.,* Fed. R.

7   Bankr. P. 2002(m) (authorizing the Court to issues orders designating the form and

8   manner of notices); Fed. R. Bankr. P. 1015(c) (authorizing the court to enter orders as

9   may tend to avoid unnecessary costs and delays in the context of jointly administered

10  cases); Fed. R. Bankr. P. 1001 (stating that the Bankruptcy Rules shall be "construed to

11  secure the just, speedy, and inexpensive determination of every case and proceeding.").

12      The Real Property Transactions are ordinary course transactions.  The Debtors

13  that hold deeds of trust and/or REOs were formed for that purpose.  For example, TD

14  REO, which holds the overwhelming majority of the outstanding loans and all of the

15  REOs, was created for the sole purpose of managing the foreclosure process for all of

16  the debtors and selling the REOs.  (*See* Grobstein Decl. at ¶ 10.)  When borrowers

17  default on the loans made by the Debtors, the Debtors must take steps to collect, such

18  as, by commencing foreclosure, accepting a short payoff, or agreeing to a short sale.

19  Similarly, upon acquiring an REO through foreclosure, TD REO must then take steps to

20  sell it.  The Real Property Transactions are entirely consistent with the Debtors' pre-

21  petition practices and are ordinary course transactions.  Thus, the Sale Procedures

22  provide notice and an opportunity to be heard where none is required by the Bankruptcy

23  Code.

24      Alternatively, assuming the Real Property Transactions require Court approval, the

25  Sale Procedures are appropriate under the particular circumstances of this case.  The

26  Sale Procedures will allow the Debtors to effectuate their Chapter 11 strategy of

27  liquidating their assets in a manner that maximizes return for creditors and investors.

28  Given the number of loans and REOs, it would be unnecessarily costly and inefficient to

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   require the Debtors to prepare and file a motion every time they wish to consummate a

2   particular Real Property Transaction.  The Sale Procedures will reduce administrative

3   costs by implementing a more cost-effective and efficient method of consummating the

4   Real Property Transactions and will, thereby, maximize the net value for the benefit of

5   creditors and investors.  (Grobstein Decl. at ¶ 11.)  The Sale Procedures are also

6   consistent with § 363(b)'s notice requirements, as detailed by § 102, and will protect the

7   rights of parties in interest by providing them with notice and an opportunity to object.

8        The Sale Procedures do not circumvent the "business judgment" standard of

9   § 363(b).  All Real Property Transactions will be subject to the business judgment and

10  approval of the CRO and all Sale Notices will be supported by a declaration from the

11  CRO that, in his business judgment, the proposed Real Property Transactions are in the

12  best interests of the estates.  Accordingly, the Sales Procedures are in best interests of

13  the estates and are consistent with the requirements of the Bankruptcy Code.

14       **B.    Sales to Third Parties Should be Free and Clear of Liens**

15       Section 363(f)(2) provides that the debtor-in-possession may sell property under

16  subsection § 363(b) free and clear of any interest in such property of an entity other than

17  the estate if such entity consents.  11 U.S.C. § 363(f)(2).  Consent for purposes of

18  § 363(f)(2) may be express or implied.  *See, e.g., FutureSource LLC v. Reuters Ltd.,* 312

19  281, 285 (7th Cir. 2002), *cert. denied*, 538 U.S. 962, 123 (2003) ("lack of objection

20  (provided of course there is notice) counts as consent"); *Matter of Tabone, Inc.,* 175 B.R.

21  855, 858 (Bankr. D.N.J. 1994) (in the context of a sale hearing set on shortened notice,

22  failure to object to sale after receiving notice constitutes implied consent for purposes of

23  § 363(f)(2)); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345

24  (E.D. Pa. 1988) (implied consent was sufficient to satisfy § 363(f)(2) requirement

25  authorizing trustee to sell property free and clear of lienholder's lien when lienholder

26  failed to timely object after receiving notice of the sale).

27       The sale of any real property assets to third parties free and clear of liens is

28  appropriate.  As an initial matter, the Debtors' real property assets should not be subject

1   to any liens.  REOs were acquired by TD REO through foreclosure and should not be

2   encumbered.  Moreover, foreclosure sales via a first-position mortgage held by the

3   Debtors should eliminate any junior encumbrances.  However, the Sale Procedures will

4   provide any lienholders with notice of the proposed Real Property Transaction and an

5   opportunity to object and request a hearing.  Based on the case law cited above, a

6   lienholder's failure to object to a Sale Notice would constitute consent for purposes of

7   § 363(b)(2).  Accordingly, the Court should authorize the sales of the Debtors' real

8   property to third parties free and clear of liens.

9       **C.**    <u>**Waiver of the 14-Day Stay Set Forth in Bankruptcy Rule 6004(h) Is**</u>

10      <u>**Appropriate**</u>

11        Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or

12  lease of property other than cash collateral is stayed until the expiration of 14 days after

13  entry of the order, unless the court orders otherwise."  Here, in order to facilitate the most

14  expeditious sale closings possible, the Debtors request that the 14-day stay be waived.

15      **D.**    <u>**The Debtors' Continued Use of BSI and Citivest is Supported by a**</u>

16      <u>**Valid Business Justification**</u>

17        The Debtors' continued use of BSI and Citivest on the terms set forth herein is

18  supported by a valid business justification.  The Debtors have ongoing foreclosure

19  proceedings and REOs located throughout the United States.  At this stage, the Debtors

20  could not proceed without any loan servicer or asset manager without substantial

21  increased cost and risk.  The Debtors have used BSI and Citivest since 2014 and the

22  Debtors benefit from their familiarity with the Debtors' loan and REO assets.  The CRO

23  evaluated other potential alternatives to the current arrangement with the hopes of

24  lowering the Debtors' costs.  Unfortunately, the Debtors' options are limited.  As

25  discussed above, to the CRO's knowledge, there is not a less costly alternative to using

26  Citivest and BSI.  Moreover, the CRO has negotiated discounts to the pre-petition fee

27  structure of Citivest, which will provide some savings.  Therefore, with the discounts set

28  forth herein, the CRO believes that the continued use of Citivest and BSI pursuant to their

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  respective pre-petition agreements is in the best interests of the estates.  (Grobstein

2  Decl. at ¶ 12-13.)

3       BSI's fees for a particular loan, *e.g.*, the monthly loan fee and any one-time fees,

4  will be paid from the proceeds of such loan.  Similarly, the pass-through expenses, such

5  as attorney's fees, taxes, and insurance premiums associated with a particular loan shall

6  be paid by the Debtor that holds such loan in the ordinary course.  As TD REO owns 76

7  of the 81 outstanding loans and all of the REOs, TD REO will pay Citivest's monthly fees.

8  Citivest's asset disposition fee for a particular REO shall be paid from the proceeds of the

9  sale of such REO.

10      The CRO requests authority to compensate BSI and Citivest for fees and

11  expenses since the petition date.  The CRO understands from BSI that it has advanced

12  amounts to pay taxes and insurance premiums related to the real property collateral

13  securing the Debtors' loans and attorney's fees for the pending foreclosure proceedings.

14  The payment of these types of pass through expenses are ordinary course expenses of

15  the Debtors' that hold the corresponding loans.  Citivest and BSI should also be

16  compensated the fees provided in their respective contracts for the services provided

17  since the Petition Date and for which they have not yet been compensated pending the

18  CRO's consideration of alternatives and the filing of this Motion.  Accordingly, the

19  reimbursement of expenses and the payment of fees since the petition is appropriate.

20

21  **V.    <u>CONCLUSION</u>**

22      Based on the foregoing, the Debtors respectfully request that this Court enter an

23  order providing for the following relief:

24      1.    Granting this Motion;

25      2.    Approving the Sale Procedures and authorizing the Debtors to engage in

26  and close any Real Property Transactions utilizing the Sales Procedures;

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

3.      Authorizing the Debtors to compensate BSI and Citivest in the ordinary course as set forth in their respective agreements for all post-petition services, and as provided herein;

4.      Authorizing and ordering that any sales of real property by any Debtor to a third party is free and clear of liens and is on an "as is, where is" basis;

5.      Authorizing the waiver of Bankruptcy Rule 6004(h)'s 14-day stay as to any sales of real property pursuant to the Sales Procedures; and

6.      For such other relief as the Court may deem just and necessary.

DATED:  July 14, 2017                    SMILEY WANG-EKVALL, LLP

By:      /s/ Robert S. Marticello
        ROBERT S. MARTICELLO
        Attorneys for Debtors

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

## DECLARATION OF HOWARD GROBSTEIN

I, Howard Grobstein, declare as follows:

1.      I am the Chief Restructuring Officer of the Debtors and a founder and partner of Grobstein Teeple, LLP ("GT").  I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto.  I make this declaration in support the Motion.  Unless otherwise defined in this declaration, all terms defined in the Motion are incorporated herein by reference.

2.      To my knowledge, as of the Petition Date, TD REO owned approximately 31 REOs and the Debtors collectively held approximately 81 loans as follows: (a) two loans are held by TD Opportunity Fund, LLC; (b) one loan each is held by Secure California Income Fund, LLC, WJA Secure Real Estate Fund, LLC, and Equity Indexed Managed Fund, LLC; and (c) 76 loans are held by TD REO.

3.      Attached hereto as Exhibit "1" is a true and correct copy of the agreement between WJA Asset Management ("WJAAM") and BSI.

4.      It is my understanding that it was the pre-petition practice for the Debtors or WJAAM to pay to BSI in advance amounts necessary to satisfy upcoming estimated taxes and insurance premiums and the advanced funds were held in a reserve account in BSI's name pending payment.

5.      I understand from BSI that the attorneys they retain for foreclosure proceedings are permitted to charge fees in accordance with the schedule established by FannieMae, a copy of which is attached hereto as Exhibit "2", subject to certain increases based on circumstances.  I am also informed by BSI that it pays the attorney's fees as certain milestones are reached in the foreclosure process.

6.      Attached hereto as Exhibit "3" is a true and correct copy of WJAAM's agreement with Citivest.

7.    I am informed that Citivest has agreed to be compensated in accordance with the agreement between Citivest and WJAAM, Exhibit "3," subject to the following modifications: (1) Citivest will not receive a monthly accounting fee of $1,500 per month; (2) Citivest's asset disposition fee shall be the greater of $750.00 or 2% of the sale price (down from 3%); and (3) the systems fee for "GLASS" will be reduced to $5.00 per unit from $12.50 per unit.

8.    I considered several options regarding whether to continue using BSI to service the Debtors' loans and whether to continue using Citivest to oversee the loan servicing by BSI and to handle the process of selling REOs.  I considered moving the entire loan and REO portfolio to FCI Lender Services, Inc. ("FCI").  However, it was not clear to me that FCI is a better option.  Attached hereto as Exhibit "4" is a true and correct copy of FCI's rate sheet for standard loan servicing and REO management as listed on FCI's website as of the date of the filing of the Motion.  Among other reasons, I was informed that FCI would service the loans only and would not manage the disposition of the REOs.  Thus, even if the Debtors used FCI, they would still be required to use Citivest in conjunction with FCI.  Moreover, moving the loans to FCI would cause the Debtors to incur setup fees and it was not clear that FCI's monthly servicing fees are less than BSI's fees.  That said, FCI was ultimately unwilling to service the Debtors' loans.

9.    I also considered moving the REOs to BSI such that BSI would both service the loans and manage the REOs for reduced overall fees.  However, I believe that the terms proposed by BSI to manage the REOs were not an improvement from the fees charged by Citivest.  I was informed that BSI would charge a $45.00 flat fee per month for managing the REOs and charge a disposition fee in the amount of the greater of 1.25% of the sale price and $1,500.  I was also informed that BSI would charge a monthly flat fee to the Debtors for managing the REOs, which I believe the Debtors do not currently pay with Citivest.  I believe that continuing to use BSI and Citivest pursuant to the reduced fee structure described above is the best, and perhaps only, alternative.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

10.     It is my understanding that the Debtors that hold deeds of trust and/or REOs were formed for the purpose of holding these types of assets and, therefore, proceeding with foreclosures, agreeing to short sales or short payoffs, and selling any REOs would be part of the ordinary course of business of the Debtors and consistent with their pre-petition practices.  It is my understanding that TD REO, which, to my knowledge, holds the overwhelming majority of the outstanding loans and all of the REOS, was created for the sole purpose of managing the foreclosure process for all of the Debtors and selling the REOs.

11.     I believe that the Sale Procedures as defined in the Motion will allow the Debtors to effectuate their Chapter 11 strategy of liquidating their assets in a manner that maximizes return for creditors and investors.  Given the number of loans and REOs, I believe it would be unnecessarily costly and inefficient to require the Debtors to prepare and file a motion every time they wish to consummate a particular Real Property Transaction.  Further, I believe that the Sale Procedures will reduce administrative costs by implementing a more cost-effective and efficient method of consummating the Real Property Transactions and will, thereby, maximize the net value for the benefit of creditors and investors.

