1  **SMILEY WANG-EKVALL, LLP**
   Lei Lei Wang Ekvall, State Bar No. 163047
2  *lekvall@swelawfirm.com*
   Kyra E. Andrassy, State Bar No. 207959
3  *kandrassy@swelawfirm.com*
   Robert S. Marticello, State Bar No. 244256
4  *rmarticello@swelawfirm.com*
   Michael L. Simon, State Bar No. 300822
5  *msimon@swelawfirm.com*
   3200 Park Center Drive, Suite 250
6  Costa Mesa, California 92626
   Telephone:  714 445-1000
7  Facsimile:  714 445-1002

8  Attorneys for Debtors-in-Possession

9                **UNITED STATES BANKRUPTCY COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11                     **SANTA ANA DIVISION**

12 | In re                                  | Case No. 8:17-bk-11996-SC

13 | WJA ASSET MANAGEMENT, LLC,             | Chapter 11

14 |            Debtor-in-Possession.       | (Jointly Administered with Case Nos.
                                              8:17-bk-11997-SC; 8:17-bk-11998-SC;
15                                            8:17-bk-11999-SC; 8:17-bk-12000-SC;
   | ☐ Affects 5827 WINLAND HILLS DRIVE       8:17-bk-12001-SC; 8:17-bk-12002-SC;
16 |   DEVELOPMENT FUND, LLC                  8:17-bk-12003-SC; 8:17-bk-12004-SC;
                                              8:17-bk-12005-SC; 8:17-bk-12006-SC;
17 | ☐ Affects ALABAMA HOUSING FUND,          8:17-bk-12008-SC; 8:17-bk-12009-SC;
   |   LLC                                    8:17-bk-12010-SC; 8:17-bk-12011-SC;
18 |                                          8:17-bk-12012-SC; 8:17-bk-12013-SC;
   | ☐ Affects CA EXPRESS FUND, LLC           8:17-bk-12014-SC; 8:17-bk-12015-SC;
19 |                                          8:17-bk-12016-SC; 8:17-bk-12018-SC;
   | ☐ Affects CA SEE JANE GO FUND,           8:17-bk-12019-SC; 8:17-bk-12124-SC;
20 |   LLC                                    8:17-bk-12125-SC; 8:17-bk-12126-SC;
                                              8:17-bk-12127-SC and 8:17-bk-12285-SC)
   | ☐ Affects CA WHIRL FUND, LLC
21 | ☐ Affects CLAIRTON RESIDENTIAL
   |   RENEWAL, LLC                         Chapter 11
22 | ☐ Affects EQUITY INDEXED
   |   MANAGED FUND, LLC                    **MOTION OF WJA EXPRESS FUND, LLC
23 | ☐ Affects LUXURY ASSET                 AND WJA ASSET MANAGEMENT, LLC,
   |   PURCHASING INTERNATIONAL,            FOR ORDER (1) APPROVING BID
24 |   LLC                                   PROCEDURES PURSUANT TO LOCAL
                                             BANKRUPTCY RULE 6004-1(b) IN
25 | ☐ Affects LVNV MULTI FAMILY LLC         CONNECTION WITH SALE OF
                                             PARTNERSHIP INTERESTS IN
26 | ☐ Affects PMB MANAGED FUND, LLC         GOTHARD EXPRESS PARTNERS, L.P.,
   | ☐ Affects PROSPER MANAGED FUND,        (2) SALE OF PARTNERSHIP INTEREST
27 |   LLC                                   IN GOTHARD EXPRESS PARTNERS,
                                             L.P. PURSUANT TO 11 U.S.C. § 363(b)
28                                           AND (f), AND (3) SETTLEMENT WITH**

*(vertical left margin)* SMILEY WANG-EKVALL, LLP · 3200 Park Center Drive, Suite 250 · Costa Mesa, California 92626 · Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1

☐ Affects TD OPPORTUNITY FUND, LLC

2

☐ Affects TD REO FUND, LLC

3

☐ Affects URBAN PRODUCE FUND, LLC

4

☐ Affects WHIRL FUND, LLC

5

☒ Affects WJA ASSET MANAGEMENT, LLC

6

☒ Affects WJA EXPRESS FUND, LLC

7

☐ Affects WJA REAL ESTATE OPPORTUNITY FUND I, LLC

8

9

☐ Affects WJA REAL ESTATE OPPORTUNITY FUND II, LLC

10

☐ Affects WJA SECURE REAL ESTATE FUND, LLC

11

☐ Affects WJA SECURE INCOME FUND, LLC

12

☐ Affects WILLIAM JORDAN INVESTMENTS, INC.

13

14

☐ Affects CA REAL ESTATE OPPORTUNITY FUND I, LLC

15

☐ Affects CA REAL ESTATE OPPORTUNITY FUND II, LLC

16

☐ Affects CALIFORNIA INDEXED GROWTH FUND, LLC

17

☐ Affects SECURE CALIFORNIA INCOME FUND, LLC

18

19

☐ Affects CA REAL ESTATE OPPORTUNITY FUND III, LLC

20

☐ Affects All Debtors

21

22

23

24

25

26

27

28

THE REMAINING PARTNERS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF

<u>Hearing Information:</u>
DATE:     **January 25, 2018**
TIME:     **11:00 a.m.**
CTRM     **5C**

2730646.3

2

MOTION

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  BACKGROUND FACTS ...................................................................... 2

    A.  Organization of the Debtors and CA Express ................................ 2

    B.  The Partnership .......................................................................... 3

    C.  The Proposed Sale ..................................................................... 3

    D.  Proposed Overbid Procedures .................................................... 4

        1.  Approval of the Buyer as the Stalking Horse and the Form of the Agreement ......................................................... 5

        2.  Auction Date ..................................................................... 5

        3.  Overbid Requirements ...................................................... 5

        4.  Bidding at the Auction ...................................................... 6

        5.  Closing of Sale and Forfeiture of Deposits ........................ 7

        6.  Buyer as Back-Up Bidder ................................................. 7

        7.  Break-Up Fee ................................................................... 7

    E.  The Settlement Agreement with the Remaining Limited Partner and the General Partner of the Partnership ........................................... 8

III.  LEGAL ARGUMENT ......................................................................... 9

    A.  The Bid Procedures, Which Are Intended to Ensure That the Highest and Best Price Is Received, Should Be Approved ......................... 9

    B.  The Sale Is a Proper Exercise of Business Judgment and May Be Approved Pursuant to 11 U.S.C. § 363(b) and (f) ....................... 11

    C.  The Settlement Agreement Is in the Best Interests of the Estate .............. 13

    D.  WJA Express Requests that the Court Relieve Kingdom Trust as the Custodian of the WJA Interest and Authorize the Manager to Execute the Agreement and the Settlement Agreement on Behalf of WJA Express ........................................................................... 14

IV.  CONCLUSION ................................................................................. 15

DECLARATION OF HOWARD GROBSTEIN ................................................. 17

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

# TABLE OF AUTHORITIES

<b>Page</b>

## CASES

*Cottle v. Storer Comm. Inc.*,
    849 F.2d 570 (11th Cir. 1988) ................................................................. 10

*In re 240 North Brand Partners, Ltd.*,
    200 B.R. 653 (9th Cir. BAP 1996) ........................................................... 12

*In re A & C Properties*,
    784 F.2d 1377 (9th Cir. 1986) ................................................................. 13

*In re America West Airlines*,
    166 B.R. 908 (Bankr. D. Ariz. 1994) ................................................... 11, 13

*In re Atlanta Packaging Prods., Inc.*,
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ........................................................ 9

*In re Financial News Network, Inc.*,
    126 B.R. 152 n.5 (Bankr. S.D.N.Y. 1991) ............................................... 10

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992) ................................................................. 10

*In re Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983) ................................................................. 11

*In re Mickey Thompson Entertainment Group, Inc.*,
    292 B.R. 415 (9th Cir. BAP 2003) ........................................................... 13

*In re S.N.A. Nut Co.*,
    186 B.R. 98 (Bankr. N.D. Ill. 1995) ......................................................... 10

*In re Schmitt*,
    215 B.R. 417 (9th Cir. BAP 1997) ........................................................... 13

*In re Wilde Horse Enterprises, Inc.*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ..................................................... 12

*In re Woodson*,
    839 F.2d 610 (9th Cir. 1988) ................................................................. 13

*In re World Health Alternatives, Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ........................................................ 13

*Martin v. Robinson*,
    479 U.S. 854, 107 S.Ct. 189 (1989) ........................................................ 13

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1

## **STATUTES**

2    11 U.S.C. § 363(b) .................................................................................. 1, 11, 15

3    11 U.S.C. § 363(f) ............................................................................ 1, 11, 12, 15

4

## **RULES**

6    Federal Rule of Bankruptcy Procedure 9019(a) ............................................ 13

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  **TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY**

2  **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE OFFICIAL**

3  **COMMITTEE OF UNSECURED CREDITORS AND THEIR COUNSEL, AND OTHER**

4  **PARTIES IN INTEREST:**

5      WJA Express Fund, LLC ("WJA Express"), one of the debtors in possession, owns

6  a 50% interest as a limited partner in Gothard Express Partners, L.P. (the "Partnership"),

7  and WJA Asset Management, LLC (the "Manager"), another of the debtors in possession,

8  is the manager of CA Express Fund II, LLC ("CA Express"), a non-debtor entity which

9  owns an 8% limited partnership interest in the Partner.  Pursuant to this motion (the

10  "Motion"), WJA Express seeks approval of (1) bid procedures in connection with the sale

11  of its interest in the Partnership, (2) the sale of the interest in the partnership to FAIT

12  Insurance Partnership, LLC, or the highest bidder free and clear of liens under 11 U.S.C.

13  § 363(b) and )(f), (3) the relieving of Kingdom Trust Company as the custodian of the

14  partnership interests held by WJA Express, and (4) a related settlement with the general

15  partner and remaining limited partner of the Partnership regarding distributions owed

16  through the date of closing.  Also through the Motion, the Manager seeks authority to use

17  its interest in CA Express to approve (1) the bid procedures and the sale of CA Express's

18  interest in the Partnership so that the interests can be sold together to the highest bidder,

19  and (2) the settlement with the general partner and the remaining limited partner

20  regarding pending distributions.  In support of the Motion, WJA Express and the Manager

21  submit the following memorandum of points and authorities and the declaration of

22  Howard Grobstein in support thereof, and respectfully represent as follows:

23

24  I.    **INTRODUCTION**

25      The Partnership operates a car wash in Huntington Beach, California.  WJA

26  Express and CA Express have accepted an offer from FAIT Insurance Partnership, LLC

27  (the "Buyer"), to purchase their limited partnership interests in the Partnership for

28  $1,950,000.00, subject to overbids.  Although CA Express is not a debtor, it believes that

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

it is in its best interests to participate with WJA Express in the auction process in order to ensure that the highest and best price is obtained. The asset purchase agreement with the Buyer provides that it is subject to overbids. In addition, in connection with this sale and because the purchase agreements contains a release of the general partner and the Partnership, WJA Express and CA Express have entered into a related settlement agreement with the general partner and the Partnership under which they have resolved issues regarding the distributions owed to both WJA Express and CA Express.

Accordingly, through the Motion, WJA Express seeks (1) approval of the proposed bid procedures for the sale of the partnership interests it owns, (2) approval of the sale of its partnership interests to FAIT Insurance Partnership, LLC, or the highest bidder, and (3) approval of the settlement agreement with the general partner and the remaining limited partner. In addition, the Manager is seeking approval (1) to utilize its interest in CA Express to cause CA Express to approve the bid procedures and authorize the sale of its partnership interests and (2) to enter into the settlement agreement regarding the pending distributions.

## II.  **BACKGROUND FACTS**

On May 18, 2017, the Manager and its above-captioned affiliates filed voluntary petitions under chapter 11 of the United States Bankruptcy Code. On May 25, 2017, four other affiliates filed voluntary petitions under chapter 11. On June 6, 2017, CA Real Estate Opportunity Fund III filed its chapter 11 petition (together, these debtor entities are referred to as the "Debtors"). The Debtors' cases are jointly administered and the Debtors continue to operate their businesses and manage their affairs as debtors-in-possession.

### A.    **Organization of the Debtors and CA Express**

William Jordan Investments, Inc. ("Advisor"), is a registered investment advisor, and the Manager is the managing member of the Debtors, with the exception of itself and Advisor. It is also the manager for several entities, including CA Express, that have not

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  filed bankruptcy petitions because they did not have the requisite corporate authority to

2  do so.  Prior to the bankruptcy filings, William Jordan was the president and sole owner of

3  Advisor and was the sole member and manager of Manager.  Pursuant to Court orders,

4  Howard Grobstein is now serving as the chief restructuring officer of the Debtors and Mr.

5  Jordan no longer has any ongoing role in the operations of the Debtors or their non-

6  debtor affiliates.  With respect to WJA Express's interests in the Partnership, the

7  custodian of these partnership interests is Kingdom Trust Company for the benefit of

8  WJA Express.  A copy of the documents pursuant to which Kingdom Trust was appointed

9  as the custodian is attached as Exhibit "1."

10  CA Express is a nondebtor entity whose membership interests are equally held by

11  two third party investors:  Texas Capital Holdings, L.P. and The Padova Trust.  The

12  Manager is its manager under its operating agreement, a copy of which is attached as

13  Exhibit "2."

14  **B.    The Partnership**

15  The Partnership owns a car wash in Huntington Beach.  WJA Express owns a

16  50% limited partnership interest (the "WJA Express Interest") and CA Express holds an

17  8% limited partnership interest (the "CA Express Interest" and, together, the "Partnership

18  Interests").  H2Go Partners, L.P. ("H2Go") owns the remaining 41% limited partnership

19  interest and Green-N-Clean Express is the general partner with a 1% interest (the

20  "General Partner") in the Partnership.  In 2016, an investment banker valued the

21  Partnership at approximately $3.145 million, which would put the value of the Partnership

22  Interests as a percentage of the total value at $1,824,388.  Kurt Stake, a certified

23  valuation analyst at Grobstein Teeple, has verified that this valuation is in the range of

24  reasonable valuations for the Partnership Interests.

25  **C.    The Proposed Sale**

26  The Buyer has been negotiating with WJA Express and CA Express for a number

27  of months, and this has materialized in the Partnership Interest Purchase Agreement (the

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   "Agreement") that is attached as Exhibit "3."[1]  Under the Agreement, the Buyer will pay a

2   total of $1,950,000 (the "Purchase Price") for the Partnership Interests, with

3   $1,681,034.48 of the purchase price allocated to the WJA Express Interest and the

4   remaining $268,965.52 allocated to the CA Express Interest based on their percentage

5   interests in the Partnership.  The Agreement is in the process of being executed and,

6   upon execution, the Buyer will pay a $50,000.00 deposit that will be held by the Manager

7   pending Court approval.  The balance of the purchase price is to be paid at the closing,

8   which is to occur no later than ten days after the order approving the sale becomes a final

9   order.  The sale is without any representations or warranties other than those contained

10  in the Agreement, and is subject to overbid.  The general partner of the Partnership has

11  consented to the proposed sale, and the owners of CA Express have similarly give their

12  consent to the proposed sale.  Copies of the signed consents are collectively attached as

13  Exhibit "4."

14        The sale is also subject to the right of first refusal held by the other partners.  In

15  particular, the partnership agreement for the Partnership requires that after obtaining the

16  general partner's written consent to the proposed sale, the selling partners must give the

17  other partner(s) a complete copy of the offer, after which the non-selling partners have

18  thirty days to give written notice of their intention to exercise their right of first refusal.

19  That right of first refusal contains some limitations, as more fully set forth in the

20  partnership agreement that is attached as Exhibit "5."  The other partners have waived

21  the right of first refusal with respect to the Buyer, but have not yet agreed to waive it with

22  respect to any overbids that may be received.

23        **D.    Proposed Overbid Procedures**

24        Under the Agreement and in order to ensure that the highest and best price is

25  received, the Buyer's offer is subject to overbid, and the following procedures are

26  proposed for approval (the "Bid Procedures"):

27  _____

28  [1] The Agreement is in substantially final form and expected to be executed shortly.  The form of the
    Agreement will not be materially different than that attached as Exhibit "3."

1.    **Approval of the Buyer as the Stalking Horse and the Form of the Agreement**

WJA Express and the Manager seek an order approving the Buyer as the stalking horse bidder and the Agreement as the stalking horse agreement.

2.    **Auction Date**

The auction shall be scheduled for the same date and time as the hearing on the Motion, which is proposed to be scheduled for January 25, 2018, at 11:00 a.m.  The auction will take place at or outside Courtroom 5C of the Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth St., Santa Ana, California.

3.    **Overbid Requirements**

Any party interested in submitting an overbid and participating in the auction must, not later than 5:00 p.m. (prevailing Pacific time) on January 18, 2018, submit an overbid in writing to counsel for WJA Express and the Manager (Kyra E. Andrassy, Esq., Smiley Wang-Ekvall, LLP ("SWE"), 3200 Park Center Drive, Suite 250, Costa Mesa, California 92626, email:  kandrassy@swelawfirm.com; facsimile:  714-445-1002) in accordance with the requirements below:

i.    The proposed purchase price must be in the sum of at least $100,000 over the Purchase Price, or $2,050,000.  Any overbid must be on the same or better material terms and conditions as those set forth in the Agreement, or as the Bankruptcy Court may determine are in the best interests of the creditors and the estate.  The one exception is that the closing may be delayed for the period of time that is necessary for the other partners to determine whether to exercise their right of first refusal.

ii.    Only qualified bidders may submit an overbid.  For the purposes of this provision, a qualified bidder ("Qualified Bidder") is one who, within two (2) business days before the auction, delivers to SWE: (a) a deposit of $50,000.00 via cashier's check payable to the Manager or wire to the Manager; (b) written evidence demonstrating to the satisfaction of the Partnership, WJA Express, the Manager, and the Court that it has sufficient liquidity to timely close and to perform any obligations to the Partnership; (c) a

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  written disclosure of whether the overbidder is an insider or creditor of any of the Debtors

2  or of CA Express or their affiliates; (d) a signed Non-Disclosure and Non-Circumvention

3  Agreement in the form attached as Exhibit "6"; and (e) a proposed partnership interest

4  purchase agreement and a written statement signed by the overbidder stating that if it is

5  successful at the auction and confirmed as the successful purchaser, it will be bound by

6  the terms of its partnership interest purchase agreement and that its deposit will be

7  nonrefundable.  No overbids that are contingent on due diligence or financing will be

8  considered and all overbids must include both the WJA Express Interest and the CA

9  Express Interest.  Overbids are subject to the right of first refusal of the other partners in

10 the Partnership, and the highest qualifying overbid will be transmitted on January 18,

11 2018, to the general partner for consent and to the other partners so that they can

12 determine whether to exercise their right of first refusal.  Although this right of first refusal

13 has been waived with respect to the Buyer, the partners will need to determine whether

14 to exercise this right with respect to an overbidder.

15         **4.**        **Bidding at the Auction**

16         Only Qualified Bidders may participate in the auction and, for purposes of clarity,

17 the Buyer shall be considered a Qualified Bidder.  If at least one Qualified Bidder who

18 has submitted an overbid appears at the auction, then WJA Express and the Manager

19 will together designate what they determine, in their reasonable judgment, to be the

20 highest and best bid for the Partnership Interests to be the leading bid at the auction.

21 Thereafter, they will solicit higher and better bids for the Partnership Interests in bid

22 increments of at least $25,000 from the Qualified Bidders participating in the auction, until

23 the best and highest bid for the Partnership Interests has been identified.  If the best and

24 highest bid is from a Qualified Bidder other than the Buyer such that the right of first

25 refusal must be given to the other partners, then as set forth below, the closing for the

26 sale cannot occur until such time as the right of first refusal has been waived.

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

### 5.    Closing of Sale and Forfeiture of Deposits

If the winning bidder is the Buyer, then the Buyer will have until the date that is ten (10) days after the order approving the Motion (the "Sale Order") becomes a final order to consummate the sale of the Partnership Interests.  If the tenth day falls on a weekend or holiday, then the next business day will be the deadline for closing.  If the winning bidder is an overbidder, then the overbidder will have until the later of the date that is (a) ten (10) days after the Sale Order becomes a final order or (b) the time period for the other partners to exercise their right of first refusal has passed without the exercise of that right. If the winning bidder fails to timely close, then the winning bidder will be deemed to have forfeited its deposit unless WJA Express and the Manager agree to give the winning bidder an extension of time.  If the other partners elect to exercise their right of first refusal, then the exercise of that right of first refusal shall be deemed final and the sale to the other partners may proceed at the same price and on the same material terms as the bid they are matching.

### 6.    Buyer as Back-Up Bidder

If the winning bidder is a party other than the Buyer, then at its option, the Buyer may be declared the back-up bidder (the "Back-Up Bidder").  If the winning bidder is unable to timely complete the purchase of the Partnership Interests, then WJA Express and the Manager (on behalf of CA Express) shall be authorized to proceed with the sale of the Partnership Interests to the Back-Up Bidder without further notice, hearing, or order of the Court.  If WJA Express and the Manager intend to proceed with the Back-Up Bidder, then they shall provide the Back-Up Bidder with at least three (3) business days' written notice of the date set fort the closing with respect to the bid from the Back-Up Bidder.

### 7.    Break-Up Fee

If the winning bidder for the purchase of the Partnership Interests following the auction is a party other than the Buyer and that party closes the purchase of the Partnership Interests, then the Buyer shall be entitled to the payment of a break-up fee of

1    $50,000.00 (the "Break-Up Fee") to compensate it for the time and expense that it

2    incurred conducting due diligence and serving as the stalking horse bidder.  In addition,

3    the Buyer will receive its deposit back.

4         **E.**     **The Settlement Agreement with the Remaining Limited Partner and the**

5             **General Partner of the Partnership**

6         As a condition to the proposed transaction with the Buyer, the consent of the

7    general partner was required.  As both a condition to the giving of that consent and

8    because the Buyer also wanted the selling partners to have no outstanding issues

9    regarding the Partnership, the Agreement contains a release by the selling partners of

10   the Partnership and the general partner from any claims, known or unknown, that relate

11   in any way to the Partnership or the general partner and that may exist as of the closing

12   date.  Because this release is broad enough in scope that it includes any issues related

13   to distributions that may be owed through the date of closing, the selling partners

14   engaged in a dialogue with the general partner regarding distributions owing to them as

15   of the date of execution of the Agreement and that may come due to them prior to the

16   closing date.  These discussions have resulted in a settlement agreement regarding

17   pending distributions.

18        The major point of contention was that the partnership agreement requires that the

19   general partner make periodic distributions to the partners of cash generated from

20   operations.  Although the general partner indicated an intention to make a distribution in

21   late 2017, the selling partners believed that the proposed distribution was calculated with

22   reserves that were artificially high, thereby reducing the amount of cash available for

23   distribution now.  The general partner disagreed.  The partners have discussed and

24   reached the resolution that is documented in the Settlement Agreement that is attached

25   as Exhibit "7" (the "Settlement Agreement").  As set forth in the Settlement Agreement, at

26   the closing of the sale of the Partnership Interests, the general partner will make a

27   distribution to the partners of $210,000, to be allocated based on their respective

28   ownership interests, so that WJA Express would receive 50% and CA Express would

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  receive 8%.  In addition, the parties agreed that the Partnership should make an

2  additional payment to the selling partners of $30,000, to be divided between them based

3  on their respective ownership interests in the Partnership.  Although this additional

4  payment is not expressly contemplated under the partnership agreement, the remaining

5  limited partner has consented to the general partner making this additional payment.

6  There will be no further distributions to the selling partners, including preferred interest

7  payments of a couple thousand dollars a month, pending the closing of the sale.

8  Approval of the Settlement Agreement is a condition to the sale to the Buyer, and

9  approval of the sale to the Buyer or a successful overbidder is similarly a condition to the

10  effectiveness of the Settlement Agreement.  If either agreement is not approved, then the

11  Settlement Agreement will be of no further force or effect and the parties will go back to

12  being governed by the terms of their partnership agreement.

13

14  **III.    LEGAL ARGUMENT**

15      **A.    The Bid Procedures, Which Are Intended to Ensure That the Highest**

16      **and Best Price Is Received, Should Be Approved**

17      Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure

18  provide specific guidance as to the procedures to be employed by a trustee in conducting

19  a sale of assets of an estate.  Nonetheless, as one court has stated, "[i]t is a well-

20  established principle of bankruptcy law that the objective of bankruptcy rules and the

21  trustee's duty with respect to such sales is to obtain the highest price or greatest overall

22  benefit possible for the estate."  *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131

23  (Bankr. N.D. Ga. 1988).  Additionally, courts have long recognized the need for

24  competitive bidding at hearings on bankruptcy sales, noting that "[c]ompetitive bidding

25  yields higher offers and thus benefits the estate.  Therefor the objective is to 'maximize

26  bidding, not restrict it."

27      WJA Express and the Manager believe that the bidding procedures proposed

28  above will ensure that the highest and best price is received for the Partnership Interests,

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    while still protecting the estate from parties wishing to bid on the Partnership Interests but

2    who are ultimately unable to consummate their proposed purchase.  The bid procedures

3    are intended to foster competitive bidding among serious potential purchasers, eliminate

4    from consideration potential bidders who would be unable to actually close a sale, and

5    ensure that the highest and best price is received for the Partnership Interests.

6         With respect to the Break-Up Fee, neither the Bankruptcy Code nor the Federal

7    Rules of Bankruptcy Procedure provide guidance with respect to break-up fees.

8    However, break-up fees are fairly common and are routinely approved by bankruptcy

9    courts when they are reasonable in amount and bear some relation to the fees and

10   expenses incurred by the stalking horse bidder.  In general, a "'break-up fee' is an

11   incentive payment to an unsuccessful bidder who placed the estate property in a sales

12   configuration mode . . . to attract other bidders to the auction."  *In re Financial News*

13   *Network, Inc.*, 126 B.R. 152, 154 n.5 (Bankr. S.D.N.Y. 1991); *see also In re Integrated*

14   *Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y. 1992)(providing that "[a] break-up fee, or

15   more appropriately, a termination fee, is an incentive payment to a prospective purchaser

16   with which a company fails to consummate a transaction.").  Agreements to provide such

17   fees are intended to compensate the potential acquirer who serves as a "stalking horse,"

18   which attracts more favorable offers.  *See In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr.

19   N.D. Ill. 1995).  Outside of bankruptcy cases, break-up fees are typically allowed if they

20   enhance bidding.  *Id.* at 102.  Indeed, Local Bankruptcy Rule 6004-1(b) requires bid

21   procedures to provide evidence that the break-up fee will enhance bidding.  In the

22   bankruptcy context, break-up fees are permissible "if reasonably related to the bidder's

23   efforts and the transaction's magnitude."  *Cottle v. Storer Comm. Inc.*,. 849 F.2d 570, 578

24   (11th Cir. 1988).  Generally, whether the payment of a break-up fee is appropriate is

25   evaluated under a business judgment standard.  *See S.N.A. Nut*, 186 B.R. at 102.  Under

26   this rule, there is a presumption that in making a business decision, the trustee or debtor

27   is acting on an informed basis, in good faith, and in the honest belief that the action is

28   taken in the best interest of the debtor.  Therefore, procedures proposed by a corporate

1  debtor with respect to a proposed sale are appropriately approved when the court finds

2  that the procedures are fair and do not violate any of the debtor's fiduciary duties.  *Id.*

3      Here, the Break-Up Fee is approximately 2.6% of the Purchase Price and is in an

4  amount that is intended to compensate the Buyer for the fees and costs it has incurred

5  conducting due diligence and negotiating the provisions of the Agreement.  WJA

6  Express, CA Express, the Manager, and the Buyer believe that the Break-Up Fee is in an

7  amount that is reasonable and that has incentivized the Buyer to continue its negotiations

8  with WJA Express and CA Express and that will compensate the Buyer for the expenses

9  it has incurred.  Negotiations have been ongoing since the first half of 2017, with the

10  Buyer negotiating not only with WJA Express and the Manager, but doing due diligence

11  with the General Partner and H2Go to make sure that the Buyer was comfortable with the

12  transaction and fully aware of the business details.  This effort should facilitate the

13  overbidding process by providing potential overbidders with assurances that the Buyer

14  has undertaken a thorough vetting process and remains willing to close the transaction.