12.     I believe that the Debtors' continued use of BSI and Citivest on the terms set forth in the Motion are supported by a valid business justification.  The Debtors have ongoing foreclosure proceedings and REOs located throughout the United States.  I do not believe that the Debtors can proceed with the Real Property Transactions without any loan servicer or asset manager without substantial increased cost and risk.  To my knowledge, the Debtors have used BSI and Citivest since 2014 and I believe that the Debtors benefit from their familiarity with the Debtors' loans and REO assets.

13.     I evaluated other potential alternatives to the current arrangement in hopes of lowering the Debtors' costs.  However, to my knowledge, there is not a less costly alternative to using Citivest and BSI.  I have negotiated discounts to the pre-petition fee structure of Citivest, which will provide some savings.  Therefore, I believe that the

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1 | continued use of Citivest and BSI pursuant to their respective pre-petition agreements is

2 | in the best interests of the estates.

3 |     I declare under penalty of perjury under the laws of the United States of America

4 | that the foregoing is true and correct.

5 |     Executed on this 14th day of July, 2017, at _LAGUNA Hills_, California.

6

7

8 | HOWARD B. GROBSTEIN

9

10

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

# EXHIBIT "1"

## BSI FINANCIAL SERVICES, INC.
## SERVICING AGREEMENT

THIS SERVICING AGREEMENT (this "Agreement") is made and entered into this _____, 2014, by and between WJ asset management CA,LLC _____ ("Lender"), whose principal place of business is located at _____, and SERVIS ONE, INC. D/B/A BSI FINANCIAL SERVICES, INC., a Delaware corporation ("Servicer"), whose principal place of business is located at 1425 Greenway Drive, Suite 400, Irving, Texas 75038.

### RECITALS:

WHEREAS, Servicer is engaged in the business of managing and servicing mortgage loans, including residential mortgage loans evidenced by notes and secured by deeds of trust, mortgages, trust deeds or like security instruments; and

WHEREAS, Lender desires that Servicer perform certain subservicing functions with respect to certain residential mortgage loans pursuant to this Agreement, and Servicer is willing to perform such functions on and subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Capitalized terms used but not otherwise defined in this Agreement have the following meanings, unless the context otherwise requires:

1.1     **Agreement:** "Agreement" shall mean this subservicing agreement as the same may be from time to time amended or supplemented.

1.2     **Borrower:** "Borrower" shall mean any maker, endorser, guarantor or other person or entity obligated for the payment of a Note in accordance with its terms.

1.3     **Delivery Date:** "Delivery Date" means the date loans are received from Lender by Servicer. All Loans to be serviced in a particular month must be received pursuant to Servicer requirements.

1.4     **Direct Cost:** "Direct Cost" shall mean all costs incurred by Servicer in underwriting the Loans and accepting them for subservicing, including costs of travel, meals and lodging, costs of transferring data to Servicer from the current servicer, if applicable, and letters to Borrowers advising them of the change in servicing.

1.5     **Effective Date:** "Effective Date" shall mean, with respect to each Loan, the date of transfer of servicing of such Loan to the Servicer under the terms of this Agreement.

1.6     **FDIC:** "FDIC" shall mean the Federal Deposit Insurance Corporation and any successor thereto.

1.7     **FHA:** "FHA" shall mean the Federal Housing Administration.

EXHIBIT 1, PAGE 19

1.8    **FHLMC:** "FHLMC" shall mean the Federal Home Loan Mortgage Corporation and any successor thereto.

1.9    **FNMA:** "FNMA" shall mean the Federal National Mortgage Association and any successor thereto.

1.10    **HUD:** "HUD" shall mean the U.S. Department of Housing and Urban Development or any federal agency or official thereof which may from time to time succeed to the functions thereof.

1.11    **Lender:** "Lender" shall mean the owner and holder of a Note.

1.12    **Loan Documents:** "Loan Documents" shall mean any and all documents related to a Loan, including the Note, the Mortgage, and any other documents evidencing or securing the Loans or otherwise related to the Loans.

1.13    **Loans:** "Loans" shall mean any loans made subject to this Agreement on a periodic basis. Any one of the Loans shall be referred to herein as a "Loan".

1.14    **Mortgage:** "Mortgage" shall mean the original security deed, trust deed, deed of trust, security agreement, financing statement, guaranty, and other document securing a Loan, including any riders, addenda, assumption agreements, modifications, and amendments thereto.

1.15    **Mortgagor:** "Mortgagor" or "Mortgagors" shall mean the grantors or makers of any Mortgages, including mortgagors and trustors of trust deeds and deeds of trust.

1.16    **Note:** "Note" shall mean for each Loan, the original promissory note, bond or other evidence of indebtedness executed by a Borrower and evidencing the indebtedness of such Borrower under such Loan and any riders, addenda, modification or amendments thereto.

1.17    **Servicer:** "Servicer" shall mean Servis One, Inc. d/b/a BSI Financial Services, Inc., a Delaware corporation, and its successors and permitted assigns.

1.18    **Taxes:** "Taxes" shall mean all real estate taxes and other taxes assessed against property securing Loans, the nonpayment of which will result in a lien taking priority over the Mortgage (if applicable).

1.19    **Termination Fee:** "Termination Fee" means the fee described on Exhibit I to this Agreement that is payable to Servicer under Article IV and Article V hereof.

1.20    **VA:** "VA" shall mean the U.S. Department of Veterans Affairs.

**ARTICLE II**
**AGREEMENTS OF SERVICER**

2.1    **General:**

Servicer hereby agrees to service each Loan pursuant and subject to the terms of this Agreement. Lender and Servicer agree that this Agreement shall be effective as of the Effective Date.

**Compliance:**

Servicer will comply with the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. 6801 *et seq.*) and the regulations promulgated with respect thereto (the "GLB Act") regarding privacy of nonpublic personal information. Servicer will comply with all state and federal laws and regulations relating

to its obligations under this Agreement. With respect to Loans insured by private mortgage insurance, Servicer shall comply with the requirements of private mortgage insurance companies, including those requiring the giving of notices.

**2.2**    **Confidentiality and Exchange of Proprietary Data**

Privacy of Consumer Financial Information

All capitalized terms used in this Section and not otherwise defined shall have the meanings set forth in the Federal "Privacy of Consumer Financial Information" Regulation (12 CFR Part 40), as amended from time to time (the "**Privacy Regulation**"), issued pursuant to Section 504 of the GLB Act. The parties acknowledge that the Privacy Regulation governs disclosures of nonpublic personal information about consumers ("**Nonpublic Personal Information**").

(i)    Servicer hereby agrees that it shall:

(A)    Comply with the terms and provisions of the Privacy Regulation, including, without limitation, the provisions regarding the sharing of Nonpublic Personal Information (as defined in the Privacy Regulation);

(B)    Not disclose or use any Nonpublic Personal Information that it obtains from the Lender except to carry out the purposes for which the Lender provided such Nonpublic Personal Information, or as otherwise permitted by the Privacy Regulation and other applicable laws;

(C)    Refrain from sharing and/or transmitting Nonpublic Personal Information by means of e-mail or other methods which transmit information in the public domain. In the event Servicer discovers that it has transmitted Nonpublic Personal Information in an unauthorized format or in a format contrary to the Privacy Regulation, Servicer shall immediately notify those individuals listed in Section 9.8 below via facsimile at the numbers provided; and

(D)    Not disclose any Nonpublic Personal Information disclosed to Servicer by Lender or Borrower to any other entity, except as follows:

(1)    to Lender affiliates, with the prior consent of Lender;

(2)    to Servicer affiliates, provided, that its affiliates may, in turn, disclose and use the information only to the extent that Servicer may disclose and use the information;

(3)    to an unaffiliated third party, in the ordinary course of business in order to carry out the activity for which the information was disclosed to Servicer, pursuant to one of the following exceptions to the Privacy Regulation:

(a)    as necessary to effect, administer or enforce a transaction that a consumer requests or authorizes;

(b)    in connection with servicing or processing a financial product or service that a consumer requests or authorizes, or maintaining or servicing the consumer's account with Lender;

*Loan Sale and Service*
*Servicing Agreement:*

(c)      with the consent or at the direction of the consumer; or

(d)      to protect the confidentiality or security of Lender's records pertaining to the consumer, service, product or transaction; to protect against or prevent actual or potential fraud, unauthorized transactions, claims or other liability; for required institutional risk control; for resolving consumer disputes or inquiries; to persons holding a legal or beneficial interest relating to the consumer, or acting in a fiduciary or representative capacity on behalf of the consumer; to provide information to insurance rate advisory organizations, guaranty funds or agencies, or Lender's attorneys, accountants and auditors; to the extent specifically permitted or required under other provisions of law, to law enforcement agencies, a state insurance authority, self-regulatory organizations or for an investigation on a matter related to public safety; to a consumer reporting agency in accordance with the Fair Credit Reporting Act; to comply with Federal, State or local laws, rules and other applicable legal requirements, or a properly authorized civil, criminal or regulatory investigation, or subpoena or summons; or to respond to judicial process or to government regulatory authorities having jurisdiction over Servicer for examination, compliance or other purposes as authorized by law.

(ii)      At any time, upon Lender's request, Servicer shall return to Lender or destroy all Nonpublic Personal Information in its possession. Servicer agrees that money damages would not be a sufficient remedy for any breach of this Section and that Lender shall be entitled to seek injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Section by Servicer. Such remedy shall not be the exclusive remedy for any breach of this Section by Servicer, but shall be in addition to all other rights and remedies available to Lender at law or in equity. Finally, Lender shall be under no obligation to take any action which, in Lender's reasonable judgment, would constitute a violation of the Privacy Regulation or its internal privacy policies.

(iii)      Notwithstanding any other term to the contrary contained herein, this Section regarding Privacy of Consumer Financial Information shall survive any termination, cancellation, expiration, and/or rescission of this Agreement.

<u>Confidentiality</u>

Both Servicer and Lender have made and, throughout the term of this Agreement, will continue to make available to the other party confidential and proprietary materials and information (**"Proprietary Information"**). Prospectively, each party shall advise the other of material and information that is confidential and/or proprietary. All material and information provided by either party to the other relating to the business, policies, procedures, customs, forms, customers and strategies of such party or any of its affiliates, including information previously or hereafter divulged or delivered to the other party by such party regarding the aforementioned subject matter is hereby designated as confidential and proprietary and shall be considered to be Proprietary Information. It is understood that the obligations set forth in this Section do not apply to materials or information that: (i) are already, or otherwise become, generally known by third parties as a result of no act or omission of the receiving party; (ii) subsequent to disclosure hereunder are lawfully received from a third party having the right to disseminate the information

*Asset Purchase and Servicing Agreement*

without restriction on disclosure; (iii) are generally furnished to others by the disclosing party without restriction on disclosure; (iv) were already known by the receiving party prior to receiving them from the disclosing party and were not received from a third party in breach of that third party's obligations of confidentiality; or (v) are independently developed by the receiving party without the use of Proprietary Information of the disclosing party.

Each party shall maintain the confidentiality of the other party's Proprietary Information and will not use or disclose such Proprietary Information without the prior written consent of the other party.  Notwithstanding the foregoing, each party may disclose the other party's Proprietary Information to its affiliates, agents, and other third parties on a need-to-know basis, provided that such third-parties are under a similar obligation to maintain the confidentiality of the Proprietary Information so disclosed.

Further, the parties may disclose the other's Proprietary Information in a judicial or quasi-judicial proceeding when required to do so by law when responding to a subpoena, deposition notice or similar judicial or governmental demand; in such situations, however, the party being requested to disclose the other's Proprietary Information shall provide notice to the other party whereby the other party may intervene in the proceeding, if it wishes, and endeavor to prevent such disclosure. Additionally, the parties may, upon inquiry and if required by governing law, disclose the other's Proprietary Information to their various governmental regulatory agencies.

Notwithstanding any contrary provision of this Agreement, as long as each party protects the Proprietary Information of the other, neither the exposure to the other party's Proprietary Information, nor its ownership of work products, shall prevent either party from using ideas, concepts, expressions, know-how, skills and experience possessed by either party prior to its association with the other party or developed by either party during its association with the other party, so long as the Proprietary Information of the other party is not used.