15  Without the incentive of the break-up fee, the Buyer may not have incurred the time and

16  expense that it has throughout this process or may have decreased the amount it was

17  willing to purchase the Partnership Interests for.  Because the Buyer's efforts will have

18  played a critical role in bringing other bidders to the table and helps to ensure that the

19  highest and best price is received for the Partnership Interests, WJA Express and the

20  Manager believe it is appropriate and request that the Break-Up Fee be approved.

21  **B.**    **The Sale Is a Proper Exercise of Business Judgment and May Be**

22         **Approved Pursuant to 11 U.S.C. § 363(b) and (f)**

23      Section 363(b) empowers a trustee to "use, sell or lease . . . other than in the

24  ordinary course of business, property of the estate."  In considering a proposed

25  transaction to use, sell, or lease, courts look at whether the transaction is in the best

26  interests of the estate based on the facts and history of the case.  *See In re America*

27  *West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (citing *In re Lionel Corp.*, 722

28  F.2d 1063, 1071 (2d Cir. 1983)).  This requires examination of the "business justification"

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  for the proposed sale.  *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653 (9th Cir. BAP

2  1996); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991).

3  "In approving any sale outside the ordinary course of business, the court must not

4  only articulate a sufficient business reason for the sale, it must further find it is in the best

5  interest of the estate, i.e., it is fair and reasonable, that it has been given adequate

6  marketing, that it has been negotiated and proposed in good faith, that the purchaser is

7  proceeding in good faith, and that it is an 'arms-length' transaction."  *Wilde Horse*

8  *Enterprises, Inc.*, 136 B.R. at 841; *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653.  A

9  sale may be free and clear of liens, claims, and interests under certain circumstances,

10  including where applicable nonbankruptcy law would permit the sale free and clear of

11  such interests, the interest is a lien and the sale price exceeds the value of all liens

12  against the property, or the interest is in bona fide dispute.  *See* 11 U.S.C. § 363(f).

13  Here, the proposed transaction has a legitimate business justification and is in the

14  best interest of the WJA Express estate and a proper exercise of the Manager's authority

15  with respect to CA Express.  The intention of these bankruptcy cases is to engage in an

16  orderly liquidation of assets, with the proceeds distributed first to allowed claims and then

17  to the holders of equity in the debtors.  Negotiations regarding the sale of the Partnership

18  Interests commenced prepetition and have continued since the bankruptcy filings.  The

19  CRO has independently verified that the proposed sale price represents fair value for the

20  Partnership.  Moreover, the Partnership is a borrower on a loan that is secured by its real

21  property that will require refinancing in 2018, and the bankruptcies of WJA Express and

22  its affiliated entities were anticipated to make that refinancing more difficult since the

23  financial strength of 58% of the partnership interests would be considered questionable.

24  If refinancing could not be obtained, that would jeopardize the value of the Partnership

25  Interests.  Moreover, the Buyer has obtained the consent of the general partner and has

26  the financial wherewithal to close.  There are no known liens, claims, and encumbrances,

27  and therefore the sale may be approved under 11 U.S.C. § 363(f).

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    For these reasons, WJA Express and the Manager request that the Court approve

2    the sale on the terms set forth in the Agreement.

3    **C.    The Settlement Agreement Is in the Best Interests of the Estate**

4    Federal Rule of Bankruptcy Procedure 9019(a) provides, in part, that a court may

5    approve a compromise upon the proper motion by the trustee and after a hearing on

6    notice to the debtor, all creditors, and all interested parties.  The standard to be applied to

7    the approval of a settlement includes (1) the probability of success in the litigation; (2) the

8    difficulties in collection on a judgment; (3) the complexity of the matter and the expense,

9    inconvenience or delay occasioned by resolution through litigation; and (4) the interest of

10    creditors and the reasonableness of the compromise.  *See In re A & C Properties*, 784

11    F.2d 1377, 1380-81 (9th Cir. 1986), *cert. den.*, *Martin v. Robinson*, 479 U.S. 854, 107

12    S.Ct. 189 (1989).

13    "The bankruptcy court has great latitude in approving compromise agreements."

14    *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988).  In approving a settlement agreement,

15    the court must find that it is fair and equitable and the product of good faith negotiations.

16    *See In re A & C Properties*, 784 F.2d at 1381.  Generally speaking, the court may defer to

17    the business judgment of the debtor-in-possession or trustee in deciding whether to settle

18    a matter.  *See In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (9th

19    Cir. BAP 2003).  The court need not conclude that the proposed settlement is the best

20    possible compromise, but only that the settlement is "within the reasonable range of

21    litigation possibilities."  *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 296

22    (Bankr. D. Del. 2006).  Similarly, the court need not, and should not conduct a "mini-trial"

23    on the compromised claims but simply determine that disputes related to those claims

24    exist.  *See In re Schmitt*, 215 B.R. 417, 423 (9th Cir. BAP 1997).  It is enough that the

25    court conclude the probability of success is uncertain.  *See, e.g., In re America West*

26    *Airlines, Inc.,* 214 B.R. 382, 386 (Bankr. D. Ariz. 1997).

27    Here, the Settlement Agreement is in the best interests of the estate because it

28    paves the way for the sale to close while resolving a dispute with the general partner

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000  •  Fax 714 445-1002

regarding the amount of distributions due to the estate through the closing.  Although the

partnership agreement contemplates that distributions from operating cash will be made

on a regular basis, the general partner has a fair amount of discretion to set appropriate

reserves in order to ensure that the Partnership has sufficient cash on hand on a going

forward basis.  For six months from the date of each distribution, the Partnership may

"claw back" the distribution or a portion of it if it determines that the distribution rendered

it unable to pay its debts as they come due.  Under the Settlement Agreement, the selling

partners will have no liability for any clawback and may retain their distributions.  The

amount of the proposed distribution is substantially higher than what was previously

offered and avoids attorney's fees and costs that would result were the disagreement not

resolved.  In addition, it paves the way for the sale to the Buyer, which WJA Express and

the Manager believe is a positive outcome.  For these reasons, it is requested that WJA

Express be authorized to enter into the Settlement Agreement and that the Manager be

authorized to execute it on behalf of CA Express.

**D.**    **WJA Express Requests that the Court Relieve Kingdom Trust as the**
**Custodian of the WJA Interest and Authorize the Manager to Execute**
**the Agreement and the Settlement Agreement on Behalf of WJA**
**Express**

Prior to February 2015, Millennium Trust served as the custodian of the WJA

Interest.  In February 2015, it assigned this role to Kingdom Trust, which now holds the

WJA Interest for the benefit of WJA Express and its creditors and owners.  A copy of the

Assignment of Interest is attached as Exhibit "8."  There is no practical or business

reason why Kingdom Trust should continue to act as custodian.  If anything, forcing the

CRO of the Manager to have to obtain signatures of an authorized representative of

Kingdom Trust on the Agreement, the Settlement Agreement, and any other documents

that may be required to consummate the transactions contemplated by this Motion would

be cumbersome.  Accordingly, it is requested that any order granting the Motion relieve

Kingdom Trust Company of its duties as the custodian of the WJA Interest and authorize

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1 the Manager to execute the documents required to consummate the transactions

2 contemplated by this Motion.

3

4 **IV.** **CONCLUSION**

5 Based on the foregoing, WJA Express and the Manager request that the Court

6 enter an order:

7 (1) Granting the Motion;

8 (2) Approving the Bid Procedures, including the payment of the Break-Up Fee

9 to the Buyer if the Buyer becomes entitled to it under the provisions of the Agreement;

10 (3) Relieving Kingdom Trust Company of all of its duties as custodian of the

11 WJA Interests and authorizing the Manager to execute all documents required to

12 consummate the transactions contemplated by this Motion on behalf of WJA Express;

13 (4) Approving the terms and conditions of the Agreement and authorizing WJA

14 Express to enter into the Agreement and the Manager to enter into the Agreement on

15 behalf of CA Express pursuant to 11 U.S.C. § 363(b);

16 (5) Authorizing the sale of the WJA Interest to the Buyer free and clear of all

17 liens, claims and encumbrances pursuant to 11 U.S.C. § 363(b) and (f);

18 (6) Approving the terms and conditions of the Settlement Agreement and

19 authorizing WJA Express to enter into the Settlement Agreement pursuant to Federal

20 Rule of Bankruptcy Procedure 9019 and the Manager to enter into the Settlement

21 Agreement on behalf of WJA Express pursuant to 11 U.S.C. § 363(b); and

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1          (7)     Granting such other and further relief as the Court deems just and

2    appropriate.

3

4                                          Respectfully submitted,

5    DATED:  January 4, 2018               SMILEY WANG-EKVALL, LLP

6

7                                   By:        /s/ *Kyra E. Andrassy*
                                           KYRA E. ANDRASSY
8                                          Attorneys for Debtors-in-Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

## DECLARATION OF HOWARD GROBSTEIN

I, Howard Grobstein, declare as follows:

1.      I am a founder and partner of Grobstein Teeple, LLP.  I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto.  I make this declaration in support of the motion (the "Motion") of Luxury Asset Purchasing International, LLC, to enter into agreements as necessary with various consultants who may be needed to provide services that are critical to the entitlements process and to authorize the members of Luxury to fund the payments to these consultants.

2.      I was approached prior to the filing of the Debtors' bankruptcy cases to serve as the chief restructuring officer of the Debtors in order to provide the Debtors with advice and guidance about their bankruptcy options and to oversee their daily operations. The Court has approved my retention as their chief restructuring officer.  My firm and I are now in possession of the Debtors' books and records.

3.      On May 18, 2017, the Manager and its above-captioned affiliates filed voluntary petitions under chapter 11 of the United States Bankruptcy Code. On May 25, 2017, four other affiliates filed voluntary petitions under chapter 11.  On June 6, 2017, CA Real Estate Opportunity Fund III filed its chapter 11 petition (together, these debtor entities are referred to as the "Debtors") .  The Debtors' cases are jointly administered and the Debtors continue to operate their businesses and manage their affairs as debtors-in-possession.

4.      William Jordan Investments, Inc. ("Advisor"), is a registered investment advisor, and WJA Asset Management, LLC (the "Manager") is the managing member of the Debtors, with the exception of itself and Advisor.  It is also the manager for several entities, including CA Express Fund II, LLC ("CA Express"), that have not filed bankruptcy petitions because they did not have the requisite corporate authority to do so.  Prior to the bankruptcy filings, William Jordan was the president and sole owner of Advisor and was the sole member and manager of Manager.  Pursuant to Court orders, I am now serving

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    as the chief restructuring officer of the Debtors and Mr. Jordan no longer has any ongoing

2    role in the operations of the Debtors or their non-debtor affiliates.

3         5.     Based on my review of the Debtors' books and records, one of the assets of

4    WJA Express is its 50% limited partnership interest in Gothard Express Partners, L.P.

5    (the "Partnership").  Based on WJA Express's books and records, it appears that the

6    custodian of these partnership interests is Kingdom Trust Company for the benefit of

7    WJA Express.  A true and correct copy of the documents pursuant to which Kingdom

8    Trust appears to have been appointed as the custodian is attached as Exhibit "1."

9         6.     CA Express is a nondebtor entity and according to its books and records, it

10    holds an 8% limited partnership interest in the Partnership.  Its books and records reflect

11    that its membership interests are equally held by two third party investors:  Texas Capital

12    Holdings, L.P. and The Padova Trust.  A true and correct copy of the operating

13    agreement for CA Express is attached as Exhibit "2."  The Manager is its manager under

14    its operating agreement.

15         7.     I am informed that the Partnership owns a car wash in Huntington Beach.

16    WJA Express owns a 50% limited partnership interest (the "WJA Express Interest") and

17    CA Express holds an 8% limited partnership interest (the "CA Express Interest" and,

18    together, the "Partnership Interests").  H2Go Partners, L.P. ("H2Go") owns the remaining

19    41% limited partnership interest and Green-N-Clean Express is the general partner with a

20    1% interest (the "General Partner") in the Partnership.  I am informed that in 2016, an

21    investment banker valued the Partnership at approximately $3.145 million, which would

22    put the value of the Partnership Interests as a percentage of the total value at

23    $1,824,388.  At my request, Kurt Stake, a certified valuation analyst at Grobstein Teeple,

24    reviewed this valuation as well as recent financial statements and has verified that this

25    valuation is in the range of reasonable valuations for the Partnership Interests.

26         8.     After my appointment, I continued the negotiations with FAIT Insurance

27    Partnership, L.P. (the "Buyer"), that had commenced prepetition.  These negotiations

28    have taken place over a number of months and the parties have gone back and forth on

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    both the terms and conditions of the sale and the purchase price, before arriving at the

2    agreement for the sale that is represented by the Purchase Agreement (the

3    "Agreement"), a true and correct copy of which is attached as Exhibit "3."  The owners of

4    CA Express have consented in writing to the proposed sale to the Buyer.  True and

5    correct copies of the consents are attached as Exhibit "4."  Attached hereto as Exhibit "5"

6    is a true and correct copy of the partnership agreement for the Partnership, with

7    confidential information redacted.  Attached hereto as Exhibit "6" is a true and correct

8    copy of the form of a Nondisclosure Agreement agreed to between the partners to the

9    Partnership for any potential overbidder to sign before conducting due diligence.

10        9.      The Buyer required that the selling partners release the general partner and

11   the partnership from any claims, and this release was also required to obtain the general

12   partner's consent to the sale.  Because this release includes a release to claims related

13   to pending distributions, negotiations were also required between the partners to the

14   Partnership.  When the general partner circulated its calculation of the proposed

15   distribution of cash from operations for the latter part of 2017, we took issue with the

16   calculation because it appeared to include a number of new reserves or reserves in

17   higher amounts than we believed appropriate.  After a couple of weeks, these

18   discussions resulted in the settlement agreement between the partners to the

19   Partnership, a true and correct copy of which is attached as Exhibit "7."

20        10.     I believe that the sale of the Partnership Interests on the terms proposed is

21   in the best interests of both of the selling partners.  As I have expressed to the Court on

22   prior occasions, the intention of these bankruptcy cases is to engage in an orderly

23   liquidation of assets, with the proceeds distributed first to allowed claims and then to the

24   holders of equity in the debtors.  Negotiations regarding the sale of the Partnership

25   Interests commenced prepetition and have continued since the bankruptcy filings.  I have

26   independently verified that the proposed sale price represents fair value for the

27   Partnership.  Moreover, I am informed that the Partnership is a borrower on a loan that is

28   secured by its real property that will require refinancing in 2018, and the bankruptcies of

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2730646.3                                    19                                    DECLARATION

1   WJA Express and its affiliated entities were anticipated to make that refinancing more

2   difficult since the financial strength of 58% of the partnership interests would be

3   considered questionable.  If refinancing could not be obtained, that would jeopardize the

4   value of the Partnership Interests.  Moreover, the Buyer has obtained the consent of the

5   general partner and has the financial wherewithal to close.  According to the Debtor's

6   books and records, there are no known liens, claims, and encumbrances against the

7   Partnership Interests.

8       11.    The Bid Procedures are proposed with the goal of ensuring that the highest

9   and best price is received.  The Buyer has spent a significant amount of time negotiating

10   this transaction, doing due diligence, and then negotiating the terms of the Agreement.

11   The extent of these efforts is significant and should provide assurances to any overbidder

12   that the proposed purchase price represents fair value for the Partnership Interests and

13   that the transaction makes business sense.  I am informed and believe that the Break-Up

14   Fee was a material component of the Agreement because it provide a measure of

15   comfort to the Buyer that in the event of an overbid, it would receive compensation for the

16   fees and expenses that it has incurred throughout this process and the other

17   opportunities it may have lost out on by attempting to acquire the Partnership Interests.

18       12.    With respect to the settlement with the other partners, I believe that the

19   settlement between the partners to the Partnership is in the best interests of the selling

20   partners.  It paves the way for the sale to close while resolving a dispute with the general

21   partner regarding the amount of distributions due to the estate through the closing.

22   Although the partnership agreement contemplates that distributions from operating cash

23   will be made on a regular basis, the general partner has a fair amount of discretion to set

24   appropriate reserves in order to ensure that the Partnership has sufficient cash on hand

25   on a going forward basis.  For six months from the date of each distribution, the

26   Partnership may "claw back" the distribution or a portion of it if it determines that the

27   distribution rendered it unable to pay its debts as they come due.  Under the Settlement

28   Agreement, the selling partners will have no liability for any clawback and may retain their

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1  distributions.  Initially, the general partner did projections that included reserves for the

2  winter months, and proposed to (and did) make a distribution of $24,451 to the Selling

3  Partners for a preferred return and then a disbursement of $72,594, which was divided

4  58% to the Selling Partners and 42% to the remaining partners.  Some of the reserves

5  appeared to be artificially high and we believed that the distribution to the Selling

6  Partners should be $227,325.40 greater than what was actually made.  A dialogue

7  ensued about how to resolve the issue so that the release being requested could be

8  given.  This resulted in the figures in the settlement agreement, which reflect a reduction

9  of approximately $76,000.00 from our demand.  In addition, preferred interest payments

10  of approximately $4,600 a month ceased in November.  The amount of the proposed

11  distribution is substantially higher than what was previously offered and avoids attorney's

12  fees and costs that would result were the disagreement not resolved.

13         I declare under penalty of perjury under the laws of the United States of America

14  that the foregoing is true and correct.

15         Executed on this 4 day of January, 2018, at Woodland Hills, California.

16

17  _____

18  HOWARD B. GROBSTEIN

19

20

21

22

23

24

25

26

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714.445.1000 • Fax 714.445.1002

# EXHIBIT "1"

**MILLENNIUM**
TRUST COMPANY
THE SMART ALTERNATIVE

mtrustcompany //.com

# ASSIGNMENT OF INTEREST
## Change in Ownership

## ASSET INFORMATION

**Asset:** Gothard Express Partners, LP

**Asset Type:** LPs / LLCs - OTHER

**Units/shares:** 481.039.0000 **Last Reported Value:** $481,039.00

**Current registration of Asset being assigned to Assignee:**
Millennium Trust Company, LLC as Custodian
FBO: WJA EXPRESS FUND LLC ACC# xxxx2G199
2001 Spring Road, Suite 700
Oak Brook, IL 60523

## ASSIGNOR

Millennium Trust Company, LLC (Assignor) in its capacity as Custodian hereby assigns, transfers and conveys all rights, title, interests and claims which Assignor may have in and to the asset described above to the Assignee. This assignment and transfer is being made to one of the following parties: 1) the beneficial owner of the Millennium Trust account; 2) another custodian/trustee FBO the beneficial owner of the Millennium Trust account; or 3) if the beneficial owner is deceased, the beneficial owner's designated beneficiary on the Millennium Trust account. Assignor hereby certifies that as Custodian it has full authority to make this assignment and transfer. Assignor hereby directs the investment sponsor/issuer to transfer the above referenced assets/interest on its books and records.

**Assignor's Release:** _____

**Date:** 2 / 9 / 15      **Signature Guarantee:** _____

## ASSIGNEE

Kingdom Trust Company, Custodian FBO
WJA Express Fund, LLC Acct# IC15004607
PO Box 870
Murray, KY 42071
Tax-ID# 27-4336351

EXHIBIT 1, PAGE 22



## THE KINGDOM TRUST CO.

**The Kingdom Trust Company**
P.O. Box 870 | Murray, KY 42071
Phone 270.226.1000 | Toll Free 888.753.6972
kingdomtrustco.com

## CONFIRMATION OF RE-REGISTRATION

Please return this to The Kingdom Trust Company either by fax. 270-226-1001 or email,
help@kingdomtrustco.com

Please accept this as confirmation for the change of ownership for the following:

New Custodian: The Kingdom Trust Company FBO WJA Express Fund, LLC Acct# IC15004607

Old Custodian: Millennium Trust Company FBO WJA Express Fund, LLC Acct# 16572G199

Investment Name:        Gothard Express Partners, LP

Number of Shares/Units:        3,100,000

Price Per Share/Unit:        $1.00

Total Investment Value:        $3,100,000.00

Date of Change:        3/31/15

_____
Signature

DRETT BLANCHARD
Printed Name

4-17-15
Date

PRES
Title

# EXHIBIT "2"

# EXHIBIT "A"

## OPERATING AGREEMENT
## OF

# WJA EXPRESS FUND LLC,
a California limited liability company

THIS Operating Agreement governs **WJA EXPRESS FUND LLC,** a California limited liability company, (the "Company") and is made and entered into as of September 24, 2013 by and among those Members admitted to the Company pursuant to the requirements and procedures set out in this Operating Agreement.

## ARTICLE I
## FORMATION, NAME, PURPOSES AND DEFINITIONS

1.1     Formation. Pursuant to the limited liability provisions of the Beverly Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq. ("Act"), the parties have formed a California limited liability company by filing Articles of Organization with the California Secretary of State on August 8, 2013. The parties now adopt this Operating Agreement (the "Agreement") to provide for the regulation and management of the affairs of the Company.  This Agreement is subject to, and governed by the Act and the Articles of Organization. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Act, the mandatory provisions of the Act will be controlling.

1.2     Intent. It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a partnership under the Internal Revenue Code of 1986 ("Code") for federal and state income tax purposes. It also is the intent of the Members that the Company not be operated or treated as a partnership for purposes of Section 303 of the federal Bankruptcy Code. No Member shall take any action inconsistent with the express intent of the parties hereto.

1.3     Name.  The  name of this limited liability company is  CA Express Fund II, LLC

1.4     Place of Business. The principal place of business of the Company is 23046 Avenida De La Carlota, Suite 150, Laguna Hills, CA 92653, or such other place as the Manager shall determine.

1.5     Purpose. The Company has been formed to engage in the purchase and/or operation of businesses and/or real estate and related activities, to conduct and transact any lawful business for which limited liability companies may be formed under the laws of the State of California and to exercise all powers permitted thereby, and to engage in any activities that are

*CA Express Fund II, LLC*                                                                                     *30*
*Confidential Private Placement Memorandum*

*Ver. 1*

related to the accomplishment of such purposes.

1.6   <u>Term</u>. The Company shall commence upon the filing of Articles of Organization and shall continue until such time as it shall be terminated under the provisions of Article XI hereof.

1.7   <u>Members</u>. The names of the Company's Members shall be kept by the Company or by a transfer agent appointed by the Manager.

1.8   <u>Agent for Service of Process</u>. The name and business address of the agent for service of process on the Company shall be such other person as the Manager shall appoint.

## ARTICLE II
## <u>CAPITALIZATION OF THE COMPANY</u>

2.1   <u>Units</u>. The Company is authorized to issue a total of One Thousand Investment Units each consisting of 10,000 Common Units ("Units"). The rights, duties, and obligations of the Members of the Company shall be governed by the terms and conditions of this Agreement and shall be represented by Units. The Company does intend to pay dividends from cash flows, and/or from business operations. Each Unit shall carry the right to cast one vote on any matter submitted to the Members of the Company and be entitled to profit and loss distributions and allocations.

2.2   <u>Payments made by Manager subsequent to funding</u>. The Manager has contributed Legal fees and other fees and services in the form of cash and loans to complete the start up of the Company and will be reimbursed for such expenses ("Initial Costs") in the amount of $25,000.

2.3   <u>Additional Units</u>. Additional Members may join the Company by purchasing a required minimum of ten (10) Units, which minimum can be waived at the Manager's sole discretion. The cost of such units ("Initial Capital Contribution") shall be One Hundred Thousand Dollars ($100,000.00). The purchasers of Units shall be admitted as Members of the Company upon the acceptance of their Subscription Agreements, if any, to purchase Units, receipt of their executed Operating Agreement Counterpart Signature Page and Power of Attorney (the "Counterpart Signature Page") indicating their agreement to be bound by all the terms and conditions of this Agreement, and receipt of their respective Capital Contributions. New Members may be admitted upon the affirmative, written approval of the Company's Manager.

2.4   <u>Additional Capital Contributions</u>. No additional Capital Contribution shall be required of any Member after the Member's Initial Capital Contribution.

2.5   <u>Withdrawal of Contributions</u>. No Member shall have the right or be permitted to withdraw from the Company or demand the return of all or any part of its Capital Contribution except as agreed in writing by the Manager.

EXHIBIT 2, PAGE 25

2.6    <u>Transfer of Units</u>. Units are held, and may only be transferred, assigned, pledged, hypothecated, sold, or otherwise disposed of, in accordance with all of the terms and conditions of this Agreement.

2.7    <u>Admission of Additional Members</u>. On the issuance of newly authorized Units in accordance with the provisions of Section 2.3 and on receipt of the Capital Contribution specified and the delivery to the Company of an executed Counterpart Signature Page indicating the holder's agreement to be bound by all of the terms and conditions of this Agreement, such holder shall become an additional Member of the Company (an "Additional Member").

2.8    <u>Transfer Limitations</u>. In addition to other limitations on transfer or disposition of a Unit set forth herein, no disposition of any Unit by a Member may be made if the Unit or any part thereof sought to be transferred, when added to the total of all other Units disposed of within the period of 18 consecutive months prior to the proposed date of disposition, in the opinion of counsel for the Company, results in the termination of the Company under the Code. Further, no disposition of any Unit may be made without registration under the Securities Act of 1933, as amended, and under state securities laws or unless the Company receives an opinion of counsel satisfactory to it that an exemption from registration is available. In addition, no disposition of any Unit may be made if, in the opinion of counsel of the Company, such disposition would cause the Company to be treated as an association taxable as a corporation rather than as a limited liability company subject to the provisions of Subchapter K of the Code, or any comparable provisions then in effect.

## ARTICLE III
## <u>POWERS AND DUTIES OF MANAGER; OFFICERS</u>

3.1    <u>Management</u>. The Manager shall manage the business and affairs of the Company. The Manager is entitled to hire a third party, persons or business organization to manage the business and affairs of the Company on its behalf. As of the date of this Operating Agreement, a majority of the Members have consented to the appointment of WJA Asset Management, LLC to manage the Company. The Manager, or its appointee, shall direct, manage and control the business of the Company to the best of its ability and shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things which the Manager shall deem to be reasonably required to accomplish the business and objectives of the Company. No Member, other than the Manager or its appointee, shall have the authority to bind the Company.

3.2    <u>Number, Tenure and Qualifications</u>. WJA Asset Management, LLC, shall be the Manager of the Company. In the event the Manager resigns, a new manager shall be elected by the vote of Members owning in the aggregate a simple majority of the Percentage Interests ("Majority-In-Interest") at a meeting of the Members and shall hold office until the next

meeting of Members at which an election of the Manager is held, or such longer period as shall be approved by such vote, and until its successor shall have been duly elected and qualified. The Company may engage the Manager pursuant to a written management agreement for the period to which the Manager was elected. The Manager need not be a resident of the State of California. The Manager shall not be precluded from serving the Company in capacities other than management of the Company, for which the Manager receives compensation from the Company.

3.3    <u>Certain Powers of Manager</u>. Without limiting the generality of Section 3.1 hereof, the Manager shall have power and authority, on behalf of the Company, to do the following:

(a) To invest in businesses or real estate projects, including those the Manager may determine even if a Member is directly or indirectly affiliated or connected with such businesses or real estate project and even if the project or investment is partially or totally owned, managed or controlled by the Manager;

(b) To purchase insurance to protect the Company's property and business;

(c) To hold and own, directly or as collateral, any real and/or personal properties in the name of the Company;

(d) To invest any of the Company's funds temporarily in time deposits, short-term governmental obligations, commercial paper or other investments;

(e) To sell or otherwise dispose of or transfer assets of the Company in the ordinary course of business;

(f) To execute on behalf of the Company all contracts, instruments, and documents including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, deeds, security agreements and financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, stock powers, leases, Operating Agreements, and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company; and, subject to any limitation contained in the Articles of Organization or in this Agreement, authorize in writing an agent, generally or specifically, to execute and deliver any contract or other instrument in the name and on behalf of the Company;

(g) To cause the Company to change its domicile to a jurisdiction other than California;

(h) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from the Company funds;

(i) To act as "tax matters partner" pursuant to Section 6221 of the Code;

(j) To make an assignment for the benefit of creditors of the Company, file a voluntary petition in bankruptcy or appoint a receiver for the Company, provided such action has been approved in advance in writing by a Majority-In-Interest;

(k) To enter into any and all other agreements on behalf of the Company, with any other person or entity for any purpose, in such form as the Manager may approve; and

(l) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

3.4 General Duties of Manager. In addition to the Manager's responsibilities resulting from its empowerment in Section 3.3 hereof and the Manager's duties under any pertinent agreement with the Company, the Manager shall be responsible for:

(a)     The day-to-day management and control of the Company;

(b)     The business affairs of the Company, dominion and control of the Company assets and general supervision over its employees and agents, and professional advisors;

(c)     Signing and executing the official documents and other instruments for and on behalf of the Company;

(d)     Keeping or causing to be kept a record of all proceedings and meetings of the Members;

(e)     Causing all notices to be duly given in accordance with the provisions of this Agreement and as required by law;

(f)     Storing the records of the Company;

(g)     Assuring that the books, reports, statements, certificates, and other documents and records required by law are properly kept and filed;

(h)     Maintaining the Unit ledger and books of the Company and causing such books to be kept in such manner as to show at any time the number of Units of the Company issued and outstanding, the manner in which and date when such Units were paid for, the names, alphabetically arranged, and the addresses of the Members of record, the number of Units held by each Member, and the date when each became a Member of record;

(i)     Causing the records required to be maintained pursuant to The Act to be kept and exhibited at the principal place of business of the Company and in the manner and for the

*CA Express Fund II, LLC*                                                                                      *34*
*Confidential Private Placement Memorandum*

*Ver. 1*

purpose provided in such section;

(j)      Having charge and supervision over and being responsible for the monies, securities, receipts, and disbursements of the Company;

(k)      Causing the monies and other valuable effects of the Company to be deposited in the name and to the credit of the Company in such banks or trust companies or with such banks or other depositories as shall be selected by the Manager;

(1)      Causing the monies of the Company to be disbursed by checks or drafts drawn on the authorized depositories of the Company;

(m)      Rendering, when reasonably requested, a statement of the financial condition of the Company, and rendering a full financial report at least annually;

(n)      Causing to be kept correct books of account of all the business and transactions of the Company and exhibiting such books to any Member on request during ordinary business hours;

(o)      Designating an agent for service of process on the Company in compliance with The Act; and

(p)      Performing such other duties as from time to time may be assigned to it by the Company.