**2.3     Procedure:**

Until the principal and interest of each Note and all obligations under each Note and Mortgage are paid in full, unless sooner terminated pursuant to the terms hereof, Servicer shall:

a)      Collect as they become due (i) payments of principal and interest, (ii) any sums to be held in escrow for the payment of taxes, assessments and other public charges that are generally impounded, hazard and/or flood insurance premiums, FHA insurance or private mortgage insurance premiums, condominium association dues and fees and other sums required to be collected and disbursed for Borrowers (collectively, "Escrowed Sums"), if applicable, and (iii) all other amounts due from Borrowers and/or Mortgagors;

b)      Accept payments of principal and interest and impound deposits (if applicable) only in accordance with the Loan Documents or information provided by Lender including information received from Lender's/Servicer's servicing system. Deficiencies or excess in payments or deposits shall be accepted and applied in accordance with the Loan Documents or, if not covered in such documents, in accordance with Lender's instructions;

c)      Apply all installments and impound deposits (if applicable) collected by it from the Borrower or Mortgagor, and maintain permanent mortgage account records capable of producing, at any time in chronological order: the date, amount, distribution, installment due date or other transactions affecting the amounts due from or to the Borrower and/or Mortgagor and indicating the latest outstanding balances of principal, impound deposits, advances, and unapplied payments;

*vice*
*Servicing Agreement:*

d)    Pending disbursement, segregate and hold by it in a custodial account or accounts in a financial institution insured by the FDIC (each a **"Custodial Account"** and collectively, the **"Custodial Accounts"**), in such manner as to show the custodial nature thereof, and so that the Lender and each separate Borrower whose funds have been deposited in any such account will be individually protected under the rules of the FDIC. Servicer's records shall show the respective interest of the Lender and each Borrower in all Custodial Accounts. All funds collected for principal and interest shall be held by and carried in records of the Servicer as "trustee" for the Lender, and accounts shall be established in compliance with all applicable rules and regulations of any governmental agency insuring or guaranteeing each Loan;

e)    Maintain deposits received for the payment of Escrowed Sums in a separate custodial account as specified in subparagraph (d) of this Section for each Borrower (**"Borrower Custodial Account"**). If any federal or applicable state statute or regulation requires the payment of interest on escrowed funds, Servicer will pay such interest on each affected Borrower Custodial Account, which it maintains or controls. Lender shall reimburse Servicer for such interest payments immediately upon billing. Servicer will determine the amount of deposits to be made by Borrowers and will furnish to each Borrower, at least once a year, an analysis of his/her Borrower Custodial Account (if applicable);

f)    Maintain accurate records reflecting the status of taxes, ground rents and other recurring charges which may result in a lien against the secured property. For all Loans providing for the payment to and collection by Servicer of any Escrowed Sums, Servicer shall pay such charges before any penalty date. Servicer assumes responsibility for the timely payment of all Escrowed Sums and will hold harmless and indemnify Lender from all penalties, loss or damage resulting from Servicer's failure to discharge said responsibility (if applicable);

g)    For all Loans having no provisions for the collection by Servicer of Escrowed Sums for Taxes, Servicer shall, upon notification by its tax service, promptly contact Lender regarding the delinquency of any such Taxes. Upon Lender's instruction and remittance, Servicer will pay any delinquent Taxes. Additionally, Servicer shall not be responsible for payment for ground rents or other charges for any Loan for which it is not obligated to collect Escrowed Sums and will pay such charges only upon Lender's instruction and remittance;

h)    When Escrowed Sums held in a Borrower Custodial Account are insufficient to pay Taxes, assessments, mortgage insurance premiums, hazard or flood insurance premiums, or other items due therefrom, Lender shall reimburse Servicer monthly for all outstanding deficiencies, and any other advances made by Servicer to protect the security of Lender and Lender shall wire funds necessary to reimburse Servicer for any advances within five (5) days after receipt of an invoice therefor. Funds received after the fifth day will bear interest on the unpaid balance from the due date until the date paid to Servicer at a rate equal to the lesser of the maximum rate permitted by law or one and one-half percent (1.5%) above the prime rate of interest published in *The Wall Street Journal* or any successor publication on the due date of the payment obligation (the **"Default Rate"**).

i)    Maintain in full force and effect at all times FHA mortgage insurance, or private mortgage insurance, as applicable, in accordance with the type of Loan, and will assume responsibility for the payment of the premium thereon for each Loan to the extent funds are available from each Borrower Custodial Account; and

Confidential & Proprietary

j)    Assure that improvements on property securing each Mortgage are insured by hazard insurance issued by companies acceptable to Lender in an amount at least equal to the unpaid principal balance of the Loan or the full insurable value of the improvements, whichever is less, of a type at least as protective as fire and extended coverage, and containing a "standard" or "union" mortgage clause (without contribution) in the form customarily used in the area in which the property is located. In all events, the provisions of the Loan Documents shall prevail. The mortgagee clause will be reflected as running to the benefit of Lender, its successors and assigns. During the course of subservicing, the mortgagee clause in the hazard insurance will read as follows:

WJ Asset Management

Its Successors and Assigns
c/o BSI Financial Services, Inc.
PO Box 702168
Dallas, Texas 75370

## 2.4    Other:

To further safeguard Lender's interest and rights in any real property, mobile home, or other property securing any Loan under any Mortgage, Servicer shall:

a)    Upon Lender's request, inspect such property when any Borrower becomes sixty (60) days or more delinquent in the payment of principal and interest or Escrowed Sums under the Note and perform such other inspections in accordance with accepted servicing practices or upon written request from Lender. These will occur monthly while in foreclosure;

b)    Upon Lender's request, to the extent possible, secure any such property found to be vacant or abandoned, and advise Lender of the status thereof;

c)    Notify Lender whenever Servicer receives notice or otherwise becomes aware of any notice of liens, bankruptcy, condemnations, probate proceeding, tax sale, partition, local ordinance violation, condemnation, or proceeding in the nature of eminent domain or similar event that would, in Servicer's reasonable judgment, impair Lender's security; and Servicer shall assist Lender in undertaking appropriate action to preserve its security;

d)    Advise Lender with respect to requests for partial releases, easements, substitutions, division, subordination, alterations, or waivers of security instrument terms;

e)    Advise Lender of any change in ownership of secured property, and subject to governing laws and regulations, comply with all instructions from Lender with respect to the acceleration of the Note.

f)    Maintain in force at all times a policy of errors and omissions insurance coverage at Servicer's sole expense. Among others purposes, one purpose of such coverage is to provide Lender protection in liquidating a Loan against net loss that can be attributed to damage to the property from a hazard or peril required to be insured by the Lender and that otherwise would be insured but for Servicer's negligence in allowing insurance coverage to lapse or failing to keep a sufficient amount of insurance in force; and

g)    Disburse insurance loss settlements according to Lender's guidelines.

## 2.5    Lender Accounting:

*Private Label Servicing Agreement:
Servicing Agreement:*

Servicer shall:

a)     Make interest rate adjustments in accordance with the terms of the Note and applicable laws. Servicer shall execute and deliver all appropriate notices required by applicable laws and the Note regarding such interest rate adjustments; including, but not limited to, timely notification to Borrower of: (i) applicable date of such interest rate adjustment, (ii) new rate of interest, and (iii) new payment amount;

b)     Perform such other reasonable duties, furnish such other reports and execute such other documents in connection with its duties hereunder as Lender may from time to time require consistent with accepted servicing practices. By way of example and not limitation, such reports may include categories including: Reporting cutoff date, Loan Number, Borrower Name, Beginning Principal Balance, Date Paid, P&I Payment Amount, Amount Paid, Interest Rate, Installment Due Date, Next Installment Due Date, Amount Applied to Principal, Amount Applied to Interest, Total Remittance, Ending Principal Balance;

(c)     Not accept any prepayment of any Loan except as specified by law or as permitted by law or by the terms of the Loan Documents, nor waive, modify, release or consent to postponement on the part of the Borrower or Mortgagor of any term or provision of the Loan Documents without the written consent of Lender; provided, however, that Servicer shall not be required to obtain written consent for the waiver of any late charge or the waiver, modification, release or consent to postponement of any term or provision which may be waived, modified, released or consented to without the consent of the Lender under the terms of its written instruction ("**Lender's Instructions**");

d)     Upon payment of a Loan in full, prepare or cause to be prepared and file any necessary release or satisfaction documents, and shall continue subservicing of the Loan pending final settlement, and refund any Escrowed Sums (if applicable);

e)     Remit to the Lender, on a/those date(s) and in a manner specified by Lender, all principal and interest collected from Borrowers or Mortgagors, subject to Servicer's right to retain as compensation the fees set forth in Exhibit I attached hereto; and

f)     In the event the Lender instructs Servicer to service release any Loan(s) and Lender delivers written notice thereof to Servicer, Servicer shall proceed in accordance with the Lender's instructions.

**2.6**     **Delinquency Control:**

Servicer shall:

a)     Be responsible for protecting Lender's investment in the Loans by maintaining the maximum possible number of Loans in a current status, dealing quickly and effectively with Borrowers who are delinquent or in default. Servicer's delinquent mortgage servicing program shall include an adequate accounting system which will immediately and positively indicate the existence of delinquent Loans, a procedure that provides for sending delinquent notices, assessing late charges, and returning inadequate payment, and a procedure for the individual analysis of distressed or chronically delinquent Loans;

b)     Maintain a collection department and on-line automated collection system. All delinquent Loans shall be serviced in accordance with Lender's Instructions or where none apply, then in accordance with accepted servicing practices;

Confidential & Proprietary

8

EXHIBIT 1, PAGE 26

*Servicing Agreement:*

c) Provide Lender with a month-end collection and delinquency report. Servicer will from time to time as the need may arise, provide Lender with loan service reports relating to any items of information which Servicer is otherwise required to provide hereunder, or detailing any matters the Servicer reasonably believes should be brought to the special attention of Lender; and

d) Upon the request and under the direction of Lender, assist in the foreclosure or other acquisition of the property securing the Loan pursuant to a Mortgage, the transfer of title to such property and the collection of any applicable mortgage insurance, and pending completion of these steps, protect such property from waste and vandalism. Servicer will cause title to such property to be conveyed to the entity designated by Lender. Lender agrees to immediately reimburse Servicer, for all of its actual expenses incurred under this paragraph, including court costs and attorneys' fees, net five (5) days after receipt of an invoice from Servicer for such expenses. In case of a voluntary deed in lieu of foreclosure, and purchase by Lender for its account, Servicer will protect the property while so owned. These operations shall be on terms and as determined and directed by Lender from time to time.

2.7    **Book and Records:**

Upon Lender's written request, Servicer shall give Lender or its authorized representative the opportunity at any time during Servicer's normal business hours to examine Servicer's books and records as they relate to the Loan portfolio serviced by the Servicer. Any additional requests for a Loan audit or confirmations to be performed by Servicer's audit firm on Loans shall be at Lender's sole expense. Servicer will keep records satisfactory to Lender pertaining to each Loan, which records shall be the property of Lender, and upon termination of this Agreement, such records shall be delivered to Lender at Lender's expense. Notwithstanding the foregoing, Servicer at its own expense may produce and retain a copy any such records before delivery to the Lender.

2.8    **Insurance:**

Servicer will maintain in effect at all times and at its cost, a blanket fidelity bond and an errors and omission policy. If so requested by Lender, Servicer shall cause certificates evidencing the existence of such coverage to be delivered to Lender.

**ARTICLE III**
**AGREEMENTS OF LENDER**

3.1    **Documentation:**

Lender shall provide to Servicer at Lender's sole cost and expense:

a) Any documents or records which are reasonably necessary or appropriate for Servicer to receive in order to service the Loans;

b) Applicable documentation for each Loan submitted hereunder to enable Servicer to place and continue each Loan on its computer system. All such documentation must be received in a reasonable amount of time by Servicer, prior to any reporting due Lender;

c) Its pro-rata portion of the fee required for any extraordinary audit expense levied by any state or other jurisdiction;

Confidential & Proprietary

EXHIBIT 1, PAGE 27

*First Sub-Servicer
Servicing Agreement:*

d)    If applicable and as soon as possible, a complete listing of any Loans where the mortgage payment is inclusive of a personal or group insurance premium. This list will include the name of the insurance company; type of premium coverage; premium amount; and the name and telephone number of the individual at Lender's firm or affiliate knowledgeable of such coverage.    Should Lender misrepresent, misinform, provide inadequate information or provide no information to Servicer regarding the status of such personal or group insurance coverage (e.g., mortgage, life or disability insurance) which would cause Servicer to incur a loss or damage, Lender agrees to hold Servicer harmless from any and all claims, liabilities, damages, and loss, including reasonable attorney's fees, resulting therefrom, other than claims, liabilities, damages, or losses to the extent arising as a result of Servicer's gross negligence or willful misconduct;

e)    Physical evidence that a hazard insurance policy is in force for each Mortgage delivered to Servicer for subservicing. Lender shall allow Servicer up to thirty (30) days to verify hazard insurance coverage and/or Lender required insurance coverage for any Loan transfer up to a maximum of fifty (50) Loans per week. Further, Lender agrees to hold Servicer harmless from any loss or damage caused by insufficient evidence of hazard insurance coverage delivered to Servicer or any loss or damage which occurred during a lapsed policy prior to delivery of servicing to Servicer; and

f)    Remittance by check for any amount sufficient to pay for a real estate tax contract issued by Servicer's tax service. If a tax contract is in existence, pay any fees associated with a transfer to Servicer as described on <u>Exhibit I</u> and attachment (if applicable).