(q)      Appointing other officers to serve the Company.

(r)      Buying, Selling, Transferring, Mortgaging and Hypothecating Real Property in the name of the Company.

3.5      <u>Authority to Bind the Company</u>. Unless authorized, in writing, to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. The Manager may act, however, by a duly authorized attorney-in-fact.

3.6      <u>The Company Records and Accounts</u>.  The Manager shall maintain a principal place of business where it shall preserve the records and accounts of the operations and expenditures of the Company including the following:

(a) a current list of the full name and last known business, residence or mailing address of each Member, both past and present;

(b) a copy of the stamped Articles of Organization of the Company and

*CA Express Fund II, LLC*                                                                                                    *35*
*Confidential Private Placement Memorandum*

*Ver. 1*

all amendments thereto together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c) copies of the Company's federal, state, and local income tax and ad valorem returns and reports, if any, for the three most recent years;

(d) copies of the Company's currently effective Operating Agreement and all amendments thereto, copies of any prior written Operating Agreement no longer in effect, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services;

(e) the financial statements of the Company;

(f) copies of all executed Subscription Agreements, executed Suitability Questionnaires, and executed Counterpart Signature Pages and a statement of:

(i) the amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member;

(ii) the date on which, or events on the happening of which, any additional contributions agreed to be made by each Member are to be made;

(iii) any right of a Member to receive distributions which include a return of all or any of the Member's contributions; and

(iv) any event upon the happening of which the Company is to be dissolved and its affairs wound up;

(g) minutes or other records of every meeting or other action of the Members.

Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy the Company's records and accounts at the Member's expense. The Manager shall keep the records and accounts of the Company at the Company's principal place of business unless otherwise required by The Act

3.7    Bank Accounts; Brokerage Accounts. The Manager may, from time to time, open bank accounts and brokerage accounts in the name of the Company.

3.8    Tax Returns and other Elections; Financial Statements. The Manager shall at the expense of the Company cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns or pertinent information shall be furnished to the Members within a reasonable time after the end of the Fiscal Year. All elections permitted to be made by the Company under federal or state laws may be made by the Manager. The Manager may cause the Company's annual financial statements to be reviewed or audited at the expense of the Company on an annual basis by an

accounting firm selected by the Manager.

3.9 <u>Removal</u>. The Manager may only be removed if cause shall exist, and then only by the affirmative vote of a group of Members together owning more than ninety percent (90%) of the Units ("Supermajority-In-Interest") at a meeting duly called expressly for that purpose. Cause shall only be deemed to exist if the Manager has been grossly negligent in the performance of its duty or engaged in willful misconduct or fraud against the Company.

3.10 <u>Vacancies</u>. Any vacancy occurring for any reason in the office of the Manager may be filled by the affirmative vote of the Majority-In-Interest.  The Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until the Manager's earlier death or dissolution, resignation or removal. The Manager chosen to fill a position resulting from an increase in the number of officers and directors shall hold office until its successor shall be elected and shall qualify, or until the earlier death or dissolution, resignation or removal of such officer or director. If no officer or director is elected, the business of the Company shall be managed by the Majority-In- Interest.

3.11 <u>Salary</u>. The Manager will be compensated a 2% annual asset management fee paid quarterly.  If greater than a 10% investor return is achieved, the investors will be paid any remaining profits on a 80%/20% split with the Manager with the investors receiving 80%.

3.12 <u>Program Administrator</u>. The Manager will act as the administrator and disburse working capital to purchase real properties from banks and other third parties. The Manager will direct the Company's assets in identifying properties to be purchased and may hire other third parties to assist in selection of the properties to be purchased.

3.13 <u>Management Team</u>. The day-to-day management and control of the Company may be delegated by the Manager to one or more persons as may be appointed by the Manager.  The Manager from time to time may delegate to any agent the power to appoint and remove any such subordinate or agent and to prescribe their respective  authorities and duties.

### ARTICLE IV
### <u>BORROWINGS, DEPOSITS, CHECKS, AND SECURITIES</u>

4.1 <u>Loans</u>. No loan or advance shall be contracted on behalf of the Company except for acquisition of real estate or real estate related assets such as notes and partnerships,  no negotiable paper or other evidence of its obligation under any loan or advance shall be issued in its name, and no property of the Company shall be mortgaged, pledged, hypothecated, transferred, or conveyed as security for the payment of any loan, advance, indebtedness, or liability of the Company, unless and except as authorized by the Manager in exceptional or

*CA Express Fund II, LLC*                                                                                               *37*
*Confidential Private Placement Memorandum*

*Ver. 1*

unexpected circumstances. Any such authorization may be general or confined to specific instances.

4.2    <u>Deposits</u>. All monies of the Company not otherwise employed shall be deposited from time to time to its credit in such banks or trust companies or with such bankers or other depositories, including brokerage companies duly qualified and licensed under federal and state law, as the Manager may select, or as from time to time may be selected by any agent authorized to do so by the Manager.

4.3    <u>Checks, Drafts, Etc</u>. All notes, drafts, acceptances, checks, endorsements and, subject to the provisions of this Agreement, evidences of indebtedness of the Company, shall be signed by the Manager or such duly authorized agent or agents of the Company in such manner as the Manager from time to time may determine. Endorsements for deposit to the credit of the Company in any of its duly authorized depositories shall be in such manner as the Manager from time to time may determine.

4.4    <u>Bonds and Debentures</u>.  Every bond or debenture duly authorized by the Manager and issued by the Company shall be evidenced by an appropriate instrument which shall be signed by the Manager.

4.5    <u>Sale, Transfer, Etc. of Securities</u>. Sales, transfers, endorsements, and assignments of stocks, bonds, and other securities owned by or standing in the Company's name, and the execution and delivery on the Company's behalf of any and all instruments duly authorized by the Manager in writing incident to any such sale, transfer, endorsement, or assignment, shall be executed by the Manager or by any agent thereunto authorized by the Manager.

## ARTICLE V
## <u>RIGHTS AND OBLIGATIONS OF MEMBERS</u>

5.1    <u>Limitation of Liability</u>. Each Member's liability for the debts and obligations of the Company shall be limited as set forth in The Act and other applicable law.

5.2    <u>List of Members</u>. Upon written request of any Member, the Manager shall provide a list showing the names, last known addresses and each Member's right to share in distributions of cash and other property from the Company ("Interest").

5.3    <u>Return of Capital.</u> Members shall receive the return of their Initial Capital Contributions solely out of the net Profits as set out in Article VIII.  Requests for a return of capital shall be met on a good faith basis in the sole discretion of the manager.

## ARTICLE VI

*CA Express Fund II, LLC*                                                                                          *38*
*Confidential Private Placement Memorandum*

*Ver. 1*

EXHIBIT 2, PAGE 32

## <u>MEETINGS OF MEMBERS</u>

6.1    <u>Annual Meetings</u>. There shall not be annual meetings of the Members. Actions to be taken by the Members may be taken by written consent of Members in lieu of meeting.

6.2    <u>Special Meetings</u>. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called at any time by the Manager or on the written request of a Majority-In-Interest of the membership, with such written request specifying the purpose or purposes of the meeting. In case of failure to call such meeting within 30 days after such request, the Member or Members holding not less than 25% of the Units may call such special meeting.

6.3    <u>Place of Meetings</u>.  The Manager may designate any place, either within or outside the State of California, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be held at the offices of the Company. Any or all Members may participate in any special meeting of the Members by, or through the use of, any means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting.

6.4    <u>Other Meeting Procedures</u>. Meeting procedures and notices shall be conducted as set out by the Manager consistent with The Act.

6.5    <u>Action by Members Without a Meeting</u>. Unless otherwise provided under law or in the Articles of Organization, any action which may be, or is required to be, taken at a meeting of the Members, may be taken without a meeting, without prior notice, and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by Members with outstanding Units entitled to vote with respect to the subject matter thereof sufficient to take such action if voted on at a meeting of Members at which all Members holding Units were in attendance. Notice of such action shall be provided to all Members not signing the consent within ten (10) days of such action.

6.6    <u>Actions Requiring Supermajority-In-Interest Vote</u>. Notwithstanding anything herein to the contrary, the following decisions and actions by the Company shall be made only by the approval of the Supermajority-In-Interest:

(a)  Any act in contravention of this Operating Agreement;

(b)  Any act which would make it impossible to carry on the ordinary business of the Company;

(c)  Any change of the Company into any other legal form;

(d)  Any amendment of this Operating Agreement, except as may otherwise be provided in Article X hereof;

(e)  The merger of the Company with and into another entity; and

*CA Express Fund II, LLC*                                                                                          *39*
*Confidential Private Placement Memorandum*

*Ver. 1*

(f)  The removal of the Manager, except as otherwise provide herein.

## ARTICLE VII
## MEMBERSHIP CERTIFICATES

7.1    Membership Certificates.    The Investment Units of the Company shall be represented by certificates, or shall be un-certificated Units that may be evidenced by a book-entry system maintained by the registrar of such Units, or a combination of both. To the extent that Units are represented by certificates, such certificates whenever authorized by the Manager, shall be in such form as shall be approved by the Manager. The certificates representing Units shall be signed by, or in the name of, the Company by the Manager. Any or all such signatures may be facsimiles if countersigned by a transfer agent or registrar. Although any person whose manual or facsimile signature is affixed to such a certificate ceases to be an authorized agent of the Company before such certificate has been issued, it may nevertheless be issued by the Company with the same effect as if such person were still such at the date of its issue.

The Investment Unit ledger and blank Unit certificates shall be kept by the Manager or by a transfer agent or by a registrar or by any other agent designated by the Manager.

7.2    Transfer of Units. Transfer of Investment Units of the Company shall be made on the books of the Company by the Member, or by its attorney thereunto duly authorized by a power of attorney duly executed in writing and filed with the Manager or any of its transfer agents, and on surrender of the certificate or certificates, properly endorsed or accompanied by proper instruments of transfer, representing such Units. Except as provided by law, the Company and transfer agents and registrars, if any, shall be entitled to treat the holder of record of any Units as the absolute owner thereof for all purposes and, accordingly, shall not be required to recognize any legal, equitable or other claim to or interest in such Units on the part of any other person whether or not it or they shall have express or other notice thereof.

7.3    Maintenance of Units Ledger at Principal Place of Business.  A Unit ledger shall be kept at the principal place of business of the Company, or at such other place as the Manager shall determine, containing the names, alphabetically arranged, of all Members of the Company, their addresses, their units, the amount paid on their Units, and all transfers thereof and the number of Units held by each. Such Unit ledger shall at all reasonable hours is subject to inspection by the Members and by other persons entitled by law to inspect the same.

7.4    Transfer Agents and Registrars.  The Manager may appoint one or more transfer agents and one or more registrars with respect to the certificates representing Units of the Company, and may require all such certificates to bear the signature of either or both. The Manager may from time to time define the respective duties of such transfer agents and registrars. No certificate for Units shall be valid until countersigned by a transfer agent, if at the

date appearing thereon the Company had a transfer agent for such Units, and until registered by a registrar, if at such date the Company had a registrar for such Units.

7.5    Closing of Transfer Books and Fixing of Record Date.

(a)  The Managing Member shall have power to close the Unit ledger of the Company for a period not to exceed fifty (50) days preceding the date of any meeting of Members, or the date for payment of any distribution, or the date for the allotment of rights, or the date when any change or conversion or exchange of Units shall go into effect, or a date in connection with obtaining the consent of Members for any purpose.

(b) In lieu of closing the Unit ledger as aforesaid, the Manager may fix in advance a date, not exceeding thirty (30) days preceding the date of any meeting of Members, or the date for the payment of any distribution, or the date for the allotment of rights, or the date when any change or conversion or exchange of Units shall go into effect, or a date in connection with obtaining any consent, as a record date for the determination of the Members entitled to a notice of, and to vote at, any such meeting and any adjournment thereof, or entitled to receive payment of any such distribution, or to any such allotment of rights, or to exercise the rights in respect of any such change, conversion or exchange of Units, or to give such consent.

(c)  If the Unit ledger shall be closed or a record date set for the purpose of determining Members entitled to notice of or to vote at a meeting of Members, such books shall be closed for, or such record date shall be, not less than ten (10) days immediately preceding such meeting.

7.6    Lost or Destroyed Certificates.  The Company may issue a new certificate for Units of the Company in place of any certificate theretofore issued by it, alleged to have been lost or destroyed, and the Manager may, in its discretion, require the owner of the lost or destroyed certificate or its legal representatives, to give the Company a bond in such form and amount as the Manager may direct, and with such surety or sureties as may be satisfactory to the Manager, to indemnify the Company and its transfer agents and registrars, if any, against any claims that may be made against it or any such transfer agent or registrar on account of the issuance of such new certificate. A new certificate may be issued without requiring any bond when, in the judgment of the Manager, such is proper.

## ARTICLE VIII
## PROFITS, LOSSES, DISTRIBUTIONS, AND EXPENSES

8.1    Distributions.  Subject to this Section 8.1, Section 13.3 (Curative Allocations) and Section 2.1 (Units), the Company's Net Profits and Net Losses shall be allocated to the Members

*CA Express Fund II, LLC*                                                                                          *41*
*Confidential Private Placement Memorandum*

*Ver. 1*

in that proportion which is equal to the total number of Units owned or held by each respective Member at the time such allocations are made, as recorded in the Company's Unit ledger, divided by the total number of Units owned or held by all of the Members at the time of such allocations, as recorded in the Company's Unit ledger, subject to adjustment for amount of paid in capital (the "Percentage Interest"). The proceeds from the sale and cash flow of the assets is to be split by the Members and Manager at the time specified by the Company, dependent upon the final sale of the properties and the provisions of the PPM and Operating Agreement. The profit allocation will be based on the number of Units owned at the time the allocation is made.

8.2    Priority of Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager from time to time shall distribute Distributable Cash to the Members, in an amount equal to the profits of the Company determined on a cash receipts and disbursements basis, less reasonable reserves as determined by the Manager which distributions shall be in the following order of priority:

(a)    To the Members in proportion to their unreturned Capital Contributions until each Member has recovered its Capital Contributions; and

(b)    To the Members in proportion to their Percentage Interests.

All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Manager shall incur any liability for making distributions in accordance with this Section 8. In no event shall distributions of distributable cash for a fiscal year be less than the Net Profits of the Company times the highest federal individual income tax rate for such fiscal year. Such distributions will be made quarterly unless the Manager, in its sole discretion, elects to make distributions at some other interval, but not less than annually.

### ARTICLE IX
### ADMISSIONS AND WITHDRAWALS
### OBLIGATION TO PURCHASE AND SELL

9.1    Admission of Member. No person shall be admitted as an additional member ("Additional Member") of the Company without the written consent of the Manager at the time of such admission and compliance with Section 2.9 regardless of whether such person has acquired a Unit in the Company from another Member or from the Company as an original issuance. An Additional Member shall execute a Counterpart Signature Page prior to admission.

9.2    Expulsion of Member. Any Member may be expelled from the Company on 10 day's prior notice to the Member if the board Manager in its sole discretion determines that

EXHIBIT 2, PAGE 36

expulsion of the Member would be in the best interests of the Company or the Members. Such expulsion shall constitute a voluntary act of a Member that constitutes a withdrawal from the Company for purposes of Section 2.7 of this Agreement.

9.3    Rights of Member Upon Death or Expulsion. Following the death or expulsion of a Member, the Member (and the Member's successor, personal representatives and assigns) shall cease to have any rights of a Member except only the right to receive distributions to the same extent as a permitted assignee of the Member's Units in the Company, in accordance with the terms of this Agreement, until such time as the Company is wound up and terminated. Distributions to such Member or a return of such Member's Capital Account shall be made by the Manager at such time as a distribution or a return of Member Capital Accounts is made to all Members.

9.4    No Withdrawal. No Member shall have the right or be permitted to withdraw from the Company unless otherwise permitted by the Manager. If a Member attempts to withdraw from the Company, the Member shall not be entitled to receive a distribution of its share of Net Profits following the date of the attempted withdrawal and shall not receive any return of its Capital Account until all Members receive a return of their Capital Accounts. The Manager may, at its sole discretion, allow an early withdrawal upon the Member agreeing to accept a discounted amount for its Membership Certificates.

9.5    Addition or Withdrawal of Funds. Notwithstanding the provisions herein, to the extent funds are allowed by the Manager to be withdrawn or added, such withdrawals or additions can only be made in the first week of the quarter, and only upon thirty (30) days advance notice. However, if a Member or prospective Member wishes to deposit funds at any time after the first week of the quarter, the Manager may allow such deposit upon condition that no interest or other return be made to the Member for that quarter.

9.6    Liquidity. Distributions of income and principal are paid the first week of each quarter at the discretion of the Manager who may choose to make no such distributions. The investor may request any of the following distribution options and such options maybe be changed by the investor each quarter. Distribution options are as follow:

Option 1. Reinvestment of all income within the fund.

Option 2. Distribution of all income, no principal distribution.

Option 3. Distribution of all income and a specific amount of principal.

Distribution options may be changed within 10 days of receipt of the quarterly statement and will then take effect with the following quarter's distribution.

*CA Express Fund II, LLC*                                                                  *43*
*Confidential Private Placement Memorandum*

*Ver. 1*

## ARTICLE X
## AMENDMENTS

10.    <u>Amendments</u>. This Agreement and the Company's Articles of Organization may be amended from time to time by the Manager with no vote of the Members. A proposed amendment shall be effective on the date it is duly approved by the Manager and shall be binding on all Members.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.1    <u>Dissolution</u>.  The Company shall be dissolved upon any of the following events:

(i)  99 years from the date of the Company's organization;
(ii) written consent of the Supermajority-In-Interest to dissolve the Company;
(iii) written action of the Manager to dissolve the Company;
(iv) entry of a judicial decree of dissolution;
(v) the Company being adjudged bankrupt;
(vi) the disposal of the final asset of the Company.

11.2    <u>Effect of Filing Cancellation of Articles of Organization</u>. The Company shall cease to carry on its business, except insofar as may be necessary for the winding up of limited liability company business, as of the date designated by the Manager on the Cancellation of Articles of Organization form filed with the California Secretary of State.

11.3    <u>Winding Up, Liquidation and Distribution of Assets</u>.

(a)  Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)  Unless the business of the Company is to continue pursuant to Section 11.1, the Manager shall proceed to liquidate the Company's assets (except to the extent the Manager may determine to distribute any assets to the Members in kind), discharge the Company's obligations, and wind up the Company's business and affairs as promptly as is consistent with obtaining the fair value thereof. The proceeds of liquidation of the Company's assets, to the extent sufficient therefore, shall be applied and distributed as follows:

(i)  First, to the payment and discharge of all of the Company's debts

and liabilities to third parties except those owing to Members or to the establishment of any reasonable reserves for contingent or un-liquidated debts and liabilities;

(ii)    Second, to the payment of any debts and liabilities owing to Members; and

(iii) Third, to the Members, either in cash or in kind, as determined by the Manager, in accordance with the positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Any assets distributed in kind shall be both valued by the Manager for this purpose at their net fair market value and deemed to have been sold as of the date of dissolution. Any such distributions to the Members in respect of their Capital Accounts shall be made within the time requirements of Section l.704-l (b) (2) (ii) (b) (2) of the Regulations.

(c) Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1 (b)(2)(ii)(g) of the Regulations, if any Member has a negative deficit Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company's, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

(d) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e) The Manager shall comply with any requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

11.4    <u>Notice of Dissolution</u>. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets have been distributed to the Members, a Notice of Dissolution shall be filed with the California Secretary of State.

11.5    <u>Return of Contribution Non-Recourse to Other Members</u>. Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution.

# ARTICLE XII
## ACCOUNTS

12.1    <u>Books</u>. The Manager shall maintain complete and accurate books of account of all transactions of the Company, which books of account shall be kept at the Company's principal place of business. All decisions regarding accounting matters, except as otherwise set forth herein, shall be made by the Manager.

12.2    <u>Member's Accounts</u>. A capital account shall be established and maintained on the Company's books with respect to each member related to his or her Units. Each Member's Capital Account consist of such Member's initial Capital Contribution increased by any additional Capital Contributions made by such Member and decreased by (a) distributions to such Member in reduction of the Company's capital. The Manager shall (a) maintain the Member's Capital Accounts at all times as determined above. Payment of any amount owed to the Company shall be made at such time and in such manner as the Managing Member may determine.

12.3    <u>Reports</u>. The Manager shall close the books of account promptly after the close of each Fiscal Year, and shall prepare and send to each Member a statement of such Member's distributive share of income and loss for federal income tax reporting purposes.  The Manager will issue quarterly reports within 60 days of the close of the quarter.  The quarterly reports will contain basic financial data and written summaries if necessary.  The Manager may issue more frequent reports with more detail to Members at the sole discretion of the Manager.

# ARTICLE XIII
## ALLOCATION OF PROFITS AND LOSSES

13.1    <u>Accounting Definitions</u>. The following terms, which are used predominately in this Article, shall have the meanings set forth below for all purposes under this Agreement:

"<u>Adjusted Capital Account Balance</u>" means, with respect to any Member, the balance of such Member's Capital Account as of the end of the relevant Fiscal Year.

"<u>Book Value</u>" means, with respect to any asset, the assets adjusted basis for federal income tax purposes.

"<u>Depreciation</u>" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Book Value of any asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period

EXHIBIT 2, PAGE 40

bears to such beginning adjusted tax basis; provided, however, that if such depreciation, amortization or other cost recovery deductions with respect to any such asset for federal income tax purposes is zero for any Fiscal Year, Depreciation shall be determined with reference to the asset's Book Value, at the beginning of such year using any reasonable method selected by the Manager.

"Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Minimum Gain of the Company that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Debt" has the meaning set forth in section 1.704-2(b) (4) of the Regulations.

"Member Nonrecourse Deductions" has the meaning set forth in Regulation section 1.704-2(i) (1) and (2) and shall be determined in accordance with the provisions of Regulations section 1.704-2(i) (2).

"Minimum Gain" means an amount determined by computing, with respect to each Nonrecourse Liability of the Company, the amount of gain (of whatever character), if any, that would be realized by the Company if it disposed of (in a taxable transaction) the property subject to such liability in full satisfaction thereof, and by then aggregating the amounts so computed, such computation to be made in accordance with Regulations section 1.704-2(b) (2) and 1.704-2(d).

"Nonrecourse Deductions" has the meaning set forth in section 1.704-2(b) (1) of the Regulations.

"Profits" or "Losses" means, for each Fiscal Year or other period, the taxable income or taxable loss of the Company's as determined under Code Section 703(a) (including in such taxable income or taxable loss all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(l) of the Code)

13.2    Profits and Losses.  Subject to Section 13.3, 13.4, 13.5, 13.6, 13.7, 13.8, 13.9, and 13.10 hereof, each Member shall share in the Profits and Losses of the Company according to its Percentage Interest, as follows:

a)    Allocation of profits shall be made as follows:

(i)  First, to the Members, up to the aggregate of, and in proportion to, any Losses previously allocated to each Member, to the extent not previously offset by allocations of Profits pursuant to this Section;

(ii) Second, to Members, subject to the Manager's election to redeem the Membership Units pursuant to Section 2 (return of capital);

(iii) Third, to the Members, in proportion to their unredeemed Percentage Interest

based on the allocation of profit and loss to investors and manager.

b) Allocation of losses shall be made as follows:

(i) First, to the Members, up to the aggregate of, and in proportion to, any Profits previously allocated to each Member in accordance with Section 13.2(a)(iii) hereof and not previously offset by Losses allocated pursuant to this Section until their capital account balances have been reduced to zero;

(ii) Second, to the Members until their capital account balances have been reduced to zero;

(iii) Third, to the Members, in proportion to their unredeemed Percentage Interest.

c) Authority to Vary Allocations. The Manager has the authority to vary these allocations to the extent necessary to comply with federal income tax laws.

13.3 <u>Curative Allocations</u>. Certain allocations may be required to comply with the requirements of Regulations Sections 1.704-1(b) and 1.704-2 (the "Regulatory Allocations").

13.4 <u>General Allocation Rules</u>.

(a) Generally, all Profits and Losses allocated to the Members shall be allocated among them in proportion to their unredeemed Percentage Interest.

## ARTICLE XIV
## INDEMNIFICATION OF MEMBERS AND MANAGER; OFFICER AND MANAGER CONTRACTS; LIMITATION OF LIABILITY

14.1 <u>Indemnification of Members and Manager</u>.

(a) <u>Third Party Actions</u>. To the greatest extent possible, the Company will indemnify the Management team and any Member who was or is a party or is threatened to be made a party to any threatened, pending or completed proceeding because such individual is or was part of the Management team or a Member, as a matter of right, against all liability

*CA Express Fund II, LLC*    *48*
*Confidential Private Placement Memorandum*

*Ver. 1*

incurred by such individual in connection with any proceeding; provided that it is determined that the specific indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (d) of this Section. The Company will pay for or reimburse the reasonable expenses incurred by such person or entity in connection with any such proceeding in advance of final disposition thereof if (i) the individual or entity furnishes the Company a written affirmation of the standard of conduct for indemnification described in subsection (d) of this Section, (ii) the individual or entity furnishes the Company a written undertaking, to repay the advance if it is ultimately determined that such individual or entity did not meet such standards of conduct, and (iii) a determination is made in accordance with subsection (e) that, based upon facts then known to those making the determination, indemnification would not be precluded under this Section. The undertaking described in subsection (a) (ii) above must be a general obligation of the individual or entity subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company will indemnify an individual or entity who is successful, on the merits or otherwise, in the defense of any such proceeding or in defense of any claim, issue, or matter therein, without the requirement of a determination as set forth in subsection (d) of this Section. Upon demand by an individual or entity for indemnification or advancement of expenses, as the case may be, the Company will expeditiously determine whether the individual or entity is entitled thereto in accordance with this Section. The indemnification and advancement of expenses provided for under this Section will be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) <u>The Company Actions</u>. To the greatest extent possible, the Company will indemnify any individual or entity who was or is a party or is threatened to be made a party to any threatened, pending or completed proceeding by or in the right of the Company because such individual is or was part of the Management team or a Member against all liability incurred by such individual in connection with proceeding; provided that it is determined that the specific indemnification of such individual is permissible in the circumstances because the individual or entity has met the standard of conduct for indemnification set forth in subsection (d) of this Section, except that no indemnification shall be made in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable for gross negligence or misconduct in the performance of its duty to the Company unless and only to the extent that the court in which the action or suit was brought shall determine on application that, despite the adjudication of liability, but in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnity for such expenses as the court deems proper. The Company will pay for or reimburse the reasonable expenses incurred by the Management team or a Member, in connection with any such proceeding in advance of final disposition thereof if, (i) the individual or entity furnishes the Company a written affirmation of the standard of conduct for indemnification described in subsection (d) of this Section, (ii) the individual furnishes the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standards of conduct, and (iii) a determination is made in accordance with subsection (e) that, based upon facts then

known to those making the determination, indemnification would not be precluded under this Section. The undertaking described in subsection (b)(ii) above must be a general obligation of the individual or entity subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company will indemnify the individual or entity who is successful, on the merits or otherwise, in the defense of any such proceeding or in defense of any claim, issue, or matter therein, without the requirement of a determination as set forth in subsection (d) of this Section. Upon demand by the individual or entity for indemnification or advancement of expenses, as the case may be, the Company will expeditiously determine whether the individual or entity is entitled thereto in accordance with this Section. The indemnification and advancement of expenses provided for under this Section will be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(c)    Additional Capacities. The Company will have the power, but not the obligation, to indemnify any individual or entity who is or was an employee, officer or agent of the Company or the Management team, or is or was serving at the request of the Company as an officer, director, member, trustee, employee, or agent of another limited partnership, limited liability company, association, corporation, joint venture, trust, employee benefit plan, or other enterprise to the same extent as if such individual is or was a part of the Management team or a Member.