**3.2    <u>Default:</u>**

In the event Lender shall fail to pay to Servicer any sums due and payable to Servicer under this Agreement when and as the same shall be due and payable, whether as compensation, reimbursement, or otherwise, Servicer shall be entitled to offset against Lender's remittance due hereunder the amount of any sum so owing and unpaid, together with any finance charges payable in accordance with <u>Section 9.12</u> below or as otherwise provided herein, after providing written notice of such offset to Lender prior to Servicer's exercise of such right of offset.

**ARTICLE IV
COMPENSATION**

**4.1    <u>Compensation to Servicer:</u>**

For providing the services contained in this Agreement, the parties hereto agree that:

a)    Servicer shall be paid in accordance with the fees established by the attached fee schedules, attached hereto as <u>Exhibit I</u>. Servicer may change any fees set forth herein at any time upon thirty (30) days prior written notice delivered to Lender;

b)    Any miscellaneous costs incurred by Servicer from extraordinary requests, which costs Servicer will advise Lender of before incurring, shall be billed to Lender and promptly paid by Lender upon receipt of billing;

c)    All monthly fees and charges (including guaranty fees on pools of mortgage-backed securities, net curtailment interest and unrecoverable scheduled interest and all Lender charges and/or interest related to negative balances, for example, interest charged by Servicer's depository bank for payments received but not collected from Borrower's depository bank and disbursed to the appropriate Custodial Accounts but not collected

as of the date of disbursement) shall be billed to the Lender and due within five (5) days of receipt of the invoice thereof. All invoices for special services will be due within five (5) days after receipt of the invoice therefor. Funds received after five (5) days will bear interest at the Default Rate from the due date until the date paid. Servicer reserves the right to deduct any unpaid fees and charges from Lender's gross servicing fee remittance.

**4.2**   **Servicer's Termination Fee:**

If subservicing hereunder is terminated with respect to any or all of the Loans for any reason other than foreclosure or acquisition of the property securing the Loan in lieu of payment or payment in full, Lender shall pay to Servicer the Termination Fee described on <u>Exhibit I</u> in consideration of Servicer's work in assisting with the transfer of servicing for any such Loans. Servicer shall offset the Termination Fee against amounts next due to Lender hereunder. Any amount still due to Servicer after this offset is exhausted shall be paid by Lender within five (5) days after receipt of an invoice therefor. Funds received after five (5) days will be subject to interest at the Default Rate from the due date until the date paid.

**ARTICLE V**
**TERM AND TERMINATION**

**5.1**   **Term:**

The term of this Agreement shall be for three (3) year(s) commencing upon the Effective Date. Thereafter, the term of this Agreement will automatically renew for successive terms of one year each, provided that either party may terminate this Agreement at any time upon not less than 120 days prior written notice of termination to the other party.

**5.2**   **Notice:**

a)   In the event Lender terminates this Agreement pursuant to <u>Section 5.1</u> during the initial three (3) year term, Lender shall pay Servicer the Termination Fee described in <u>Exhibit I</u>. If any termination of subservicing for 75% or more of the Loans (except Interim Servicing) occurs at any time during the initial term of this Agreement, Lender shall pay Servicer the Termination Fee unless otherwise agreed to in writing.

b)   Subject to <u>Section 5.2(d)</u> below, this Agreement shall immediately terminate, at Lender's option, upon fifteen (15) days prior written notice after the occurrence of any event which constitutes a material breach on the part of the Servicer of its servicing obligations and covenants described in <u>Articles II</u> and <u>VII</u> and <u>VIII</u>.

c)   Subject to <u>Section 5.2(d)</u> below, this Agreement shall immediately terminate, at Servicer's option, upon fifteen (15) days prior written notice after the occurrence of any event which constitutes a breach on the part of the Lender of the obligations and covenants described in <u>Articles III</u>, <u>VI</u> and <u>VIII</u>. If terminated pursuant to this <u>Section 5.2 (c)</u>, Servicer shall be entitled to receive a Termination Fee with respect to all Loans.

d)   Notwithstanding the provisions of <u>Sections 5.2(b)</u> and <u>5.2(c)</u> above, any party receiving notice of termination under those paragraphs shall have thirty (30) days to cure any breach of a covenant (other than a covenant to make payments hereunder which shall be made in strict accordance with the terms hereof), or to correct any untrue or inaccurate facts, unless curing any such failure requires acts to be done or conditions to be removed which cannot, by their nature, be performed, done or removed, as the case may be, within such thirty (30) day period, in which event, the curing party may avoid termination so long

*Loan Subservicing*
*Servicing Agreement:*

as such curing party shall have commenced curing such failure within such thirty (30) day period and shall diligently prosecute the cure to completion, provided that the curing party shall in any event complete such cure within seventy-five(75) days after written notice of termination, and termination shall become effective upon such date if the cure has not been completed at the expiration of such seventy-five (75) day period.

5.3    <u>Servicer's Contingencies:</u>

Servicer's obligation and duties under this Agreement shall be contingent upon Lender providing the information and documents described in <u>Section 3.1 (a)</u> above.

5.4    <u>Reimbursement of Servicing Released Loans:</u>

Servicer's right to reimbursement for actual expenses, and reimbursement for any advances of principal and interest and escrow (if applicable) made on behalf of Lender in accordance with the terms of this Agreement, shall also apply to any Loans sold by Lender to a new investor on a "servicing released" basis.

5.5    <u>Accounting:</u>

Upon termination of this Agreement under this <u>Article V</u>, Servicer will: (i) account for and turn over to Lender, or Lender's designee, all funds collected under each Note and Mortgage, less the Servicer's compensation and any fees due Servicer in accordance with <u>Exhibit I</u> of the Agreement, (ii) deliver to Lender, or Lender's designee all records and documents relating to each Loan then subserviced at the expense of the Lender, and (iii) notify Borrowers in writing that their Loans will henceforth be serviced by Lender, or Lender's designee.

ARTICLE VI
REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER

Lender warrants and represents to, and covenants and agrees with, Servicer as follows:

6.1    <u>Assistance:</u>

Lender warrants and represents to, and covenants and agrees with Servicer that, to the extent possible, Lender shall cooperate with and assist Servicer as requested by Servicer, in carrying out Servicer's covenants, agreements, duties and responsibilities under this Agreement, and in connection therewith, Lender shall execute and deliver all such papers, documents, quality control check sheets and instruments as may be reasonably necessary and appropriate in furtherance thereof.

6.2    <u>Notice of Breach:</u>

Lender shall immediately notify Servicer (i) of any failure or anticipated failure on Lender's part to observe and perform any covenant or agreement required to be observed and performed by it as a Lender, and (ii) if any representation or warranty of Lender made in connection with this Agreement is untrue or inaccurate in any material respect.

6.3    <u>Taxes:</u>

Lender will indemnify and hold Servicer harmless of and from any tax penalties and interest which arose or accrued prior to the Effective Date and for any other claims, demands, costs fee or expenses, including attorney's fees, resulting from any failure to pay such Taxes in a timely manner.

*Subservicing Service*
*Servicing Agreement:*

6.4    **Authority; Prior Servicing:**

Lender is duly organized, validly existing and in good standing under the laws of its state of formation and has all requisite power and authority to enter into this Agreement, and the persons executing this Agreement on behalf of Lender are duly authorized so to do. Lender is the owner of all servicing rights for all Loans, represents, and warrants that all information contained in any database or document related to the Loans is true, accurate, and correct in all material respects.

**ARTICLE VII**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF SERVICER**

Servicer warrants and represents to, and covenants and agrees with, Lender as follows:

7.1    **Notice of Breach:**

Servicer shall immediately notify Lender (i) of any failure or anticipated failure on Servicer's part to observe and perform any covenant or agreement required to be observed and performed by it as Servicer, and (ii) if any representation or warranty of Servicer made in connection with this Agreement is untrue or inaccurate in any material respect.

7.2    **Agency Approvals:**

Servicer is an approved servicer for FHLMC, FNMA and well as VA and FHA.

7.3    **Authority:**

Servicer is a duly organized, validly existing and in good standing under the laws of its state of formation and has all requisite power and authority to enter into this Agreement, and the persons executing this Agreement on behalf of Servicer are duly authorized so to do.

Servicer has all requisite licenses, permits and approvals to perform its obligations hereunder in each jurisdiction in which any property securing a Mortgage is located, except where the failure to possess any such license, permit, or approval would not materially and adversely affect the enforceability of the related Note or Mortgage.

**ARTICLE VIII**
**INDEPENDENCE OF PARTIES; INDEMNIFICATION SURVIVAL**

8.1    **Independence of Parties:**

The following terms shall govern the relationship between Lender and Servicer.

a)    Servicer shall have the status of and act as an independent contractor. Nothing herein contained shall be construed to create a partnership or joint venture between Lender and Servicer.

b)    Servicer shall not be responsible for representations, warranties, or contractual obligations in connection with (i) any sale to an investor of any of the Loans, or (ii) the servicing of any such Loans prior to the assumption of subservicing of the Loans pursuant to this Agreement.

c)    Anything herein contained in this Article VIII or elsewhere in this Agreement to the contrary notwithstanding, the representations and warranties of Servicer contained in

this Agreement shall not be construed as a warranty or guarantee by Servicer as to future payments by any Borrower or Mortgagor.

d)      Anything contained in this <u>Article VIII</u> or elsewhere in this Agreement to the contrary notwithstanding, Servicer shall not be responsible for performance or compliance under any loan repurchase agreements, representations or warranties of an origination nature, or those servicing representations and warranties directly or indirectly related to the origination process made between Lender and any investor, either prior or subsequent to this Agreement.

## 8.2     <u>Indemnification by Servicer</u>:

Except as otherwise stated herein, Servicer indemnifies and holds harmless Lender from any liabilities, claims, losses, damages, actions, fees, costs and expenses, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Servicer's failure to observe or perform any or all of Servicer's covenants, agreements, warranties or representations contained in this Agreement.

## 8.3     <u>Indemnification by Lender</u>:

Except as otherwise stated herein, Lender indemnifies and holds harmless the Servicer from any liabilities, claims, losses, damages, actions, fees, expenses and costs, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of (I) Lender's failure to observe or perform any or all of Lender's covenants, agreements, warranties or representations contained in this Agreement, (ii) the performance, negligence, actions or failure to act of any servicer of the Loans, other than Servicer, (iii) any inaccuracies in any information provided by Lender, and (iv) the untruth or inaccuracy of any of the representations and warranties contained in this Agreement, other than claims, losses or damages arising out of the gross negligence or willful misconduct of Servicer, including, but not limited to, <u>Section 6.4</u> and the following additional representations and warranties.

a)      To the best of Lender's knowledge (excepted as stated in <u>subsection (c)</u> below), each Loan, the Note and Mortgage, any insurance policy, certificate of coverage, or other contract or agreement relating to each Loan: is in every respect genuine; is complete in all respects; is the legal, valid, binding and enforceable obligation of the Borrower thereunder in accordance with its terms and is free from all claims, defenses, rights of rescission, any discount, allowance, set-off, counterclaim, presently pending bankruptcy or other defenses or contingent liability by any Borrower which could adversely affect the value or collectability of any Loan; none of the Note or Mortgages nor anything contained in the Loan Documents is forged or has affixed thereto any unauthorized signature or has been entered into by any persons without the required legal capacity; and no foreclosure or any other legal action has been brought by any servicer in connection therewith.

b)      To the best of Lender's knowledge (excepted as stated in <u>subsection (c)</u> below), the applicable Loan Documents have been duly and properly executed by the Borrower, acknowledged, and recorded.  To the best of Lender's knowledge, each Loan is valid and complies with all applicable lending laws and regulations, including the Truth-In-Lending Act, Real Estate Settlement and Procedures Act, Equal Credit Opportunity Act, Fair Housing and Disclosure Act and Regulation Z (collectively, the "**Acts**").  The Loan Documents have been duly executed on the dates indicated and in due and proper form.

c)      Except as otherwise stated herein, Lender and Servicer agree that Lender will from time to time acquire loans that maybe out of compliance.  Lender indemnifies and holds