(d)    Required Conduct. Indemnification is permissible under this Section only if (i) the subject party conducted himself or itself in good faith, (ii) the subject party reasonably believed that its conduct was in or at least not opposed to the Company's best interest; and (iii) in the case of a criminal proceeding, the subject party had no reasonable cause to believe its conduct was unlawful. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent is not, of itself, demonstrative or sufficient to create a presumption that the individual did not meet the standard of conduct described in this subsection.

(e)    Determination. A determination as to whether indemnification or advancement of expenses is permissible shall be made by one of the following procedures; (i) by the Manager, if not a party to such proceeding; (ii) if the Manager is party to the proceeding, by the Majority-In-Interest, not at the time party to such proceedings, at any meeting duly called for such purpose; or (iii) by independent legal counsel selected by the Majority-In- Interest at any meeting duly called for such purpose.

(f)    Application to the Court. A Member or Manager who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines: (i) in a proceeding in which the Member or the Manager is wholly successful, on their merits or otherwise, the Member, or the Manager is entitled to indemnification under this Section, in which

case the court will order the Company to pay the Member, or the Manager his reasonable expenses incurred to obtain such court ordered indemnification; or (ii) the Member or the Manager is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Member, or the Manager meets the standard of conduct set forth in subsection (d) of this Section.

(g)    <u>Employee Benefit Plan</u>.  Indemnification will be provided for an individual's or Manager's conduct with respect to an employee benefit plan if the individual or Manager reasonably believed his conduct to be in the interests of the participants and beneficiaries of the plan.

(h)    <u>General Indemnification</u>. Nothing contained in this Section will limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual or entity who is or was a Member or Manager, or is or was serving at the Company's request as a manager, officer, director, member, trustee, employee, or agent of another, limited partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise. Nothing contained in this Section will limit the ability of the Company to otherwise indemnify or advance expenses to any individual or entity. It is the intent of this Section to provide indemnification to Members and the Manager to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification will be provided in accordance with this Section irrespective of the nature of the legal or equitable theory upon which    a claim is made including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, as amended, or violation of any other state or federal law.

(i)    <u>General Definitions for Purposes of This Section</u>:

(i)    The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii)    The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii)    The term "party" includes an individual who was, is, or is

*CA Express Fund II, LLC*                                                                                              *51*
*Confidential Private Placement Memorandum*

*Ver. 1*

threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(j) <u>Scope of Indemnification</u>. The indemnification authorized by this section shall apply to all present and future managers, officers, employees, and agents of the Company and shall continue as to such persons who cease to be managers, officers, employees, or agents of the Company, and shall inure to the benefit of the heirs, executors, and administrators of all such persons and shall be in addition to all other indemnification permitted by law.

(k) <u>Insurance</u>. The Company may purchase and maintain insurance for its benefit, the benefit of any individual or entity who is entitled to indemnification under this Section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service, whether or not the Company would have the power to indemnify such individual against liability.

14.2 <u>Manager Contracts; Limitation of Liability</u>. No contract or other transaction between the Company and any other person, firm, or entity shall be affected by the fact that a manager, officer, employee, or agent of the Company has an interest in, or is a manager or officer of the Company or any such other entity. Any officer or manager, individually or with others, may be a party to, or may have an interest in, any transaction of the Company or any transaction in which the Company is a party or has an interest. Each person who is now or may become an officer or manager of the Company is hereby relieved from liability that such person might otherwise obtain in the event such officer or manager contracts with the Company for the benefit of himself or any firm or other entity in which it may have an interest; *provided,* such officer or manager acts in good faith. The foregoing limitation on liability extends to any and all actions referred to in Section 3.6 of this Agreement taken by the Company agents of the Company and by the Manager and its agents. The Manager may act as a Financial Advisor to some or all of the Members and may charge a separate fee for acting in that capacity.

## <u>ARTICLE XV</u>
## <u>MISCELLANEOUS</u>

15.1 <u>Complete Agreement</u>. This Operating Agreement constitutes the complete and exclusive statement of agreement among the Members. This Agreement supersedes any other contradictory agreement between the parties.

15.2 <u>Notices</u>. Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for

*CA Express Fund II, LLC* 52
*Confidential Private Placement Memorandum*

*Ver. 1*

all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or the Company's address, as appropriate, which is set forth in this Agreement or in the Counterpart Signature Page signed by the Member. Except as otherwise provided herein, any such notice shall be deemed to be given two (2) business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid or, if transmitted by way of facsimile or email, such notice shall be deemed to be delivered on the date of such facsimile or email transmission to the fax number or email address for the Member or the Company, as the case may be. Each member shall be responsible for maintaining current mailing, telephone, facsimile and email contact information with the Company by sending changes to the same in writing to the Company, attention office of the Manager.

15.3    <u>Governing Law</u>. This Agreement and its application and interpretation shall be governed exclusively by its terms and by the laws of the State of California.

15.4    <u>Waiver of Action for Partition</u>. Each Member irrevocably waives during the term of the Company any right that the Member may have to maintain any action for partition with respect to the property of the Company.

15.5    <u>Execution of Additional Instruments</u>. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

15.6    <u>Construction</u>. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders and vice versa; and the word "person" or "party" shall include a corporation, firm, limited liability company, proprietorship or other form of association. Any reference to the Code or the statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

15.7    <u>Headings</u>. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

15.8    <u>Waivers</u>. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

15.9    <u>Rights and Remedies Cumulative</u>.    The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition

to any other rights the parties may have by law, statute, ordinance or otherwise.

15.10    _Severability_. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

15.11    _Title to the Company Property_. Legal title to all property of the Company will be held and conveyed in the name of the Company.

15.12    _Reliance on Authority of Person Signing Agreement_. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any act or circumstance bearing upon the existence of the authority of such individual or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

15.13    _Heirs, Successors, and Assigns_. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted herein, their respective heirs, representatives, successors and assigns.

15.14    _Creditors_. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

15.15    _Counterparts_. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of October 14, 2010.

WJA MANAGEMENT ASSOCIATES, INC.


_____
By: WILLIAM JORDAN, President Managing Mbr

EXHIBIT 2, PAGE 48

EXHIBIT "3"

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made this _____ day of _____, 2017 (the "Execution Date"), by and between WJA Express Fund, LLC ("WJA Express"), a California limited liability company, and CA Express Fund II, LLC ("CAF"), a California limited liability company (together, the "Sellers"), and FAIT Insurance Partnership, LLC, a California limited liability company (the "Buyer") for the purpose of documenting the sale and purchase of the Sellers' partnership interests in Gothard Express Partners, L.P., a California limited partnership (the "Partnership"). The Sellers and the Buyer may sometimes be individually referred to as a "Party" and collectively as the "Parties."

## RECITALS

A.      Sellers have represented that they collectively own 58% of the interests in the Partnership as limited partners, with WJA holding a 50% limited partnership interest in the Partnership (the "WJA Interest") and CAF holding an 8% limited partnership interest in the Partnership (the "CAF Interest" and, together with the WJA Interest, the "Partnership Interests").

B.      WJA Express is a debtor in a chapter 11 case pending before the United States Bankruptcy Court, Central District of California, Santa Ana Division (the "Bankruptcy Court"), under jointly administered case number 8:17-bk-11996-SC.

C.      Kingdom Trust Company has represented that it is the custodian of the WJA Interests for the benefit of WJA Express. Sellers represent that the manager of WJA Express is WJA Asset Management, LLC (the "Manager"), which is also the manager of CAF. By order of the Bankruptcy Court entered on June 15, 2017, Howard Grobstein is the chief restructuring officer for the Manager and WJA Express and the other jointly administered debtors with cases pending before the Bankruptcy Court.

D.      Sellers desire to sell to Buyer and Buyer desires to acquire the Partnership Interests and, to the extent consistent with applicable law and the Partnership Agreement, as defined below, the Sellers' pro-rata interest in all Assets[1] relating thereto as of the date of execution of this Agreement by the Buyer and accruing hereafter until the Effective Date from Sellers upon the terms set forth in this Agreement (the "Transaction").

E.      Buyer's acquisition of the Partnership Interests is expressly subject to: (i) the consent of the Partnership's general partner and remaining limited partner (in the form attached hereto as Exhibit "A") (the "Consent"), consenting to the assignment and assumption of the Partnership Interests as set forth herein and the admission of the Buyer to the Partnership as a limited partner, holding the Partnership Interests free and clear of the claims of others; and (ii)

---

[1] For purposes of this Agreement, the term Assets means any and all tangible and intangible assets of every kind and nature of the Partnership and all proceeds thereof existing as of the date of execution of this Agreement by the Buyer and accruing hereafter until the Effective Date.

the transfer, assignment, and delivery of the CAF Interest to the Buyer in form and substance satisfactory to the Buyer in its sole and absolute discretion.

NOW, THEREFORE, incorporating the foregoing recitals and in consideration thereof, in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## TERMS AND CONDITIONS

## ARTICLE I

## PURCHASE AND SALE OF PARTNERSHIP INTERESTS

1.1     Agreement to Purchase and Sell.     Subject to all of the terms, conditions and provisions of this Agreement, and for the consideration herein set forth, Sellers hereby agree to sell the Partnership Interests and, as a result, the Assets, to Buyer, and Buyer hereby agrees to purchase the Partnership Interests and, as a result, the Assets, from Sellers.  Neither Buyer nor Sellers shall be obligated to complete the purchase and sale of any of the Partnership Interests unless the purchase and sale of all of the Partnership Interests is completed simultaneously.

1.2     Amount of Purchase Price.     The purchase price for the Partnership Interests, and the Sellers' pro-rata interest in all Assets as of the date of execution of this Agreement and accruing hereafter until the Effective Date, shall be one million nine hundred fifty thousand dollars ($1,950,000.00) (the "**Purchase Price**"), with $1,681,034.48 of the Purchase Price allocated to the WJA Interest and $268,965.52 of the Purchase Price allocated to the CAF Interest.

1.3     Payment of Purchase Price.     The Purchase Price shall be paid as follows:

(a)     Within three (3) business day following the Execution Date, Buyer shall deliver to the Manager the sum of fifty thousand dollars ($50,000.00) (the "**Deposit**").  If Buyer fails to timely deliver the Deposit, then this Agreement shall terminate and shall be of no force or effect and neither party shall have any further rights or obligations hereunder.  The Deposit shall be applicable to the Purchase Price upon the Closing, and shall be held by the Sellers pending the Closing or termination of this Agreement, as applicable.  If the Closing does not occur due to Buyer's default under this Agreement, Sellers shall retain the Deposit as liquidated damages in accordance with Section 6.1 below.  The Deposit is refundable as set forth in this Agreement.

(b)     On or prior to the Closing Date, Buyer shall deliver to Sellers in good funds an amount equal to the Purchase Price, less the amount of the Deposit.

"Good funds" shall mean a wire transfer of funds or delivery of cash in funds of the United States of America.

1.4     Sale Free and Clear; Assumption of Partnership Interests/Indemnification and Release.     As of the Closing Date, the sale and assignment of the Partnership Interests to the

Buyer shall be free and clear of any and all adverse claims, liens, causes of action, or other interests impairing the Partnership Interests, other than the Buyer's obligations under the Partnership Agreement, as defined below.   As of the Closing Date, the Buyer shall assume all of the rights and obligations of the Sellers with respect to the Partnership Interests as may be modified by the Buyer, Green-N-Clean Express Car Wash, Inc. (the "General Partner"), and H2Go Partners, L.P. (the "Remaining Limited Partner").  Buyer agrees to indemnify and hold the Sellers and the Manager harmless from any claims made after the Closing Date against the Sellers, as limited partners of the Partnership, with respect to the Partnership Interests and from any claims against the Sellers related to any acts or omissions of the Buyer after the Closing Date.  This indemnity shall not operate in any way to reduce or diminish the representations and warranties of the Sellers contained herein.

       1.5    <u>Release of Partnership and General Partner</u>.   As of the Closing Date and in exchange for the consent of the Partnership and the general partner to the Transaction and except for the payments due to the Selling Partners under the Settlement Agreement, the Sellers are releasing all claims, demands, controversies, actions, causes of action, accountings, suits, proceedings, obligations, liabilities, fines, penalties, costs, expenses, attorneys' fees, damages, and rights to remedies of whatsoever character, mature or kind, in law or in equity, whether known or unknown, fixed or contingent, and liquidated or unliquidated, which relate in any way to the Partnership and the General Partner that may exist as of the Closing Date.  As a condition to the giving of this release and concurrent with this Agreement, the Selling Partners are entering into a Settlement Agreement (the "Settlement Agreement") with the General Partner and the remaining limited partner.

ARTICLE II

<u>BANKRUPTCY COURT APPROVAL OF THE OVERBID PROCEDURES AND THE SALE</u>

       2.1    <u>Bankruptcy Court Approval</u>.  Promptly after the Execution Date, WJA Express and the Manager shall file a motion (the "Sale Motion") with the Bankruptcy Court for approval of bid procedures and the sale of the WJA Interest, and for authorization for the Manager to take the necessary action to sell the Partnership Interests (together, the "Sale Motion"). This Agreement is contingent upon entry of a Final Order(s) of the Bankruptcy Court (1) authorizing the sale of the WJA Interest to the Buyer free and clear of liens, claims, and encumbrances, (2) relieving Kingdom Trust of its duties as custodian for the benefit of WJA Express and authorizing Howard Grobstein to sign the Agreement and all documents required for the closing in his capacity as the chief restructuring officer of the manager of WJA Express, and (3) authorizing Howard Grobstein to sign the Agreement and all documents required for the closing in his capacity as the chief restructuring officer of the manager of CAF,  and (4) approving the Settlement Agreement (the "Sale Order").  The Sale Order  will become a Final Order fifteen days after its their entry if no appeals are timely filed.  If an appeal is timely filed, the Sale Order  will become a Final Order after the appeal is dismissed, the Sale Order  is affirmed on appeal, or if  no stay pending appeal of the Sale Order is obtained, the Sale Order contains a finding that the Buyer is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m).  The Sellers will provide counsel for the Buyer with a draft of the Sale Motion  before it is filed, and the Parties agree to cooperate in obtaining the Sale Order and in defending any appeal of the Sale Order.

2.2     Overbid Procedures.  No later than January 31, 2017, WJA Express shall obtain the approval of the Bankruptcy Court for bidding procedures.  The minimum initial overbid for the Partnership Interests shall be two million fifty thousand dollars ($2,050,000.00).  Subsequent bids shall be in increments of at least $25,000.00.  All overbids must be all cash with no contingencies of any kind.  All overbidders must qualify in advance no later than two business days before the auction, which will be scheduled for a date after the bid procedures are approved.  Overbidders must prequalify by:  (i) disclosing whether they are "insiders" or creditors of any of Sellers or their affiliates; (ii) demonstrating to the satisfaction of the Partnership, the Sellers, and the Court that they possess sufficient liquidity to timely close and to perform any obligations to the Partnership; and (iii) signing a Non-Disclosure and Non-Circumvention Agreement in a form acceptable to the Sellers and the Partnership.  If the Buyer is overbid and the successful overbidder acquires the Partnership Interests at the Closing, then the Buyer shall receive $50,000.00 from the proceeds as a break-up fee (the "Break-up Fee") and its Deposit, and Sellers shall be relieved of all other obligations to Buyer under this Agreement.  Buyer may credit bid its Break-up Fee.  Buyer is not entitled to the Break-up Fee if the Buyer is the successful bidder or overbidder.   Sellers agree that they shall not release any non-public information about the Partnership, its assets, or its financial affairs to anyone who has not executed a form Non-Disclosure and Non-Circumvention Agreement in form and substance acceptable to the Buyer and the Partnership.  Notwithstanding anything to the contrary in this Article, the Parties may agree to file one motion that seeks concurrent approval of bid procedures and the sale.

2.3     No Abrogation of Partnership's Right of First Refusal.   Notwithstanding the potential for an overbid and the possibility that someone other than the Buyer may be proposed to be the purchaser for the Partnership Interests, nothing contained in this Agreement or to be contained in the Approval Motion shall abrogate the right of first refusal contained in Section 11.4 of the Partnership Agreement (as defined below).

ARTICLE III

CLOSING

3.1     Closing; Closing Date.  The "Closing Date" shall mean and refer to the date following the entry of the Sale Order (defined below) that is designated by the Buyer but that is no later than ten days after the Sale Order becomes a Final Order.  The Closing Date shall be the date that the Closing actually takes place.  If the tenth day falls on a holiday or weekend, then the next business day shall be the deadline for the Closing Date.  Notwithstanding any other provision herein and except as may be otherwise agreed to in writing by the Parties, the Closing Date shall be no later than February 28, 2018.

3.2     Controlling Documents/Binding Effect. On the Closing Date, and solely as it relates to the Transaction, this Agreement, the Consent, and the Sale Order shall constitute the controlling documents with regard to the Transaction and shall be binding on the Sellers, the Buyer, the General Partner, the Remaining Limited Partner, and the Partnership.

3.3     Completion, Delivery and Distribution of Documents and Funds.  At the Closing, (i) the Parties shall confirm that any documents signed in counterpart are the matching documents and shall combine the signature pages thereof so as to create fully executed documents, (ii) Buyer

shall deliver to the Manager the additional funds required hereunder in order to complete this transaction, and (iii) subject to Buyer's delivery of such funds and, if so requested by the Buyer, Sellers shall execute a bill of sale or conveyance instrument in a form acceptable to the Parties and consistent with this Agreement and deliver the document to Buyer.

    3.4    <u>Governing Documents of the Partnership</u>.  Based on the representations set forth in the Consent of the General Partner and Remaining Limited Partner that are attached to the Agreement, the Parties are informed that the following constitutes the governing documents of the Partnership:

    a.    Certificate of Limited Partnership (in the name of MAGNOLIA EXPRESS PARTNERS, LP) filed on January 10, 2011, with the California Secretary of State ("SOS"), under SOS File # 201102500012;

    b.    Amendment to Certificate of Limited Partnership (LP-2) filed on September 9, 2011, with the SOS, which changed the name of the Partnership to Gothard Express Partners, LP;

    c.    Amendment to Certificate of Limited Partnership (LP-12) filed on May 4, 2015, with the SOS, which changed the address of the Partnership;

    d.    Amended and Restated Limited Partnership Agreement of GOTHARD EXPRESS PARTNERS, LP, a California limited partnership, effective as of October 1, 2013 (the "Amended and Restated Limited Partnership Agreement");

    e.    First Amendment to Amended The Amended and Restated Limited Partnership Agreement of GOTHARD EXPRESS PARTNERS, LP, a California limited partnership, effective as of October 1, 2014 (the "First Amendment"); and

    f.    Second Amended and Restated Exhibit "B" to Amended and Restated Limited Partnership Agreement of GOTHARD EXPRESS PARTNERS, LP, effective as of October 6, 2014 (the "Restated Exhibit 'B'").

    For purposes of this Transaction, the foregoing documents, described in Paragraph 3.4.a.–f. shall constitute, collectively, the existing and current "Partnership Agreement," as that term is used in this Agreement.

ARTICLE IV

<u>DUE DILIGENCE</u>

    4.1    <u>Due Diligence Approval</u>.  By its execution of this Agreement, Buyer acknowledges, confirms and agrees that Buyer has had adequate and ample opportunity and ability to undertake such investigations, inquiries, reviews, studies, or other due diligence efforts as Buyer has determined to be appropriate, desirable and necessary with respect to the Partnership Interests and the books, records, assets, liabilities and value thereof, in order for Buyer to enter into this Agreement and to deliver the Deposit on a non-refundable basis as provided herein, and that Buyer does not desire or require any further or additional time or opportunity to evaluate the Partnership Interests or the Partnership, to review or inspect the books and records of the Partnership or the assets thereof, to evaluate the Partnership Interests

and the status, condition or value thereof or the status of the other partnership interests in the Partnership which are not being conveyed pursuant to this Agreement, or to investigate or evaluate any other matters relevant thereto in order to proceed with this Transaction.  Buyer's execution and delivery of this Agreement shall for all purposes constitute Buyer's conclusive and absolute approval of the Partnership Interests, the value thereof (including all underlying matters pertaining to the Partnership, and all matters associated therewith), and Buyer shall have no further or additional review or approval rights regarding same, and no ability to terminate this Agreement and/or to obtain a return of the Deposit based upon any objection or disapproval of the Partnership Interests or the Partnership, or any matter related thereto, except as otherwise set forth in this Agreement.

  4.2 <u>Material Adverse Change</u>.  In the event of a Material Adverse Change relating to the Partnership Interests, Buyer shall have no obligation to purchase the Partnership Interests and shall be entitled to a refund of the Deposit.  For purposes of this Agreement, Material Adverse Change means any event, change, effect, condition or occurrence (regardless of whether such event, change, effect, condition or occurrence constitutes a breach of any representation, warranty or covenant of Sellers hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other events, changes, effects, conditions or occurrences a material adverse change in, or a material adverse effect upon, the value of the Partnership Interests.

ARTICLE V

<u>REPRESENTATIONS AND WARRANTIES</u>

  5.1 <u>Sellers' Representations and Warranties</u>.  The Sellers represent, for the benefit of Buyer, the General Partner and the Remaining Limited Partner, the following:

    a. The Partnership Interests are currently held by the Sellers, as follows:

      (i) WJA Express  50%; and

      (ii) CAF   8%.

    b. The Sellers have not previously transferred or encumbered the Partnership Interests.

    c. The Partnership Interests are owned by the Sellers free and clear of the claims or rights of any third parties.

    d. The consents of any third parties, pursuant to California Corporations Code 17704.07(c)(4)(A) or as otherwise required, that based on the books and records need to be obtained by Sellers in order to transfer the Partnership Interests to Buyer, free and clear of all liens, claims and interests, have been obtained by Sellers.

    e. Howard Grobstein is the chief restructuring officer of WJA Express and the Manager pursuant to a Bankruptcy Court order and, upon entry of the Sale

Order, will have the requisite authority to execute this Agreement and any other documents reasonably necessary to consummate the Transaction on behalf of the Sellers.

f.     CAF is a California limited liability company, duly formed and validly existing and in good standing under the laws of the State of California, and has the corporate power and authority to own its property and assets and to carry on its business as now being conducted, with Howard Grobstein, the duly-appointed and serving chief restructuring officer appointed in the above referenced bankruptcy cases, having full dominion and control over such assets and authority to act on behalf of CAF.

5.2     <u>Buyer's Representations and Warranties</u>.  As of the date of this Agreement and again as of the Closing, Buyer represents, for the benefit of the Sellers, the following:

(a)     The execution and delivery of this Agreement have been authorized and approved by all requisite actions of Buyer, and the consummation of the Transaction will be duly authorized and approved by all requisite actions of Buyer.

(b)     This Agreement and all other documents to be executed by Buyer hereunder, upon execution and delivery thereof, have been duly executed by Buyer and will constitute legal, valid and binding obligations of Buyer, and to Buyer's knowledge, neither the execution of this Agreement nor the performance of Buyer's obligations hereunder will result in a default by Buyer under any agreement to which Buyer is a party, which default would adversely impact or impair Buyer's ability to perform its obligations under this Agreement.

(c)     Buyer is a California limited liability company that is in good standing under the laws of the State of California.  No internal or third party consents, approvals or authorizations are required to be obtained in order to duly authorize Buyer's execution of this Agreement or Buyer's performance of the obligations specified herein.

(d)     Buyer is not a party to any bankruptcy, insolvency or receivership proceeding of any kind, whether voluntary or involuntary, nor is any such proceeding contemplated.

(e)     Buyer undertakes and assumes the risks associated with all matters pertaining to the Partnership Interest and the Partnership.  BUYER EXPRESSLY AGREES AND ACKNOWLEDGES THAT EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLERS HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATE AND DISCLAIM ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PARTNERSHIP INTERESTS OR THE PARTNERSHIP OR ANY MATTER RELATED THERETO, INCLUDING, WITHOUT LIMITATION, THE VALUE, MERCHANTABILITY, MARKETABILITY OR

PROFITABILITY OF THE PARTNERSHIP, THE MANAGEMENT OR CONTROL OF THE PARTNERSHIP, THE VALUE OF THE ASSETS OF THE PARTNERSHIP, THE SCOPE, EXTENT OR AMOUNT OF THE DEBTS AND OBLIGATIONS OF THE PARTNERSHIP, OR THE VALUE, CHARACTER, FUTURE TRANSFERABILITY OR STATUS OF THE PARTNERSHIP.

Based on the foregoing, Buyer is relying solely upon its own inspection, investigation and analysis of the Partnership Interests and the Partnership and is acquiring the Partnership Interests "AS IS," WITH AND SUBJECT TO ALL FAULTS, DEFECTS AND DEFICIENCIES, WHETHER KNOWN OR UNKNOWN.  As of the Closing, Buyer assumes all obligations, costs, liabilities, expenses and responsibilities associated with the post-Closing ownership of the Partnership Interests.   Except for claims, demands, losses, causes of action, damages, fines, penalties, liabilities, obligations, costs and expense arising from or relating to this Agreement, Buyer, on behalf of itself and its successors-in-interest in the Partnership Interests, agrees to, and hereby does, fully and forever waive, release and discharge Sellers and the Manager from any and all claims, demands, losses, causes of action, damages, fines, penalties, liabilities, obligations, costs and expenses, known or unknown, which Buyer or its successors-in-interest in the Partnership Interests had, now have, or hereafter may have or acquire or possess arising out or in any way connected with the Partnership Interests and/or the Partnership.

## ARTICLE VI

### DEFAULT

**6.1    DEFAULT OF BUYER; LIQUIDATED DAMAGES.  BUYER SHALL BE DEEMED TO BE IN MATERIAL DEFAULT OF THIS AGREEMENT IF IT FAILS TO CLOSE THIS TRANSACTION ON THE TERMS SET FORTH HEREIN.  IF THE CLOSING DOES NOT TIMELY OCCUR DUE TO BUYER'S FAILURE OF PERFORMANCE OR DEFAULT UNDER THIS AGREEMENT, THEN AND IN SUCH EVENT, AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, BUYER AND SELLERS AGREE THAT SELLERS WILL INCUR DAMAGES BY REASON OF SUCH DEFAULT BY BUYER, WHICH DAMAGES SHALL BE IMPRACTICAL AND EXTREMELY DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN.   BUYER AND SELLERS, IN A REASONABLE EFFORT TO ASCERTAIN WHAT SELLER'S DAMAGES WOULD BE IN THE EVENT OF SUCH DEFAULT BY BUYER, HAVE AGREED BY PLACING THEIR INITIALS BELOW THAT THE DEPOSIT SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF SELLERS' DAMAGES AND THE AGREED AMOUNT OF DAMAGES DUE TO SELLERS.  IN THE EVENT OF AND FOR SUCH DEFAULT BY BUYER, SELLERS SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT AND TO RECEIVE AND TO RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES AS SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST BUYER.  BY INITIALING THIS PROVISION IN THE SPACES BELOW, SELLERS AND BUYER EACH SPECIFICALLY AFFIRM THEIR RESPECTIVE AGREEMENTS CONTAINED IN THIS SECTION AND AGREE THAT SUCH SUM IS A REASONABLE SUM**

CONSIDERING THE CIRCUMSTANCES AS THEY EXIST ON THE DATE OF THIS
AGREEMENT.

_____          _____

**SELLERS' INITIALS**                              **BUYER'S INITIALS**

6.2    <u>Default of Sellers</u>.  Sellers shall not be in default under this Agreement if this transaction is not consummated due to a successful overbid by another party or because a Sale Order is not obtained despite the best efforts of the Sellers, and in any such event Buyer's sole recourse and remedy shall be to obtain a return of its Deposit and, if applicable, the payment of the $50,000 Break-Up Fee, and whereupon this Agreement shall automatically terminate and neither party shall have any further liability to the other.  If Sellers materially default in their obligations under this Agreement following receipt of written notice of default from Buyer and failure to cure same within five (5) business days from receipt of such notice, then so long as Buyer is not in default with respect to any of its obligations hereunder, Sellers and Buyer understand and agree that money damages would not be a sufficient remedy for any such breach of this Agreement by the Sellers and Buyer shall be entitled to specific performance and injunctive other equitable relief as a remedy for any such breach by the Sellers.