*PSA Loan Servicing
Servicing Agreement:*

harmless the Servicer from any liabilities, claims, losses, damages, actions, fees, expenses, and costs, including reasonable attorneys' fees, directly or indirectly resulting from or arising out of Servicer's obligations under this Agreement. At Lender's request, Servicer will use commercially reasonable efforts to bring the Loan into compliance based on commercially reasonable methods and agreed to by both parties.

d) To the best of Lender's knowledge, in connection with the creation, acquisitions, ownership, servicing, execution, and content of all Loans, all applicable federal and state laws, rules, and regulations have been, and are being, complied with by each servicer thereof. All information requested to be disclosed to the Borrower by the Acts has been properly and accurately disclosed to the Borrower by each Servicer thereof, in compliance and in accordance with the Acts. The Borrower has duly executed appropriate documents or evidence indicating that the Borrower has received the disclosure materials as required by applicable law and regulations, including the Acts, and such evidence is located among the Loan Documents.

e) To the best of Lender's knowledge, the servicing and collection procedures used by each servicer (other than Servicer) with respect to each Loan have been in all material respects legal, proper, and prudent.

f) To the best of Lender's knowledge, all of the terms, conditions and provisions of the interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance are enforceable, and all adjustments have been timely and properly made, including, but not limited to all required notices, and any adjustments so made will not affect the enforceability of each Note (if applicable).

g) **Specific Limitation on Liability of the Servicer and Others – Direct Contact**

Lender agrees and understands that all communication with Borrowers is to be conducted by/through Servicer. Notwithstanding the foregoing, where the Lender, with or without the Servicer's approval, engages in direct communication with the Borrower for the purpose of collection, modification, information request, whether oral or in writing, Lender agrees to the following provision to this Section 8.3:

Lender has all requisite licenses, permits, qualifications and approvals to contact Borrowers in each jurisdiction in which any Mortgaged Property is located; and,

The Servicer and any director, officer, agent, or employee of the Servicer shall be indemnified and held harmless by Lender against any loss, liability, forfeiture or expense, including, without limitation, carrying costs, investigation costs, fines, penalties and attorneys' fees and expenses, including, without limitation, the costs and expense of curing any breaches of Lender's representations and warranties relating to the serviced assets (collectively, the "**Liabilities**"), suffered or incurred by Servicer arising out of, resulting from or relating to:

    i. Lender's willful misconduct, bad faith, fraud, gross negligence, or reckless disregard of its obligations hereunder, including, but not limited to, violation of: Equal Credit Opportunity Act ( ECOA) and Regulation D, Federal Truth in Lending Act (FTLA) and Regulation Z, Home Ownership and Equity Protection Act (HOEPA), Real Estate Settlement, Procedures Act (RESPA), Fair Credit Reporting Act (FCRA), Fair Debt Collection Practices Act (FDCPA), state debt collection statutes and regulations, Telephone Consumer Protection Act, GLB

Act, USA Patriot Act, Servicemembers' Civil Relief Act, Fair and Accurate Credit Transactions Act of 2003 (FACT);

ii.   any material breach by Lender of a representation, warranty or covenant contained in this Agreement, the Loan, the Note or the Mortgage;

iii.  errors and omissions in the processing, acquiring, origination or servicing of any Loan prior to the applicable Delivery Date;

iv.   compliance by the Servicer with instructions or requirements of Lender in connection with this Agreement and special instructions by Lender in connection with collection and loss mitigation request(s); and

v.    any claim, litigation or proceeding to which Servicer is made a party as a result of its acting as, or status as, Servicer of a serviced asset, other than any such claim, litigation or proceeding (i) which is based on a misrepresentation, breach or error or omission on the part of Servicer and under which Servicer is found liable for such action, and (ii) with respect to which Servicer must indemnify Lender pursuant to <u>Section 8.2</u>.

In no event shall Servicer be entitled to indemnification of any Liabilities pursuant to this <u>Section 8.3</u> that are otherwise compensable by Servicer pursuant to this Agreement.

**8.4**   <u>Survival</u>:

The terms and conditions of this Agreement regarding confidentiality, indemnification, payment, representations and warranties, and all others that by their sense and context are intended to survive the execution, delivery, performance, termination or expiration of this Agreement survive and continue in effect.

**ARTICLE IX**
**MISCELLANEOUS**

**9.1**   <u>Changes in Practices</u>:

The parties hereto acknowledge that the standard practices and procedures of the mortgage servicing industry change or may change over a period of time. To accommodate these changes, Servicer may from time to time notify Lender of such changes in practices and procedures. Should any such proposed changes, made in good faith by Servicer, be unacceptable to Lender, then Servicer shall have no further obligation to continue to accept subservicing under the terms of this Agreement, and may terminate this Agreement in accordance with <u>Article V</u>.

**9.2**   <u>Assignment</u>:

Neither party may assign this Agreement, by operation of law or otherwise, or delegate its obligations hereunder without the prior written consent of the other party hereto, which consent will not be unreasonably withheld.

**9.3**   <u>Force Majeure</u>:

Neither party will be liable to the other party for any losses arising out of the delay or interruption of its performance of its obligations under this Agreement (other than its payment obligations) due to any natural disaster, act of governmental authority, act of public enemy, terrorism, war

*Servicing Agreement:*

(whether or not declared), riot, flood, civil commotion, insurrection, or any other material event beyond the reasonable control of the party delayed (each, "**Force Majeure Event**"). The party not claiming protection from a Force Majeure Event may terminate this Agreement, without penalty and at no additional cost, if a Force Majeure Event delays performance by more than fifteen (15) days.

**9.4    Entire Agreement:**

This Agreement, together with the referenced exhibits and attachments hereto, contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, proposals, discussions and communications, whether written or oral, in relation to this subject matter. This Agreement cannot be modified in any respect except by an instrument in writing signed by an officer or other authorized person of both parties.

**9.5    Severability:**

If any provision of this Agreement is found invalid, illegal, or unenforceable pursuant to judicial decree or decision of a court of competent jurisdiction or under applicable law, then (i) such invalidity, illegality, or unenforceability will not affect the remaining provisions of this Agreement; (ii) this Agreement will be construed as if such invalid, illegal, or unenforceable provision were excluded from this Agreement; and (iii) the court in its discretion may substitute for the excluded provision an enforceable provisions which in economic substance reasonably approximates the excluded provision.

**9.6    Effect:**

Unless otherwise terminated in accordance with the terms and conditions of this Agreement, this Agreement shall remain in effect until Lender's interest in all of the Loans, including the underlying security, are liquidated completely.

**9.7    Applicable Law:**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

**9.8    Notices:**

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given and received (i) upon delivery if personally delivered, (ii) on the next business day if sent for next day delivery by a nationally-recognized overnight courier service, or (iii) on the third business day after deposit in the U.S. Mail if sent by registered or certified mail, return receipt requested, addressed to the party to receive notice at the following addresses or at such other address as a party may hereafter designate in the manner provided herein:

**If to BSI Financial Services, Inc.:**
Gagan Sharma
President and CEO
1425 Greenway Drive, Suite 400
Irving, Texas 75038

**With a Copy to:**

Case 8:17-bk-11996-SC    Doc 130    Filed 07/14/17    Entered 07/14/17 17:58:21    Desc
Main Document    Page 42 of 63

Case 8:17-bk-11996-SC    Doc 13    Filed 05/23/17    Entered 05/23/17 15:05:46    Desc
Main Document    Page 82 of 106    *Asset Subservicing*
*Servicing Agreement:*

BSI Financial Services, Inc
1425 Greenway Drive, Suite 400
Irving, Texas 75038
Fax: 972-518-1385
Attn: General Counsel

If to Lender:

_____

**9.9**    **Waiver:**

No waiver of any provision of this Agreement is effective unless in writing and signed by the party against whom such waiver is sought to be enforced. No failure or delay by either party in exercising any right, power, or remedy under this Agreement operates as a waiver of any such right, power, or remedy. The express waiver of any right or default hereunder is effective only in the instance given and does not operate as or imply a waiver of any similar or other right or default on any subsequent occasion.

**9.10**    **Binding Effect:**

This Agreement inures to the benefit of and is binding on the parties hereto and their respective successors and permitted assigns.

**9.11**    **Headings; Certain Terms:**

Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect. The term "include" or "including" shall mean without limitation by reason of enumeration. References herein to "paragraphs," "sections" and other subdivisions without a reference to document are to designated paragraphs, sections and other subdivisions of this Agreement. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders, the singular shall include the plural and vice versa.

**9.12**    **Due Date of Payments:**

Unless otherwise stated herein, all fees, payments, charges, expenses, advances and any other sums payable to Servicer by Lender hereunder are due and payable within five (5) business days from date of Servicer's invoice. Any sums not paid when due will bear interest at the Default Rate from the due date until the date received by Servicer..

**9.13**    **Multiple Counterparts:**

This Agreement may be executed in multiple counterparts, each of which is deemed an original, and all which when taken together constitute one and the same instrument.

**IN WITNESS WHEREOF,** each party has caused this Agreement to be signed in its corporate name on its behalf by its duly authorized representative to be effective as of the day, month, and year first above written.

*Private Label Servicing*
*Servicing Agreement*

**SERVICER:**

**SERVIS ONE, INC.**
**d/b/a BSI FINANCIAL SERVICES, INC.**

By: _____

Name: __Jordan D Dorchuck__

Title: __Executive Vice President__

**LENDER:**

WJ Asset Management

By: _____

Name: __James Nichols__

Title: __President__

EXHIBIT 1, PAGE 37

*Asset Backstop Service Servicing Agreement:*

EXHIBIT I Fee Schedule

Case 8:17-bk-11996-SC    Doc 130    Filed 07/14/17    Entered 07/14/17 17:58:21    Desc
Main Document    Page 45 of 63

Case 8:17-bk-11996-SC    Doc 13    Filed ... /23/.. Entered 05/23/17 15:05:46    Desc
Main Docu...

# BSI Financial Services, Inc.

# Special Servicing LM

| As of: | 10/7/2014 | SPECIAL SERVICING PRICING |
|---|---|---|
| A. One Time Program Set Up Fee | | Note: This fee includes reasonable implementation cost, planning, development and project management. Any additional services would require a mutually agreed to SOW. |
| Non-Private Label | $ 2,000.00 | |
| B. Loan Boarding Fee Per Loan | | |
| | $ 50.00 | |
| C. Monthly Service Fee Per (per Loan) | | Per loan/ $40 from loans tranferred from FCI until 12-31-14 |
| | $ 15.00 | Per loan |
| D. Default Servicing Fee (fee is in addition to mthly service fee) | | |
| Collection/Loss Mitigation 30-59 days | $ 28.00 | Loss Mitigation Solicitation, Collections Calling, Past Due Letters. Includes determining optimal workout strategy and negotiation of workouts. Per Month In addition to base Subservicing Fee. Applies for every occurrence of delinquency activity. Once loan is current or goes into foreclosure/ bankruptcy, this fee does not apply. |
| Collection/Loss Mitigation 60+ days | $ 38.00 | |
| Special State Upcharge | $ 12.50 | Currently applicable only to California loans to comply with SB900 (includes sending out denial letters, acknowledgement letters, missing doc letters etc, monitoring of denial, appeal etc.). In addition to all other fees, applicable to 30+ delinquent loans. |
| Foreclosure Administration | $ 72.00 | Per Month In addition to base Subservicing Fee. |
| Bankruptcy Administration | $ 72.00 | Per Month In addition to base Subservicing Fee. |
| Loss Mitigation Fulfillment : Repayment Plan/Forbearance | $ 220.00 | Includes generation of workout document and closing the loan. One time fee. Repayment plan/ Forbearance fee due after borrower makes 3 payments in 3 months. |
| Loss Mitigation Fulfillment : Modification | $ 550.00 | Includes generation of workout document and closing the loan. Payment due after borrower makes 3 payments in 3 months for trial or permanent mod.In case of HAMP, BSI to retain HAMP Servicer Incentives |
| Loss Mitigation Fulfillment : Deed-in-Lieu/ Cash For Keys | $ 825.00 | |
| Loss Mitigation Fulfillment : Short Sale / Short Payoff/ Full Payoff/Third Party Sale/ Loss Mit Refinance | 1.28% or $1,000 (whichever is greater) | Loan must be at least 90 days delinquent prior to full/ short payoff |
| Full Reinstatement Fee | 1% of UPB | Loan must be at least 60 days delinquent prior to reinstatement |
| Hardest Hit Funds/ MI Claims/ Hazard Claims | 10% | Percentage of gross recovery amount |
| E. Asset Liquidation and REO Marketing Fee | | |
| Eviction Services | $ 250.00 | One time fee. *Waived if BSI manages REO sale process.* |
| BSI manages REO sale process | 1.25% or $1,250 (whichever is greater) | Per REO. BSI keeps REO open for inspections, manage evictions, insurance and accounting purposes. Calculated of the net funds received |
| Investor manages REO sale process | $45.00 | Monthly fee if loan kept open on system for inspections, paying force placed insurance, taxes and accounting purposes. |
| F. Ancillary Income | | |
| Loan Prepayment Fees | 100% | Lender |
| Late Charges & Other Ancillary Income | 100% | BSI |
| G. Lien Releases, Assignments and Transfers | | |
| Deboarding fee -- for Lien Releases (for Full Payoff), Assignments (for loan sales to third party), and Transfers (to another servicer) | $ 40.00 | per loan |
| Deconversion Fee (0 - 6 Mos) | $ 40.00 | WAIVED |
| H. Special Reporting/ Special Projects | | |
| Special Reports & Projects, Technology | $ 125.00 | per hour. Any issues of clean up due the prior servicer, is billed as an hourly fee, based on scope and is on a case-by-case basis. |
| Tax & Insurance Track only | $ 2.00 | Per loan per month fee payable in case investor wants to track insurance, but not utilize BSI force placed insurance placement services |
| I. Web - System Access | | |
| Fiserv Web Access Set Up | $ 600.00 | One time fee to set up client on servicing system |
| Fiserv access Monthly Fee | $ 50.00 | Per named user per month, includes access to loan data and images |
| J. Termination Fee due BSI | | |
| | $ 150.00 | Per Loan. Payable in case Client terminates servicing agreement. |
| K. CPI Adjustment | | |
| Calendar CPI Adjustment | 4% or CPI (Whichever is greater) | Adjusted annually on Jan 1 following the signature of the agreement and annually thereafter (after minimum of 6 months of agreement). Applies to all BSI fees with exception of pass through fees |
| L. Advances | | |
| | | Client to provide funding for all required servicing advances, i.e. principal, interest, taxes, insurance, foreclosure costs, etc. In case advances are not forwarded to BSI within required timeframe, Client is responsible for any fees and penalties assessed to the loan and/ or BSI |