ARTICLE VII

<u>MISCELLANEOUS</u>

7.1    <u>Further Assurances</u>.  The Parties shall do such further acts, shall perform such further actions, and shall execute and deliver such additional agreements, documents, and instruments as the others may reasonably require to consummate, effect, evidence, or confirm the agreements and understandings contained herein in the manner contemplated hereby.

7.2    <u>No Admission Against Interest</u>.  Nothing contained in this Agreement, or the negotiations and communications leading up to it, shall be construed as admissions against the interest of any of the Parties.

7.3    <u>Modifications</u>.  This Agreement may not be amended, canceled, revoked, or otherwise modified except by written agreement signed by all of the Parties hereto.

7.4    <u>Severability</u>.  In the event any provision of this Agreement shall be held to be void, voidable, or unenforceable, the remaining provisions shall remain in full force and effect.

7.5    <u>Availability of Counsel</u>.  The Parties acknowledge and agree that they have been advised by legal counsel of their choice regarding the meaning and consequences of this Agreement, including, but not limited to, the release and the waiver of unknown and unsuspected claims set forth above.

7.6    <u>Entire Agreement</u>.  This Agreement is the complete and exclusive expression of the terms included herein, which terms supersede and shall not be contradicted by proof of prior or contemporaneous oral or written term sheets, agreements, discussions, and representations. Nor shall the terms included herein be explained or supplemented by evidence of consistent additional terms.  In furtherance of the foregoing, the Parties agree that upon the entry of the Sale

EXHIBIT 3, PAGE 57

Order which conforms to the terms of this Agreement, this Agreement shall supersede any Term Sheet in its entirety.

7.7      No Reliance; Independent Investigation.  In connection with the negotiation and execution of this Agreement, each Party has relied upon its own investigation and judgment concerning all matters herein contained and has not relied on any representations made by the other Parties other than those set forth herein.  Except as otherwise expressly stated in this Agreement, the Parties have not made any statement or representation to the other regarding any facts relied upon by them in entering into this Agreement.

7.8      Voluntary Agreement.  The Parties acknowledge and agree that they are entering into this Agreement freely and voluntarily and of their own volition.  The Parties represent and warrant that they are not acting under any misapprehension as to the effect of this Agreement, and that they have acted and do hereby act freely and voluntarily and not under any duress, coercion, or undue influence from any source whatsoever.

7.9      No Mistake of Fact or Law.  In entering into this Agreement, the Parties recognize that no facts or representations are ever absolutely certain.  Accordingly, each party assumes the risk of any mistake, and if any Party should subsequently discover that any understanding of the facts or of the law was incorrect, each Party understands and expressly agrees that said Party shall not be entitled to set aside this Agreement by reason thereof, regardless of any mistake of fact or law; provided, however, that the foregoing shall not act as a waiver of the Parties' other rights or remedies.

7.10      Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles.

7.11      Venue and Jurisdiction.  In the event of a dispute arising under this Agreement involving the Sellers, the Bankruptcy Court shall have sole and exclusive jurisdiction to interpret and enforce this Agreement.

7.12      Participation in Agreement's Preparation.  Each Party to this Agreement has participated in and contributed to the preparation of this Agreement.  The Parties agree that each Party has reviewed this Agreement, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to any interpretation of this Agreement.

7.13      Binding Effect.  This Agreement shall be binding on and shall inure to the benefit of the Parties and their respective predecessors in interest, successors, trustees, shareholders, directors, officers, affiliates, employees, agents, attorneys, advisors, insurers, consultants, professionals, designees, and assigns to the extent permitted by law.

7.14      Authority.  Each Party whose signature is affixed hereto in a representative capacity represents and warrants that he or she has the authority and capacity to act on behalf of the Party for whom he or she is signing, to bind the Party and all who might claim through it to the terms of this Agreement, and to perform on behalf of the Party as provided for hereunder,

and that no other or further signatures are needed on behalf of the Party for whom he or she is signing to bind the Party.

7.15    <u>Business Day</u>.  For purposes of this Agreement, "business day" means any day other than Saturday, Sunday, or any other day on which federally insured banks are not open for business.

7.16    <u>Miscellaneous</u>.  Unless otherwise expressly provided herein, no delay or omission by any of the Parties in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy and shall not be construed as a bar to or a waiver of any such right or remedy on any future occasion.  All remedies of any of the Parties hereunder are cumulative, and may, to the extent permitted by law, be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed to be an election of such remedy to the exclusion of any other remedy or to preclude the exercise of any other remedy at any other time.  The headings appearing at the commencement of the paragraphs hereof are descriptive only and for convenience of reference.

7.17    <u>Counterparts</u>.  This Agreement and the Consent may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  Any of the parties hereto may execute this Agreement or the Consent by signing any such counterpart.  Facsimile or pdf signatures on this Agreement, or any counterpart of this Agreement, shall have the same force and effect as original signatures.

7.18    <u>Assignment by Buyer</u>.  Subject to the consent of the General Partner and the Sellers, which shall not be unreasonably withheld, Buyer shall have the right to assign its interests and rights under this Agreement to an affiliated entity.

7.19    <u>Notices</u>.  Any notice which any Party may desire to give to another Party must be in writing and shall be effective (i) when personally delivered by the other party or by messenger or courier; (ii) upon actual receipt or refusal of delivery if sent via the United States mail, registered or certified; (iii) one (1) business day after deposit before the daily deadline time with a reputable overnight courier or service where next day service has been fully paid for by the sending party; or (iv) upon receipt of an e-mail (as evidenced by a computer generated receipt confirming a successful transmission):

**The Sellers:**

CA Express Fund II, LLC, and/or WJA Express
Fund, LLC
c/o Howard Grobstein, CRO of WJA Asset
Management, their manager
6300 Canoga Avenue, Suite 1500
Woodland Hills, California 91367
Fax: (818) 532-1120
Phone:  (818) 532-1020
Email:  hgrobstein@gtfas.com

**With a copy to Sellers'
Counsel:**

Kyra E. Andrassy
Smiley Wang-Ekvall, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Fax:  (714) 445-1002
Phone:  (714) 445-1000
kandrassy@swelawfirm.com

**Buyer:**

FAIT Insurance Partnership, LLC
190 Newport Center Drive, Suite 100
Newport Beach, CA 92660
Attn: Guy Lemmon
Fax:  (949) 644-1142
Phone:  (949) 644-1860
Email:  guyl@mrc1.com

**With a copy to Buyer's
Counsel:**

Sainick Law, Inc.
190 Newport Center Drive, Suite 200
Newport Beach, CA 92660
Attn: Fred Sainick, Esq.
Fred@sainicklaw.com
Fax:     (949) 644-3999
Phone: (949) 644-9400

7.20   <u>Exhibits</u>.   The exhibits attached to this Agreement are incorporated into this Agreement by reference as if fully set forth herein.

WHEREFORE, the Parties hereto have executed this Agreement as of the date first above written.

**Sellers:**

Dated:  December __, 2017

WJA Express Fund, LLC, a California limited liability company

By:  WJA Asset Management, LLC, a California limited liability company, its manager

_____
By:  Howard Grobstein, its chief restructuring officer and authorized representative

Dated:  December __, 2017

CA Express Fund II, LLC, a California limited liability company

By:  WJA Asset Management, LLC, a California limited liability company, its manager

_____
By:  Howard Grobstein, its chief restructuring officer and authorized representative

**Buyer:**

Dated:  December __, 2017

FAIT Insurance Partnership, LLC
a California limited liability company

By:  _____
     Macara F. Bonja, Its Manager

EXHIBIT "A"

**Consent of General Partner and Remaining Limited Partner**

The undersigned, GREEN-N-CLEAN EXPRESS CAR WASH, INC., a California corporation ("Green/Clean" and/or "General Partner") and H2Go PARTNERS, L.P., a California limited partnership ("H2Go" and/or "Remaining Limited Partner"), are, respectively, the sole general partner of the Partnership and sole remaining other limited partner of the Partnership.

1.    Consent to Assignment.  Green/Clean and H2Go hereby each voluntarily consent to the assignment to and assumption by Buyer, FAIT Insurance Partnership, LLC ("FAIT"), and waive any right that they may have to acquire the Partnership Interests instead of FAIT, and furthermore agree to the admission of FAIT, as of the Effective Date, to the Partnership as a limited partner holding a 58% Percentage Interest in the Partnership.  Notwithstanding Green/Clean's and H2Go's approval of FAIT, nothing contained herein shall constitute consent to the assignment to and assumption by anyone else, including any overbidders to FAIT.

2.    Partnership Documents.  The General Partner represents and warrants that the documents, described in Paragraph 3.4 of the Agreement, constitute all of the formation and operating documents governing the Partnership.

3.    Acknowledgment.

a.    Green/Clean and H2Go each acknowledge that there are no amounts owing to the Partnership with respect to the Partnership Interests and that there are no outstanding requests for: (a) additional Capital Contributions; or (b) loans from the Partnership under Section 3.5 of the Amended and Restated Partnership Agreement.

b.    Green/Clean and H2Go each acknowledge that there are no amounts owing to them, respectively, with respect to the Partnership Interests.

4.    No Outstanding Claims.  Green/Clean and H2Go each represent that they are unaware of any third party claims to the Partnership Interests or any reason why the Partnership Interests will not vest in the Buyer upon full execution and delivery of this Agreement and the concurrent delivery of the Consideration.

5.    No Default.  The execution, delivery and performance of the Agreement will not cause the Partnership to be in default under the terms of any agreement to which the Partnership is a party or the acceleration of any debt owed by the Partnership.

6.    Authorized Parties.  The undersigned have the full authority to execute this Consent and bind the General Partner and the Remaining Limited Partner hereto.

GREEN-N-CLEAN EXPRESS CAR WASH, INC.,
a California corporation


Dated: _____, 2017   By: _____

Brett Blanchard,
Its Chief Executive Officer


By: _____

Ryan Blanchard, Secretary


H2Go PARTNERS, L.P., a California limited
partnership


By:    GREEN-N-CLEAN EXPRESS CAR
WASH, INC., a California corporation, as
General Partner


Dated: _____, 2017        By: _____

Brett G. Blanchard,
Its Chief Executive Officer


By: _____

Ryan Blanchard, Secretary

EXHIBIT 3, PAGE 63

EXHIBIT "4"

## CONSENT OF MEMBER OF CA EXPRESS FUND II, LLC TO PROPOSED SALE

### RECITALS

1.    The undersigned is a member of CA Express Fund II, LLC ("CAEF II"), a California limited liability company, with a 50% ownership interest in CAEF II.

2.    CAEF II in turn holds an 8% limited partnership interest in Gothard Express Partners, L.P., a California limited partnership (the "CAEF Interest").

3.    The manager of CAEF II, WJA Asset Management, LLC (the "Manager"), is a chapter 11 debtor in a case pending before the United States Bankruptcy Court, Central District of California, Santa Ana Division, under jointly administered case number 8:17-bk-11996-SC.

4.    CAEF II has received an offer to purchase its interest in Gothard Express Partners, L.P. for approximately $260,000.  The sale would be to FAIT Insurance Partnership, LLC, a California limited liability company, or to any party with an offer that is determined to be a better offer.  After payment of the costs of sale, including attorney's fees, the net sale proceeds would be held by CAEF II for distribution in accordance with applicable law and the operating agreement, a copy of which is attached to this Consent (the "Operating Agreement").

5.    The Operating Agreement provides that the Manager has authority to sell or otherwise dispose of assets of CAEF II in the ordinary course of business, to do and perform all acts necessary or appropriate to the conduct of its business, and is responsible for the dominion and control of all assets owned by CAEF II. Therefore, the Manager has the authority to cause the CAEF Interest to be sold without obtaining the consent of the members of CAEF II.  Notwithstanding that authority, the proposed purchaser has requested that CAEF II obtain the consent of the undersigned member to the proposed transaction.

### CONSENT

Based on the foregoing, the undersigned member hereby indicates his or her consent to (1) the proposed transaction or any similar transaction involving the CAEF Interest,  and (2) the Manager's authority to take all actions that the Manager deems reasonably necessary in order to consummate the sale of the CAEF Interest, whether to FAIT Insurance Partnership, LLC, or another bidder.

Dated:  August 3_0_2017

TEXAS CAPITAL HOLDINGS, L.P.

By: _____

Its general partner

2716850.2

## CONSENT OF MEMBER OF CA EXPRESS FUND II, LLC TO PROPOSED SALE

### RECITALS

1.    The undersigned is a member of CA Express Fund II, LLC ("CAEF II"), a California limited liability company, with a 50% ownership interest in CAEF II.

2.    CAEF II in turn holds an 8% limited partnership interest in Gothard Express Partners, L.P., a California limited partnership (the "CAEF Interest").

3.    The manager of CAEF II, WJA Asset Management, LLC (the "Manager"), is a chapter 11 debtor in a case pending before the United States Bankruptcy Court, Central District of California, Santa Ana Division, under jointly administered case number 8:17-bk-11996-SC.

4.    CAEF II has received an offer to purchase its interest in Gothard Express Partners, L.P. for approximately $260,000. The sale would be to FAIT Insurance Partnership, LLC, a California limited liability company, or to any party with an offer that is determined to be a better offer. After payment of the costs of sale, including attorney's fees, the net sale proceeds would be held by CAEF II for distribution in accordance with applicable law and the operating agreement, a copy of which is attached to this Consent (the "Operating Agreement").

5.    The Operating Agreement provides that the Manager has authority to sell or otherwise dispose of assets of CAEF II in the ordinary course of business, to do and perform all acts necessary or appropriate to the conduct of its business, and is responsible for the dominion and control of all assets owned by CAEF II. Therefore, the Manager has the authority to cause the CAEF Interest to be sold without obtaining the consent of the members of CAEF II. Notwithstanding that authority, the proposed purchaser has requested that CAEF II obtain the consent of the undersigned member to the proposed transaction.

### CONSENT

Based on the foregoing, the undersigned member hereby indicates his or her consent to (1) the proposed transaction or any similar transaction involving the CAEF Interest, and (2) the Manager's authority to take all actions that the Manager deems reasonably necessary in order to consummate the sale of the CAEF Interest, whether to FAIT Insurance Partnership, LLC, or another bidder.

THE PADOVA TRUST

Dated: ~~August~~ , 2017
Sept 11,

By: _James A Padova Tee_
(print name)

X

_Marilyn A Padova Tee_
MARILYN A PADOVA Tee

2716849.2

EXHIBIT 4, PAGE 65

# EXHIBIT "5"

# AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF GOTHARD EXPRESS PARTNERS, L. P.,

## A CALIFORNIA LIMITED PARTNERSHIP

## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF GOTHARD EXPRESS PARTNERS, L.P., A CALIFORNIA LIMITED PARTNERSHIP

This Amended and Restated Limited Partnership Agreement of Gothard Express Partners, L.P., is entered into by and between Green-N-Clean Express Car Wash, Inc., a California corporation, as General Partner, and each of H2Go Partners, L.P., a California limited partnership ("H2Go"), and Millennium Trust Company, LLC, Custodian FBO: WJA Express Fund, LLC, a California limited liability company ("WJA"), as Limited Partners and is effective as of October 1, 2013.

This Agreement is intended to govern the formation, operation, dissolution and all other activities of the Partnership in conjunction with California's Uniform Limited Partnership Act of 2008, effective January 1, 2008; the former shall control all such aspects of the Partnership except where it is in conflict with the Act with respect to terms or provisions which may not vary from the Act or where it is silent; in those circumstances, if any, the Act shall control.

1. **Definitions**

When used in this Agreement, the following capitalized terms shall have the meanings set forth below:

1.1. "Act." The Uniform Limited Partnership Act of 2008, as set forth in California Corporations Code §§15900-15912.07, as it may be amended or succeeded from time to time.

1.2. "Affiliate." Any of the following with respect to any Person (as defined below) : (1) Any other Person directly or indirectly, owning, controlling, or holding with the power to vote more than 50 percent of the outstanding voting securities of such Person; (2) any other Person more than 50 percent of whose outstanding voting securities are directly or indirectly owned, controlled or held, with the power to vote, by a such Person; (3) any other Person directly or indirectly controlling, controlled by or under common control with such Person; (4) any executive officer, director, trustee, or General Partner of such Person; and (5) any legal entity for which such Person acts as an executive officer, director, trustee, or General Partner.

1.3. "Agreement." This Agreement, as amended from time to time.

1.4. "Capital Account." The Partnership shall maintain among its records a capital account record for each Partner, which account shall be established for each Partner consisting of the amount of the total Capital Contributions (initial and additional ) actually made to the Partnership pursuant to the Agreement, as amended, reduced by any distributions to such party.

1.5. "Capital Contribution." For each respective Partner, the aggregate amount of cash received by the Partnership from such Partner.

Gothard Express Partners, L.P.

1.7.    "Cash Available for Distribution." The amount of cashgenerated from the Partnership(as defined below) that the General Partner, within its sole and absolute discretion, deems available for distributionafter payment of all the Partnership's obligations, and taking into account (a) all of the Partnership'sobligations coming due in the near term,and (b) such amounts the General Partnerdeemsappropriate to hold in reserve to satisfy its future obligations or to expandits business.

1.8.    "Certificate of Limited Partnership." The certificate described in California Corporations Code thathas been filed with the Secretary of State of California on behalf of the Partnership. The term also includes the Certificate as amended or restated.

1.9.    "Commitment." For each respective Partner, the aggregate amount of cash that such Partner has agreed to contribute to the Partnership as set forth on Exhibit B (as modified from time to time in accordance with the terms of this Agreement).

1.10.    "Debtor in Bankruptcy." A Person that is the subject of (1) an order for relief under title 11 of the United States Code or a comparable order under a successor statute; or (2) a comparable order under federal, state, or foreign law governing insolvency.

1.11.    "Designated Office." The office that the Partnership is required to designate under the California Corporations Code and where it will maintain the Partnership records.

1.12.    "Distribution." A distribution of Cash Available for Distributionfrom the Partnership to a Partner or to a Transferee.

1.13.    "General Partner."    Green-N-Clean Express Car Wash, Inc. until such time as it is replaced pursuant to the terms of this Agreement.

1.14.    "Indemnitee."Any General Partner or a director, officer or employee of aGeneral Partner, anyemployee of the Partnership, or any Limited Partnerof the Partnership.

1.15.    "Limited Partner."Each Personwho is identified on, and has executed, the **Signature Page**to this Agreemenentas a limited partner and whose spouse, if applicable, has executed the separate property waiver and acknowledgment in the form attached as **Exhibit A** .

1.16.    "Majority of Limited Partners."Those Limited Partners who hold more than 50 percent of the Percentage Interests held by all Limited Partners.

1.17.    "Majority of Partners."Those Partners, whether General Partner or Limited Partner, who hold more than 50 percent of the PercentageInterests held by all Partners.

1.18.    "Operations." The business of the Partnership, excluding a Capital Event.

1.19.    "Partner Loan." A loan from a Partner to the Partnership.

LEGAL28227161.8

EXHIBIT 5, PAGE 68

1.20.    "Partners." The General Partner(s) and allLimited Partners. "Partner" means any one of the Partners, unless the context requires otherwise.

1.21.    "Partnership."The Partnership identified in this Agreement.

1.22.    "Partnership Interest." A Partner's ownership interest in the Partnership, including the right to receive Distributions in accordance with this Agreement.

1.23.    "Percentage Interest."   For each Partner, the percentage set forth on Exhibit B.

1.24.    "Person." Any individual, partnership, limitedliability company, corporation, joint venture, trust, or other entity.

1.25.    "Preferred Return."   All Capital Contributions made by the Partners pursuant to Section 3.1 herein below shall have a preferred return at the rate of ten percent (10%) per annumfrom the date made until the date repaid (the "Preferred Return").   This Preferred Return is not a guaranteed payment pursuant to Code Section 707(c), but, rather, represents a priority allocation of cash available for distribution.

1.26.    "Record" or "Records."Partnership information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

1.27.    "Related Party." Any of the following with respect to any Person: (1) any other Person with respect to which such Person or an Affiliate of such Person is a direct or indirect beneficial owner; (2) any other Person or an Affiliate of such other Person that is a direct or indirect beneficial owner of such Person.

1.28.    "Transfer." Anysale, assignment, or conveyance for consideration;any gift; or transfer by operation of law, of a portion or all of a Partner's Partnership Interest. Unless otherwise notified, the Partnership shall treat a Transfer as including the transferor's Capital Account.

1.29.    "Transferee." A Person to which or to whom all or part of a Partnership Interest has been transferred, whether by a non-Partner ("Transferor") or by a Partner. A Transferee does not become a Partner by reason of such transfer, despite receiving a Partnership Interest.

2.  Organization

2.1.    Formation of Partnership
   2.1.1.  The Partners identified on the **Signature Page**have agreed to continue a limited partnership, the "Partnership" described in this Agreement,under the provisions of the Act and on the terms and conditions set forth in this Agreement.

   2.1.2.  The Partnership  was formed on January 10, 2011 through the filing of the Certificate of Limited Partnership with the Secretary of State of the State of California.

2.2.    New Partners by Admission or after Transfer of Existing Partnership Interests

From time to time a Person not already a Partner may be admitted to the Partnershipas a Limited Partner or as aGeneral Partner as an increase in the number of existing Partners or after a Transfer to such Person, but only with the approval and upon such terms and conditions as a Majority of Partners then existing shall agree upon in writing, including in cases of a new Partner, adjustment of the Percentage Interestsin recognition of the new Partner's Percentage Interest, and provided such Person:

  a.    Agrees to be bound by this Agreement (and any amendments to this Agreement) in its capacity, as the case may be, as Limited Partner or General Partner through execution of this Agreement; and

  b.    Any spouse of the additional Limited or General Partner executes a separate property waiver and acknowledgment in the form attached as **Exhibit A**.

Upon satisfaction of all the foregoing, and any other requirements set forth in this Agreement, the Person shall be admitted as aLimited Partner orGeneral Partner, as the case may be, and shall thereby acquire all rights and obligations of a Limited Partner or General Partner, respectively. Simultaneously, the Partnership's Records shall be amended to reflect (a) thenew Percentage Interests of each Partner as adjusted in accordance with the foregoing, and (b) either the new Partner's Capital Account based on his or her capital contribution or, in the case of a Transfer, the change in ownership of the Transferor's Capital Account to the newPartner.

2.3.    Partnership Name, Business Name and Partnership Purpose

The Partnership's name shall be "Gothard Express Partners, L.P. "  Provided, however, the Partnership's business shall be conducted under the name of "H2Go," subject to the terms and conditions governing the use of such name set forth in a commercially reasonable license agreement between the Partnership and the owner of the rights to such name.  By their execution of this Agreement, the Partners acknowledge and agree that the Partnership does not have any right, title or interest in the name or brand of "H2Go" other than its licensed use by the Partnership as expressly set forth  in the license agreement.  By execution of this Agreement, the Partners acknowledge and agree that the Partners, in their capacity as such, do not have any rights to the "H2Go" name or brand. Any sale or transfer of any Partner's interests in the Partnership or of the HB Project shall not include the sale or use of the name or brand of "H2Go."

The Partnership's business shall be to invest in, construct and operate an express car wash and ancillary businesses, including retail business, located at 7311 Edinger Ave, Huntington Beach, CA ("HB Project") and at any other locations as may be determined and agreed upon by all the Partners.

2.4.      Designated Office

The Partnership's designated office shall be at 26342 Oso Parkway, Suite 201, Mission Viejo, California (92691). The General Partner may change the location of the designated office to any other place upon not less than 20 days' written notice to the Limited Partner.

2.5.      Certificate of Limited Partnership

The Partnership's Certificate of Limited Partnershiphas been filed with the Secretary of State of California. The General Partner may record the certified copy of the Certificate of Limited Partnership in each county in which any Partnership real property is located.The General Partner shall amend the Certificate of Limited Partnership if and to the extent required by the Act.

3.   Partner CapitalContributions and Distributions

3.1.      Capital Contributions; Financing.

By executing this Agreement each Partner agrees to make Capital Contributions in an aggregate amount equal to the amount set forth under the heading "Capital Commitment" opposite such Partner's name on Exhibit B.   Each Partner agrees that it has made the Capital Contributions set forth under the heading "Capital Contributions" opposite such Partner's name on Exhibit B.   As and when appropriate from time to time during the term of the Partnership to permit the Partnership to make an investment and/or to pay or otherwise establish reserves for the Partnership's obligations and other liabilities, each Partner shall make contributions pro rata (based upon the Partners' respective outstanding Commitments) to the capital of the Partnership in the aggregate amount equal to its Commitment by contributing installments in cash when and as called by the General Partner upon at least 10 business days' prior written notice.   Each Capital Contribution to the Partnership shall be made in United States dollars by means of a certified or cashier's check or by wire transfer of funds to a bank account designated by the General Partner.

With respect to the development of the HB Project, the General Partner shall use its best efforts to cause the Partnership to secure a construction loan ("Construction Loan") in the amount of approximately ▮▮▮▮▮▮ for the HB Project to be developed at 7311 Edinger Ave, Huntington Beach, CA based upon the budget attached hereto as Exhibit_ C ("Construction Budget").

3.2.      Property Contributions

No Partner shall be required to contribute any property on behalf of, to or for the Partnership without such Partner's prior written consent and the vote of all remaining Partners.The Partners' Percentage Interests shall be adjusted to take into full account any credit for such property contribution as all Partnersshall agree upon in writing.

EXHIBIT 5, PAGE 71

## 3.3.  Services Contributions

No Partner shall be required to contribute any services on behalf of, to or for the Partnership without the Partner's prior written consent.

## 3.4.  Failure to Contribute

If any Partner fails to make full payment of any portion of its Commitment or any other payment required hereunder when due (the amount of such failed payments in the aggregate, the "Defaulted Amounts") and such failure is not cured within five business days after delivery to such Limited Partner of written notice from the General Partner with respect to such failure to pay, such Limited Partner shall be deemed to be a "Defaulting Partner" as of the expiration of such five business day period and the General Partner may (but shall not be obligated to) undertake any one or more of the following steps in any order of priority:

a.   In addition to all Defaulted Amounts owed by the Defaulting Partner, the Partnership may (A) accrue and collect interest on all Defaulted Amounts at a rate not to exceed 10% per annum (but not in excess of the highest rate per annum permitted by law), as such rate shall be determined by the General Partner in its sole discretion with respect to each failure to make such payments, and (B) receive reimbursement from the Defaulting Partner for all out-of-pocket expenses (including for attorneys' fees) incurred in connection with the collection and other efforts in respect of the Defaulted Amounts (which payment of such interest and expense reimbursement shall not be treated as a Capital Contribution by the Defaulting Partner).

b.   So long as any Defaulted Amounts or other amounts remain unpaid, in the sole discretion of the General Partner, the Partnership may withhold all distributions (or portions thereof) that would otherwise be made to the Defaulting Partner pursuant to this Agreement and apply such withheld distributions to offset any Defaulted Amounts or other amounts owing by the Defaulting Partner to the Partnership or the General Partner.

c.   The General Partner, on its own behalf or on behalf of the Partnership, may pursue and enforce all rights and remedies the Partnership and/or the General Partner may have against such Defaulting Partner with respect thereto, including pursuing a lawsuit to collect the Defaulted Amounts and any other amounts due to the Partnership and/or General Partner.

d.   The General Partner in its sole discretion may offer to the Partners (other than any Defaulting Partners) the Defaulting Partner's Partnership Interest, at an aggregate price equal to the amount of Capital Contributions made by such Defaulting Partner that have

not previously been repaid (as reasonably determined by the General Partner). At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall, as payment in full for the Defaulting Partner's Partnership Interest being purchased by such Partner, deliver cash in an amount equal to the purchase price for the Partnership Interest being acquired by such Partner. The Defaulting Partner shall cooperate in all respects with any sale pursuant to this Section 3.4(d).

3.5.    Additional Capital Contributions and Partner Loans

In the event that the General Partner determines that the Partnership requires additional Capital Contributions beyond the available Commitments(or in a circumstance where a Defaulting Partner has failed to make Capital Contributions equal to its Commitment) in order to pay operating expenses, or any other expenditures or obligations of the Partnership, WJA (so long as it is not a Defaulting Partner) shall have the right (but not the duty) to make a Partner Loan up to an amount equal to the required additional capital. To the extent WJA elects not to make a Partner Loan equal to the full amount of additional capital required, the other Partners shall make a Partner Loan for the balance required in such proportion as such Partners elect.

Partner Loans shall bear simple interest at 10% per annum and be payable on the earliest to occur of (i) the fifth anniversary of the loan, (ii) a sale of the Partnership (whether pursuant to the sale of the Partnership Interests, a merger where the Partners immediately prior to the merger own less than 50% of the merged entity following the merger or a sale of substantially all of the assets of the Partnership), and (iii) in accordance with the payments required by Section 3.8. The Partner Loans shall be documented by a commercially reasonable note in form reasonably satisfactory to the Partnership.