Note: There may be additional pass through fees for additional items including legal costs of foreclosure, bankruptcy, force placed insurance, skip tracing, property preservation, taxes, county charges for recordings, filing claims with FHA/ VA, tax contracts etc. This is not an exhaustive list of possible pass through charges.

*Hard Money SS Orange County*

EXHIBIT 1  PAGE 39

EXHIBIT "2"

**FannieMae**

## Allowable Foreclosure Attorney Fees Exhibit

The following table contains the maximum attorney's fees that Fannie Mae allows for legal work related to foreclosures of whole mortgage loans, participation pool mortgage loans, and MBS mortgage loans serviced under special servicing options.

| State | Non-Judicial Foreclosure | Judicial Foreclosure |
|---|---|---|
| Alabama | $900 | On Approval[2] |
| Alaska | $1,200 | On Approval[2] |
| Arizona | $925 | On Approval[2] |
| Arkansas | $1,050 | On Approval[2] |
| California | $1,000[3] | On Approval[2] |
| Colorado | $1,225 | On Approval[2] |
| Connecticut | N/A | $1,700[4, 5] |
| Delaware | N/A | $1,350 |
| District of Columbia | $600[1, 6] | On Approval[2] |
| Florida | N/A | $2,250[12] |
| Georgia | $900 | On Approval[2] |
| Guam | $1,200 | On Approval[2] |
| Hawaii | $1,100 | $2,400[8] |
| Idaho | $1,050 | On Approval[2] |
| Illinois | N/A | $1,750 |
| Indiana | N/A | $1,500 |
| Iowa | $850 | $1,300 |
| Kansas | N/A | $1,250 |
| Kentucky | N/A | $1,700 |
| Louisiana | N/A | $1,350 |
| Maine | N/A | $1,750 |
| Maryland | $2,100 | On Approval[2] |
| Massachusetts | N/A | $2,000[4] |
| Michigan | $1,000 | On Approval[2] |
| Minnesota | $1,025[9] | On Approval[2] |
| Mississippi | $900[1] | On Approval[2] |
| Missouri | $950 | On Approval[2] |
| Montana | $1,000 | On Approval[2] |
| Nebraska | $900 | On Approval[2] |
| Nevada | $1,100 | On Approval[2] |
| New Hampshire | $1,150 | On Approval[2] |
| New Jersey | N/A | $2,425 |
| New Mexico | N/A | $1,500 |
| New York | $800[10] | **$2,900**[4, 10] |
| North Carolina | $1,150 | On Approval[2] |
| North Dakota | N/A | $1,250 |

| State | Non-Judicial Foreclosure | Judicial Foreclosure |
|---|---|---|
| Ohio | N/A | $1,700 |
| Oklahoma | N/A | $1,450 |
| Oregon | $1,000 | $2,050 |
| Pennsylvania | N/A | $1,650 |
| Puerto Rico | N/A | $1,500[4, 11] |
| Rhode Island | $1,300 | On Approval[2] |
| South Carolina | N/A | $1,650 |
| South Dakota | N/A | $1,250 |
| Tennessee | $900 | On Approval[2] |
| Texas | $900 | On Approval[2] |
| Utah | $925 | On Approval[2] |
| Vermont | N/A | $1,700 |
| Virgin Islands | N/A | $1,800 |
| Virginia | $925 | On Approval[2] |
| Washington | $1,500 | On Approval[2] |
| West Virginia | $1,000[1,6] | On Approval[2] |
| Wisconsin | N/A | $1,500 |
| Wyoming | $1,000 | On Approval[2] |

Footnotes:
[1]This fee covers the combined attorney's and notary's fees.
[2]Because this is not the preferred method of foreclosure, the servicer must obtain approval of its use from Fannie Mae's Regional Counsel prior to initiation by sending a request to nonroutine_litigation@fanniemae.com. Fannie Mae will provide procedural instructions and applicable fees at the time it grants approval.
[3]This fee applies to completed foreclosures. If the mortgage loan is reinstated after recordation of the Notice of Default (but before mailing of the Notice of Sale) the maximum fee is $500 or the maximum allowed by statute, whichever is less. If the mortgage loan is reinstated after mailing of the Notice of Sale but before the Trustee's Sale, the maximum fee is $750 or the maximum allowed by statute, whichever is less.
[4]An additional $200 will be permitted when the property is sold to a third party and the attorney must perform additional work to complete the transfer of title to the successful bidder.
[5]This fee applies to Strict Foreclosures. If the court orders a Foreclosure by Sale, the fee will be $1,950.
[6]This fee includes the attorney's fee, the notary's fee and the trustee's commission (or statutory fee).
[7]This fee includes reimbursement for any fee for the attorney's certificate of title.
[8]A fee of $3,400 will be permitted for judicial foreclosures in locations other than Honolulu County
[9]This fee increases to $1,400 for any case in which the attorney provides services for "proceedings subsequent" that involve registered land.
[10]In New York, the non-judicial foreclosure process is to be used only in connection with cooperative share loans. The fee includes all steps in the foreclosure process, including the transfer of the stock and the lease for an occupied cooperative unit. **The allowable fee for judicial foreclosures in New York, where judgment is obtained as a result of an uncontested trial, is established at $3,650. For judicial foreclosures in the City of New York and on Long Island (Nassau and Suffolk Counties), the allowable fee is $3,500 (or $4,250 if judgment is obtained via uncontested trial).**
[11]In addition to the allowable foreclosure fee, Fannie Mae will pay a notary fee up to the greater of $250 or one percent (1%) of the bid amount on the mortgage being foreclosed.
[12]The allowable fee for foreclosures in Florida, where judgment is obtained as a result of an uncontested trial, is established at $3,000.

When servicers request reimbursement from Fannie Mae for a fee amount based on specified conditions contained in a footnote above, the servicer's reimbursement request must contain a description or sufficient supporting documentation to allow Fannie Mae to properly evaluate the request.

EXHIBIT 2, PAGE 41

# EXHIBIT "3"

# ASSET MANAGEMENT AGREEMENT

This Asset Management Agreement ("Agreement") is entered into effective as of September 17, 2014, (the "Effective Date") between WJA Asset Management, LLC, ("Owner"), and Citivest, Inc., a California Corporation ("Manager").

In consideration and mutual covenants expressed herein, and for other good and valuable consideration, the sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    MANAGER'S ENGAGEMENT AND SERVICES.

1.1    Services. Owner hereby retains Manager to provide, and Manager agrees to provide, the asset management services described herein and in the attached Exhibit A (the "Services") in connection with the operation and disposition of a portfolio (the "Portfolio") of performing, semi-performing and/or nonperforming notes ("Notes") secured by mortgages and deeds of trust encumbering single family residences and condominiums ("Properties") as more particularly described in Exhibit B which Portfolio may be amended by mutual written consent from time to time.

1.2    Term.  The term of Manager's engagement shall commence on the Effective Date and continue for a period until the earlier of one (1) year or sale of all of the Notes and REO's or rented homes to one or more third parties, unless sooner terminated or extended as provided herein. The Agreement shall automatically renew for another one (1) year period unless terminated in writing by the Owner. The Agreement can be terminated upon thirty (30) day written notice by the Owner to the Manager at any time.

2.    OWNER'S RESPONSIBILITIES AND APPROVALS.

2.1    Responsibilities.  Owner shall have the following responsibilities in connection with the services to be provided by Manager:

2.1.1    Owner shall pay all amounts due under this Agreement promptly, provided that all amounts are accompanied by detailed invoices and appropriate back-up approved by Owner.

2.1.2    Owner shall designate a representative fully acquainted with the Portfolio and with full mandate and authority to approve matters requiring Owner's approval and to render decisions promptly (the "Owner's Rep").

2.2    Pre-Authorized Actions.  Owner authorizes the Manager to take the following actions in the name of the Owner; provided, however, that all of the actions associated with loan modification terms, listings, leases, contracts and agreements, and dispositions of Notes and/or REO's are consistent with Owner's preapproved value/price guidelines and business methodology, and all contracts and agreements will be in Owner's name or freely assignable to Owner. All contracts and agreements shall include standard payment terms of net 30 days from receipt of invoices by Manager.

2.2.1    Enter into retainer, engagement, listing and/or representation agreements with attorneys, accountants, property managers, property security companies, real estate and mortgage brokers, and other similar professionals ("Professional Agreements") at fair market cost and without any mark up by/for the manager; provided, however, Manager may not enter into any such Professional Agreement in which the Fund's estimated payment liability would exceed $5,000 in any calendar year without the Owner's Rep's written approval; and

2.3    Actions Requiring Further Approval.  Manager is authorized to engage in the following activities subject to the prior written approval of the Owner's Rep:

2.3.1    Enter into loan modification agreements, forbearance agreements, deeds in lieu of foreclosure, short sale agreements, short pay agreements, and other similar loss mitigation or refinancing arrangements with the borrowers on the Notes.

2.3.2    Take all actions, incur all costs, and execute all documents reasonably necessary to sell any portion of the Portfolio or the Properties.

3.    COSTS AND FEES.

3.1    Owner shall pay Manager fees (the "Fees") in the amounts set forth below; provided that Manager may direct that certain of Manager's fees shall be directly payable to certain Affiliates of Manager although Manager shall remain directly responsible for the performance of all services by Manager's affiliates.

3.1.1    Asset Management Fee.  Owner shall pay Manager an Asset Management Fee of $40/loan per month.

3.1.2    Disposition Fee. 3% of the selling price, (3%) or a minimum of $750, payable to the Manager, for all Properties sold with or without the participation by an outside broker.

3.1.3    Systems Fees.  Owner shall pay subscriber fees associated with the use of GLASS, Res.net and any other asset management tools. Currently Res.net charges a monthly maintenance fee of $500 for 1-125 files or $4 for each active file over 125 assets. This fee is divided over all assets boarded. Currently GLASS charges a monthly hosting fee of $500 which is divided over all assets boarded by the Manager.

3.1.4    Property Management Fee. Upon acquisition of title to Properties following Manager's loss mitigation efforts, Manager shall assume asset management responsibility for such "REO" Properties. If the properties are leased the Manager may retain a local property management company to manage the property and will oversee such property management company for a fee of $40/property per month. If the Manager manages the property directly and collects the rent on behalf of the Owner directly, such management will be done pursuant to a separate Property Management Agreement between the Manager and the Owner.

3.2    Payment of Costs.  During the Term, Owner shall pay all of the Portfolio's direct third party costs approved by Owner (the "Direct Costs").  Owner shall pay such expenses directly to vendors or reimburse Manager for any out-of-pocket third party costs.