3.6.    No Interest

Except as expressly provided otherwise in this Agreement, no Partner shall be entitled to receive interest on the unreturned or outstanding balance of itsCapital Account.

3.7.    No Withdrawal from Capital Account

Except as expressly provided otherwise in this Agreement, no Partner shall have the right, without the prior vote of all Partners, to withdraw all or any part of the balance ofitsCapital Account from the Partnership. A corresponding debit shall be recorded to the withdrawing Partner's Capital Account in the amount of any withdrawal so permitted.

3.8.    Distributions. The General Partner shall make Distributions to the Partners either from (i) Operations or (ii) Capital Events as set forth hereinbelow.

    (a)    Cash Distributions from Operations. The General Partner shall make periodic distributions at such times as the General Partner shall determine, but not

EXHIBIT 5, PAGE 73

less than bi-monthly (i.e., every other month), to the Partners or Transferees so entitled, of Cash Available for Distribution arising from Operations, with each such Distribution disbursed in the following order and amounts:

> (i)    First, to the Partners holding Partner Loans, paripassu in accordance with the respective amounts outstanding under such Partner Loans;

> (ii)    Second, to the Partners, paripassu, the Preferred Return on their Capital Contributions;

> (iii)    Third, the remainder, if any, in the ratio of their respective Percentage Interests.

(b)    <u>Cash Distributions from Capital Events</u>.    Upon the occurrence of a Capital Event, the General Partner shall make distributions to the Partners or Transferees so entitled, of Cash Available for Distribution arising from such Capital Event, with each such Distribution disbursed in the following order and amounts:

> (i)    First, to pay all loans, as reflected in the budget or as approved by the Partners, in order of priority and consistent with the terms of any such financing;

> (ii)    Second, to the Partners holding Partner Loans, paripassu in accordance with the respective amounts outstanding under such Partner Loans;

> (iii)    Third, to the Partners, paripassu, any unpaid Preferred Return on their Capital Contributions;

> (iv)    Fourth, to the Partners, paripassu, until they have received cumulative distributions pursuant to this Section 3.8 in an amount equal to their respective total Capital Contributions; and

> (v)    Fifth, the remainder, if any, in the ratio of their respective Percentage Interests.

3.9.    <u>Return of Distributions to the Partnership</u>

Each Partner agrees and acknowledges that the General Partner may require each Partner to returnto the Partnership any portion or all of aprior Distribution within six (6) months after such Distribution was made in the same proportion to the other Partners as such Distribution was received, if in the opinion of the General Partner:



EXHIBIT 5, PAGE 74

Gothard Express Partners, L.P.

a.   The Partnership would not be able to pay its debts as they become due in the ordinary course of the Partnership's activities as a consequence, partially or wholly, of the Distributions to the Partners; or

b.   For any other reason recognized in Corporations Code sec. 15905.08.

4.  General Partner's Rights, Powers, Obligations and Liabilities

4.1.    General   All powers of the Partnership shall be exercised by or under the authority of, and the business and affairs of the Partnership shall be managed under the direction of, the General Partner.   The General Partner shall manage the day-to-day business and affairs of the Partnership, but shall not be required to devote its full time efforts to the Partnership.   A management fee ("Management Fee") in the amount of ▉▉ of the gross revenues of the Partnership shall be paid by the Partnership to the General Partner as manager on a monthly basis.

Subject to Section 5.1 of this Agreement and except as otherwise provided for herein, the General Partner shall have full, complete and exclusive power, discretion and responsibility to operate and manage the Partnership business and maximize its results for the benefit of the Partners including the authority to take, but not limited to, the following actions on behalf of the Partnership:

a.   Negotiate and execute agreements, contracts, and other documents in connection with the Partnership business;

b.   Employ or discharge, at the Partnership's expense, agents, employees, independent contractors, attorneys, and/ or accountants to render services to the Partnership;

c.   Perform daily and long range or strategic management and planning of the Partnership business;

d.   Cause the Partnership to purchase real property, personal property and equipment on such terms and conditions as the General Partner determines to be in the Partnership's best interests;

e.   Borrow money in the name of the Partnership to finance its business or expand its business;

f.   Satisfy, refinance, increase, modify, or extend any Partnership obligation;

g.   Inspect and copy Partnership records as provided in California corporations Section 15904.07; and

h.   Otherwise exercise all rights and responsibilities that the Act grants or imposes on General Partner of a limited partnership.

EXHIBIT 5, PAGE 75

4.2.    Indemnification

The Partnership shall indemnify, defend, and hold harmless each Indemnitee from and against any and all losses, expenses, damages, and liabilities, arising out of or in connection with the operation of the Partnership's business, except for those losses, expenses, damages, and liabilities which (a) arise by reason of an Indemnitee's breach of this Agreement, or (b) are caused by an Indemnitee's fraud.

4.3.    Devotion of Time; Non-Competition

The General Partner, including its employees, officers and directors, if any, shall devote to the Partnership and the conduct of its business the amount of time necessary and appropriate to carry out its responsibilities under this Agreement.    Aside from this obligation, each of the General Partner and Limited Partners or any of their respective partners or affiliates may engage in any other business activity for its own profit or advantage, including owning car washes, without the other Partners' approval, provided the other business activity is not a car wash in competition with the Partnership's business within a radius of ███ miles from    the HB Project located at 7311 Edinger Ave, Huntington Beach CA(the "Radius Zone"). Notwithstanding the foregoing, each of the Partners may invest in or operate the existing H2Go car wash now located at 6491 Westminster Boulevard, Westminster, CA 92683(the "Westminster Location"), which the Partners hereto acknowledge may be less than ███ miles from the HB Project. The foregoing non-competition clause shall only apply to future business activity of the Partners within the Radius Zone.

4.4.    Employment or Retention of Partners and Affiliates

The General Partner may employ, contract with, or retain an Affiliate of a General Partner or Limited Partnerin connection with the Partnership business, whether as a buyer, lessor, lessee, manager, furnisher of goods or services, broker, agent, lender, or otherwise, for any service or product used in the Partnership business, and paysuchcompensation, price, or other remuneration which is commercially reasonable as determined by the General Partner.

4.5.    Insurance

The General Partner shall obtain insurance at the Partnership's expense that the General Partner deems reasonably necessary for the proper protection of the Partnership and the Partners and Partnership property and its business activities.

4.6.    Limitations on Liability of General Partner to the Partnership

4.6.1.  TheGeneral Partner shall not be liable for monetary damages to the Partnership or any Partners for losses sustained or liabilities incurred as a result of errors in judgment or due to any act or omission if the General Partner acted (a) in good faith based on an examination of the facts of a given situation assessed in a commercially reasonable and prudent manner and (b) in a manner consistent with its rights, powers or obligations under this Agreement.

4.6.2.  The Partners expressly acknowledge and agree that the role of theGeneral Partner is to act on behalf of the Partnershipand not individual Partners and that therefore the General Partner maynot consider the separate interests of any Partner (including, without limitation, the tax consequences to a Limited Partner) in deciding whether to cause the Partnership to take or decline to take any action or in carrying out its rights, powers or obligations under this Agreement.

5.  <u>Limited Partner's Rights, Powers, Obligations and Liabilities</u>

5.1.  <u>Approval Required</u>

The General Partner shall not do any of the following without the prior written approval by unanimous vote of all of the Limited Partners and the General Partner:

a.  Dissolve the Partnership;

b.  Merge the Partnership into another entity;

c.  Sell, lease, exchange, mortgage, refinance, encumber, pledge or otherwise transfer or grant a security interest in the Partnership's real or personal property, except (i) as provided in the then current Budget, (ii) in the ordinary course of business, or (iii) in connection with a distribution to the Partners in an aggregate amount such that following such distribution the Partners shall have received aggregate distributions equal to the aggregate Capital Contributions together with any unpaid Preferred Return on such Capital Contributions;

d.  Incur Partnership indebtedness, except (i) as provided in the then current Budgetor (ii) in the ordinary course of business;

e.  Engage in a transaction in which a General Partner has an actual conflict of interest with the Partnership (provided that neither: (i) investing in or managing the Westminster Location andcar wash facilities outside the Radius Zone; nor (ii) investingin or managing real estate projects are deemed to represent a conflict of interest);

f.  Require additional Capital Contributions be made by a Partner in excess of the Commitment of such Partner;

g.  Admit new Partners to the Partnership;

h.  Increase the amount of the Management Fee paid to the General Partner.

i.  Increase the expenditures of anannual operating budget (whether the Construction Budget, the 2013 budget attached hereto as <u>Exhibit D</u> or a budget approved in accordance with Section 5.2), by greater than ten percent (10%).

j.  Acquire additional car wash property locations within the Radius Zone.

EXHIBIT 5, PAGE 77

5.2.      Budget Approval

5.2.1.  Attached hereto as Exhibit D is the budget for the Partnership for 2013.   On or before December 1 of each year the General Partner shall submit to the Limited Partners for approval a preliminary budget with respect to the next calendar year.

5.2.2.  The General Partner shall work together, in good faith, with the Limited Partners to adjust each such preliminary budget as necessary to resolve any concerns of the Limited Partners. Each Limited Partner shall, in good faith, (i) seek to respond to such an updated preliminary budget within 15 days of the budget's initial submission to the Limited Partners pursuant to this Section 5.2, and (ii) cooperate with the General Partner to seek to resolve any concerns and to provide its approval of the budget within 30 days of the budget's initial submission to the Limited Partners. Each such budget shall take effect with respect to the Partnership only once approved by the Limited Partners. Reasonable fixed charges presented in a preliminary budget, including debt service payments, real estate taxes and insurance premiums, or reasonable projections of revenue which by their nature are speculative, shall not require approval of the Limited Partners, except to the extent that (i) such amounts are reasonably expected to require additional Capital Contributions or (ii) such amounts constitute a material change to a previously approved budget. For greater certainty, capital expenditures proposed in any budget shall require Limited Partner approval.

5.2.3.  If the proposed budget for a calendar year has not been approved by the Limited Partners prior to the commencement of the applicable calendar year, then until a budget for such calendar year is approved, the approved budget for the prior calendar year shall continue to remain operative for the following calendar year in respect of all items of operating expenditure until a new budget for such calendar year is approved by the Limited Partners; provided, however, that such budget continuing in effect shall be automatically adjusted to increase any line items for expenses by the year-over- year percentage increase in the Consumer Price Index-All Urban Consumers for Los Angeles, California, as published from time to time by the United States Department of Labor or, in the event such index is no longer published, such replacement index as may be agreed upon by the Partners, it being agreed that the General Partner shall be authorized to pay current taxes, insurance premiums and utility charges as charged for such calendar year even if in excess of amounts approved in the adjusted budget.

5.2.4.  If the budget has not been approved by the Limited Partners prior to the commencement of the applicable calendar year the General Partner and the Limited Partners shall negotiate in good faith to resolve any such dispute.   If any budget has not been approved within 90 days after the commencement of the applicable calendar year, then the dispute shall be resolved pursuant to the dispute resolution mechanics set forth in Section 15.2.

EXHIBIT 5, PAGE 78

5.2.5.  The General Partner shall have the right (and the Limited Partners may request that the General Partner) from time to time during each calendar year to submit a proposed amendment to the budget to the Limited Partners for their consideration; provided that the failure to agree on any proposed amendment to the budget may not result in a dispute requiring resolution pursuant to Section 15.2.

5.3.    Participation

A Limited Partner shall not participate in the management or control of Partnership business, nor shall a Limited Partner transact any business for or in the name of the Partnership, nor shall a Limited Partner have the power to sign for or bind the Partnership in any matter; such powers are vested solely and exclusively in the General Partner.

5.4.    Liabilities

No Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership.

5.5.    Cessation as Limited Partner

5.5.1.  A Limited Partner shall cease being a Limited Partner, in which event it will be deemed to have simultaneously relinquished all rights of a Limited Partner hereunder (but without relinquishing its rights or its legal successor's rights of ownership in its Partnership Interest or Distributions, or to its Capital Account), upon:

(1)     The General Partner's receipt of written notice of the Limited Partner's decision and effective date to withdraw as a Limited Partner;

(2)     The Limited Partner is a corporation and, within 90 days after the Partnership notifies the Limited Partner that it will be expelled as a Limited Partner because it has filed a certificate of dissolution or the equivalent, its charter has been revoked, or its right to conduct business has been suspended by the jurisdiction of its incorporation, and there is no revocation of the certificate of dissolution or no reinstatement of its charter or its right to conduct business; or

(3)     The Limited Partner is a limited liability company or partnership that has been dissolved and whose business is being wound up;

(4)     On legal action taken by the Partnership, the Limited Partner's expulsion from the Partnership by judicial order because:

(a) The Limited Partner engaged in conduct that adversely and materially affected the Partnership's activities;

(b) The Limited Partner willfully or persistently committed a material breach of the Agreement or of the obligation of good faith and fair dealing under California Corporations Code §15903.05(b) with respect to the Partnership;

(5) In the case of a Limited Partner who is an individual, his or her death;

(6) The termination of a Limited Partner's legal status that is not an individual;

(7) A Limited Partner becomes a Debtor in Bankruptcy; or

(8) The new spouse of an existing Limited Partner fails to execute and deliver the Waiver and Acknowledgment in the form of **Exhibit A** to the Partnership's offices within thirty (30) days of marriage to the Limited Partner.

5.5.2. In the event of a death of a Limited Partner, the decedent's legal representative is entitled to exercise the rights of a Transferee and, in settling the estate of the decedent, the rights of a current Limited Partner in accordance with Corporations Code sec. 15903.04.

5.5.3. In the event of a Transfer of a Limited Partner's entire Partnership Interest confirmed by the General Partner, the Transferor shall no longer be a Limited Partner, and shall relinquish its rights to its Capital Account and to Distributions to the Transferee, which in turn may be only be admitted as a Limited Partner in accordance with section 2.2 above.

5.6.    Status of Transferee

In the event of a voluntary or involuntary Transfer of a Limited Partner's entire Partnership Interest for any reason, the Transferor shall no longer be a Limited Partner, and shall relinquish its rights to its Capital Account and Distributions to the Transferee, which in turn may be only be admitted as a Limited Partner in accordance with section 2.2 above.

6.   Partnership Books and Records

6.1.    Access to Records

The General Partner shall keep at the Partnership's Designated Office, at the Partnership's expense, accurate books and records of all Partnership business transactions and all Records required to be maintained under California Corporations Code §15901.11, including those listed in sections (1)-(8) below, and make all such items available during normal business hours for inspection, copying, and auditing by each Partner (or its agent or attorney); the Limited Partner need not have any particular purpose for seeking the information:

(1) A current list showing the full name and last known street and mailing address of each Partner, separately identifying the General Partner and the Limited Partner (in alphabetical order), as well as each Partner's electronic mail

EXHIBIT 5, PAGE 80

Gothard Express Partners, L.P.

address; this information shall also be distributed upon request to each requesting Partner;

(2)    A copy of the initial Certificate of Limited Partnership and all amendments to and restatements of the Certificate, together with signed copies of any powers of attorney under which any certificate, amendment, or restatement has been signed;

(3)    A copy of any filed certificate of conversion or merger;

(4)    A copy of the Partnership's federal, state, and local income tax returns and reports, if any, for the six most recent years;

(5)    A copy of any Partnership Agreement made in a record and any amendment made in a record to any Partnership Agreement;

(6)    A copy of any financial statement of the Partnership for the six most recent years;

(7)    A copy of any record made by the Partnership during the past three years of any approval given by or vote taken of any Partner pursuant to the Act or the Agreement; and

(8)    Unless contained in this Agreement, a record stating:

a.    The amount of cash, and a description and statement of the agreed value of the other benefits, contributed and agreed to be contributed by each Partner;

b.    The times at which, or events on the happening of which, any additional contributions agreed to be made by each Partner are to be made;

c.    For any Person that is both a General Partner and a Limited Partner, a specification of what PercentageInterest the Person owns in each capacity; and

d.    Any events on the happening of which the Partnership is to be dissolved and its activities wound up.

The General Partner shall prepare and distribute to all of the Partners, monthly financial statements and operational reports for the Partnership's HB Project.

6.2.    <u>Reports and Copies When Approval Required</u>

Whenever the Act or this Agreement provides for a Limited Partner to vote on a matter, the Partnership shall, before the vote is taken, without demand, provide each Limited Partner

LEGAL28227161.8

**EXHIBIT 5, PAGE 81**

with all information material to the Limited Partner's decision within the possession or control of the Partnership.

6.3.    Trade Secrets

Nothing in this Agreement prevents the General Partner from keeping confidential from the Limited Partners, for a period of time deemed reasonable by the General Partner and as permitted in the Act, any information that the General Partner reasonably believes to be a Partnership trade secret or other information the disclosure of which the General Partner in good faith believes is not in the best interest of the Partnership or could damage the Partnership or its business or that the Partnership is required by law or by agreement with a third party to keep confidential.

6.4.    Rights of Former Limited Partner

A former Limited Partner may inspect and copy required information during regular business hours in the Partnership's designated office, subject to the restrictions and requirements contained above, if:

   a.    The information pertains to the period during which the Person was a Limited Partner; and

   b.    The Person seeks the information in good faith.

7.  Partnership's Duties After Partner Demand for Record

Within 10 days after receiving a demand pursuant to California Corporations Code §15903.04(b) or §15904.07(c), the Partnership shall inform the Partner that made the demand:

   a.    What information the Partnership will provide in response to the demand;

   b.    When and where the Partnership will provide the information; and

   c.    If the Partnership declines to provide any demanded information, the Partnership's reasons for declining.

8.  Tax Matters

8.1.    Tax Returns

The General Partner shall prepare and file, or cause to be prepared and filed, in a timely manner and at the Partnership's expense, all federal, state, or local tax or information returns on behalf of the Partnership. The Partnership shall maintain copies of all federal, state, or local tax or information returns for the 6 most recent years at the Partnership's Designated Office.

8.2.    Tax Matters Partner

Gothard Express Partners, L.P.

The General Partnershall act as the Partnership's "tax matters partner," as that term is defined in Internal Revenue Code §6231(a)(7).

### 8.3.    Taxable Year

The taxable year of the Partnership shall be from January 1 to December 31.

### 8.4.    Accounting Method

The Partnership's books shall be kept on the cash method of accounting.

### 8.5.    Bank Accounts

The General Partner shall maintain a bank account for the Partnership in which all Partnership funds shall be deposited. Withdrawals of Partnership funds from the bank account shall be made only by check, and shall require the signature of the General Partner's Chief Executive Office until changed by the General Partner or through amendment of this Agreement.

## 9.    Partnership Meetings; Written Consent without a Meeting

### 9.1.    Special Meetings

A call for a meeting of the Partners to vote on a matter which the Partners are entitled to approve under this Agreementor for other purpose shall be made in accordance with the following:

(1) TheGeneral Partner may call for a meeting after giving written notice to all Partners not less than 10 days or more than 60 days before the meeting or vote. The notice shall set forth the hour, date, and location of the meeting or vote and the general nature of the business proposed to be transacted at the meeting or by vote.

(2) Alternatively, those Limited Partners who hold more than 10 percent of the Percentage Interestsheld by all Limited Partners may request, in writing, that the General Partner call a meeting. The request shall set forth the hour, time, and place of the meeting and the general nature of the business proposed to be transacted at the meeting or by vote. Promptly on receipt of such request, the General Partner shall give written notice to all Partners that a meeting will be held at the time specified in the request, but not less than 10 days or more than 60 days after the General Partner's receipt of the request. The notice shall also specify the general nature of the business proposed to be transacted at the meeting or by vote. If the General Partner does not give such notice to all Partners within 20 days after the Limited Partners request the meeting or vote, the requesting Limited Partners may give notice in the manner set forth in this section.

EXHIBIT 5, PAGE 83

9.2.     Regular Meetings

Regular meetings of the Partnership shall be held on such dates and times during normal business hours as the General Partner shall select and so notify the Partners in writing not less than 10 days prior to the meeting, provided that such meetings shall be held not less than annually. If any matter on which the Limited Partners are entitled to vote will be presented at such meeting, the General Partner shall include in the notice the general nature of the vote to be taken.

9.3.     Quorum; Waiver of Notice by Consent or Attendance at Meeting

9.3.1.  A quorum is necessary to open a meeting of the Partners; Partnerswho own a majority of all Percentage Interestsand present in person or by proxy constitute a quorum.

9.3.2.  The Partners present at a meeting at which a quorum is present may continue to transact business until adjournment of the meeting, notwithstanding the withdrawal of enough Partners to leave less than a quorum, if any action taken (other than adjournment) is approved by the requisite percentage specified under the Act or this Agreement, or, alternatively, after the withdrawal of enough Partners to leave less than a quorum, the meeting may be adjournedby the vote of a majority of the interests so present.

9.3.3.  However a meeting is called or noticed, if a quorum is present and if either before or after the meeting each Partner personally signs a written waiver of notice or a consent to the holding of the meeting or an approval of the minutes of the meeting, the transactions at the meeting are as valid as though conducted at a meeting duly called and held in accordance with this Agreement. Any such waiver, consent or approval must be filed with the Partnership records.

9.3.4.  Attendance of a Partner at a meeting constitutes the Partner's waiver of notice of the meeting unless the Partner objects at the beginning of the meeting to the transaction of any business because the meeting was not called in accordance with this Agreement.

9.3.5.  A Partner's attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the meeting notice but not so included if the objection is expressly made at the meeting.

9.4.     Partners' Written Consent

The written consent of all the Partners or of all the Limited Partners to any matter which the Partners or the Limited Partners are entitled to approve or voteupon under this Agreement is acceptable in lieu of a meeting to conduct a vote on the matter.

EXHIBIT 5, PAGE 84

## 10. Record Date of Advent of Partner's Rights

For all purposes under this Agreement concerning the rights or obligations of a Person, other than an initial Partner under this Agreement, by virtue of that Person's admission to the Partnership as a Partner, the record date of the advent of such rights and obligations shall be the business date next following satisfaction of the conditions described in Section 2.2 ("    New Partners by Admission or after Transfer of Existing Partnership Interests") above, or in Article 11 ("Voluntary Transfers of Partnership Interests"), or in Article 12 ("General Partner Default"). In the case of a Transfer, until such record date the transferring Partner shall retain all its rights and obligations.

## 11. Voluntary Transfers of Partnership Interests

### 11.1    Voluntary Transfers by a General Partner

A General Partner may make a Transfer of any portion of its Partnership Interest only with the prior approval by vote of a Majority of Partners; provided that a Transfer of its Partnership Interest to a Related Party of the General Partner or H2Go shall not require prior approval by vote of a Majority of Partners but shall only require prompt notice of such Transfer to the Limited Partners and provided further that any Transferee shall automatically become a General Partner upon satisfaction of the conditions set forth in Section 2.2(a) and (b) to the extent applicable. Notwithstanding such approval, if given, or such permitted transfer, if applicable, in no event is the Transferee of the General Partner permitted to become a General Partner except in accordance with section 2.2 above.

### 11.2    Voluntary Transfers by a Limited Partner

Subject to section 11.4 below, a Limited Partner may make a Transfer of any portion of its Partnership Interest only with the prior approval by vote of a Majority of Partners; provided that a Transfer of its Partnership Interest to a Related Party of the General Partner or H2Go shall not require prior approval by vote of a Majority of Partners but shall only require prompt notice of such Transfer to the Limited Partners and provided further that any Transferee shall automatically become a Limited Partner upon satisfaction of the conditions set forth in Section 2.2(a) and (b) to the extent applicable. Notwithstanding a Limited Partner's Transfer in accordance with this Agreement of any portion of its Partnership Interest to a non-Partner, in no event is such Transferee of the Limited Partner permitted to become a Limited Partner except in accordance with section 2.2 above.

### 11.3    Permitted Voluntary Transfers by Limited Partner

Notwithstanding any other provision in this Agreement to the contrary, a Limited Partner may, without the other Partners' approval, make a Transfer to the following Transferees, who will be deemed a Limited Partner for all purposes under this Agreement:

(1) Another Partner;

(2) A trust established for the primary benefit of the Limited Partner, his or her spouse, and/or his or her lineal descendants as long as the Partner is a trustee of such trust; or

(3) Any entity, the legal and beneficial ownership interests of which are held only by the Partner, his or her spouse, and/or his or her lineal descendants as long as the Partner controls the management and operation of that entity.

11.4    Voluntary Sale and Right of First Refusal

If a Limited Partner (the "Selling Partner") receives a bona fide offer to purchase all or any part of itsPartnership Interestfrom a third party, whether such offer is solicited or not,and is willing to accept such offer, the following shall apply:

(1) The Selling Partner shall first obtain the General Partner's written consent to the sale of the Partnership Interest to be sold within thirty (30) days of the General Partner's receipt from the Selling Partner of a true and complete copy of the third party offer;

(2) If the Selling Partner obtains the General Partner's consent to the sale of the Partnership Interest to be sold in accordance with subpart (1) above, the Selling Partner shall next deliver to the other Partners a true and complete copy of the offer and the selling Partner's written statement that he or she intends to accept the offer;

(3) From the date the selling Partner delivers a copy of the offer to them, the other Partners shall have thirty (30) days from the date the last Partner receives its copy of the offer to accept the selling Partner's proposal by giving written notice of acceptance to the selling Partner;

(4) Unless they agree in writing otherwise, each Partner shall have the right to purchase no more than that portion of the Selling Partner's Partnership Interest for sale which is in the same proportion as the Percentage Interest of each Partner to the aggregate Percentage Interests of all Partners other than the Selling Partner;

(5) If the Partners fail to accept the Selling Partner's proposal for the entirety of the Partnership Interest to be sold within the required period or any purchasing Partner fails to consummate its purchase of the Partnership Interest in accordance with the third party offer, the Selling Partner may proceed to sell whatever portion of the Partnership Interest the Partners fail to purchase upon the purchase price and on substantially the same terms and conditions set forth in the offer, provided such sale is consummated no later than six months therefrom (and irrespective whether the period allowed in the third party offer is longer); and

(6) If the sale is not consummated within the six month period above to the original offeror, the Selling Partner shall not consummate the sale without renewing the offer to the other Partners in accordance with subparts (3) and (4) above.

(7) If any party acquires any part of a Partner's Partnership Interest in the Partnership in violation of this Agreement, such party shall have no rights under this Agreement and the Transfer shall be deemed automatically null and void.

(8) In no event is the Transferee of the Limited Partner permitted to substitute in as a Limited Partner under this Agreement without the prior approval of all the other Partners and unless the Transferee:

> a. Executes a written agreement agreeing to be bound by this Agreement; and

> b. Any spouse of the Transferee executes a separate property waiver and acknowledgment in the form attached as **Exhibit A**.

Upon satisfaction of all the foregoing, the Transferee shall immediately be deemed a Limited Partner, and shall acquire all rights and obligations of the former Limited Partner in the Partnership.

(9) In the event the third party offer to the Selling Partner is made verbally and not in written form, the Selling Partner shall instead provide a written description in full of the offer and attest under penalty of perjury that it contains a true and complete rendition of the actual offer made, in lieu of and to the same effect as a true and complete copy of the offer.

(10) In deciding whether to approve the sale pursuant to subpart (1) above, the General Partner shall take into consideration such factors it deems reasonable, within it sole and absolute discretion.

Provided, however, notwithstanding what may be contained in the Agreement, without the consent of the General Partner but with written notice to the General Partner, (a) WJA shall have the right to transfer its interest in the Partnership to an (i) Affiliate or (ii) to an entity that was specifically formed to hold said interest and in which new entity WJA has at least a 51% controlling interest and (b) H2Go shall have the right to transfer its interest in the Partnership to an (i) Affiliate or (ii) to an entity that is a Related Party of H2Go.

11.5     Pledges Prohibited

Notwithstanding anything to the contrary in this Agreement, no Partner is permitted to pledge, hypothecate or grant a security interest in its Partnership Interest in the Partnership, whether to another Partner or to a third party unless such a pledge is granted to a secured

lender with respect to a loan to such Partner or a Related Party of such Partner. Any pledge that is not permitted by this Section 11.5 shall be automatically deemed null and void.