3.3    Transfer Reimbursement.  In the event the Owner shall sell, assign, or transfer all or a portion of the Portfolio to an Affiliate, Owner shall reimburse Manager for any third party, out-of-pocket costs incurred by Manager and approved by Owner as a result of such a transfer.

EXHIBIT 3, PAGE 43

4.    INDEPENDENT CONTRACTOR.

4.1    Status.  Manager is an independent contractor of Owner and shall not perform any services under this Agreement as an employee of Owner.

4.2    No Exclusive Duty.  Except as otherwise provided in this Agreement and as may be reasonably necessary to provide the Services, (i) the Manager shall not be required to devote all or substantially all of its time or efforts to the management of the Owner, (ii) the Manager may have other business interests and may engage in other activities not related to the Owner, (iii) the Manager may also own and/or manage interests in numerous other real estate projects, pools of mortgages, and ventures, some of which might be considered competitive with the portfolio or the Owner, and (iv) neither the Owner nor the Manager shall have any right to share or participate in such other business interests or activities.

4.3    Licenses.  The Owner and Manager acknowledge that the loans will be serviced by a third party Servicer, who shall be responsible for procuring, obtaining, maintaining and complying with all licenses, permits, state banking requirements, or other governmental approvals, if any, which may be required under any applicable laws for the provision of the services to be rendered.

5.    INDEMNITY.

5.1    Indemnity by Owner.  Owner shall indemnify and hold the Manager and its agents and Affiliates harmless from and against all claims, losses, damages, liabilities and expenses, including without limitation reasonable attorney's fees ("Claims") arising in connection with the Portfolio and the Properties, to the fullest extent permitted by law, but only to the extent that such Claims are caused by the negligent or wrongful acts or omissions of Owner or its affiliates.

5.2    Indemnity by Manager.  Manager shall fully indemnify and hold Owner and its agents and Affiliates harmless from and against all claims, losses, damages, liabilities and expenses, including without limitation reasonable attorney's fees ("Claims") arising in connection with the Portfolio and the Properties, to the fullest extent permitted by law and caused by (a) the negligent or wrongful acts or omissions of the Manager or its agents, or (b) any acts of Manager or its agents outside the scope of its engagement or authority.

5.3    Survival.  The obligations set forth in this Section 5 shall survive any termination of Manager's engagement.

6.    TERMINATION AND SUSPENSION.

6.1    Manager's Breach.  If the Manager fails to perform any of the Manager's obligations under this Agreement, and such failure is not cured by the Manager to Owner's reasonable satisfaction within thirty (30) calendar days after the Manager receives written notice from Owner which must specify the breach, the Manager shall be in default under this Agreement.  Upon such default, Owner shall have, in addition to any and all rights and remedies available under applicable law or under the terms of this Agreement, the right to immediately terminate the Manager's engagement without the need for further notice, legal proceedings or court order, Manager shall have no further right to receive fees or reimbursements pursuant to this Agreement, and Manager shall assign all agreements, contracts and work product associated with the portfolio or the management thereof to Owner.

6.2    Owner's Breach. If Owner fails to perform any of Owner's obligations under this Agreement and such failure is not cured by Owner to the Manager's reasonable satisfaction within thirty (30) calendar days after Owner receives written notice from the Manager specifying the breach, Owner shall be in default under this Agreement. Upon such default, the Manager shall have the right to immediately terminate the Manager's engagement without the need for further notice, legal proceedings or court order.

6.3    Suspension. The Manager shall not be obligated to continue to provide services under this Agreement so long as Owner has failed to pay a substantial amount as described in Section 3 of this Agreement. For the purpose of this agreement a substantial amount means any amount in excess of $5,000.

## 7.    GENERAL PROVISIONS.

7.1    Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) on the date of delivery if personally delivered by overnight courier, telegram or facsimile, or (ii) three business days after mailing if mailed by first class mail to Owner and Manager at their addresses set forth below, or such other address designated from time to time in writing by Owner or Manager.

7.2    Confidentiality. Except as permitted in Section 8.3 below, the Manager undertakes to keep strictly confidential all information, whether in written or in any other form, which has been provided by the Owner or exchanged under this Agreement. The Manager undertakes not to use any such information for any purpose other than the performance of the services hereunder and the Manager shall procure that its shareholders, officers, directors, employees and representatives keep secret and treat as confidential all such information. This confidentiality undertaking shall survive the expiry or earlier termination of this Agreement.

7.3    License to Use Proprietary Information. Subject to applicable provisions of state and federal law, including without limitation, the Gramm-Leach-Bliley Act (*15 USC Sec. 6801-6809*), Owner hereby grants to the Manager a non-exclusive license to use, manipulate, and disclose proprietary and other information regarding the Portfolio which the Manager obtains by operation of this Agreement. The terms of this Section 8.4 shall govern any termination of the Manager's engagement.

7.4    Assignment. The Manager may not assign or transfer its rights and/or obligations under this Agreement without the written consent of the Owner, which consent may be granted or withheld in Owner's sole and absolute discretion. The Owner may assign, transfer, dispose or otherwise deal with all or part of its rights and/or obligations under this Agreement to any third party.

7.5    Amendment and Waiver. This Agreement may be amended only by a written Agreement signed by Owner and Manager. Waiver of any provision of this Agreement shall not be deemed or constitute a waiver of any other provision, nor shall such waiver constitute a continuing waiver.

7.6    Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall constitute a binding Agreement.

7.7    Governing Law and Severability. This Agreement shall be governed by and construed under the laws of the State of California, without regard to its conflicts of laws principles. If any provision of this Agreement is invalid or unenforceable, such provision shall (i) be modified to the minimum extent necessary to render it valid and enforceable, or (ii) if it cannot be so modified, be deemed not to be a part of this Agreement

and shall not affect the validity or enforceability of the remaining provisions.

7.8    _Approval._ Wherever in this Agreement the consent or approval of a party is required to be given, the same shall not be unreasonably withheld or delayed.

7.9    _Entire Agreement._ This Agreement represents the entire Agreement between the parties with respect to the subject matter set forth above, and supersedes all previous oral and written agreements, communications, representations or commitments.

*OWNER:*

WJA Asset Management, LLC

By: _____
    James Nichols, President

*MANAGER:*

CITIVEST, INC.,
A California Corporation

By: _____
    Dana Haynes, President

## EXHIBIT A

### Scope of Services

Manager will be providing the following services:

- Oversee the Servicer's Conduct, which will include all borrower contact on behalf of the Owner, including without limitation, the following, all of which shall conform to applicable law:

  o Contact borrowers to introduce the Owner as each borrower's lender.

  o Negotiate any advisable loan modifications with borrowers for the purpose curing current defaults and mitigating future defaults through principal reductions, rate adjustments, and forbearances.

  o Oversee any required foreclosures or negotiated deeds in lieu of foreclosure.

- Provide reports to Owner and access to all of Manager's information, computer programs, and online servicing websites regarding the operation of the Portfolio including stabilization estimates, borrower contact logs, loan modification and forbearance activity, collections, and any foreclosure or real estate ownership or rental activity.

- Provide representatives to meet with Owner and their associates to review and discuss the operation of the Portfolio.

- Immediately Notify Owner of anticipated material budget variances, and recommend revisions to the budget for approval by Owner.

- Engage and supervise third party service providers reasonably necessary for the performance of these Services.

- Oversee the tax and insurance management by the Servicer.

- Oversee the duties of third party property management companies who are retained to manage leased properties owned by the Owner.

792213.06/SD
142681-00011

EXHIBIT A
-1-

EXHIBIT 3, PAGE 47

# EXHIBIT "4"



*Nation's Leading Private Money Services Provider*
**A Partner You Can Trust Since 1982**

Home    About Us    Borrower Payment Options    Customer Login    Start Loan Servicing    Start Foreclosure    Transmittal Forms    Strategic Partners & Associations    Contact Us

Loan Servicing

**Standard Loan Servicing**

Specialty Loan Servicing

Mortgage Fund Servicing

Foreclosure Service

General Fee Schedule

Reo Management

Eviction Services

Bankruptcy Relief Referral

Secured Investments

Buy/Sell Loans

Borrower Contact & Options to Avoid Foreclosure

# STANDARD LOAN SERVICING

## (Basic Performing)

### For Newly Originated & Performing Loans

**LOAN SERVICING SETUP PROCESS**
(For a Single Loan or a Loan Pool)



PLEASE CLICK THE BUTTON BELOW TO BEGIN THE
SERVICING SETUP PROCESS:

**◄◄ START SERVICING ►►**

**Which one is Right for you?**



**Sub Servicing**          **Private Label Servicing**          **Interim servicing**

                    

**Broker earns a Spread Servicing Fee**       **Minimum 5,000 Active Loans**       **Very Short Term**

## LOAN TYPES SERVICED

Residential Loans    **Commercial Real Estate**    Consumer Real Estate    **Land**    Prime

**Manufactured Housing**    Construction    **Sub Prime**    **Fixed**    **ARM**    HELOC

**NOTE:  FCI will not service Negative Amortization (Neg Am) Loans, Daily Simple Interest Loans (interest accrual method from date received to date received).  This with the exception of:  Lender agrees to let FCI service the Loan as a regular or partially amortized Loan or as an interest only Loan with no negative amortization.**

## STANDARD LOAN SERVICING/BASIC PERFORMING FEES

**\*A complete Loan Servicing Setup Package must be received to start servicing.**

**\*The Setup Fee is due at the time of Setup, with all documents/information, and is non-refundable.**

**\*Missing documents/information requested by FCI must be provided within 30 days of initial Boarding or the Loan will be Deboarded.**

**\*Loans can be prelim Boarded with copies of UNRECORDED documents, but copies of required RECORDED documents (Deed, Mortgage, Assignments, etc.) must be provided within 60 days.**

| LOAN SETUP FEES |
| --- |
| (All Programs) |

EXHIBIT 4, PAGE 48

| LOAN SETUP for Fixed Rate, Single Lender, non escrow/impounded | $45 per Loan for 1 - 9 Loans $25 per Loan for 10+ Loans submitted at one time |
|---|---|
| LOAN SETUP for more than one Lender | Add $10 per Lender |
| LOAN SETUP for ARM/HELOC - Performing | Add $5 per Loan |
| LOAN SETUP for ARM/HELOC - Delinquent | Add $15 per Loan |
| LOAN SETUP for Loans with Escrow/Impounds | Add $15 per Loan |
| LOAN SETUP with activated Default Rate | Add $15 per Loan |
| LOAN SETUP for Active Bankruptcy, Forbearance Plan, Complex Loans & Complex Loan Modifications | $150 per Loan |
| LOAN SETUP for Partial Note Sale (Hypothecation) Loans | $75 per Loan |

| STANDARD Loan Servicing/Basic Performing PROGRAM FEES (For Newly Originated and Performing Loans) | |
|---|---|
| PAYMENT PROCESSING Base Fee (Loans up to $500K) | $15 per Loan/Month/Lender |
| PAYMENT PROCESSING (Loans over $500K up to $1M) | 0.075% of Principal Balance/12, ($1M = $62.50) |
| PAYMENT PROCESSING (Loans over $1M) | $62.50 at $1M plus $20 per $M (or portion thereof), or $15 Loan/Month/Lender (if greater) |
| ARM/HELOC LOANS | Add $5 per Loan/Month |
| COVERED LOAN (Dodd Frank) COMPLIANCE on Performing Loans that become 25 days delinquent | Add $20 Loan/Month for 2 Months |
| ESCROW/IMPOUNDS service included | Add $15 per Loan/Month for 1-2 entities (taxes & insurance) Add $2.50 per Loan/Month per entity over 2 entities (city, county taxes) |
| LOAN RESET for Data Entry | $45.00 per Loan for 1 - 9 Loans $25 per Loan for 10+ Loans submitted at one time |

**COVERED LOAN (Dodd Frank) Regulatory Compliance Action Fee:** PERFORMING LOANS secured by a Consumer Primary Residence (Owner Occupied) that become 25 days delinquent are subject to an additional $20 monthly charge for 2 months to fulfill mandated servicing requirements.

**COVERED LOAN (Dodd Frank) FORECLOSURE PREVENTION ALTERNATIVES Servicer Response Fee:** If the Lender on a Covered Loan offers Foreclosure Prevention Alternatives (FPAs), there is a $150 charge for the Servicer required response to written Borrower/Consumer loss mitigation applications

The Servicer of Record is accountable for all aspects of Loan servicing compliance, including loss mitigation compliance, and will not agree to Lender requests to answer written loss mitigation applications themselves. **FCI will produce and mail all correspondence required to respond to the written Borrower/Consumer loss mitigation application.** This process requires up to 10 written communications, compliance timeline tracking, and immediate Servicing File progress notation.