## 12. General Partner Default

### 12.1.    General

Notwithstanding anything to the contrary in this Agreement and subject to section 12.2 below, aGeneral Partner shall be in default under this Agreement if any of the following occurs (including any of the following arising from conduct of a General Partner's Affiliates unless the General Partner itself is identified below):

  a.    A General Partner breaches its duty of loyalty to the Partnership;

  b.    A General Partner acts for or on behalf of a party with an adverse interest to the Partnership, provided that unless a car wash is located within the Radius Zone and is not the Westminster Location, such party shall be conclusively deemed not to have an adverse interest to the Partnership;

  c.    A General Partner commits gross negligence, engages in reckless conduct or in intentional misconduct or a knowing violation of law in the conduct of the Partnership business;

  d.    A General Partner fails to act towards, or discharge its responsibilities to, the Partnership or the Limited Partners in good faith and consistent with fair dealing;

  e.    A General Partner breaches any material term of this Agreement;

  f.    AGeneral Partner becomes a Debtor in Bankruptcy;

  g.    AGeneral Partner withdraws, or attempts to withdraw, from the Partnership;

  h.    AGeneral Partner transfers or encumbers itsPartnership Interest in the Partnership in violation of this Agreement; or

  i.    The new spouse of an existing General Partner fails to execute and deliver the Waiver and Acknowledgment in the form of **Exhibit A**to the Partnership's offices within thirty (30) days of marriage to General Partner.

### 12.2.    Notice of Default and Time to Cure

No default of the General Partner shall occur until a Majority of the Partners sends the defaulting General Partner written notice of the default, giving it no less than twenty (20) days from the date of notice to cure the default and the General Partner fails to cure the default with such period.

EXHIBIT 5, PAGE 88

**12.3.**    <u>Election of Remedies After Default of General Partner</u>

If the defaulting General Partner does not cure the default within the period specified above, a Majority of the Partnersmay elect any of the remedies set forth below:

**12.3.1.** <u>Removal of General Partnerand its Conversion to Limited Partner</u>

To remove the defaulting General Partner as a General Partner of the Partnership by giving written notice of removal to the General Partner within thirty (30) days following expiration of the cure period. On the removal of the defaulting General Partner under this section, the removed General Partnershall be converted to a Limited Partner. From and after conversion, the removed General Partner shall have only those rights and obligations of a Limited Partner of the Partnership but shall retain its right to Distributions. The removal of a defaulting General Partner under this section which is the sole General Partner of the Partnership shall not dissolve the Partnership, provided that at least one General Partner is admitted to the Partnership within ninety (90) days of the removal of the former General Partner in accordance with section 2.2 above.

**12.3.2.** <u>Purchase of Partnership Interest</u>

To purchase the defaulting General Partner's entire Partnership Interest as follows:

(1) Each Partner shall have the right, but not the obligation, to purchase that portion of the defaulting General Partner's Partnership Interest that is in the same proportion as itsPercentage Intereststo the aggregate Percentage Interests of all Partner(s) who desire to purchase the defaulting General Partner's Partnership Interest. TheLimited Partners who so desire to participate in the purchase of the General Partner's Partnership Interestin accordance with the foregoing sentence may exercise their right by giving written notice to the defaulting General Partner of their participation within thirty (30) days following expiration of the cure period;

(2) The purchase price for the defaulting General Partner's Partnership Interest shall equal the fair market value of itsPartnership Interest, determined in accordance with this Agreement;

(3) Each purchasing Partner's share of the purchase price shall be in the same proportion as its Percentage Interestto the aggregate Percentage Interestsof all purchasing Partner(s); and

(4) The removal of a defaulting General Partner under this section which is the sole General Partner of the Partnership shall not dissolve the Partnership, provided that at least one General Partner is admitted to the Partnership within three (3) months of the removal of the former General Partner.

EXHIBIT 5, PAGE 89

### 12.3.3. Dissolution of Partnership

Alternatively, a Majority of Partnersmay elect to dissolve the Partnership. If dissolved, the Partnership shall be wound up, liquidated, and terminated in accordance with this Agreement.

### 12.4.    Determination of Fair Market Value

Whenever the fair market value of a defaulting General Partner's Partnership Interestis required, the purchasers and the seller shall determine fair market value through negotiation. If the purchasers and the seller cannot mutually agree on the fair market value within sixty (60) days following the purchasers' written notice to the defaulting General Partner in accordance with section 12.3.2 above, independent appraisers shall determine fair market value in the following manner:

(1) The purchasers shall select one appraiser and send written notice of their selection to the selling party within twenty (20) days after the period described above. The seller shall either agree to the appraiser that the purchasing party has selected or select a second appraiser by giving written notice of his or her selection to the purchasing party within ten (10) days after the selling party receives notice of the purchasers' selection. The selling party's failure to give written notice withinsuch period shall constitute its agreement to the appraiser that the purchasers have selected. Each appraiser selected in accordance with this subsection shall be a member of a recognized professional organization for appraisers and have at least ten (10) years' experience in appraising assets similar to the Partnership's assets.

(2) The appraiser(s) selected in accordance with section (1) shall determine the fair market value of the defaulting General Partner'sPartnership Interestwithin ninety (90) days after the last appraiser is selected.

(3) If the purchasers' appraiser is the only appraiser, then the fair market value set forth in the appraiser's appraisal shall constitute the fair market value of the defaulting General Partner's Partnership Interest.

(4) If two appraisers are selected under section (1) and the fair market values set forth in their respective appraisals are within 10 percent of each other, then the fair market value of the defaulting General Partner's Partnership Interest shall equal the average of the two appraisals.

(5) If two appraisers are selected under section (1) and the fair market values set forth in their respective appraisals are not within 10 percent of each other, then the two appraisers shall appoint a third appraiser. The third appraiser shall be a member of a recognized professional organization for appraisers and have at least ten (10) years' experience in appraising assets similar to the Partnership's assets. The third appraiser shall determine the fair market value of the defaulting General

EXHIBIT 5, PAGE 90

Partner's Partnership Interest within sixty (60) days after appointment. The two appraisals that are nearest in amount shall be retained and the third appraisal shall be discarded. The fair market value shall equal the average of the two retained appraisals.

(6) The parties shall bear the cost of their respective appraisers. The purchasers, on one hand, and the seller, on the other, shall each bear one-half of the cost of any third appraiser.

(7) The appraisal process shall terminate during the appraisal process if a party accepts the other party's value or the parties negotiate a mutually agreeable value.

(8) All amounts payable in liquidation of the defaulting General Partner's Partnership Interest shall be paid within thirty (30) days of the final determination of the fair market value in accordance with subparts (3), (4) or (5) above. Upon satisfaction of all such amounts, the defaulting General Partner shall be deemed removed as General Partner.

13. Events of Dissolution

The Partnership shall dissolve on occurrence of any of the following:

(1) In the event there remains in the Partnership only one or more General Partners (and no Limited Partners) or only one or more Limited Partners (and no General Partners) for whatever reason,unless a Majority of the Partners who remainagree in writing to continue the Partnership's business and, within ninety (90) days after the last remaining General Partner has ceased to be a General Partner or last remaining Limited Partner has ceased to be a Limited Partner, admit one or more newGeneral Partners or one or more new Limited Partners, respectively, into the Partnership in accordance with section 2.2 above;

(2) Any event that makes it unlawful for the Partners to carry on the Partnership's business; or

(3) The entry of a decree of judicial dissolution under California Corporations Code §15908.02; or

(4) The unanimous vote of all the Partners to dissolve the Partnership; or

(5) Thirty (30) days after the sale or other disposition of all or substantially all of the Partnership's assets; or

(6) Any other grounds for dissolution specified in this Agreement.

Gothard Express Partners, L.P.

14. Winding Up After Dissolution

14.1.      Winding Up

Upon the Partnership's dissolution, the Partnership's business shall be wound up within a reasonable period of time, its assets liquidated, a final accounting made, and the Partnership's books closed.

14.2.      Partner Authorized to Wind Up

The General Partnershall wind up the Partnership's affairs. However, if the Partnership has dissolved by reason of a decree of judicial dissolution under California Corporations Code §15908.02, the winding up shall be conducted in accordance with the decree. In the absence of General Partner to wind up the Partnership's affairs, a Majority of Limited Partners shall vote to select a Limited Partner to wind up the Partnership's affairs.

14.3.      Filings

The party winding up the Partnership's affairs shall sign, cause to be executed, and file with the Secretary of State of California on or before the last day of the taxable year in which the Partnership ceases to do business a Certificate of Cancellation in the form required by California Corporations Code §15902.03.

14.4.      Distribution of Liquidation Proceeds

Those proceeds that the Partnership derives from the liquidation of its assets shall be applied and distributed in the following order of priority:

> (1) First, to satisfy the Partnership's obligations to its creditors other than Partners;
>
> (2) Second, to the payment of any Partnership debts owed to each Partner and to satisfy each Partner's Capital Account; and
>
> (3) Third, with respect to any balance remaining to the Partners in accordance with Section 3.8(b).

15. General Provisions

15.1.      Amendment

This Agreement may be amended only with the approval, each acting within their sole and absolute discretion,of the General Partner and a Majority of Limited Partners.

EXHIBIT 5, PAGE 92

Gothard Express Partners, L.P.

### 15.2.    Arbitration

Any controversy among the Partners involving the construction or application of any provision of this Agreement shall be submitted to arbitration in Orange County, California, on the request of any Partner. Arbitrations shall comply with and be governed under the provisions of the California Arbitration Act.

### 15.3.    Binding Effect

Subject to the restrictions contained in this Agreement, this Agreement shall be binding on the Partners and their respective successors, assigns, representatives, and beneficiaries.

### 15.4.    Captions and Headings

Captions and headings used in this Agreement are for convenience purposes only. They shall not control, affect, modify, amend, or change the meaning or construction of any term or provision contained in this Agreement.

### 15.5.    Counterparts and Facsimiles

The Partners may execute this Agreement simultaneously, in any number of counterparts, or on facsimile copies, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 15.6.    Counting of Days

If a party is required to complete the performance of an obligation under this Agreement by a date certain and that date is a Saturday, Sunday, or federal bank holiday, then the required date of completion of performance shall be the next day that is not a Saturday, Sunday, or federal bank holiday. All references to days herein are to calendar days.

### 15.7.    Cumulative Remedies

The Partner's remedies under the Agreement are cumulative and shall not exclude any other remedies to which the Partner may be lawfully entitled.

### 15.8.    Entire Agreement

This Agreement contains the Partners' entire agreement and supersedes any prior oral or written agreements among them with respect to the subject matter of the Agreement. There are no representations, agreements, arrangements, or understandings (oral or written) among the Partners relating to the subject matter of this Agreement that are not fully expressed in this Agreement.

### 15.9.    Exhibits

All exhibits referenced in this Agreement are incorporated herein by this reference.

LEGAL28227161.8

EXHIBIT 5, PAGE 93

15.10.    Further Documents

Each party agrees to execute, with acknowledgment and affidavit if required, all documents that may be required under this Agreement.

15.11.    Governing Law

The transactions contemplated by the provisions of this Agreement and the Partners' respective rights and obligations under this Agreement shall be governed by and construed in accordance with the laws of the State of California.

15.12.    Notice

A notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given (1) on personal delivery; (2) 24 hours after deposit with Federal Express or a comparable express courier, addressed to a Limited Partner at the address set forth in the Partnership records or, if intended for the General Partner, at the Designated Office; or (3) 48 hours after deposit in the United States mail, by regular mail, postage prepaid, addressed to a Limited Partner at the address set forth in the Partnership records or, if intended for the General Partner, at the Designated Office, or (4) by electronic mail transmission upon its receipt by the recipient at the email address on record with the Partnership. A Limited Partner may designate another address for notice purposes by giving written notice to the General Partner in the manner described in this section.

15.13.    Prevailing Party's Fees

In any dispute among the Partners resulting in litigation, the party substantially prevailing shall be entitled to recover from the other party reasonable attorney fees, costs, and expenses; court costs; and other costs of the action. For purposes of this Agreement, the terms "attorney fees" or "attorney fees and costs" shall mean the fees and expenses of legal counsel to the parties and may include, without limitation, printing, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians, and others not admitted to the bar but performing services under the supervision of an attorney, as well as the costs of experts consulted as a consequence of the action, including any experts testifying at deposition or at trial. The terms "attorney fees" or "attorney fees and costs" shall also include, without limitation, all fees and expenses for appeals, arbitrations, and bankruptcy proceedings. The term "attorney" shall have the same meaning as the term "counsel."

15.14.    Severability

If a court of competent jurisdiction finds any provision in this Agreement to be invalid, such invalidity shall not affect the remainder of the Agreement; the invalid provision shall be deemed severed from it and the remainder of the Agreement shall remain enforceable in accordance with its terms and of full force and effect.

WJ

EXHIBIT 5, PAGE 94

Gothard Express Partners, L.P.

15.15.    Time of Essence

Time is of the essence of this Agreement and all terms, covenants, conditions, and provisions set forth in this Agreement.

15.16.    Waiver

A party's waiver of any breach of any provision contained in this Agreement shall not constitute a continuing waiver or a waiver of any subsequent breach of that provision or any other provision of this Agreement.

16. Right of First Refusal.

Commencing ██████████ and continuing for ██████████ months thereafter, in the event the General Partner or H2Go desire to open another car wash facility at any site or location anywhere and no capital or other funds are required for the acquisition of such property, other than from the General Partner or H2Go, the General Partner shall first notify WJA, in writing setting forth the terms and conditions of said transaction for said new car wash facility ("New Car Wash Facility").   Within thirty (30) calendar days after receipt by WJA of said notice for said New Car Wash Facility, WJA shall elect whether to participate or not participate as a limited partner in the New Car Wash Facility transactionon terms substantially the same as the terms contained herein and shall deliver written notice to General Partner of its decision. In the event WJA elects to participate in the New Car Wash Facility transaction, along with said notice, WJA shall also provide the General Partner with written documentation evidencing WJA's financial ability to participate in the New Car Wash Facility transaction.   Failure of WJA to respond to the notice for said New Car Wash Facility within said thirty (30) calendar days or failure to provide accurate written documentation evidencing WJA's financial ability to participate in the New Car Wash Facility transaction shall be deemed as an election not to participate in the New Car Wash Facility transaction.In the event, if WJA elects to participate in the New Car Wash Facility transaction, the parties shall agree and confirm in writing as to the terms of the New Car Wash Facility transaction, with such terms substantially the same as the terms contained herein.   The terms and conditions contained in this Section 16 shall be binding upon the heirs, successors and assigns of the Partners.

WJ

EXHIBIT 5, PAGE 95

Gothard Express Partners, L.P.

### Signature Page

## GENERAL PARTNER

GREEN-N-CLEAN EXPRESS CAR WASH, INC., a
California corporation

By: _____
      Brett G. Blanchard, Chief Executive Officer


## LIMITED PARTNERS

H2Go PARTNERS, L.P., a California limited partnership

By:    GREEN-N-CLEAN EXPRESS CAR WASH, INC.,
    a California corporation

    By: _____
        Brett G. Blanchard, Chief Executive Officer


MILLENNIUM TRUST COMPANY, LLC, Custodian
FBO: WJA EXPRESS FUND, LLC, a California limited
liability company

By:    WJA Asset Management LLC, a California limited
    liability company, Its Manager

    By: _____
        William Jordan, Its Authorized Representative

86.0614  2641099.1

## Exhibit A

### SEPARATE PROPERTY WAIVER AND ACKNOWLEDGMENT

I, _____, certify and declare that:

1. I am the spouse of _____.

2. My spouse has acquired a Partnership Interest in Gothard Express Partners, L.P., a California limited partnership ("Partnership") and has agreed to be bound by all of the terms and conditions set forth in the Agreement of Limited Partnership for GothardExpress Partners, LP, as amended from time to time ("Agreement"). For purposes of this Separate Property Waiver and Acknowledgment, the term "Partnership Interest" shall mean all rights, title, and interests in and to the Partnership, including without limitation the right to any Distribution (as defined in the Agreement), which my spouse now possesses or may hereafter acquire by any means.

3. To the extent that the Partnership Interest already is the sole and separate property of my spouse, I agree and intend that this Separate Property Waiver and Acknowledgment shall serve as further evidence and acknowledgment of the status of this Partnership Interest.

4. To the extent that I may have had any community property or other rights in the Partnership Interest, I agree and intend that this Separate Property Waiver and Acknowledgment shall evidence and affect the transmutation of that Partnership Interest into the sole and separate property of my spouse.

5. I acknowledge, to the fullest extent allowed by law, that I have waived, transferred, and released to my spouse all my right, title, and interest, if any, in and to the Partnership Interest, and that this Partnership Interest is the sole and separate property of my Spouse.

6. I agree not to take any action at any time that might interfere with the operation of the Agreement or with the interests or rights now or later acquired by me or my Spouse related to the Agreement.

7. If and to the extent that I acquire any interest in the Partnership, whether by operation of law, a decree of dissolution, separate maintenance agreement, property settlement agreement, similar agreement, or otherwise, I agree to be bound by all of the terms and conditions set forth in the Agreement.

8. I have been afforded the opportunity to seek independent legal and tax counsel of my own choosing to (a) help me evaluate whether the character of my interest in the Partnership is community or separate property and (b) provide advice concerning my rights, interests, and obligations in the Agreement, this Community Property Spousal Consent, and the Partnership.

9. I have read, understand, and agree to have my legal rights determined by this Separate Property Waiver and Acknowledgment.

Name: _____

Date: _____

blank
MJ
EXHIBIT 5, PAGE 97

# EXHIBIT B

## PARTNERS; CAPITAL CONTRIBUTIONS;
## PERCENTAGE INTEREST

| Name | Capital Commitment | Capital Contributions | Percentage Interest |
|---|---|---|---|
| **General Partner:** | | | |
| Green-N-Clean Express Car Wash, Inc.<br>26342 Oso Parkway, Suite 201<br>Mission Viejo, California 92691<br>Attn:  Mr. Brett Blanchard | | | 1.0% |
| **Limited Partners:** | | | |
| H2Go Partners, L.P<br>26342 Oso Parkway, Suite 201<br>Mission Viejo, California 92691<br>Attn:  Mr. Brett Blanchard | | | 49% |
| Millennium Trust Company, LLC,<br>Custodian FBO: WJA Express Fund,<br>LLC<br>23332 Mill Creek, Suite 260<br>Laguna Hills, CA  92653<br>Attn:  Mr. James Nichols | | | 50% |
| Total | | | 100% |

Exhibit B - Page 1

EXHIBIT 5, PAGE 98

H2Go Huntington Beach Budget

| | | |
|---|---|---|
| Demolition | $ | |
| On Site & Off Site | $ | |
| Car Wash Building | $ | |
| Commercial Building | $ | |
| Car Wash Equipment | Balance | $ |
| Soft Costs | | |
|    Design | $ | |
|    Permits | $ | |
|    TI | $ | |
|    Development Fee | $ | |
|    Legal | $ | |
|    Property Taxes | $ | |
|    Loan Fees | $ | |
|    Other Broker Commissions | $ | |
| | | |
|    Interest Reserve | $ | |
|    Lease Commission | $ | |
|    Ground Rent | $ | |
|    Sponsor Investment to Date | $ | |
| | | |
| Total Budget | $ | |
| | | |
| Debt | $ | |
| Equity | $ | |
|    Sponsor Equity | $ | |
|    Investor Equity | $ | |

Accepted and approved by:

Dated: 10/10/13 , 2013 - Green-N-Clean Express Car Wash, Inc.    Initials

Dated: 10/10/13 , 2013 - H2Go Partners, L.P.    Initials

Dated: 10/15/13 , 2013 - LOTA Asset Management LLC    Initials

REAFFIRMED @ 11/27/13

@ 11/27/13

"WSA"
11/27/13

EXHIBIT 5, PAGE 99

# EXHIBIT D

## 2013 Budget

# FIRST AMENDMENT
## TO
## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
## OF
## GOTHARD EXPRESS PARTNERS, L.P.
A California Limited Partnership

**THIS FIRST AMENDMENT TO AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF GOTHARD EXPRESS PARTNERS, L.P.,** a California Limited Partnership (the "Partnership") is effective as of October 1, 2014, by and between **GREEN-N-CLEAN EXPRESS CAR WASH, INC.,** a California corporation ("General Partner" or "Green-N-Clean"), **H2Go PARTNERS, L.P.,** a California limited partnership ("H2Go"), **MILLENNIUM TRUST COMPANY, LLC CUSTODIAN F/B/O WJA EXPRESS FUND, LLC,** a California limited liability company ("Millennium"), and **CA EXPRESS FUND II, LLC,** a California limited liability company ("CAF") (collectively, H2Go, Millennium and CAF shall be referred to as "Limited Partners").  The term "Limited Partner" shall include any future holder of a limited partnership interest in the Partnership, who acquires such limited partnership interest, via an Assignment and Assumption of Limited Partnership Interest, pursuant to the terms of this Agreement.  The Limited Partners and the General Partner shall all hereinafter be referred to as "Partners".  This First Amendment to Amended and Restated Limited Partnership Agreement of Gothard Express Partners, L.P. is referred to herein as the "Amendment".

## RECITALS

**WHEREAS,** Green-N-Clean, H2Go and Millennium entered into that certain Amended and Restated Limited Partnership Agreement of Gothard Express Partners, L.P., dated October 1, 2013 (the "Partnership Agreement");

**WHEREAS,** Millennium has agreed to invest Four Hundred Twelve Thousand Dollars and No/100 ($412,000.00) in the Partnership; and

**WHEREAS,** all of the parties hereto desire to amend the Partnership Agreement to set forth the terms of the agreement, with regard to such additional investment in the Partnership by CAF.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.    **Incorporation of Recitals**.  The Partners hereby incorporate into the terms of this Amendment each and every one of the Recitals, as though fully set forth herein.

2.    **Definitions / Controlling Documents**.  Except as otherwise set forth herein, all terms used herein shall have the same respective meanings as set forth in the Partnership Agreement.  Except as modified hereby, the terms of the Partnership shall remain in full force

and effect, with the understanding that, in the event of a conflict between the terms of this Amendment and the Partnership Agreement, this Amendment shall control.

3.  **Investment by CAF**.  CAF shall, effective as of the date of this Amendment, invest Four Hundred Twelve Thousand Dollars and No/100 ($412,000.00), in exchange for an Eight Percent (8%) Limited Partnership Interest in the Partnership, which additional investment shall accrue a Preferred Return, commencing and effective as of the date of such additional investment.

4.  **Assignment of Additional Interest.**  The Partners agree, by their execution of this Amendment, that CAF, without advance notice to the other Limited Partners, and subject to the written consent of the General Partner, which shall not be unreasonably withheld or denied, shall have the right to transfer and assign all or a portion of such additional Eight Percent (8%) interest to any affiliate, designee or other third-party, in the sole discretion of CAF.  Any such assignment shall be in the form of the attached Exhibit "A", Assignment and Assumption of Limited Partnership Interest, pursuant to which any such assignee shall assume any and all obligations of a Limited Partner, as set forth under this Amendment and/or the Partnership Agreement.

5.  **Adjustment of Limited Partnership Interest**.  As a result of the additional investment by Millennium and the accompanying acquisition of an additional Eight Percent (8%) Limited Partnership Interest in the Partnership, the Partners agree that the Partnership Interests in the Partnership, as of September 15, 2014, shall be held, as follows:

| | |
|---|---|
| Green-N-Clean Express - General Partner | 1% |
| H2Go Partners, L.P. – Limited Partner | 41% |
| Millennium Trust Company, LLC - Limited Partner | 50% |
| CA Express Fund II, LLC – Limited Partner | 8% |

*The Partners shall execute, in conjunction with this Amendment, a Second Amended and Restated Exhibit "B", to the Amended and Restated Limited Partnership Agreement of the Partnership, reflecting the additional investment, in the form attached hereto.*

6.  **Counterparts**.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same document.  The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.  Any party may deliver its signed counterpart of this Amendment to the other party by electronic transmission, and such delivery shall be deemed made and completed upon receipt of such electronic transmission by the other party.  Any party delivering a signed counterpart by electronic transmission agrees to promptly send the counterpart bearing its original signature to the other party; provided that a delay or failure to do so shall not negate the effectiveness of the delivery made by the electronic transmission.

7.  **Effective Date.**  The Effective Date of this Amendment shall be, as between the Partners, October 1, 2014, notwithstanding the date of execution of this First Amendment by each Partner.

37.0004  2758301.1

**IN WITNESS THEREOF**, the Partners have executed this First Amendment to Amended and Restated Limited Partnership Agreement of Gothard Express Partners, L.P.

**GENERAL PARTNER:**

**GREEN-N-CLEAN EXPRESS CAR WASH, INC.,**
a California corporation

Dated: ___9/22/14___

By:_____

Brett G. Blanchard, **Its** Chief Executive Officer

**LIMITED PARTNERS:**

**H2Go PARTNERS, L.P.,** a California limited partnership

By:    **GREEN-N-CLEAN EXPRESS CAR WASH, INC.,** a California corporation

Dated: ___9/22/14___

By:_____

Brett G. Blanchard, **Its** Chief Executive Officer

**MILLENNIUM TRUST COMPANY, LLC
CUSTODIAN F/B/O/ WJA EXPRESS FUND, LLC,**
a California limited liability company

By:    **WJA ASSET MANAGEMENT LLC,** a California limited liability company, **Its** Manager

Dated: ___10-6-14___

By:_____

William Jordan, **Its** Authorized Representative

**CA EXPRESS FUND II, LLC,** a California
limited liability company

Dated: _____

By: **WJA Asset Management, LLC,** a California
limited liability company, **Its** Manager

By: _____
   William Jordan,
   **Its** Authorized Representative

EXHIBIT 53 PAGE 104

## EXHIBIT "A"

### ASSIGNMENT OF LIMITED PARTNERSHIP INTEREST

*(Gothard Express Partners, L.P.)*

**THE UNDERSIGNED** hereby transfers and assigns _____ Percent (__%) Limited Partnership Interest, as a Limited Partner of Gothard Express Partners, L.P., a California limited partnership (the "Partnership"), held in the name of **CA Express Fund II, LLC,** a California limited liability company, to _____, pursuant to the First Amendment to Amended and Restated Limited Partnership Agreement.  Notwithstanding the date of execution of this Assignment, the transfer of the Limited Partnership Interest, and the accrual of any preferred return, in connection with such Limited Partnership Interest, shall be as of October 1, 2014.

### ASSIGNOR:

**CA EXPRESS FUND II, LLC,** a California
limited liability company

**Dated: _____**

**By: WJA Asset Management, LLC,** a California
limited liability company, **Its** Manager

**By:** _____
William Jordan,
**Its** Authorized Representative

### ACCEPTANCE OF ASSIGNMENT

**THE UNDERSIGNED,** hereby accepts the transfer of ____ Percent (__%) Limited Partnership Interest, pursuant to the foregoing Assignment of Limited Partnership Interest in Gothard Express Partners, L.P., and further assumes all of the rights, duties and obligations of the assignor, as a Limited Partner, under the Gothard Express Partners, L.P. Limited Partnership Agreement, and consents to admission of the undersigned as a Limited Partner.

Date: _____      _____

## CONSENT TO ASSIGNMENT OF INTEREST IN PARTNERSHIP
## AND ADMISSION OF PARTNER

**THE UNDERSIGNED**, as the General Partner of Gothard Express Partners, L.P., hereby consents to the foregoing Assignment of Limited Partnership Interest from **CA EXPRESS FUND II, LLC**, a California limited liability company, to _____, and further agrees that said assignee shall be and hereby is admitted as a Limited Partner of Gothard Express Partners, L.P.

The Limited Partnership Agreement of Gothard Express Partners, L.P. shall be, and hereby is, deemed amended to effect the foregoing assignment.

**GENERAL PARTNER**:

**GREEN-N-CLEAN EXPRESS CAR WASH, INC.,**
a California corporation

**By:** _____

Brett G. Blanchard, **Its** Chief Executive Officer

37.0004   2758301.1

5
EXHIBIT 5, PAGE 106

## SECOND AMENDED AND RESTATED
## EXHIBIT "B"
## TO
## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
## OF
## GOTHARD EXPRESS PARTNERS, L.P.