NOTE:  On verbal loss mitigation discussions between Consumers and their Lenders, without written Consumer loss mitigation applications received by FCI or the Lender, the Regulation X §1024.41 process is not required.  However, the Lender must keep FCI informed of all communication content and outcomes.

**Optional ESCROW/IMPOUNDS service:** When the borrower's monthly payment on a performing first position Loan includes amounts for the payment of Property Taxes, Hazard Insurance or other entities, FCI will collect and hold those proceeds in a trust account and disburse the scheduled payments to the respective authority as scheduled.  The fee is $15 per Loan per month for 1 or 2 entities and will be added to the monthly Loan Servicing Fee and prorated to the respective Lenders.

**Taxes and Insurance Notice:** On loans where the Borrower's monthly payment does not include Escrow/Impounds for Property Taxes and Hazard Insurance, it is standard in the industry for the Broker or Investor/Lender to file a Loss Payee Notice with the insurance company, check for payment of taxes once a year or use a Tax Service, and (if applicable) file a Request for Notice of foreclosure with any senior lien holders.  FCI offers Insurance Tracking as an option within its servicing and access to deeply discounted force placed Hazard Insurance.

**Payoff and Reconveyance Notice:** Regulations require the Servicer to maintain complete and current records of all loan servicing activities.  As the entity that accepts Payoff Funds, FCI is responsible for ensuring the Reconveyance is recorded according to Regulatory timelines and requirements. **FCI must perform all activities involved in processing Reconveyances** including recording of all related documents such as release of Assignment of Rents, and Deed of Trust.  Fees are charged according to State Code, $45 minimum (Borrower portion per State maximum), plus recording costs.

## STANDARD LOAN SERVICING/BASIC PERFORMING PROGRAM FOR BROKERS, LENDERS AND INSTITUTIONS

EXHIBIT 4, PAGE 49

On this program FCI is the Servicer acting at the direction of its Lender Clients (Owner of the Notes) for Newly Originated Loans, Performing Loans and Performing Loan Pools. Standard Loan Servicing is an automated Payment Processing program, and under this program FCI does <u>not</u> perform collection and loss mitigation services, except as is required for regulatory compliance.

This program consists of Payment Processing, Basic Collection, and Default Servicing Option to transfer the Loan to Specialty Loan Servicing Full Collection program for collection and loss mitigation services. **There is a one time Loan Setup Fee per the above Fee Schedule due at Setup.** Loans with an Active Bankruptcy are serviced and charged as two loans: a pre-petition loan and a post petition loan. Data entry fee to reset any Loan terms, including Disbursements and Assignments of new Lenders, after a Loan is set up is $45 per instance, reduced to $25 per Loan if 10 or more are reset at one time. Transfer of servicing from FCI to another entity (excluding payoffs) is $90 per Loan.

## (I) PAYMENT PROCESSING

The Payment Processing portion of the program includes:

- Borrower Welcome Letters
- Payoff Demands
- Lender Welcome Letter
- Lender Monthly Statement of all Account
- <u>Daily Disbursement of Funds</u> (after clearing)
- Free Hazard Insurance Tracking
- 24/7 Account Access
- Downloadable Reports

- Optional Escrow/Impounds Service for Insurance and Taxes
- Borrower Monthly Statement with Payment Coupon
- Subordination Agreements
- Electronic deposit of Funds (ACH) into Lender's account
- Disbursements and Draws
- Releases and Reconveyances
- IRS 1098 and 1099-INT Reporting

## (II) BASIC COLLECTION

Basic Collection starts when the Borrower Payment is 11 days past due. The fee is 50% of paid Late Charges and/or Default Rate on Loans to $500K, 25% on Loans $500K to $2M, 15% on Loans over $2M.

The Basic Collection portion of the program includes:

- 11 days delinquent send First Late Notice
- 21 days delinquent send Second Late Notice
- 31 days delinquent send Third Late Notice
- 41 days delinquent send Foreclosure Prevention Notice (on loans under CFPB enforcement)
- 61 days delinquent send Late Notice
- 91 day delinquent send Late Notice
- Borrower inquiry calls handled
- Act as intermediary between Borrower and Broker or Investor/Lender
- Discounted Force/Lender Placed Hazard Insurance available
- Notify Broker or Investor/Lender of Borrower need for refinance or modification

Collection Option: Troubled loans in Standard Loan Servicing can be transferred to Specialty Loan Servicing Full Collection program for collection, possible modification, or foreclosure, or for High Touch Performing Loan Servicing. Click the Specialty Loan Servicing tab for program and pricing. There is a loan reset fee at transfer.

## (III) DEFAULT SERVICING OPTION

California Foreclosure processing on non Owner Occupied loans is an integral and required part of Standard Loan Servicing. National Default Servicing is handled by the Broker or Investor/Lender proactively transferring Loans to the Specialty Loan Servicing program.

Default Servicing includes:

- Complete Loss mitigation and workout services in Specialty Loan Servicing
- FCI will work with the Borrower and Lender in an attempt to reach a workout, payment plan or modification
- Foreclosure process started at Lender direction subject to State and Federal regulations (such as Dodd-Frank)
- National Foreclosure processing or coordination
- CA Declaration of Compliance
- Legal Services coordination including Bankruptcy Relief and Eviction

EXHIBIT 4, PAGE 50

## LOAN STATUS DEFINITIONS

<u>Newly Originated Loan:</u> **A Loan of any type that has just been made and just closed. The originating Broker/Company may have funded the Investor in at the closing, or the Broker/Company may have funded the loan themselves and will assign (or sell) the note to an Investor later.**

<u>Spread:</u> **On a Newly Originated Loan the originating Broker/Company may have a Note Rate on the Loan and a Sold Rate to the Investor/Lender. For example the note was originated at a Note Rate of 12% and is being sold to the Investor/Lender at a Sold Rate of 11% with the Broker/Company keeping 1% as additional monthly compensation (known as a Spread). The Broker/Company will typically continue to monitor the loan and provide guidance to the Investor/Lender. The borrower payments will typically be disbursed to the Investor/Lender minus the Spread, and the Spread will be disbursed to the originating Broker/Company minus the Loan servicing fee.**

<u>Performing Loan:</u> **FCI Servicing Program definition is any Loan that is current, one or two months delinquent, according to its original or modified terms. Loan Servicing Tracking definition is any Loan that is paid before the passing of the grace period.**

<u>Delinquent Loan:</u> **FCI Servicing Program definition is any Loan that has missed the 3rd payment, or more. The known situation for each Loan needs to be disclosed. Loan Servicing Tracking definition is any Loan where the borrower's payment is not received within the grace period.**

<u>Partial Note Sale Loans:</u> **This is a process where the holder/owner of a performing promissory note (Primary Investor), which is usually amortized for 30 years, sells the remaining note's scheduled cash flow payments (monthly payments) to an investor (Secondary Investor) for an amount less than the current Unpaid Principal Balance of the loan, for a designated period of time (typically 8-10 years), and for an agreed upon rate of return (typically 8%-10%) to the Secondary Investor. This can be done using a Hypothecation Agreement or by Assignment of the note.**

**There are three main factors needed to create a Partial Loan (Balance, Term, Rate). (1) How much does the Secondary Investor want to invest (Balance of Note Bought)? (2) How long do they want to have their money invested (Term of the Investment)? (3) What rate of return (Rate) are they looking for on this investment?**

**FCI has software specifically designed for servicing Partial Note Sale situations. Your Customer Login will show cash flow and balances for each Investor, as well as track and display the separate amortization schedules and maturity dates.**

**A critical success factor when creating a Partial Note Sale is to be sure you have a seasoned, well performing note. If not, then many serious problems will arise.**

<u>Loan Pools:</u> **A group of Loans that may be Performing, Delinquent, or mixed. The situation for each Loan in the pool should be disclosed.**

8180 E. Kaiser Blvd Anaheim Hills, CA 92808
Toll Free Main Line: (800) 931-2424, Phone: (714) 282-2424
Loan Servicing Fax: (714) 282-2429, Specialty Servicing Fax: (714) 282-5775, Foreclosure Dept. Fax: (714) 282-2425
Business Hours: 8 am to 5 pm PST, Monday through Friday
Nationwide Mortgage Licensing System # 4920 | CA DRE # 01022780
Copyright © 2003 - 2011 FCI Lender Services, Inc. All Rights Reserved.
Terms Of Use  Privacy Statement

EXHIBIT 4, PAGE 51



*Nation's Leading Private Money Services Provider*
**A Partner You Can Trust Since 1982**

| Home | About Us | Borrower Payment Options | Customer Login | Start Loan Servicing | Start Foreclosure | Transmittal Forms | Strategic Partners & Associations | Contact Us |

Loan Servicing

Standard Loan Servicing

Specialty Loan Servicing

Mortgage Fund Servicing

Foreclosure Service

General Fee Schedule

Reo Management

Eviction Services

Bankruptcy Relief Referral

Secured Investments

Buy/Sell Loans

Borrower Contact & Options to Avoid Foreclosure

# REO MANAGEMENT & SALES

## FCI CAN COORDINATE WITH EXISTING LENDER CLIENTS TO PROVIDE LOAN AND PROPERTY INFORMATION TO THE LENDER'S CHOSEN REO SERVICES PROVIDER, (FCI DOES NOT PROVIDE REO SERVICES).

**REO services from the Lender's chosen REO Services Provider should include:**

☑ **Property Management:** Vacate and secure property, connect utilities, do trash out, maintain pool/spa and landscaping, obtain bids and supervise repairs, arrange termite inspection and repair, correct encroachment problems, do regular property inspections, and send monthly status reports.

☑ **Property Valuation:** Complete BPO package or appraisal, as-is and repaired.

☑ **Property Sale:** Aggressive multifaceted marketing, receive offers and make recommendations for counters, qualify buyers, arrange financing, coordinate closing.

**Any REO is a high liability, non producing asset that needs to be turned into cash as soon as possible.**

The Lender's chosen REO Services Provider should become it's REO department on an as needed basis and their single point of contact for any number of national properties. The focus should be to **reduce holding time, minimize expenses, and obtain the highest possible price.** They should have a carefully selected national network of agents, contractors and related services.

8180 E. Kaiser Blvd Anaheim Hills, CA 92808
Toll Free Main Line: (800) 931-2424, Phone: (714) 282-2424
Loan Servicing Fax: (714) 282-2429, Specialty Servicing Fax: (714) 282-5775, Foreclosure Dept. Fax: (714) 282-2425
Business Hours: 8 am to 5 pm PST, Monday through Friday
Nationwide Mortgage Licensing System # 4920 | CA DRE # 01022780
Copyright © 2003 - 2011 FCI Lender Services, Inc. All Rights Reserved.
Terms Of Use  Privacy Statement

EXHIBIT 4, PAGE 52

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR ORDER: (1) APPROVING PROCEDURES FOR FORECLOSURE SALES, SHORT SALES, REO SALES, AND PAYOFF SETTLEMENTS; AND (2) AUTHORIZING PAYMENT OF FEES AND EXPENSES OF BSI FINANCIAL SERVICES, INC., AND CITIVEST INC., FOR ALL POST-PETITION SERVICES; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **July 14, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **July 14, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Hon. Scott C. Clarkson
United States Bankruptcy Court
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 14, 2017 | Carol Sheets | /s/ Carol Sheets |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Kyra E Andrassy     kandrassy@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
- Jess R Bressi     jess.bressi@dentons.com, kimberly.sigismondo@dentons.com
- Frank Cadigan     frank.cadigan@usdoj.gov
- John P Dillman     houston_bankruptcy@publicans.com
- Lei Lei Wang Ekvall     lekvall@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
- Michael J Hauser     michael.hauser@usdoj.gov
- Mark S Horoupian     mhoroupian@sulmeyerlaw.com,
ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;dperez@sulmeyerlaw.com;ppenn@ecf.inforuptcy.com
- Steven J. Katzman     SKatzman@bmkattorneys.com, admin@bmkattorneys.com
- Christopher J Langley     chris@langleylegal.com, ecfllf@gmail.com;omar@langleylegal.com
- Robert S Marticello     Rmarticello@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
- Michael Simon     msimon@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
- Dheeraj K Singhal     dksinghal@dcdmlawgroup.com, dcdm@ecf.courtdrive.com
- John L. Smaha     jsmaha@smaha.com, jteague@smaha.com;gbravo@smaha.com
- Philip E Strok     pstrok@swelawfirm.com, gcruz@swelawfirm.com;csheets@swelawfirm.com;hdavis@swelawfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Jessica Vogel     Jvogel@sulmeyerlaw.com, jvogel@ecf.inforuptcy.com;mviramontes@sulmeyerlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**