### Partners; Capital Contributions;
### Percentage Interest

| Name | Capital Contributions | Percentage Interest |
|---|---|---|
| General Partner: | | |
| Green-N-Clean Express Car Wash, Inc. 26342 Oso Parkway, Suite 201 Mission Viejo, California 92691 Attn: Mr. Brett Blanchard | | 1% |
| Limited Partners: | | |
| H2Go Partners, L.P 26342 Oso Parkway, Suite 201 Mission Viejo, California 92691 Attn: Mr. Brett Blanchard | | 41% |
| Millennium Trust Company, LLC, Custodian FBO: WJA Express Fund, LLC 23046 Avenida de la Carlota, Suite 150 Laguna Hills, CA 92653 Attn: Mr. James Nichols | | 50% |
| CA Express Fund II, LLC 23046 Avenida de la Carlota, Suite 150 Laguna Hills, CA 92653 Attn: Mr. James Nichols | | 8%* |
| Total | | 100% |

*CA Express Fund II, LLC, shall have the right to transfer and assign all or part of such eight percent (8%) Limited Partnership Interest to a designee or assignee, without the consent of the other Limited Partner or the General Partner. In such event, such designee or assignee shall hold such Partnership Interest, effective as of the date of this Second Amended and Restated Exhibit "B".*

**The undersigned, as the now current Partners of Gothard Express Partners, L.P. (the "Partnership"), hereby execute this Second Amended and Restated Exhibit "B", pursuant to the terms of the First Amendment to Amended and Restated Limited Partnership Agreement of the Partnership. This Second Amended and Restated Exhibit "B" shall supersede and replace, in its entirety, the Amended and Restated Exhibit "B" to the Partnership Agreement.**

37.0004  2758301.1

**GENERAL PARTNER:**

**GREEN-N-CLEAN EXPRESS CAR WASH, INC.,**
a California corporation

Dated: 9/22/14

By: _____

Brett G. Blanchard, **Its** Chief Executive Officer

**LIMITED PARTNERS:**

**H2Go PARTNERS, L.P.,**
a California limited partnership

By:    **GREEN-N-CLEAN EXPRESS CAR WASH,
       INC., a California corporation**

Dated: 9/22/14

By: _____

Brett G. Blanchard, **Its** Chief Executive Officer

**MILLENNIUM TRUST COMPANY, LLC
CUSTODIAN F/B/O WJA EXPRESS FUND, LLC,**
a California limited liability company

By:    **WJA ASSET MANAGEMENT LLC,** a California
       limited liability company, Its Manager

Dated: 10-6-14

By: _____

William Jordan, **Its** Authorized Representative

**CA EXPRESS FUND II, LLC,** a California limited
liability company

By:    **WJA ASSET MANAGEMENT LLC,** a California
       limited liability company, Its Manager

Dated: 10-6-14

By: _____

William Jordan, **Its** Authorized Representative

# EXHIBIT "6"

## NONDISCLOSURE AGREEMENT

THIS NONDISCLOSURE AGREEMENT ("Agreement") is made and entered into as of this __ day of _____, 2018 ("Effective Date"), between _____ (the "Buyer") having an address at _____ Gothard Express Partners, L.P. (the "Partnership"), WJA Express Fund, LLC ("WJA Express") and CA Express Fund II, LLC ("CAF")(WJA Express and CAF are together referred to as the "Sellers").

1.    Purpose.  The Buyer is interested in the possible acquisition of the limited partnership interests (the "Partnership Interests") of the Sellers in the Partnership. In connection with this opportunity, the Sellers or the Partnership may disclose to the Buyer certain confidential technical and business information of or regarding the Partnership and the Partnership Interests that the Partnership requires the Buyer to treat, hold and maintain as confidential.

2.    Confidential Information.

A.    "Confidential Information" means any and all information regarding or related to the Partnership or the Partnership Interests that are disclosed to the Buyer, either directly or indirectly, in writing, orally or by inspection of tangible objects on, before or after the date hereof.

B.    Notwithstanding Section 2.A above, Confidential Information shall not include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the Sellers and/or the Partnership; (ii) becomes publicly known and made generally available after disclosure by the Sellers or the Partnership to the Buyer through no action or inaction of the Buyer; or (iii) is obtained by the Buyer from a third party without a breach of such third party's obligations of confidentiality.

3.    Nonuse and Nondisclosure.  Buyer agrees not to use any Confidential Information of the Partnership or the Sellers for any purpose except to evaluate and engage in discussions concerning a potential sale transaction related to the Partnership Interests.  The Buyer agrees not to disclose any Confidential Information to third parties or to the Buyer's employees or representatives, except to those employees and representatives of the Buyer who are required to have the information in order to evaluate or engage in discussions concerning a potential sale transaction.  The Buyer will advise employees and representatives who receive the Confidential Information of the existence and terms of this Agreement and that they are required to abide by the terms of this Agreement.  Confidential Information furnished in written, pictorial, magnetic and/or other tangible form shall not be duplicated by the Buyer except as necessary for the purposes of this Agreement.

4.    Maintenance of Confidentiality.  Buyer agrees that it shall take all measures necessary to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information.  Without limiting the foregoing, the Buyer shall use and require its employees and representatives to use at least that degree of care that they take to protect their own confidential information of a similar nature, but in no event less than reasonable care, and shall ensure that its

employees and representatives who have access to Confidential Information have signed a nonuse and nondisclosure agreement protecting Confidential Information that is substantially similar in content to the provisions hereof, prior to any disclosure of Confidential Information to such employees and representatives. Notwithstanding any other provision herein, the Buyer shall not disclose Confidential Information to any third party except as provided herein.

In the event that the Buyer is requested or required (by oral questions, interrogatories, requests for information, subpoena, civil investigation, or other process) to disclose (i) any Confidential Information or (ii) any information relating to its opinion, judgment or recommendations concerning the Partnership or the Partnership Interests as developed from Confidential Information, the Buyer will provide the Sellers and the Partnership with prompt notice of any such request or requirement so that the Sellers and/or the Partnership may seek an appropriate protective order or waive the Buyer's compliance with the provisions of this Agreement. If, failing the entry of a protective order or the receipt of a waiver hereunder, the Buyer is, in the opinion of its counsel (including, without limitation, in-house counsel), compelled to disclose Confidential Information, the Buyer will only disclose that portion of the Confidential Information which its counsel advises it in writing that the Buyer is compelled to disclose, and will exercise reasonable efforts to obtain assurance that the recipient will maintain the confidentiality of the Confidential Information. In any event, the Buyer will not oppose action by the Sellers or the Partnership to obtain an appropriate protective order or other reliable assurance that confidential treatment will be afforded this Confidential Information.

5.     <u>Employees</u>. The Buyer shall not contact any employees of the Partnership or the Sellers without their prior written consent.

6.     <u>No Obligation</u>. Nothing herein shall obligate either party to proceed with any transaction between them unless reduced to a definitive agreement in separate documentation, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the sale opportunity.

7.     <u>No Warranty</u>. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS." NEITHER THE PARTNERSHIP NOR THE SELLERS MAKE ANY WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

8.     <u>Destruction of Materials</u>. All documents and other tangible objects containing or representing Confidential Information which have been disclosed by the Sellers or the Partnership to the Buyer, and all copies thereof which are in the possession of the Buyer, shall be and remain the property of the Sellers or the Partnership, as the case may be, and shall be promptly destroyed upon the Sellers' or Partnership's written request with such destruction certified to by the Buyer.

9.     <u>No License</u>. Nothing in this Agreement is intended to grant any rights to the Buyer under any trademark, patent, copyright or other intellectual property of the Partnership nor shall this Agreement grant the Buyer any rights in or to the Confidential Information except as expressly set forth herein.

10.     Term.  The obligations of the Buyer hereunder shall survive until the earlier of (i) such time as all Confidential Information disclosed hereunder becomes publicly known and made generally available through no action or inaction of the Buyer, or (ii) two (2) years.

11.     Remedies.  The Buyer agrees that any violation or threatened violation of this Agreement may cause irreparable injury to the Partnership or the Sellers entitling these parties to seek injunctive relief in addition to all legal remedies.

12.     Indemnification.  The Buyer agrees to indemnify the Partnership and the Sellers and to hold them harmless from any liability, loss, cost or expense, including reasonable attorney's fees and expenses that shall result from or arise out of any breach of this Agreement by the Buyer, and any of the Buyer's employees or representatives.

13.     Miscellaneous.  This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns.  This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles.  This document contains the entire agreement between the parties with respect to the subject matter hereof, and neither party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other party except as set forth herein.  Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision.  This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.

GOTHARD EXPRESS PARTNERS, L.P.

By:_____
Its: _____

WJA EXPRESS FUND, LLC
By:_____
        Name:  Howard Grobstein, chief restructuring
        officer of WJA Asset Management, LLC, its manager

CA EXPRESS FUND II, LLC
By:_____
        Name:  Howard Grobstein, chief restructuring
        officer of WJA Asset Management, LLC, its manager


Buyer:

By: _____

Its: _____

# EXHIBIT "7"

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is made this __ day of _____, 2017 (the "Execution Date"), by and between WJA Express Fund, LLC ("WJA Express"), a California limited liability company, and CA Express Fund II, LLC ("CAF"), a California limited liability company (together, the "Selling Partners"), H2Go Partners, L.P., a California limited partnership ((the "Remaining Limited Partner"), and Green-N-Clean Express Car Wash, Inc., a California corporation (the "General Partner") for the purpose of documenting a settlement of certain disputes between them related to the Selling Partners' partnership interests in Gothard Express Partners, L.P., a California limited partnership (the "Partnership").  The Selling Partners, the Remaining Limited Partner, and the General Partner may sometimes be individually referred to as a "Party" and collectively as the "Parties."

## RECITALS

A.      Under the Amended and Restated Limited Partnership Agreement of Gothard Express Partners, L.P. effective October 1, 2013, as amended (together, the "Partnership Agreement"), the Parties hold partnership interests in the Partnership.  WJA Express holds a 50% limited partnership interest, CAF holds an 8% limited partnership interest, the Remaining Limited Partner holds a 41% limited partnership interest, and the General Partner holds a 1% interest as the general partner.  Under the Partnership Agreement, the General Partner is to make distributions to the limited partners from operations or capital events as set forth in greater detail in the Partnership Agreement.

B.      WJA Express is a debtor in a chapter 11 case pending before the United States Bankruptcy Court, Central District of California, Santa Ana Division (the "Bankruptcy Court"), under jointly administered case number 8:17-bk-11996-SC.

C.      Kingdom Trust Company has represented that it is the custodian of the partnership interests of WJA Express for the benefit of WJA Express.  The manager of the Selling Partners is WJA Asset Management, LLC (the "Manager").  By order of the Bankruptcy Court entered on June 15, 2017, Howard Grobstein is the chief restructuring officer for the Manager and WJA Express and the other jointly administered debtors with cases pending before the Bankruptcy Court.

D.      Concurrently with this Agreement, the Selling Partners are entering into a Partnership Interest Purchase Agreement (the "Purchase Agreement") with FAIT Insurance Partnership, LLC ("FAIT"), pursuant to which the Selling Partners will sell their interests in the Partnership to FAIT or a successful overbidder.  FAIT is requiring as a condition to entering into the Purchase Agreement that the Selling Partners release all claims against the General Partner and the Partnership that may exist as of the closing date.  The scope of this release would include a release of any rights to any distributions or accountings.  As a condition to giving that release, the Selling Partners have engaged in discussions with the General Partner and the Remaining Limited Partner regarding the current cash from operations and estimated reserves.  This Agreement resolves the discussions regarding the amount of the distributions due to the Selling Partners so that the Selling Partners can give the release required under the Purchase Agreement.

EXHIBIT 7, PAGE 112

The Purchase Agreement and this Agreement are each contingent upon Bankruptcy Court approval of the other.

NOW, THEREFORE, incorporating the foregoing recitals and in consideration thereof, in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## TERMS AND CONDITIONS

### ARTICLE I
### BANKRUPTCY COURT APPROVAL OF THE AGREEMENT

1.1.   Bankruptcy Court Approval.  Promptly after the Agreement and the Purchase Agreement are signed, WJA Express and the Manager shall file a motion (the "Settlement Motion") with the Bankruptcy Court for approval of the Agreement.   This Agreement is contingent upon a Final Order approving this Agreement (the "Settlement Order") and a Final Order approving the Purchase Agreement (the "Sale Order").   A Final Order is one where the time for appeal has run without an appeal being filed or, if an appeal is timely filed, the appeal is dismissed, the order is affirmed on appeal, or if an appeal of the Sale Order is filed, one where the Sale Order contains a finding that the buyer is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m).   If either the Sale Order or the Settlement Order is not obtained, then this Agreement shall be of no further force or effect.   In the discretion of the Selling Partners, the motion to approve the sale and the motion to approve this settlement may be contained in one consolidated motion.

### ARTICLE II
### TERMS OF SETTLEMENT

2.1.   Distribution to the Parties.  Within two (2) business days after the Closing, as defined below, the General Partner shall cause a distribution to be made to the Parties in the total amount of $210,000.00, to be allocated based on their respective percentage ownership interests in the Partnership.  For the avoidance of doubt, 58% of the $210,000.00 will be distributed to WJA Express and CAF, 42% to the Remaining Limited Partner and General Partner.   This distribution is not subject to clawback from the Selling Partners under paragraph 3.9 of the Partnership Agreement.

2.2.   Additional Payment.  In addition to the distribution and to encourage the Selling Partners to proceed with the sale on the terms set forth in the Purchase Agreement, within two (2) business days of the Closing, as defined below, the General Partner shall cause the Partnership to pay the Selling Partners a total of $30,000.00 (the "Selling Partner Payment"), which will be divided between the Selling Partners based on their respective percentage ownership interests in the Partnership.  The Selling Partner Payment is not subject to clawback under paragraph 3.9 of the Partnership Agreement.

2.3.   Payments Contingent Upon the Closing Occurring.  The payments contemplated by this Section are contingent upon: (i) the closing of a sale to FAIT or any successful

overbidder who is confirmed as the successful purchaser at the hearing on the motion to approve the sale to FAIT (the "Closing") and (ii) the entry of the Settlement Order.  If the Closing does not occur before March 15, 2018, then this Agreement shall be of no further force or effect.

2.4.    <u>ROFR and New Partner Approval Rights Unchanged</u>.  Nothing contained in this Agreement or to be contained in the Settlement Motions shall abrogate the right of First Refusal contained in Section 11.4 of the  Partnership Agreement) nor the General Partner's right to evaluate and approve in its discretion the financial condition, status and other attributes of any proposed buyer of the Selling Partners' interests other than FAIT.

2.5.    <u>Suspension of Preferred Distributions</u>.  In consideration of the payments provided for in this Agreement, the Partnership shall be entitled to upon execution of this Agreement suspend all preferred distributions allowed for under the Partnership Agreement.  Should either the Sale Order or the Settlement Order not be obtained or the Closing (as defined below) not occur, then this provision of the Agreement shall be of no further force or effect and the General Partner may recommence preferred distributions as set forth in the Partnership Agreement.

ARTICLE III
RELEASE OF THE GENERAL PARTNER

3.1.    <u>Release of Claims in Favor of the General Partner and Partnership</u>.  Effective as of the Effective Date, and except for the obligations and duties set forth in this Agreement, the Selling Partners and the Remaining Limited Partner will be deemed to have released the General Partner and the Partnership from any and all interests, claims, demands, controversies, actions, causes of action, accountings, suits, proceedings, obligations, liabilities, fines, penalties, costs, expenses, attorneys' fees, damages, and rights to remedies of whatsoever character, nature, or kind, in law or in equity, whether known or unknown, fixed or contingent, and liquidated or unliquidated, which relate in any way to the Partnership and Selling Partner Payment.  This release is in addition to the release being given to the Partnership and the General Partner by the Selling Partners in the Purchase Agreement.

3.2.    <u>Waiver of California Civil Code Section 1542</u>.  In making the release set forth in this Agreement, the Selling Partners and the Remaining Limited Partner (the "Releasing Parties") acknowledge that there is a possibility that, subsequent to their execution of this Agreement, they will discover facts or incur or suffer claims which were unknown or unsuspected at the time that this Agreement was executed, and which if known by the Releasing Parties at that time may have materially affected their decision to execute this Agreement.  The Releasing Parties have been advised of the existence of Section 1542 of the California Civil Code, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Notwithstanding the provisions of Section 1542, the Releasing Parties agree that the release set forth in this Agreement shall constitute a full release in accordance with its terms. The Releasing Parties hereto knowingly and voluntarily waive the provisions of Section 1542, as well as any other federal or state statute, rule, or common law principle of similar effect, and acknowledge and agree that this waiver is an essential and material inducement to and consideration for each party and all other parties' execution of this Agreement.

ARTICLE IV
DEFAULT

4.1.    Default.    A default under this Agreement will occur upon the failure of the General Partner to cause the Partnership to timely make any payment required by Article II.

4.2.    Remedies.    If an event of default is not cured within seven (7) days of written notice of the default sent to counsel for the General Partner, then the non-defaulting Party shall have all rights and remedies under law or in equity.

ARTICLE V
MISCELLANEOUS PROVISIONS

5.1.    Further Assurances.    The Parties shall do such further acts, shall perform such further actions, and shall execute and deliver such additional agreements, documents, and instruments as the others may reasonably require to consummate, effect, evidence, or confirm the agreements and understandings contained herein in the manner contemplated hereby.

5.2.    No Admission Against Interest.    Nothing contained in this Agreement, or the negotiations and communications leading up to it, shall be construed as admissions against the interest of any of the Parties.

5.3.    Modifications.    This Agreement may not be amended, canceled, revoked, or otherwise modified except by written agreement signed by all of the Parties hereto.

5.4.    Severability.    In the event any provision of this Agreement shall be held to be void, voidable, or unenforceable, the remaining provisions shall remain in full force and effect.

5.5.    Availability of Counsel.    The Parties acknowledge and agree that they have been advised by legal counsel of their choice regarding the meaning and consequences of this Agreement, including, but not limited to, the release and the waiver of unknown and unsuspected claims set forth above.

5.6.    Entire Agreement.    This Agreement is the complete and exclusive expression of the terms included herein, which terms supersede and shall not be contradicted by proof of prior or contemporaneous oral or written term sheets, agreements, discussions, and representations. Nor shall the terms included herein be explained or supplemented by evidence of consistent additional terms.

5.7.    No Reliance; Independent Investigation.  In connection with the negotiation and execution of this Agreement, each Party has relied upon its own investigation and judgment concerning all matters herein contained and has not relied on any representations made by the other Parties other than those set forth herein.  Except as otherwise expressly stated in this Agreement, the Parties have not made any statement or representation to the other regarding any facts relied upon by them in entering into this Agreement.

5.8.    Voluntary Agreement.  The Parties acknowledge and agree that they are entering into this Agreement freely and voluntarily and of their own volition.  The Parties represent and warrant that they are not acting under any misapprehension as to the effect of this Agreement, and that they have acted and do hereby act freely and voluntarily and not under any duress, coercion, or undue influence from any source whatsoever.

5.9.    No Mistake of Fact or Law.  In entering into this Agreement, the Parties recognize that no facts or representations are ever absolutely certain.  Accordingly, each party assumes the risk of any mistake, and if any Party should subsequently discover that any understanding of the facts or of the law was incorrect, each Party understands and expressly agrees that said Party shall not be entitled to set aside this Agreement by reason thereof, regardless of any mistake of fact or law; provided, however, that the foregoing shall not act as a waiver of the Parties' other rights or remedies.

5.10.    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles.

5.11.    Venue and Jurisdiction.  In the event of a dispute arising under this Agreement involving the Sellers, the Bankruptcy Court shall have sole and exclusive jurisdiction to interpret and enforce this Agreement.

5.12.    Participation in Agreement's Preparation.  Each Party to this Agreement has participated in and contributed to the preparation of this Agreement.  The Parties agree that each Party has reviewed this Agreement, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to any interpretation of this Agreement.

5.13.    Binding Effect.  This Agreement shall be binding on and shall inure to the benefit of the Parties and their respective predecessors in interest, successors, trustees, shareholders, directors, officers, affiliates, employees, agents, attorneys, advisors, insurers, consultants, professionals, designees, and assigns to the extent permitted by law.

5.14.    Authority.  Each Party whose signature is affixed hereto in a representative capacity represents and warrants that he or she has the authority and capacity to act on behalf of the Party for whom he or she is signing, to bind the Party and all who might claim through it to the terms of this Agreement, and to perform on behalf of the Party as provided for hereunder, and that no other or further signatures are needed on behalf of the Party for whom he or she is signing to bind the Party.

5.15.  <u>Business Day</u>.  For purposes of this Agreement, "business day" means any day other than Saturday, Sunday, or any other day on which federally insured banks are not open for business.

5.16.  <u>Miscellaneous</u>.  Unless otherwise expressly provided herein, no delay or omission by any of the Parties in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy and shall not be construed as a bar to or a waiver of any such right or remedy on any future occasion.  All remedies of any of the Parties hereunder are cumulative, and may, to the extent permitted by law, be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed to be an election of such remedy to the exclusion of any other remedy or to preclude the exercise of any other remedy at any other time. The headings appearing at the commencement of the paragraphs hereof are descriptive only and for convenience of reference.

5.17.  <u>Counterparts</u>.  This Agreement and the Consent may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  Any of the parties hereto may execute this Agreement or the Consent by signing any such counterpart.  Facsimile or pdf signatures on this Agreement, or any counterpart of this Agreement, shall have the same force and effect as original signatures.

5.18.  <u>Notices</u>.  Any notice which any Party may desire to give to another Party must be in writing and shall be effective (i) when personally delivered by the other party or by messenger or courier; (ii) upon actual receipt or refusal of delivery if sent via the United States mail, registered or certified; (iii) one (1) business day after deposit before the daily deadline time with a reputable overnight courier or service where next day service has been fully paid for by the sending party; or (iv) upon receipt of an e-mail (as evidenced by a computer generated receipt confirming a successful transmission):

| | |
|---|---|
| **The Selling Partners:** | CA Express Fund II, LLC, and/or WJA Express Fund, LLC<br>c/o Howard Grobstein, CRO of WJA Asset Management, their manager<br>6300 Canoga Avenue, Suite 1500<br>Woodland Hills, California 91367<br>Fax:    (818) 532-1120<br>Phone:  (818) 532-1020<br>Email:  hgrobstein@gtfas.com |
| **With a copy to the Selling Partners' Counsel:** | Kyra E. Andrassy<br>Smiley Wang-Ekvall, LLP<br>3200 Park Center Drive, Suite 250<br>Costa Mesa, California 92626<br>Fax:    (714) 445-1002<br>Phone:  (714) 445-1000<br>Email:  kandrassy@swelawfirm.com |

| | |
|---|---|
| **Remaining Limited Partner:** | H2Go Partners<br>26342 Oso Parkway, Suite 201<br>Mission Viejo, CA 92691<br>Attn: Brett Blanchard<br>Fax:      (949)<br>Phone:  (949)<br>Email:   brett@makenacapital.net |
| **General Partner** | Green-N-Clean Express Car Wash, Inc.<br>26342 Oso Parkway, Suite 201<br>Mission Viejo, CA 92691<br>Attn: Brett Blanchard<br>Fax:      (949)<br>Phone:  (949)<br>Email:   brett@makenacapital.net |
| **With a copy to the General Partner's Counsel** | Jess Bressi, Esq.<br>Dentons US LLP<br>4675 MacArthur Court, Suite 1250<br>Newport Beach, CA 92660<br>Fax:      (949) 732-3739<br>Phone:  (949) 241-8967<br>Email:   jess.bressi@dentons.com |

5.19.  <u>Exhibits</u>.  The exhibits attached to this Agreement are incorporated into this Agreement by reference as if fully set forth herein.

WHEREFORE, the Parties hereto have executed this Agreement as of the date first above written.

**Sellers**:

Dated:  December __, 2017

WJA Express Fund, LLC,
a California limited liability company

By:  WJA Asset Management, LLC,
       a California limited liability company, its
       manager

_____
By:  Howard Grobstein
       Its chief restructuring officer and
       authorized representative

Dated:  December __, 2017

CA Express Fund II, LLC,
a California limited liability company

By:  WJA Asset Management, LLC,
a California limited liability company, its
manager

_____

By:  Howard Grobstein
Its chief restructuring officer and
authorized representative

**Remaining Limited Partner**:

Dated:  December __, 2017

H2Go Partners, L.P.
a California limited liability company

_____

By:  Brett Blanchard, Chief Executive Officer
of Green-N-Clean Express Car Wash, Inc.,
a California corporation, its general
partner

**General Partner:**

Dated:  December __, 2017

Green-N-Clean Express Car Wash, Inc.., a
California corporation

_____

By:  Brett Blanchard, Chief Executive Officer

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **MOTION OF WJA EXPRESS FUND, LLC AND WJA ASSET MANAGEMENT, LLC, FOR ORDER (1) APPROVING BID PROCEDURES PURSUANT TO LOCAL BANKRUPTCY RULE 6004-1(b) IN CONNECTION WITH SALE OF PARTNERSHIP INTERESTS IN GOTHARD EXPRESS PARTNERS, L.P., (2) SALE OF PARTNERSHIP INTEREST IN GOTHARD EXPRESS PARTNERS, L.P. PURSUANT TO 11 U.S.C. § 363(b) AND (f), AND (3) SETTLEMENT WITH THE REMAINING PARTNERS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **January 4, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **January 4, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Hon. Scott C. Clarkson
United States Bankruptcy Court
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593                    ☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 4, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Creditors' Committee – Served by Email:**
Mark S. Horoupian     mhoroupian@sulmeyerlaw.com
Steve Williams     stevelanewilliams@gmail.com
John Sullivan     jsullivannn@yahoo.com
Kenneth R. McFall     mcfalljm@outlook.com
Jay Nash     jayinash@gmail.com
Monte Herring     mepsherring@gmail.com
Eva Alderete Herring     mepsherring@gmail.com
Daniel Morefield     danmorefield@yahoo.com
Robert Caprow     rwc890@gmail.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 4, 2018 | Carol Sheets | /s/ *Carol Sheets* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                  **F 9013-3.1.PROOF.SERVICE**

**<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:

• Kyra E Andrassy    kandrassy@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
• Jess R Bressi    jess.bressi@dentons.com, kimberly.sigismondo@dentons.com
• Richard Bunt    richbunt@gmail.com
• Frank Cadigan    frank.cadigan@usdoj.gov
• John P Dillman    houston_bankruptcy@publicans.com
• Lei Lei Wang Ekvall    lekvall@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
• Roger F Friedman    rfriedman@rutan.com
• Michael J Hauser    michael.hauser@usdoj.gov
• Mark S Horoupian    mhoroupian@sulmeyerlaw.com,
ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;dperez@sulmeyerlaw.com;ppenn@ecf.inforuptcy.com
• Steven J. Katzman    SKatzman@bmkattorneys.com, admin@bmkattorneys.com
• David Brian Lally    davidlallylaw@gmail.com
• Christopher J Langley    chris@langleylegal.com, ecfllf@gmail.com;omar@langleylegal.com
• Robert S Marticello    Rmarticello@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
• Lovee D Sarenas    lovee.sarenas@lewisbrisbois.com
• Michael Simon    msimon@swelawfirm.com,
csheets@swelawfirm.com;gcruz@swelawfirm.com;hdavis@swelawfirm.com
• Dheeraj K Singhal    dksinghal@dcdmlawgroup.com, dcdm@ecf.courtdrive.com
• John L. Smaha    jsmaha@smaha.com, jteague@smaha.com;gbravo@smaha.com
• Philip E Strok    pstrok@swelawfirm.com, gcruz@swelawfirm.com;csheets@swelawfirm.com;hdavis@swelawfirm.com
• Wayne R Terry    wterry@hemar-rousso.com
• United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
• Jessica Vogel    Jvogel@sulmeyerlaw.com, jvogel@ecf.inforuptcy.com;mviramontes@sulmeyerlaw.com

**<u>SERVED BY UNITED STATES MAIL</u>**:

| | | |
|---|---|---|
| Texas Capital Holding, L.P.<br>Attn.: William Dodd, General Partner<br>19627 I-45 North, Suite 4220<br>Spring, TX 77388 | James and Marilyn Padova<br>1209 N. Bay Front<br>Balboa Island, CA 92662 | Hamid Rafatjoo – Raines Feldman<br>*Counsel for FAIT Insurance<br>Partnership, L.P.*<br>1800 Avenue of the Stars, 12th Floor<br>Los Angeles, CA 90067 |
| Kingdom Trust Co.<br>Attn: President<br>1105 State Route 121 North, Suite B<br>Murray, KY 42071 | Employment Development Dept.<br>Bankruptcy Group MIC 92E<br>P.O. Box 826880<br>Sacramento, CA 94280-0001 | Franchise Tax Board<br>Bankruptcy Section MS: A-340<br>P.O. Box 2952<br>Sacramento, CA 95812-2952 |
| Franchise Tax Board<br>Bankruptcy Section MS: A-260<br>P.O. Box 2952<br>Sacramento, CA 95812-2952 | Internal Revenue Service<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | State Board of Equalization<br>Account Information Group, MIC:29<br>P.O. Box 942879<br>Sacramento, CA 94279-0029 |
| US Securities Exchange Comm.<br>Attn.  Bankruptcy Counsel<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071 | Harris County<br>c/o John P. Dillman<br>Linebarger Goggan Blair & Sampson LLP<br>P.O. Box 3064<br>Houston, TX 77253-3064 | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**